52.     The FAA Rules and Regulations govern NY Helicopters' activities vis a vis 135 (Charters), 136 (Sightseeing Tours), and have authority over this matter by reason of their "exemption clause," but did not envision and do not cover or apply to the acts of APH and HRPT, as outlined herein.

53.     Defendant Federal Aviation Administration ("FAA") is an indispensable party and is named herein in order to ensure that the Court can afford full relief.

54.     The FAA is primarily responsible for the advancement, safety and regulation of civil aviation, as well as overseeing the development of the air traffic. (*See* www.faa.gov/regulations/ policies), which has its main headquarters located at 800 Independence Avenue, SW Washington, DC 20591.

55.     Defendant Air Pegasus Heliport, Inc. ("APH"), incorporated in May 1996, is a Delaware corporation with its principal place of business in New Jersey.

56.     APH is the sole and exclusive fixed base operator (the "FBO") at the Heliport pursuant to a March 25, 1996 Agreement (the "Permit" attached hereto as "Ex C") with the New York Department of Transportation (the "DOT"), which the HRPT later assumed.

57.     The Permit expired, by its terms, on March 24, 2001.

58.     Defendant Hudson River Park Trust (the "HRPT") is a New York public benefit corporation that was created by the HRP Act in 1998.

59.     The HRPT was intended to be a "partnership between New York State and City," and was charged by the legislature "with the design, construction and operation of the five-mile Hudson River Park."

## JURISDICTION AND VENUE

60.     The jurisdiction of this Court over the subject matter of this action is predicated on 28 U.S.C. § 1331, as the acts herein alleged arise under the Constitution, laws or treaties of the United States, and 28 U.S.C. § 1337, as the acts herein arise under enactments of Congress regulating commerce and also relate to "due process" and 28 U.S.C 1367.

11

61.    New York Helicopter has standing to bring this action because it has a significant stake in a judicial resolution of the dispute,[18] and has been adversely affected and discriminated against as detailed herein.

62.    Declaratory relief is appropriate because an actual controversy exists regarding the operation of the Heliport by HRPT and APH.

63.    This Court may also exercise personal jurisdiction over defendants, as they have purposefully committed acts within the state of New York from which these claims arise.

## FACTUAL BACKGROUND

### I.    The Hudson River Park ("the Park")

64.    The Hudson River Park covers 550 acres on Manhattan's West Side, including 400 acres of open water that have been earmarked for various public activities such as boating, touring, fishing and swimming. *See Friends of Hudson River Park, at* http://www.fohrp.org/fohrp.php?screen=park.

65.    Once completed, the Park will extend from 59th Street to Chambers Street. *See id.* At the heart of the Park lie 13 old maritime piers, which are now being converted into public park spaces, including lawns, gardens, picnic areas, scenic overlooks, playgrounds, ball fields, historic boats, a living museum, research and educational facilities, event space, and eating facilities. *See id.* Additionally, a waterfront esplanade providing room for more active recreation will line the easternmost portion of the land comprising the Park. *See id.* Four miles of tree-shaded lawns and fountains will stand adjacent to the esplanade. *See id.*

66.    Pursuant to the HRP Act, the legislature intended to enhance the ability of New Yorkers to enjoy the Hudson river, one of the state's great natural resources; protect the Hudson river, including its role as an aquatic habitat; promote the health, safety and welfare of the people of the state; increase the quality of life in the adjoining community and the state as a whole; help alleviate the blighted, unhealthy, unsanitary and dangerous conditions that characterize much of the

---

[18]    *See Sierra Club v. Morton*, 405 U.S. 727, 731, 92 S. Ct. 1361 (1972).

12

area; and boost tourism and stimulate the economy. HRP Act at § 2(a), 1998 Sess. Law. Ch. 592 (S. 7845) (McKinney's 1998).

67.    The legislature also intended for the "creation" of the Park to "encourage, promote and expand public access to the Hudson River, promote water-based recreation, and enhance the natural, cultural, and historic aspects of the Hudson River." *Id.* at § 2(b).

68.    To this end, the legislature and executive branch of government further intended to limit commercial activity in the Park.

## II.    The Hudson River Park Trust ("HRPT")

69.    The HRPT was created to design, construct, operate and maintain the Park subject to the restrictions imposed by the HRP Act. *Id.* at § 5(1).

70.    In particular, the legislature mandated that the HRPT:

- provide a place for recreation, reflection, education, and cultural expression for the public;

- be a proper and appropriate steward of the environment;

- cooperate, and to coordinate matters relating to the park, with the federal government, the state and the city of New York as well as with community, environmental, and civic groups;

- accept contributions from philanthropic organizations, foundations, and all other entities or persons for the purpose of advancing the purposes in this act;

- accept appropriations and grants from federal, state and local governments;

- receive rents, payments in lieu of taxes, and other revenues generated within the park; and

- use the same solely to improve, operate and maintain the park; and to encourage and support public volunteer activities and participation in the operation of the park.

*Id.* at § 6(b) – (h). (Ex D).

71.    The HRP Act dictates that, upon the HRPT's creation, "the trust shall succeed to all contracts, leases, licenses and other legal obligations respecting the park to which its predecessors are party at or after the effective date of this act." *Id.* at § 5(1).

72.    The HRPT operates pursuant to by-laws which, among other things, require board approval of all "contracts for the general corporate purposes of the Authority which are in excess of one hundred thousand dollars ($100,000)." Hudson River Park Trust By-Laws at Art. III, § 3 ("Contracts Requiring Board Approval").

III.    **Provisions of the HRP Act Governing the Operation of a Heliport**

73.    In an effort to limit uses of the Park, the HRP Act stipulates: "[T]he area of the park east of the bulkhead line shall be used *solely for park use and to permit access to permitted uses* . . . ." HRP Act at § 7(9)(i) (emphasis added).

74.    The "bulkhead line" divides the *terra firma* of the Park, which is the "area east of the bulkhead line" from the "Hudson river park estuarine sanctuary," the river section of the Hudson River Park, which is the area west of the bulkhead line. Accordingly, only "park uses" are permitted on the *terra firma* of the park.

75.    The HRP Act identifies four categories of "permitted uses" in the Park:

- park use (which pursuant to § 7(9)(i) of the HRP Act is the only use allowed on the *terra firma* of the Park);

- park/commercial use;

- compatible governmental use;

- uses permitted under any lease, permit, license, or other instrument in effect upon the effective date of this act, whether or not prohibited use under this act, but only pursuant to the terms of the instrument and only for the terms thereof or pursuant to any extension according to the terms thereof if, but only if, the option to extend is exercised solely by and is a contractual right of the lessee, permittee, licensee or other contractual user, and subject to the deadlines for the removal or relocation of incompatible governmental uses under subdivision nine of section seven of this act.

HRP Act at § 3(i), 1998 Sess. Law. Ch. 592 (S. 7845) (McKinney's 1998).

14

76.    A "park use," as defined in the HRP Act, does not include a heliport. *Id.* at § 3(h)(i)-(viii).

77.    Nor does a heliport fall within the definition of a "compatible governmental use." *Id.* at § 3(b).

78.    However, "a *non-tourism/non-recreation* heliport for commercial and emergency transportation use" satisfies the definition of "park/commercial use," and therefore may be operated in the Hudson River Park, but only west of the bulkhead line. *Id.* at § 3(g) (v) (emphasis added).

79.    The fourth category of "permitted use" is a "grandfathering" clause allowing certain uses pre-dating the HRP Act to continue after the HRP Act became effective, *viz:* all uses permitted under any lease, permit, license or other instrument in effect upon the effective date of this Act . . . only pursuant to the terms of the instrument and only for the term thereof or pursuant to any extension according to the terms thereof *if, but only if, the option to extend is exercised solely by and is a contractual right of* the lessee, permittee licensee or other contractual user. *Id.* (emphasis added).

80.    The HRP Act also governs the HRPT's process with respect to awarding certain types of contracts. First, the HRPT must treat as a "significant action . . . any proposed lease, concession arrangement, license or other agreement . . . for a period in excess of ten years." *Id.* at § 7(11). In so doing, the HRPT must:

> a.    hold a public hearing on not less than 30 days' advance public notice; (b) solicit and consider the views of Manhattan community boards one, two, and four, the planning commission of the city of New York, the advisory council, elected officials representing communities neighboring the park, and interested groups and individuals, allowing not less than sixty days following the notice of the proposed action for the submission of such views; and (c) publish notice of the hearing and proposed action in the city record and state register.

*Id.* at § 7(6).

81.    In addition, the HRPT must "issue a bid prospectus for any leases, concession agreements, licenses and other agreements which would provide for a total capital investment in the park of no less than one million dollars over the proposed term of the agreement." *Id.* at § 7(11).

82.     The HRP Act requires the "bid prospectus submitted to prospective bidders" to "contain specific information concerning the nature of the capital improvements or equipment to be provided by the successful bidder and shall be provided to community boards one, two and four within the borough of Manhattan." *Id.*

IV.     **The Heliport**

83.     The Heliport was built more than 50 years ago when a dock at West 30th Street in the Chelsea section of Manhattan was converted into a landing pad for helicopters. Jefferson Siegel, *Heliport on Hudson Still Flying High After 50 Years,* The Villager, (Oct. 18-24 2006), *available at,* http://www.thevillager.com/villager_181/heliportonhudson.html.

84.     The Heliport is a public heliport that is open seven days a week and has fueling facilities.

85.     A substantial portion of the Heliport's business consists of sightseeing and charter tours.

86.     Since at least 2001, the HRPT has planned to relocate the Heliport. *See Estuarine Sanctuary Management Plan,* dated September 2001, *available at:* http://www.hudsonriverpark.com/pdfs/policies/sanctuary.pdf, at 1-23 ("The current heliport activities will be relocated pursuant to the HRP Act. Under the HRP Act, there are two possible locations on the west side of Manhattan that are permitted for relocation (Piers 72 or 76)."); HRP Act at § 7(9)(i), 1998 Sess. Law. Ch. 592 (S. 7845) (McKinney's 1998) ("Consistent with the general project plan, the area of the park east of the bulkhead line shall be used *solely for park use and to permit access to permitted uses.*") (emphasis added).

V.     **APH's Obligations as FBO of the Heliport Pursuant to the Permit**

87.     On March 25, 1996, the DOT, which preceded Defendant HRPT as the State agency overseeing the Heliport, entered into an agreement that provided Defendant APH with the sole and exclusive right to serve as the FBO at the Heliport.

88.     In return for this lucrative right, APH is required, among other things, to pay a monthly fee to the HRPT. Permit at § 6(a).

16

108.   The Permit does not include an "option to extend." Instead, its term *automatically* renews "for successive terms of one month each unless cancelled by *either* party upon thirty (30) days written notice." *Id.* at § 2 (emphasis added).

109.   Neither the HRPT nor APH has ever cancelled any automatic renewal since the Permit expired on March 24, 2001.

110.   Thus, since March 24, 2001, APH has been operating the Heliport on an exclusive basis under a series of automatic month-to-month extensions to which the HRPT has agreed. In this way, Defendants APH and HRPT have repeatedly violated the HRP Act.

111.   Upon information and belief, the HRPT never sought board approval for the dozens of extensions of the Permit, as it was required to do. *See* Hudson River Park Trust By-Laws at Art. III, § 3 ("Contracts Requiring Board Approval"). Accordingly, upon information and belief, in agreeing to extend the Permit every month over the past 5 years, the HRPT also has repeatedly violated its own by-laws.

112.   Upon information and belief, the HRPT intentionally failed to seek board approval of these extensions because doing so would have revealed that the Permit was not "grandfathered" under the HRP Act. As previously explained, "grandfathering" of a pre-HRP Act permit was only permitted if, by the permit's terms, the permittee had the sole "option to extend" it. HRP Act at § 3(i), 1998 Sess. Law. Ch. 592.

113.   Even if the Permit's automatic renewal, subject to cancellation by either the APH or the HRPT, satisfied the "grandfathering" clause of the HRP Act, use of the Heliport as a tourism/recreation heliport past the Permit's expiration on March 24, 2001 would *not* be grandfathered. *See id.* § 3(j), ("'Prohibited use' means . . . (vii) any facility for motorized aircraft, including a heliport, except a heliport which is defined as a park/commercial use"); *id* at § 3(g) ("Park/commercial use means . . . (v) a *non-tourism/non-recreation* heliport for commercial and emergency transportation use.") (emphasis added). In this separate and independent respect, the operation of the Heliport as a tourism/recreation heliport since March 25, 2001, has further violated the HRP Act.

114.    Even if the Permit had satisfied the HRP Act's grandfathering clause, operation of the Heliport by APH past March 25, 2006 was unlawful. At that point, APH's Permit had exceeded 10 years.

115.    Moreover, the Permit "provide[s] for a total capital investment in the park of no less than one million dollars." *Id.* at § 7(11).

116.    Accordingly, the HRPT was required to initiate a competitive process with respect to the contract to serve as the FBO for the Heliport by "hold[ing] a public hearing," "solicit[ing]" the views of the public, "publish[ing] notice of the hearing and proposed action in the city record and state register," and "issu[ing] a bid prospectus." *Id.* at §§ 7(6), 7(11).

117.    The HRPT failed to take any of these required steps.

118.    Instead, the HRPT simply continued to "sole source" the Heliport's operations to APH, in violation of the HRP Act.

**VIII.    Defendant HRPT's Arbitrary and Capricious Decision to Settle Its Dispute with APH on Such Favorable Terms to APH and to Permit APH to Continue to Operate, Rather Than Terminate APH**

119.    The HRPT's violations of the HRP Act are not limited to continuing the operation of the Heliport and authorizing APH to permit tourism/recreational flights at the Heliport.

120.    In the face of findings by the HRPT's own auditor of abuses by APH, and notwithstanding that the State Comptroller is expected to release similar findings imminently, the HRPT also has arbitrarily and capriciously decided to settle its dispute with APH on very favorable terms for APH, instead of terminating APH.    In this way, the HRPT has violated its duty to protect and advance the interests of the people of the State of New York.

121.    As previously explained, APH is required to remit to the HRPT, on a monthly basis, both a permit fee and 10% to 12% of its gross revenue from operations at the Heliport. *See* Permit at § 6.

**A.    The HRPT's Audit of APH**

122.    In early 2005, the HRPT commenced an inspection of APH's books and records to determine the accuracy of APH's reporting. Settlement Agm't between APH, Air Pegasus New

20

York, Inc., and the HRPT, dated Nov. 22, 2006, at 1. Specifically, the HRPT retained Debra Cutler, CPA, CFE to "evaluate whether APH had reported and remitted fees and charges in accordance with the terms of the Permit." *See* Debra A. Cutler, *Report on Schedule of Fees and Charges of Air Pegasus Heliport, Inc.*, October 31, 2006, at 3. (ExA ).

123.    Among other things, the auditor examined whether APH was properly reporting and remitting to HRPT monies arising from operations of the Heliport that were paid to an entity related to APH, Air Pegasus New York ("APNY").

124.    Even though the HRPT was fully within its rights in conducting an audit of APH's books and records, APH filed suit in the Supreme Court, New York County, challenging the breadth and scope of the HRPT's audit rights under the Permit. *Id.* (Ex E).

125.    On January 5, 2006, the HRPT filed suit against APH and its CEO, Alvin Trenk, alleging that APH had violated the Permit by, among other things, entering into subsidiary agreements without the HRPT's knowledge, consent or prior written approval, and by diverting funds received by APNY that should have been included in APH's reports and payments to the HRPT. The HRPT's action (Ex F), sought to recover all unpaid fees. *Id.*

126.    The HRPT also continued its audit, and, on October 31, 2006, Ms. Cutler issued a report of significant wrongdoing on the part of APH. (Ex A).

127.    Repeatedly noting APH's failure to maintain proper records, which complicated her inspection, Ms. Cutler nevertheless was able to reach the following alarming conclusions about APH, among others:

- Over a nine-year period from 1996 through 2005, APH concealed and diverted $3,853,229 to its related entity Air Pegasus of New York, Inc. ("APNY");

- Investigation of $565,000 received by Air Pegasus Enterprises, another APH-related entity, is continuing;

- APH gave discounts and price preferences, including non-volume discounts on fuel and landing fees, to certain preferred customers;

21

- For a number of months, US Helicopter was charged a flat monthly fee for landing and parking, rather than the fee due under the Schedule of Charges that applied to other operators;

- Zip Aviation, LLC a/k/a Wings a/k/a Print International (collectively, "ZIP") was billed a flat $500 per month regardless of the number of its landings or the amount of time parked;

- APH also disingenuously characterized NY Helicopters and Helicopter Flight Services, another of APH's sightseeing operator customers, as "charter tours on a reservation basis only," and failed to properly collect, report, or remit Sightseeing Use Charges, as required under Section 6(b) of the Permit, in connection with these operators; and

- The APH monthly Deposit Cash Sheet prepared by APH did not include all bank deposits.

**B.   The HRPT's Settlement With APH**

128.   Based on these damning findings, the HRPT should have terminated APH. Instead, on November 22, 2006, less than one month after the auditor issued her findings, the HRPT simply settled its dispute with APH, and on very favorable terms for APH ( Ex B ).

129.   For example, among other things, the HRPT stated as part of the settlement that "it has no knowledge that [APH] is in violation of any of the provisions of the permit and, accordingly, APH is in good standing with the HRPT." Settlement Agm't at 4.

130.   The HRPT agreed to this "acknowledgement" despite its actual knowledge that APH had committed significant wrongdoing.

131.   The HRPT also stated that "it is the HRPT's interpretation of the Hudson River Park HRP Act that no operator other than [APH] can be allowed to operate the Heliport." *Id.* The HRPT agreed to this acknowledgement despite the fact that, under the HRP Act, it is entitled (and, indeed, required) to "issue a bid prospectus" seeking proposals to operate the Heliport. *See* HRP Act § 7(11).

132.   Finally, the HRPT agreed to "acknowledge that it "shall not use the Litigations as a basis for disqualifying APH from any HRPT Request for proposal ("RFP") and APH shall have the right to respond to any such RFP." Settlement Agm't at 4. ( Ex B).

22

133.    The HRPT agreed to these terms exonerating APH despite its duty to operate the Park in the best interests of the public.

134.    In return for these "acknowledgements," APH paid HRPT $462,387.

135.    This payment purportedly was in "full and complete satisfaction" of the percentage of monies owed from revenues improperly diverted by APH.

136.    However, this figure does not include payments relating to other operators that APH previously withheld from the HRPT. Nor does it include any interest on any of the improperly withheld monies.

137.    In addition to violating its statutory duties, the HRPT's agreement to settle on these terms also violated its own procedures.

138.    As previously explained, the HRPT operates pursuant to by-laws which, among other things, require board approval of all "contracts for the general corporate purposes of the Authority which are in excess of one hundred thousand dollars ($100,000)." Hudson River Park Trust By-Laws at Art. III, § 3 ("Contracts Requiring Board Approval").

139.    Nevertheless, upon information and belief, the HRPT failed to seek board approval of this settlement before binding the HRPT.

140.    For many months prior to the settlement, APH had been imposing unfair and unreasonable fees on users of the Heliport in violation of the Permit. Because of the HRPT's irrational settlement with APH, APH, despite having settled for cents on the dollar, is now continuing to do so in an effort to pass along the costs of settlement to the users of the Heliport.

141.    In this way, the HRPT's arbitrary and capricious decision to settle with APH on such favorable terms has caused harm to New York Helicopters.

## FIRST CAUSE OF ACTION
### AGAINST APH

### VIOLATION OF THE EQUAL PROTECTION CLAUSE

142.    Plaintiffs repeat and reallege, as if set forth fully herein, the allegations contained in Paragraphs 1 through 141 hereof.

23

143.   The Equal Protection Clause of the Fourteenth Amendment provides, in pertinent part, that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

144.   APH is a state actor for purposes of the Fourteenth Amendment.

145.   APH has provided and is providing certain customers of the Heliport with significant discounts and price reductions for services including landing fees, parking fees, fuel charges, late-ops and SAFE fees, while not providing other similarly-situated customers of the Heliport, including New York Helicopters, with these same discounts.

146.   This disparity in treatment is arbitrary and capricious and serves no legitimate governmental objective.

147.   There is no reasonable basis for this disparity in treatment.

148.   In providing such discounts and price reductions to certain similarly-situated customers of the Heliport and not to New York Helicopters, APH has violated New York Helicopters' rights under the Equal Protection Clause.

149.   By reason of the foregoing, New York Helicopters has suffered damages in an amount to be determined at the time of trial.

## SECOND CAUSE OF ACTION
## AGAINST APH

### VIOLATION OF PROCEDURAL DUE PROCESS

150.   Plaintiffs repeat and reallege, as if set forth fully herein, the allegations contained in Paragraphs 1 through 149 hereof.

151.   On May 17, 2006, APH announced a "new" fee schedule scheduled to take effect on June 5, 2006.

152.   The new fee schedule raised fees across the board and imposed a flat $10 per passenger fee.

153.   No additional service was provided in connection with the imposition of the new fee.

154.   There is no basis or justification for the new fee.

24

155.    The new fee is unfair and unreasonable, and imposed arbitrarily and capriciously.

156.    The new fee was imposed solely for the purpose of funding APH's settlement with the HRPT.

157.    New York Helicopters has a cognizable property interest in operating at the Heliport on terms that are "fair, reasonable and nondiscriminatory."

158.    The imposition of the new fee constituted state action albeit for the benefit of APH.

159.    The imposition of the new fee was an exercise of a right or privilege created by the State.

160.    APH may fairly be said to be a state actor.

161.    The imposition of the new fee deprived New York Helicopters of its property interest and adversely impacted interstate commerce.

162.    The deprivation was without due process of law.

163.    By reason of the foregoing, New York Helicopters has suffered damages in an amount to be determined at the time of trial.

## THIRD CAUSE OF ACTION
## AGAINST APH

### VIOLATION OF SUBSTANTIVE DUE PROCESS

164.    Plaintiffs repeat and reallege, as if set forth fully herein, the allegations contained in Paragraphs 1 through 163 hereof.

165.    As stated supra, New York Helicopters has a cognizable property interest.

166.    APH's imposition of the new fee, without any legitimate basis or justification therefore, solely for the purpose of funding its settlement with the HRPT, was arbitrary and outrageous and an abuse of its position as the fixed based operation of the Heliport.

167.    The imposition of the new fee constituted state action.

168.    The imposition of the new fee interfered with New York Helicopters' property interest.

25