Liberty for financial statement purposes, established a reserve to reduce revenue by the disputed amounts.[39]

As a result of the increased rates charged, Liberty, under protest, remitted $1,273,609 to APH. APH initially held the disputed increase differential in an APH escrow account pending the arbitrator's decision. APH was ordered to re-pay Liberty approximately $635,000 in three equal installments. The installments were repaid on November 29, 2004, December 10, 2004 and January 10, 2005.[40]

The balance of the monies received from Liberty, $638,609 was retained by APH and no Percentage Fee has been paid to the Trust through the date of this report. Based on our inquiry dated September 7, 2006, APH counsel responded as follows:

> This amount remains at risk pending the outcome of the New Jersey appeal because in the event of a remand to the trial court, Liberty could recoup all the "overpayments," the payments it made in excess of fully discounted rates under the Consent Order.

Applying the 12 percent Percentage Fee on gross receipts that APH has received from Liberty, relating to the Arbitrator Determination, under appeal by APH, the Trust is due $76,633.

5. Aviation Fuel

To determine whether the fuel gallons sold per the daily flight logs were reasonably recorded, we selected customer fuel purchases and traced the gallons sold to the fuel tickets prepared by the APH attendant. The fuel ticket is a two-part ticket. APH retains one copy of the fuel ticket and gives the other copy to the customer. On the fuel testing performed, we identified a limited number of insignificant differences between the daily flight log and the fuel tickets.

---

[39] APH notified the Trust in a letter dated October 27, 2003 from Joann Cardinal to Karen Jennings that a reserve was being set up which represents "the difference between the earlier rates and the ones effective July 25. This is what we are calling the 'Reserve.' Obviously, if we are successful in defending those increased rates, we will report the results to you and pay the corresponding fees due."

[40] Since APH did not pay the Trust a Percentage Fee on any of the Liberty reserve amounts held in escrow they did not have to adjust the Percentage Fee for the $635,000 that were returned to Liberty.

Since Liberty is APH's largest customer, for the month of June, 2004, we tested whether the total fuel gallons sold per the APH daily logs agreed to the invoices rendered to Liberty. We determined the total June 2004 fuel purchased by Liberty from the daily logs was 24,408.8 gallons. The number of gallons invoiced was 24,456.7, resulting in a difference of 51.9 gallons (more gallons invoiced then recorded in the daily logs). This difference was not considered significant.

We also performed analyses to determine if the total annual amount of fuel gallons purchased was reasonable compared to the total annual gallons sold. We obtained vendor fuel invoices and summarized fuel gallons purchased for the years 2002 through 2004 and for the first quarter of 2005. We could not test 2001 as APH counsel represented that the fuel invoices could not be located.[41] The total fuel gallons purchased were then compared to fuel gallons sold for the respective periods.

The following table indicates fuel sales and purchases (in $) by calendar year:

|              | 2005[42]  | 2004        | 2003        | 2002      |
|--------------|-----------|-------------|-------------|-----------|
| Sales        | $433,824  | $1,715,344  | $1,006,700  | $867,468  |
| Purchases    | 211,012   | 805,540     | 440,165     | 401,236   |
| Gross profit | $222,812  | $ 909,804   | $ 566,535   | $466,232  |

The following table indicates fuel sales and purchases (in gallons) by calendar year:

|            | 2005[43] | 2004     | 2003     | 2002     |
|------------|----------|----------|----------|----------|
| Sales      | 106,127  | 459,095  | 320,944  | 315,112  |
| Purchases  | 106,627  | 462,326  | 323,568  | 316,775  |
| Difference | (500)    | (3,231)  | (2,624)  | (1,663)  |

Based on our procedures, fuel purchases approximated fuel sales for the years 2002 through 2004 and for the first quarter 2005, allowing for changes in the fuel inventory during the respective period.

---

[41] We located the December 2001 invoice in the 2002 group of fuel invoices.
[42] Represents first quarter of 2005.
[43] Ibid.

12

a. Fuel Purchases

During our visit to Bernardsville in May 2005, we were initially provided faxed fuel invoices for 2003 and 2004 although we had requested invoices for the entire Relevant Period.[44] In July 2006, at APH's independent accountant's office, we were provided with original fuel invoices for 2002 and faxed fuel invoices for January 2005 through March 2005. The fuel invoices for 2001 could not be located.

b. Fuel Deliveries

APH has one 8,000 gallon fuel tank[45] used for the sale of jet fuel. Fuel is purchased from Bell Petroleum and delivered by Mystic Fuel Oil usually 1-2 times per week when the tank is approximately one-half empty. It is not unusual for a sightseeing ship to purchase fuel several times a day.[46] To account for fuel gallons purchased and sold, APH performs a daily roll forward of the gallons in the tank starting with the ending gallons of the previous day, less sales, plus purchases, if any, resulting in an ending balance. This computed balance is then compared to the tank gauge. We understand that differences are investigated.

6. Analytical Review of Amounts Due to the Trust

APH's independent accountants, MTL, annually prepare an analytical review procedure ("ARP") worksheet for the Percentage Fees and Permit Fees due the Trust.[47] This worksheet includes a conversion of the accrual revenue reported in the APH financial statements to the gross receipts collected. Permit Fees are then added to Percentage Fee calculation to tally the total fees due the Trust excluding the Use Charges since the Use

---

[44] Per discussion with Ms. Cardinal, commencing in 2003 the vendor faxes the fuel invoices in order to receive quicker payment and no original invoices or statements are received. Delivery slips supplied by the carrier are attached to the fuel invoices. In addition, Ms. Cardinal receives a monthly report of fuel delivered prepared by the Heliport

[45] Section 15 of the Permit indicates that there were 2 storage fuel systems having a total capacity of 11,000 gallons at the Heliport. We learned from the Trust, through the New York State Department of Environmental Conservation, that in 1996 APH purchased a new tank and there is only one 8,000 gallon tank at the Heliport. During our fieldwork at the Heliport, we observed that helicopters fueled from one tank. Because of safety restrictions, we were not able to visit the fuel tank area.

[46] We were informed that according to FAA regulations, a ship cannot take-off with less than 20% of a tank. Due to weight restrictions, a ship normally cannot have more than 40% of a tank.

[47] We were not permitted to take a copy of the ARP.

13

Charge is not an expense of APH but rather a pass through of monies collected from Liberty. The ARP was then compared to the Trust expense recorded in the APH general ledger to determine the reasonableness of the amounts due to the Trust.

We performed an independent test of the MTL ARP for the calendar years 2001 to 2004 by agreeing the amounts per the ARP to the APH financial statements and general ledgers provided. As a result of the MTL ARP test, we forwarded certain questions to L&G through KTG. We also had a conference call with MTL, Ms. Cardinal, KTG, and L&G. We received responses to all of our inquiries.

For 2001 to 2004 we were able to reconcile the difference between the gross receipts reported to the Trust (cash basis) and sales per APH financial statements (accrual basis).[48] APH 2004 financial statements reflect Percentage Fees totaling $733,298 compared to its reporting of Percentage Fees to the Trust of $465,775. The difference of $267,523 reflects a contingent liability due the Trust if APH is successful in its appeal relating to the Liberty arbitration.[49]

B. Use Charges-Helicopter Flight Services and New York Helicopter

During the Relevant Period, sightseeing Use Charges, as required under Section 6(b) of the Permit, were not collected, reported, or remitted to the Trust timely in connection with two of APH's alleged sightseeing operations customers – Helicopter Flight Services ("HFS") and New York Helicopter ("NYH").[50] The Trust requested that we test the passenger counts tabulated by APH. We inquired of APH as to their methodology for

---

[48] Sales per APH financial statements exclude the sales tax revenue collected from customers.

[49] For financial statement purposes APH informed us that "Because APH continues to challenge the Arbitrator's Determination on appeal, it could, if it is successful, ultimately collect some or all of the "reserve". Thus it accrues, as a contingent liability to the HRPT, 12% of the reserve as of December 31, 2004." The 2004 Percentage Fee accrual of $267,523 appears to represent the total Liberty reserve of $2,857,612 ($726,150-2003 and $2,131,462-2004) less the payments to Liberty of $635,000 at 12%.

[50] APH's position is that these two operators are not conducting sightseeing operations rather they conduct "charter tours on a reservation basis only", letter dated July 21, 2006 from Christopher Gengaro, Esq. to Brian Gallagher, Esq. Use Charges paid to the Trust for these two operators were paid under protest.

14

determining passenger counts and learned that APH did not maintain the documents necessary to test such payments.[51]

Alternatively, we summarized the annual billings by year for both HFS and NYH from the monthly sales by customer report. The charges, by year and the Use Charge amounts paid to the Trust were as follows:

### Total Annual Charges by Year

| Year | NYH | HFS | Total |
|---|---|---|---|
| 2001 | $ 11,100 | $ 86,233 | $ 97,333 |
| 2002 | 20,325 | 73,977 | 94,302 |
| 2003 | 9,616 | 84,079 | 93,695 |
| 2004 | 107,720 | 149,837 | 257,557 |
| 2005* | 29,111 | 43,976 | 73,087 |
| Total | $177,872 | $438,102 | $615,974 |

* For the period January to March 2005

### Use Charges Paid to the Trust

| Payment date | Amount | | Sightseeing Operator/Period Covered |
|---|---|---|---|
| 2/23/05 | $ 585 | NYH | November 2004 to January 2005 |
| | 1,530 | HFS | October 2004 to January 2005** |
| 4/15/05 | 2,385 | NYH | 2001 to 2003 and January to October 2004 |
| 7/21/05 | 28,440 | HFS | 1998 to June 2005 excluding October 2004 to January 2005 ** |
| Total | $32,940 | | |

Since APH did not maintain a detail audit trail by ops number we cannot conclude whether the amounts paid to the Trust for NYH and HFS alleged sightseeing operations are correct without spending significant amount of time recreating the number of alleged sightseeing passengers.[52]

---

[51] We were informed that these operators only conduct alleged charter tours on weekends and holidays. Various APH sales related computer runs and daily flight logs do not segregate or accumulate weekends and holidays for these alleged charter tours making it very time consuming to recreate APH passenger count audit trail. We were also informed that APH calculation was prepared by accumulating the passenger counts from the daily flight logs for only those days that deemed potential charter tours.
[52] APH provided the Trust with a passenger count by month.

15

C. <u>Unreported Percentage Fees Relating to Consultant Agreement and Arbitrator Determination</u>

We are advised by KTG that the Trust is entitled to payment, pursuant to the gross revenue provision under Section 6(b) of the Permit, in connection with the 5% consulting payments made by Liberty to APNY under the Consulting Agreement.[53] No amounts have been remitted to the Trust from inception of the Consulting Agreement. KTG requested we calculate the Percentage Fee due the Trust through January 2006, based on Liberty's monthly gross revenues. The amount of Percentage Fee due totals $462,387.

Summarized below are the payments made under the Consulting Agreement, the gross receipts paid by Liberty that were retained by APH relating to the overpayment of operational charges at the Heliport, and the related 12 percent unreported Percentage Fee.

**Unreported Percentage Fees at 12%**
**For the period January 1996 to January 2006**

| | Consulting Agreement-APNY | | Gross Receipts Retained by APH | | Total |
|---|---|---|---|---|---|
| Year[55] | Consulting Payments[54] (1) | Trust Percentage Fee (2) | APH reserve (3) | Trust Percentage Fee (4) | Trust Percentage Fee (5)=(2)+(4) |
| 2006 | $ 315,412 | $ 37,849 | | | $ 37,849 |
| 2005 | 556,919 | 66,830 | | | 66,830 |
| 2004 | 456,544 | 54,785 | $274,409 | $ 32,929 | 87,714 |
| 2003 | 325,332 | 39,040 | 364,200 | 43,704 | 82,744 |
| 2002 | 241,269 | 28,952 | | | 28,952 |
| 2001 | 389,479 | 46,737 | | | 46,737 |
| 2000 | 459,021 | 55,083 | | | 55,083 |
| 1999 | 476,271 | 57,153 | | | 57,153 |
| 1998 | 369,989 | 44,399 | | | 44,399 |
| 1997 | 211,545 | 25,385 | | | 25,385 |
| 1996 | 51,448 | 6,174 | - | - | 6,174 |
| Total | $3,853,229 | $462,387 | $638,609 | $76,633 | $539,020 |

---

[53] In January 2006, the Trust brought an action against APH including a claim for a percentage share of the payments received by APNY under the Consulting Agreement. This lawsuit has been stayed by the consent of the parties while the parties engage in settlement negotiations. APH and APNY dispute that the Trust is entitled to a Percentage Fee on the Consulting Agreement payments.

[54] The Arbitrator reduced the Percentage Fee on the Consulting Agreement from 5% to 3.5% effective April 2005.

[55] Year is from May to April, except 1996 which year is from January to April, and 2006 which year is from May 2005 through January 2006.

16

D. Related Parties

In addition to APNY, we identified eight entities owned or controlled by Mr. Trenk and his family members, either directly or through other entities that had transactions with APH or performed similar operations.[56] The only transaction that appears to have derived revenue in connection with the Operator's operations at the Heliport was the Consulting Agreement payments made by Liberty to APNY except for one open item as set forth below.

For APNY, we requested general ledgers, tax returns and original bank statements for 2003 through 2005.[57] For 2003, we were informed that there were no general ledgers maintained and were provided with a statement of cash inflows and outflows. For 2004 and 2005, we reviewed the APNY general ledgers for items that appeared to be of a related party nature or related to Liberty. Items noted were subsequently addressed and resolved.

We were also provided with the 2003 and 2004 corporate income tax returns for APNY,[58] (the 2005 corporate income tax return had not yet been prepared). We were provided with internally prepared income statements for 2004 and 2005 and trial balances for 2002 through 2005 indicating the various balance sheet accounts of APNY.

We also reviewed the original bank statements of APNY for the years 2003 through 2005. A significant amount of the deposits were receipts from Liberty. The other receipts were either not significant or we obtained support sufficient to determine that the receipt

---

[56] In our initial request for information dated April 25, 2005 we requested a "list of any and all transactions between Mr. Alvin Trenk, Ms. Abigail Trenk and Air Pegasus or any other subsidiary or affiliate owned by Mr. Trenk or Ms. Trenk, including but not limited to Pegasus Aviation, Air Pegasus of New York, and Pegasus Holding Corporation." APH did not provide a response to our request until we recommenced our engagement in July 2006 and had access to the general ledgers of APH and APNY. We requested access to six of the eight entities in addition to APNY. In response to our inquiry, APH counsel expressly represented that Phyllis Enterprises, LLC does not receive any revenue relating to the Heliport operations except from its interest in APH and management fees from APNY. Based on this representation we did not request access to this entity's books and records. We also did not request access to Trenk Partners, LLP. APH disagrees that any of these related entities named above performs any operations similar to those performed by the Operator.

[57] APNY books and records are maintained by another accounting firm located in New Jersey.

[58] APNY corporate tax return lists business activity as rental and sales of small aircrafts.

17

was not related to Heliport operations. We were able to reconcile the revenue per the APNY income statements to the total cash receipts with insignificant differences.

We inquired and obtained representations from APH through its counsel as to the business purpose of the six entities identified as follows:

1. <u>Air Pegasus Corporation</u> – operated the Heliport prior to March 1996.

2. <u>Air Pegasus Enterprises, Inc.</u> – formed to purchase and own a single helicopter which was sold in 2005.

3. <u>Air Pegasus Ventures, Inc.</u> – formed in 1999 to purchase a helicopter, but the purchase was never consummated.

4. <u>Trenk Enterprises, LLC</u> – currently receives a management fee from APH.

5. <u>Trenk Enterprises, Inc.</u> – no longer an operating entity. It had been the entity that received a management fee from APH.

6. <u>Air Pegasus Heliport, LLC</u> – was established for the sole purpose of holding the Liberty escrow funds.[59]

For these entities, where available, we reviewed their general ledger and tax returns to determine if any of these entities were receiving funds derived from APH operations.[60] It has been represented to us that Air Pegasus Enterprises, Inc. received approximately $565,000 from Liberty for lease of a helicopter during the Relevant Period. We have requested Liberty to confirm this amount and are presently awaiting their response. Exhibit V contains a listing of the tax returns we reviewed for these six entities.

Based on our review of the above documents, other than the open question regarding Air Pegasus Enterprises, Inc. as noted above, and the Consulting Agreement payments received by APNY, nothing came to our attention which indicated that any of the six named entities above received revenue derived from the Heliport operations.

---

[59] We were informed by APH counsel that no general ledgers or trial balances exist and no tax returns were filed. The escrow funds were transferred to APH in June 2004.

[60] It is our understanding that none of these entities have any attestation accountants' reports.

18

E. <u>Accounting and Computer Deficiencies</u>

Our procedures were not designed to review and report on the effectiveness of APH's accounting and computer systems, and therefore, would not necessarily discover all matters that might be considered deficiencies. However, during the performance of our limited procedures, we noted the following accounting and computer deficiencies:

- The number of operations in the daily flight log is reconciled to the number of operations in the ops transaction journal, but there is no further reconciliation to the various sales journals produced. The current computer system does not allow corrections to be made to a day that has already been processed. Accordingly, there may be more operations in the sales journals than that particular day's daily flight log because of corrections from prior days' billings.

- Due to a computer truncation problem, sales invoices and several computer reports are missing the first digit or reflect an incorrect first digit for amounts in excess of 10,000. For example, in the Daily Sales Analysis, the fuel gallons for January and February 2005 were listed as 19,763.2 and 25,636.6, respectively, when the gallons should have been listed as 29,763.2 and 35,635.6, respectively. For March 2005, fuel gallons were listed as 20,728.3, when they should have been listed as 40,728.3. We understand that this problem has existed for some time. We also understand that the current computer accounting and billing system at the Heliport has not been updated for quite some time.

- APH staff will copy over the daily flight log if the original flight log is not easily readable. However, APH does not retain the original daily flight log in such instances.

- At the conclusion of the year, APH produces hard copies of the computer reports and deletes the electronic files from their computer system. As a result, there is no back-up for prior years' transactions other than the printed reports.

F. <u>Vending Machines</u>

During our site visit at the Heliport, we observed that there are vending machines. The Permit requires that vending machine gross receipts be included in the Percentage Fee. In response to our written request, Ms. Cardinal replied on July 19, 2006 stating:

> The vending machines have been at the Heliport since 2002 or 2003, and are owned by Answer Vending, Inc. In 2001 there was one vending machine at APH. Around 2002 or 2003, that machine was removed and replaced with 2 beverage machines and a snack machine. APH receives a percentage of the monies collected.

19

These monies are not recorded as revenue, but are used to periodically purchase lunches for the APH staff.

We were also informed that the vending machine fee received by APH for March 2006 was $165.31. We did not request APH to quantify the total vending machine revenue collected due to the insignificant amounts involved.

### G. Selected Customers

Highlighted below are five APH customers that we performed further analysis based on the results of our procedures. Four of the five customers received discounts of which two did not appear of the DCR and one customer's information did not agree to the DCR. The remaining customer was selected because its' name contained the word "Pegasus."

### 1. US Helicopter ("USH")

In 2002 USH had two different billing arrangements with APH. For the months of January, March and November, 2002, we noted that APH billed USH on an individual landing basis. From April through August 2002, regardless of the number of landings, USH was invoiced a flat charge of $500 per month.

We computed what the Schedule of Charges should have been based on the landing fee at the time of $125. For the period April through August 2002, we noted an under-billing of $3,375 (difference between the flat fee and the Schedule of Charges.) The underpayment to the Trust is 12% of 3,375 or $405. In addition, this customer did not appear on the DCR.

### 2. Zip Aviation ("Zip")/Wings/Print International ("Print")

We tested the February and March 2005 daily flight logs to determine if the same aircraft number appeared for the above companies, as we understand that all of these companies are under common control. We noted that 691S was listed as both a Print and Zip aircraft number, in the daily flight log indicating that at a minimum, Print and Zip appear to be under common control. The February 24, 2005 daily control log, ops #41, identified the customer as Zip/Wings.

20

We noted that Print was billed a flat fee of $500/month regardless of the number of landings or the time parked. Per the DCR, Print receives a flat monthly fee for parking on what is represented to be an unused landing spot on the barge. Pursuant to the Trust's request, we analyzed what the potential Percentage Fees would be to the Trust if Print were billed on an undiscounted basis.

We selected February 2005 for such analysis. The difference for the month of February 2005 in gross billings had Print been billed on an undiscounted basis would have been $180. The amount due to the Trust at 12% would be $21.60. Since there is no report produced by APH which indicates total hours parked in a month, it would be a time consuming task to determine month by month, using the daily flight logs, what the additional fees, if any, would have been had Print been billed utilizing the Schedule of Charges.

### 3. CSC Transport ("CSC")/Cablevision

We were informed by APH counsel that CSC is related to Cablevision. We selected two transactions with CSC and noted that the discounts identified on the DCR did not agree with APH customer billing. We noted the following pricing discrepancies for these two operations:

I.  Ops #: 8855
    Date: 2/15/05
    Ship #: 401CV
    Ship type: S76
    In: 06:50
    Out: 06:54

    Per ops transaction journal:
    Off ops charge: $300 (should be $400)
    Landing charge: $100 (should be $125)

II. Ops #: 9146
    Date: 2/17/05
    Ship #: 401CV
    Ship type: S76
    In: 09:12
    Out: 09:17

    Per ops transaction journal:
    Landing charge: $100 (should be $125)

### 4. Argos Capital ("Argos")

Per our review of APH's sales invoices, we noted that Argos was being charged landing fees of $32.50. This appears to be a 50% discount from the $65 landing price per the

21