UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
NEW YORK HELICOPTER CHARTER INC., and
MICHAEL ROTH, individually,                                    07 Civ. 4069(MGC)

                                Plaintiffs,

    -against-

AIR PEGASUS HELIPORT, INC.,
HUDSON RIVER PARK TRUST and FEDERAL
AVIATION ADMINISTRATION,

                                Defendants.
----------------------------------------------------------X

### MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS FILED BY AIR PEGASUS HELIPORT, INC.,

HANTMAN & ASSOCIATES
1414 Avenue of the Americas Suite 406
New York, New York 10019
Telephone:  (212) 684-3933
Facsimile:  (212) 755-1989
*Attorneys for Plaintiff*
*New York Helicopter Charter, Inc.*
*and Michael Roth.*

TABLE OF CONTENTS

Page No.

Introduction………………………………………............    3

Statement of Relevant Facts………………………….    6

Point I.    Legal Standard For A Motion To Dismiss……...    9

Point II.    The Acts Complained Of Herein, As Detailed
In The Complaint, Constitute State Action……..    10

A. "State Action" Raises A Question Of Fact….    10

B. Even applying Defendant's Legal Theories
APH's Discriminatory Practices and Rate
Increase Constitute State Action…………….    11

1. APH's Discriminatory Practices and
Rate Increase Constitute an Action
that Is An Exercise Of A Right Or
Privilege Created By The State and
The HRPT itself has supported the
Discrimination……………………………    12

1.1. The right to Operate the Heliport and
Charge Customers has its source in
State Authority………………………..    12

1.2 The Heliport is a Public Service and
APH's operations are limited by
the Permit……………………………..    13

1.3 The HRPT had Knowledge of and
Allowed the Discriminatory Practices…    15

2. APH May Fairly Be Said To Be A State Actor    16

a. Public Function Test…………………...    17

        b.  Nexus/Joint Participation Test............    20

Point III.  Plaintiff Has Pleaded Its Constitutional
        Claims Properly........................................    23

       1.  Plaintiffs have properly pleaded a claim
          for violation of the Equal Protection Clause
          under the "class-of-one" theory................    23

       2.   Plaintiffs have properly pleaded a
          claim for violation of Due Process.............    25

            a.  NYHC has a property interest
               entitled to due process protection..........    27

            b.  APH's Discriminatory Actions Are
               Depriving NYHC Of Its Property
               Interest Without Due Process Of Law,
               Thereby Causing Irreparable Injury
               to NYHC.........................................    28

Point IV.  Plaintiffs Have Standing To Bring
        This Action Because The Outcome Would Affect
        The Competitive Landscape Of The Sightseeing
        Helicopter Business......................................    29

Point V.  Plaintiffs Have Stated A Claim
        Under The Airline Deregulation Act...................    31

       A.  APH is a "State Actor" within the meaning
          of the Airline Deregulation Act................    31

       B.  The State's "permit" or "contract" with
          APH has the force of law and thereby
          circumvents the preemption by the
          Airline Deregulation Act.........................    32
       C.  An Action Will Lie Where a State Agency
          Curtails Competition Among Air Carriers.....    33

Point VI.  This court has jurisdiction to hear all the claims
        in this action because the conduct complained of
        falls within the purview of federal preemption........    34

Conclusion................................................................    35

TABLE OF AUTHORITIES

Page No.

*Scotto v. Almenas,*
143 F. 3d 105, 109-110 (2d Cir. 1998)....................    9

*Thomas v. City of New York,*
143 F. 3d.31,37 (2d Cir. 1998)...............................    9

*Geisler v. Petrocelli,*
 616 F.2d 636, 639(2d Cir. 1980)............................    10

*Conley v. Gibson,*
 355 U.S. 41, 45-46,
2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)...........................    10

*Ryder Energy Distribution Corp. v. Merrill Lynch
Commodities, Inc., 748 F 2d 774, 779
(2d Cir. 1984)*................................................    10

*Life Ins. Co. v. Merrill Lynch & Co*
32 F.3d 697, 669-700 (2nd Cir, 1994) ........................    10

*Howerton v. Gabica,*
708 F.2d 380, 383 (9th Cir. 1983)............................    10

*Lugar v. Edmondson Oil Co.*
457 U.S. 922, 939 (1981).....................................    10

*Sutton v. Providence St. Joseph Med Ctr.*
192 F.3d 826, 836 (9th Cir. 1999)...........................    11

*Burton v. Wilmington Parking Auth.,*
365 U.S. 715, 723-25 (1961)................................    14

*E.S. Evans v. Newton,*
382 U.S. 296 (1966)..........................................    17

*Gilmore v. Montgomery,*
417 U.S. 556 (1974)..........................................    17

*Jackson v. Metropolitan Edison Co.,*
419 U.S. 345, 353 (1974)....................................    17

*Okunieff v. Rosenberg,*

996 F.Supp. 343, 353 (S.D.N.Y. 1998)..........................    17

*Janusaitis v. Middlebury Volunteer Fire Dep't,*
607 F.2d 17, 22 (2d Cir. 1979)...............................    17

*Ross v. Allen,*
515 F. Supp 972, 974 S.D.N.Y. (1981).......................    18

*Shelley v. Kraemer,*
334 U.S. 1 (1948)..........................................    20

*Jackson v. Metropolitan Edison Co.,*
419 U.S. 345, 351 (1974)...................................    20

*Burton v. Wilmington Park Auth.,*
365 U.S. 715 (1961).........................................    20

*Village of Willowbrook v. Olech,*
528 U.S. 562, 564 (2000)...................................    23

*Sioux City Bridge Co. v. Dakota County,*
260 U.S. 441, 43 S,Ct. 190, 67 L.Ed.340 (1923)............    24

*Allegheny Pittsburgh Coal Co. v. Commission of Webster
City,*
488 U.S. 336, 109 S.Ct. 633, 102
L.Ed.2d 688 (1989)........................................    24

*Sunday Lake Iron Co. v. Township of Wakefield,*
247 U.S. 350, 352, 38 S. Ct 495,
62 L.Ed. 1154(1918)........................................    24

*Mitchell v. Cuomo,*
748 F.2d 804, 806 (2d Cir.)................................    25

*Bray v. New York,*
2005 U.S. Dist...............................................    25

*Mullane v. Central Hanover Trust Co.,*
339  U.S. 306, 314 (1950)..................................    26

*Memphis Light, Gas & Water Division v. Craft,*
436 U.S. 1, 14 (1978).......................................    26

*Board of Regents v. Roth,*
408 U.S. 564, 569-71 (1972).................................    26

*Women's Med. Prof. Corp. v. Baird,*
438 F.3d 595, 611 (6th Cir. 2006)............................... 27

*Watson v. Kansas City, Kansas,*
18s5 F. Supp.2d 1191, 1203 (D. Kan. 2001).................. 27

*United States v. Tropiano,*
418 F.2d 1069, 1076 (2d Cir. 1969)........................... 27

*Schwartzberg v. Lefkowitz,*
480 F.Supp. 569, 574 (S.D.N.Y. 1979)........................ 28

*Bray v. New York, 2005 U.S. Dist.*
LEXIS 21748, *13 (S.D.N.Y. Sept. 30, 2005)................. 28

*Sierra Club v. Morton,*
405 U.S. 727, 731 (1972)........................................ 32

*Olympic Pipe Line Company v. City of Seattle,*
437 F.3d 872 (9th Cir. 2006).................................... 32

*Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,*
73 F.3d 1423, 1430, FN 9 (7th Cir. 1996)..................... 32

*United Airlines, Inc. v. Mesa Airlines, Inc.,*
219 F.3d 605, 610-611 (7th Cir. 2000)........................ 32

*New York Airlines, Inc. v. Duke's County,*
*Martha's Vineyard Airport Commission,*
623b F. Supp. 1435 (D. Mass. 1985)........................... 33

*Metropolitan Express Services Inc. v. City of*
*Kansas, Missouri,*
23 F.3d 1367 (8th Cir. 1994)................................... 33

*Airship Industries (UK) Ltd. v. Goodyear*
*Tire & Rubber Co.,*
643 F. Supp. 754 (S.D.N.Y. 1986) ............................. 33

*Filtration Development Co., LLC v. United States,*
59 Fed. Cl. 658 (U.S. Claims Ct. 2004)........................ 33

*Southern Pacific Transp. Co. v. Public Utilities Commission of the*
*State of California*
716 F. 2d. 1285 (9th Cir. 1983)..... ........................... 33

## INTRODUCTION

Essentially this is a case of selective, arbitrary, irrational and discriminatory access policies implemented by a public heliport operator, Air Pegasus Heliport Inc. ("APH"), followed by the denial of heliport landing rights to plaintiff, New York Helicopter Charter Inc. ("NYHC"), at the West 30th Street Heliport, located in New York City. NYHC is a helicopter company that provides charter flights and sightseeing tours. It is submitted that the acts complained of herein shock the conscience by not only interfering with the operation of interstate airline carriers, interstate commerce and free competition, but also by violating plaintiffs' rights to have the same access to a public space as others similarly situated.

This action was filed by NYHC and its president Michael Roth against Air Pegasus Heliport Inc (referred to by name or "APH"), the Hudson River Park Trust (referred to by name or "HRPT"), and the Federal Aviation Administration ("referred to by name or FAA").[1] NYHC is a company that operates both intra-state and interstate sightseeing tours and charter flights. Its helicopters take off in one state and land in other states, thereby qualifying as interstate commerce. Its customers include, but are not limited to, business people, the public, tourists, and celebrities such as Calvin Klein and Ian Schrager. (Compl ¶49).

APH is the fixed based operator of the public heliport. The Hudson River Park Trust is the state entity that was granted the privilege to operate the heliport by the New York Department of Transportation ("NYDOT"). The heliport is now subject to the jurisdiction of the Hudson River Park Trust ("HRPT"), as described hereafter. The Federal Aviation Administration ("FAA") is a necessary party to the complaint as the instant claim involves the Airline Deregulation Act and the FAA is also involved in the

---

[1] To date only APH has filed a response as there have been extensions granted to the other defendants.

3

regulation and licensing of helicopter operators and heliports. (Cmpl¶50-59)

The claims in the complaint include violation of procedural due process; violation of substantive due process; violation of the equal protection clause; illegal operation of a public heliport and violation of the Airline Deregulation Act. The complaint also requests that the court terminate the illegal operation of the heliport and declare that: 1) the permit should have been granted under a competitive bid; 2) the extension of the permit required board approval; 3) the settlement between HRPT and APH was unreasonable and capricious; 4) the settlement required approval of HRPT's board of directors; 5) the heliport was not "grandfathered" and should be shut down.[2]

While there are a number of issues raised by Defendant APH in its motion to dismiss, all parties agree that the primary legal issue in this case is whether APH is a "state actor". In support of its motion to dismiss, APH essentially argues that it is not a "state actor", as a matter of law. [3] In doing so, APH compares it self to a newspaper stand concessionaire, and a "hamburger-restaurant" that hold permits from a governmental body, which affords them the opportunity to sell their products in an airport facility. (Def. Mem.pg 9) However, any comparison between a newspaper stand or a "hamburger-restaurant" and a public "heliport" which caters to interstate commerce is ludicrous. The simplistic approach and reasoning of APH, ignores or at least minimizes the importance of air traffic in interstate commerce. Its position also deemphasizes the improper operation of a public heliport in which a number of plaintiff's competitors have not only been given preferential treatment but NYHC, and its customers, have been denied even the opportunity to use the heliport. As detailed hereafter APH is a state actor because it is performing a public function which is subject to certain limitations such as equal

---

[2] APH makes reference to these claims and simply suggests that they must be heard in State Court to the extent this Court were to dismiss plaintiff' alleged federal actions.
[3] While APH argues to the contrary this is at least a question of fact as detailed hereafter.

4

regulation and licensing of helicopter operators and heliports. (Cmpl¶50-59)

The claims in the complaint include violation of procedural due process; violation of substantive due process; violation of the equal protection clause; illegal operation of a public heliport and violation of the Airline Deregulation Act. The complaint also requests that the court terminate the illegal operation of the heliport and declare that: 1) the permit should have been granted under a competitive bid; 2) the extension of the permit required board approval; 3) the settlement between HRPT and APH was unreasonable and capricious; 4) the settlement required approval of HRPT's board of directors; 5) the heliport was not "grandfathered" and should be shut down.[2]

While there are a number of issues raised by Defendant APH in its motion to dismiss, all parties agree that the primary legal issue in this case is whether APH is a "state actor". In support of its motion to dismiss, APH essentially argues that it is not a "state actor", as a matter of law. [3] In doing so, APH compares it self to a newspaper stand concessionaire, and a "hamburger-restaurant" that hold permits from a governmental body, which affords them the opportunity to sell their products in an airport facility. (Def. Mem.pg 9)  However, any comparison between a newspaper stand or a "hamburger-restaurant" and a public "heliport" which caters to interstate commerce is ludicrous.  The simplistic approach and reasoning of APH, ignores or at least minimizes the importance of air traffic in interstate commerce.  Its position also deemphasizes the improper operation of a public heliport in which a number of plaintiff's competitors have not only been given preferential treatment but NYHC, and its customers, have been denied even the opportunity to use the heliport.  As detailed hereafter APH is a state actor because it is performing a public function which is subject to certain limitations such as equal

---

[2] APH makes reference to these claims and simply suggests that they must be heard in State Court to the extent this Court were to dismiss plaintiff' alleged federal actions.

[3] While APH argues to the contrary this is at least a question of fact as detailed hereafter.

protection and due process.

APH's argument that plaintiffs are asserting rights under a contract to which they are not a party is as misleading as it is irrelevant. Although the permit/agreement is month to month and has never been the subject of a competitive bid or Request for Proposal for almost thirty (30) years, plaintiffs' complaint is not limited to their rights under the permit/agreement; rather it involves access to a public heliport under the same terms and conditions as other companies and individuals.

The "state action" in this case involves not only the state actor but the state itself. As explained hereafter, APH works under the auspices of the HRPT which was and is aware of APH's discriminatory practices as evidenced by the findings of an audit that was conducted by HRPT. The HRPT even sued APH for diverting money that APH had received pursuant to the permit agreement. (Compl. Exhibit C). However, rather than terminate its month to month permit and take further corrective actions, HRPT inexplicably, after investigating the matter and filing a lawsuit, entered into a settlement agreement with APH, which favored APH to the detriment of the heliport users and the public. (Compl ¶17).

Furthermore, the HRPT disregarded its own findings regarding the discriminatory practices, and the amount that APH had to repay HRPT as a result of the settlement was passed on, as a "rate increase", to selected customers who received absolutely no additional benefits. (Compl ¶23, MR Aff. ¶61). In addition, there was no correlation between the price increase and safety, maintenance, capital improvements, or any other enhancement at the heliport. The price increase was simply a contrived method for APH to increase its profits and repay "ill gotten" gains. (Compl ¶6).

## STATEMENT OF RELEVANT FACTS

NYHC has suffered improper and unfair discrimination in the application of relevant policies and regulations implemented by, or condoned by HRPT and APH, and have been arbitrarily denied operating rights at the West 30th Street Heliport since May 6, 2007.  Among the reasons for this denial is NYHC's refusal to drop a pending State lawsuit, complaining about APH's direct policies, as well as the manner in which HRPT has permitted APH to engage in unreasonable discriminatory acts against NYHC. (Compl ¶51, Michael Roth's affidavit ¶56 – hereafter referred to as "MR Aff"). Another reason for this denial is NYHC's joining other helicopter operators to complain about APH's behavior, including but not limited to: APH's providing a competitive advantage to NYHC's competitors by its unilateral and arbitrary charge of $10.00 per passenger; discriminatory pricing biased against NYHC; preferential treatment in favor of Zip Aviation LLC an other competitors of NYHC to the detriment of NYHC; ongoing threats and actual refusal to allow NYHC access to the Heliport.(Comp ¶2, 44, 152, MR Aff. ¶ 35-38)

APH and HRPT enactment of this series of unreasonable and blatantly discriminatory regulations and edicts exceeds the scope of the limited authority that federal aviation law grants to "municipal proprietors" like HRPT, and thus the authority that HRPT can legitimately cede to APH. (Comp ¶180).  Because the combined actions of HRPT and APH, acting under the color of state authority, exceed the scope of the limited exception to aviation law—where federal law typically governs—the applicable federal laws preempt the authority that HRPT has usurped for itself and for APH.  The behavior, of which NYHC is complaining, conducted under the color of state law, is therefore preempted by federal law. (Comp ¶170-178).

The discrimination and exclusion against Plaintiff is causing damage to him, his company, employees and customers (Compl ¶23, 46, 141, 222).  Roth's and NYHC's

rights to utilize the West 30th Street Heliport have been terminated to accommodate Zip Aviation LLC, who, upon information and belief, has been sponsored by APH and granted privileges and opportunities not afforded other tour and sightseeing operators (Compl ¶44). See also auditing report pg.20 Cmpl. Exhibit A. However, this is not the first time that NYHC's competitors have been given preferential treatment. The affidavit of Michael Roth explains the discriminatory policies and practices.

The Hudson River Park Trust ("HRPT"), is a public benefit corporation created pursuant to the Hudson River Park Act of 1998 ("Act").[4] (Act § 5.) It is vested with "authority over the planning, design, construction, operation and maintenance of the [Hudson River Park]." (Act, § 5.) As the Act states, "[t]he planning and development of the Hudson river park as a public park is a matter of state concern and in the interest of the people of the state." (Act, § 2.) (Comp.¶69-72).

The statutory purposes of the HRPT include, inter alia, the collecting of "rents, payments in lieu of taxes, and other revenues generated within the park, and to use the same solely to improve, operate and maintain the park[.]" (Act, § 6(g).)

The W. 30th Street Heliport is a public access heliport located within the Hudson River Park. It is owned by the New York State Department of Transportation ("NYDOT"), an agency of the State of New York.[5] (Comp ¶3, 97). Importantly, the NYDOT is ultimately responsible for operating the heliport. The HRPT succeeded the

---

[4] A public benefit corporation is "a corporation organized to construct or operate a public improvement wholly or partly within the state, the profits from which inure to the benefit of this or other states, or to the people thereof." N.Y. Gen. Const. § 66.

[5] The Act provides that "[a]ll legal and equitable title to or in any real property within the boundaries of the park which is currently held by either the state or the city of New York shall remain with the state or city of New York respectively." (Act, § 7(3) (a).) The Act, however, gives "authority with respect to . . . real property" owned by the state ("other than underwater lands held by the state") to be exercised by "the New York state office of parks, recreation and historic preservation [.]" (Id.)

NYDOT under the Permit upon the HRPT's creation in 1998.

As stated on its website (at www.dot.state.ny.us/info/info.html), the NYDOT's functions and duties include "coordinating and assisting in the development and operation of transportation facilities and services for highways, railroads, mass transit systems, ports, waterways, and aviation facilities[.]" (Emphasis added). (Comp ¶98.)

The NYDOT has delegated responsibilities for operating the heliport to a private entity, APH. APH was designated the fixed based operator of the W. 30th Street Heliport and has operated and continues to operate the heliport pursuant to a permit agreement that it entered into with the NYDOT dated March 25, 2006. (A copy of the permit agreement is attached as Exhibit C to the Complaint). There was no competitive bidding for the Permit. (Compl ¶3).

Notably, the permit agreement requires APH to operate the W. 30th Street Heliport as a "public heliport" and authorizes APH to collect "fair, reasonable and non-discriminatory" fees and charges for use of the heliport facilities. (Permit, § 3, 4, 34(b)). The permit agreement also authorizes APH to amend its schedule of fees and charges from time to time "upon fifteen (15) days prior notice to the Public and the Department." (Permit § 4).

In exchange for the privilege of operating the heliport, APH is required under the Permit to pay the NYDOT a monthly permit fee of $10,210 and a monthly percentage fee equal to 10%-12% of APH's gross revenues generated directly or indirectly from its operation of the heliport. (Permit § 6).

The HRPT succeeded the NYDOT under the Permit upon the HRPT's creation in 1998, by virtue of the fact that the W. 30th Street Heliport is geographically located

within the Hudson River Park and, therefore, within the jurisdiction of the HRPT. (Act, §

5) "Upon the coming into existence of the trust, the trust shall succeed to all contracts,

leases, licenses and other legal obligations respecting the park to which its predecessors

are party[.]").

Accordingly, the HRPT has been collecting the monthly permit fee and monthly

percentage fee from APH under the Permit since 1998. (Act, §§ 6(g).)  The Permit by its

terms expired on March 25, 2001. (Permit, § 2.)  Since then (and continuing to this day),

the HRPT has granted APH a series of month-to-month extensions to APH to continue

operating as the fixed based operator at the W. 30th Street Heliport. Comp ¶110.   Thus

the HRPT has affirmatively extended its arrangements with the APH and continuing to

receive the monthly fees from APH.


## POINT I.  LEGAL STANDARD FOR A MOTION TO DISMISS

In a Motion to Dismiss, Fed. R. Civ. P. 12 (b) (6), the Court is to determine if within

the four corners of the complaint, plaintiffs have stated any cause of action. *Scotto v.

Almenas,* 143 F. 3d 105, 109-110 (2d Cir. 1998).  In so doing, the Court is to draw all

inferences in favor of plaintiffs.  Additionally, the pleading is to be construed liberally

and the facts as alleged are to be accepted as true for evaluation purposes, such that the

court needs only to determine whether the facts as alleged fit within any cognizable legal

theory. *Thomas v. City of New York,* 143 F. 3d.31, 37 (2d Cir. 1998; 1998 U.S. App.

LEXIS 9460, 14.)

The function of a motion to dismiss "is merely to assess the legal feasibility of the

complaint, not to assay the weight of the evidence which might be offered in support

9

thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). The district court should deny the motion unless it appears to a certainty that a plaintiff can prove no set of facts entitling him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). *" Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984); 1984 U.S. App. LEXIS 16672, 12-13.

In addition, a motion to dismiss must be analyzed in the way most favorable to the nonmoving party. *Life Ins. Co. v. Merrill Lynch & Co.* 32 F.3d 697, 669-700; 1994 U.S. App. LEXIS 21775, 2; Fed. Sec. L. Rep. (CCH) P98, 361.

Therefore, the Complaint of Plaintiff, as supplemented by the affidavit of Michael Roth, read in the light most favorable to Plaintiff, and accepted as true, for purposes of this motion, preclude dismissal of this action on the above mentioned basis. Simply stated, Defendant's Motion to dismiss must be denied.

## POINT II. THE ACTS COMPLAINED OF HEREIN, AS DETAILED IN THE COMPLAINT, CONSTITUTE STATE ACTION.

### A.    "State Action" Raises A Question Of Fact

Whether or not Air Pegasus' conduct reflects "state action" is a factual issue, not a question of law. There is no specific formula for defining state action. *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983). In *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1981), ruling that a private party's attachment proceeding utilizing state officers constituted "state action," the United States Supreme Court held:

> Action by a private party, pursuant to [a] statute, without something more, [is] not sufficient to justify a characterization of that party as a "state actor." …That something more which would convert the private party into a state actor might vary with the circumstances of the case.

10

> ...The Court has articulated a number of different factors or
> tests in different contexts, *e.g.*, the "public function" test,
> the "state compulsion" test, and...a "joint action" test.
> Whether these different tests are actually different in
> operation or simply different ways of characterizing <u>the
> necessarily fact-bound inquiry that confronts the Court</u> in
> such a situation need not be resolved here. Only by sifting
> the facts and weighing the circumstances can the non
> obvious involvement of the State in private conduct be
> attributed its true significance. (Citations omitted, emphasis
> added.)

In *Sutton v. Providence St. Joseph Med Ctr.*, 192 F.3d 826, 836 (9th Cir. 1999),

the appeals Court observed that contemporary decisions stress the necessity of a *close*

*nexus* between the state and the challenged conduct rather than application of a

mechanistic formula. Under *any* formula, the inquiry into whether private conduct is

fairly attributable to the state must be determined based on the circumstances of each

case.

**B.    Even applying Defendant's Legal Theories APH's Discriminatory
    Practices and Rate Increase - a result of its being compelled to repay
    HRPT for monies previously diverted following a lawsuit and state audit-
    Constitute State Action.**

The state action requires that "the deprivation of a federal right be fairly

attributable to the State." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982).

In *Lugar v. Edmondson Oil Co., Inc.*, the Supreme Court articulated a two-part approach

to this question of "fair attribution":

> First, the deprivation must be caused by the exercise of
> some right or privilege created by the State or by a rule of
> conduct imposed by the State or by a person for whom the
> State is responsible. . . . Second, the party charged with the
> deprivation must be a person who may fairly be said to be a
> state actor.

11

Id. Both of these requirements are met in this case as explained hereafter.

1.   **APH's Discriminatory Practices and Rate Increase Constitute an Action that Is An Exercise Of A Right Or Privilege Created By The State and The HRPT itself has supported the discrimination**

1.1. The right to Operate the Heliport and Charge Customers has its source in State Authority: The NYDOT, a state agency, was responsible for the Permit and authorized and approved the granting of the "right or privilege" to impose rate increases without a hearing.  Therefore, the right to impose rates pursuant to the Permit has "its source in state authority." *Lugar, supra*, 457 U.S. at 939.  Accordingly, the requirement that the claimed constitutional deprivation was "caused by the exercise of some right or privilege created by the State" is met in this case.

In addition, the right to operate the heliport was given by the State to APH.  The NYDOT has the responsibility to operate the public heliport. *See* www.dot.state.ny.us/info/info.html.  The operation of the West 30th heliport is a traditionally exclusive function of the State as explained in detail in "public function test" subsection of this document.  The State delegated its responsibility to operate the heliport to APH.

APH has engaged in discriminatory practices and has increased the rates in an unreasonable way.  Although defendants argue that APH is autonomous and can charge any prices, the document from which APH derives the authority to manage and regulate

the heliport is a permit/agreement. APH operates the heliport in exercise of the privileges conferred by the permit. APH is not "leasing" state property and is not autonomous as argued by defendants. Proof of this is the fact that APH was audited by the Hudson River Park Trust and that sightseeing helicopter operators need to be approved by the HRPT.

    1.2 The Heliport is a Public Service and APH's operations are limited by the Permit: The original permit/agreement between the New York State Department of Transportation and APH establishes clearly the public service of the heliport at section 32(a):

> "A principal purpose of the Department in the making of
> this agreement is to have the Heliport operated as a first-
> class **public** heliport and to make available at the Heliport
> the items and/or services which the operator is permitted
> and directed to sell and/or render hereunder, and the
> Operator agrees to conduct a first-class operation and in
> accordance with the highest standards, safety and efficiency
> and to furnish all necessary and proper fixtures, equipment,
> personnel (including licensed personnel as necessary),
> supplies, materials and facilities." [emphasis added]

    Defendants' memorandum argues at page 14 that "a person who obtains a permit from government and then operates its business totally on its own is not a state actor..." As has been discussed herein, APH is not autonomous and is not entitled to operate the heliport as its own private business. However, APH apparently embodied by its monopolistic anticompetitive situation, supported by an entrenched "political cabal" argues otherwise. APH states that they are entitled to discriminate and charge more favorable rates to their business associates than those rates charged to other helicopter companies. Incredibly, APH believes it has the right to operate the heliport for its sole benefit and in detriment of the public interest and NYHC. Apparently, thirty (30), years

of entrenchment and solid "political connections" have led APH to forget that the existence of the heliport is for the public good and that it is supposed to provide a public service. One of the purposes for this action is to have this Court remind APH and HRPT that this is not the case.

In addition, the HRPT directly engaged in conduct that allowed the continuation of the discriminatory practices in the use of a public good and the anticompetitive effects of the same.  The court in *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 723-25 (1961) stated:

> "… no State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be. . . . By its inaction, the Authority, and through it the State, has not only made itself a party to the refusal of service [on the basis of race], but has elected to place its power, property and prestige behind the admitted discrimination.  The State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so "purely private" as to fall without the scope of the Fourteenth Amendment.Id. at 723-25.

The permit/agreement requires APH to: "furnish the services on a fair, equal and non-discriminatory basis to all users thereof…." [emphasis added]. Permit, § 34(b) (2). In the instant case, APH committed an improper act under the permit to operate a public heliport: withholding money from HRPT and utilizing the heliport capacity inappropriately by discriminating in favor of some users.  When APH realized that it had to repay HRPT for the diverted money, it transferred the cost of its improper conduct to

its customers. MR Aff ¶61. After settling the matter with HRPT, APH continued the

discriminatory policies. MR Aff. ¶58-69.

    1.3 <u>The HRPT had Knowledge of and Allowed the Discriminatory Practices to</u>

<u>Continue</u>: The HRPT was well aware of the discriminatory practices and anomalies

conducted by APH at the heliport. But even arguendo that they did not know anything

before the auditing, the audit report is very clear regarding the finding of

discriminatory and anticompetitive practices and the competitive advantages that APH

was giving to some users. The Report on Schedule of Fees and Charges –Exhibit A in

the Complaint- clearly stated under "selected customers" at page 20:

> "Highlighted below are five APH customers that we performed
> further analysis based on the results of our procedures. Four of the
> five customers received discounts of which two did not appear of
> the DCR and one customer's information did not agree to the
> DCR. The remaining customer was selected because its name
> contained the word 'Pegasus.'"

    Some customers were investigated merely because their name contained the word

"Pegasus". As indicated in Mr. Roth's affidavit, apparently HRPT had reasons to believe

that some type of discrimination was taking place. MR Aff ¶77. The report goes further

indicating for example: that U.S. Helicopter was charged $500 per month regardless of

the number of landings, and that this specific customer did not appear on the Device

Control Register "DCR". It says the following regarding Zip Aviation:

> "Zip Aviation: Zip/Wings/Print International…. We tested
> the February and March 2005 daily flight logs to determine
> if the same aircraft number appeared for the above
> companies, as we understand all of these companies are
> under common control. We noted that 691S was listed as
> both a Print and Zip aircraft number, in the daily flight log
> indicating that at a minimum, <u>Print and Zip appear to be</u>

15

> <u>under common control</u>. The February 24, 2005 daily
> control log, ops#41, identified the customer as Zip/Wings.
> We noted that Print was <u>billed a flat fee of $500/month</u>
> <u>regardless of the number of landings or the time parked</u>."
> [emphasis added].

Curiously, the agreement purported to prevent the use of the heliport for the

Operator's own benefit or the benefit or a third party in detriment of other users. A

requirement that the Trenk family thought APH did not comply with and for which APH

was investigated by the HRPT. The permit § 34(d) states:

> The operator shall not itself use the heliport for its own
> aircraft and shall refrain from entering into continuing
> contracts or arrangements with third parties for use of the
> Heliport of for furnishing services covered hereunder when
> such use by the Operator or contracts or arrangements will
> have the effect to utilizing to an unreasonable extent the
> operator's capacity for rendering such services...."

**2.    <u>APH May Fairly Be Said To Be A State Actor</u>**

As explained above, whether a private entity may fairly said to be a state actor is

"necessarily a fact-bound inquiry [.]" *Lugar*, 457 U.S. at 497; see *Burton v. Wilmington*

*Parking Auth.*, 365 U.S. 715, 722 (1961) ("Only by sifting facts and weighing

circumstances can the non-obvious involvement of the State in private conduct be

attributed its true significance"). The courts have articulated several tests for making that

determination, two of which are relevant here: the nexus/joint participation test and the

public function test. As discussed below, APH may be deemed a state actor under either

of these two tests.[6]

---

[6] At the very least, given that it is a fact-intensive inquiry, the Court should grant an
evidentiary hearing to allow the parties to adduce additional factual evidence on the issue.

16

a.    Public Function Test

The operation and maintenance of a portion of a public park by a private entity does not deprive the park of its public function: the private entity becomes a state actor. *E.S. Evans v. Newton*, 382 U.S. 296 (1966). See also, *Gilmore v. Montgomery*, 417 U.S. 556 (1974). A private entity exercising powers delegated to it by the state which are "traditionally exclusively reserved to the State" may be said to be a state actor for purposes of the Fourteenth Amendment. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 353 (1974). This theory applies "where the State delegates its responsibilities to private parties and then attempts to escape liability for constitutional violations caused by private parties acting pursuant to the delegation." *Okunieff v. Rosenberg*, 996 F.Supp. 343, 353 (S.D.N.Y. 1998). Air Pegasus is a State actor by virtue of its direct public function.

As stated in the complaint, the operation of the W. 30th Street Heliport is a traditionally exclusive function of the State. (Cmpl ¶97-98). Responsibility for the operation of the heliport lies exclusively with the NYDOT. Indeed, on its website (at www.dot.state.ny.us/info/info.html), the NYDOT explicitly stated that its functions and duties include "coordinating and assisting in the development and operation of transportation facilities and services for highways, railroads, mass transit systems, ports, waterways, and aviation facilities[.]" (Emphasis added). See also *Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17, 22 (2d Cir. 1979) (fire protection, police protection, education, and tax collection are examples of exclusive governmental functions).

17

The NYDOT delegated its responsibility to operate the W. 30th Street Heliport to APH pursuant to the Permit (to which the HRPT is the successor-in-interest). Accordingly, in operating the heliport pursuant to the Permit, APH can be said to be an arm of the state fulfilling a governmental function and, therefore, a state actor.

The Courts have found state action under the public function test when "the conduct of the private actor is equivalent to the performing of a state function, or is traditionally associated with sovereignty" *Ross v. Allen*, 515 F. Supp 972, 974 S.D.N.Y. (1981). The Airline Deregulation Act Bill[7] states that the act:

> ".... Amends the Federal Aviation Act of 1958 to direct the Civil Aeronautics Board in the performance of its duties with respect to interstate and overseas air transportation to consider the following as being in accordance with the public convenience and necessity: (1) the maintenance of safety as the highest priority in air commerce; (2) <u>placing maximum reliance on competition in providing air transportation services</u>; (3) the encouragement of air service at major urban areas through secondary or satellite airports; (4) the avoidance of unreasonable industry concentration which would tend to allow one or more air carriers <u>to unreasonably increase prices, reduce services, or exclude competition</u>; and (5) the encouragement of entry into air transportation markets by new air carriers, the encouragement of entry into additional markets by existing air carriers, and the continued strengthening of small air carriers. [Emphasis added]

This confirms the obvious: that air transportation has been traditionally associated with sovereignty and that the exclusion of competition and interference with market forces has been a state concern. The fact that air transportation and regulation has been traditionally associated with sovereignty is indisputable since historically the Federal

---

[7] See Library of Congress http://thomas.loc.gov/cgi-bin/bdquery/z?d095:SN02493:@@@D&summ2=m&

Civil Aeronautics Board (CAB) regulated all domestic air transport as a public utility setting fares, routes, and schedules.

The purpose of the Airline Deregulation Act was to provide a mechanism by which free competition and free markets would set the prices and routes in airspace. This is consistent with the public interest, since demand and supply would take care of ensuring the public access to airspace in a cost-effective way. Defendants misrepresent the intention of the act by arguing that the purpose was not to interfere with the prices set by the heliport. The heliport is not an airline; it is better assimilated to an airport. In that respect it controls access to airspace. When the heliport operator (APH) implements a policy that discriminates against specific helicopter operators and provides an unfair advantage to some competitors, it is affecting the helicopter's business prices and routes and violating the guiding purpose of the airline deregulation act.   APH and HRPT policies have no "rational basis" and "shock the conscience", especially since APH "passed along" the cost of its improper conduct –of which HRPT was aware- to carriers, who were not only blameless but who even cooperated with HRPT in their investigation of APH.  More appalling, NYHC and other carriers received no additional services for the "surcharge" which only served to enrich APH.

For the reasons stated above, APH is engaged in a function that has been traditionally associated with sovereignty and therefore it is a state actor under the public function test.

b. Nexus/Joint Participation Test

The relationship between HRPT and Air Pegasus meets the "nexus" test. Although *Shelley v. Kraemer*, 334 U.S. 1 (1948) dealt with invidious discrimination, its precept is subject to general application. According to the Court, where the State encourages, authorizes, and allows the arbitrary decision making of a private party to the detriment of another, such conduct by the private party becomes imbued with State action. The case at bar does not involve mere licensing. It involves State authorized unjust exclusion of Plaintiffs from their livelihood.

The inquiry here is "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974). A private entity that is a "joint participant" with the state in an enterprise may fairly be said to be a state actor. *Id.* at 357-58.

The close nexus/joint participant test has its roots in *Burton v. Wilmington Park Auth.*, 365 U.S. 715 (1961). As indicated by defendants, at issue in *Burton* was whether a private entity, Eagle Coffee Shoppe, Inc., that leased space for a restaurant from a state agency, the Wilmington Parking Authority, in a publicly-owned parking facility – and that admittedly discriminated on the basis race in refusing to serve blacks at the restaurant – may be deemed a state actor for purposes of the Fourteenth Amendment. The Supreme Court answered in the affirmative.

The facts of this case show an even closer nexus between the State and the State Actor than that in *Burton*. In *Burton* the court pointed out that the restaurant was operated as an integral part of a public building devoted to a public parking service and

found that to be the degree of state participation and involvement in discrimination that the Fourteenth Amendment was purported to condemn. In this case, the heliport itself is designed for public use and APH is the sole operator of a public heliport. The heliport generates significant revenues for the HRPT which are used "for constructing, improving, operating and maintaining the park [.]" (Act, § 7).

The APH, pursuant to the Permit, has a lucrative monopoly over the operations at the heliport. The HRPT enjoys a steady, significant revenue stream from heliport operations for park operations and maintenance without having to involve itself in any way with the complicated business of operating a heliport. The relationship is so mutually beneficial that the parties have agreed to a series of month-to-month extensions for more than five years (after the Permit expired on March 25, 2001). (Permit, § 2.). Furthermore, the fact that HRPT disregarded the discrimination and irregularities at the Heliport makes it an active participant in the challenged conduct.

Therefore, we respectfully submit that HRPT, as the successor-in-interest to the Permit, "has so far insinuated itself into a position of interdependence with [APH] that it must be recognized as a joint participant in the challenged activity [i.e., APH's rate increase action and discriminatory practices], which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." *Burton*, 365 U.S. at 725.

Defendants claim in their memorandum of law that Burton is inapplicable to this case in an attempt to have the court focus its attention to racial discrimination and disregard all the other facts. Defendants argue:

"it was only because the restaurant engaged in racial
discrimination that state action was found. If the restaurant
raised its prices on hamburgers after its lease required to
sell food at reasonable prices --our situation—no one would
claim that state action was present". Def. Mem. Pg. 9

Again, Defendants' are confusing the issues at stake in this action. First of all,

selling hamburgers has not been traditionally associated with sovereignty as opposed to

access to air traffic.  Second, their food prices example disregards whether there is

monopoly power of a public space being used in restraint of trade to favor some users to

the detriment of others.  Third, even in the hamburger case it is disputable whether a

restaurant in a public space is entitled to charge different prices in a capricious,

unreasonable and discriminatory way and state action could be found.  Fourth, in this

case the HRPT was aware of the discriminatory practices and failed to remove or

sanction APH and actually settled the dispute allowing it to continue the practices.

Furthermore, plaintiffs believe that it was only because of the cost of APH's

improper conduct [diverting money] that APH raised its prices to some customers, not

only transferring the cost of their misbehavior to them but also giving a further

competitive advantage to the companies which with it already had an apparent vested

pecuniary interest.

Defendants' memorandum (pg. 11) argues that the government is concerned about

regulating what schools may teach or regulating the routes of air carriers but "does not

care about" firing an employee or rising rates.  It is curious that while the statute refers to

regulation of the routes and rates of air carriers usually in the same sentence, defendants

chose to separate them indicating that the government cares about one but not the other.

How can the government not care about unreasonable discrimination in the fee for

accessing a public heliport when the law, including the ADA, is clearly concerned with unreasonable increments in prices, reduction of services, and exclusion of competitors in the air transportation industry? See Airline Deregulation Act Bill.[8]

## POINT III. PLANTIFF HAS PLEADED ITS CONSTITUTIONAL CLAIMS PROPERLY

### 1. Plaintiffs have properly pleaded a claim for violation of the Equal Protection Clause under the on a "class-of-one" theory

The Supreme Court has recognized that an equal protection claim is viable where the plaintiffs allege that they were intentionally treated differently from other similarly-situated individuals without any rational basis. The Court has indicated that purpose of the equal protection clause is to protect individuals against intentional and arbitrary discrimination. See *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000).

In *Village of Willowbrook* Plaintiff sued the Village, claiming that the Village's demand of an additional 18-foot easement violated the Equal Protection Clause of the Fourteenth Amendment. Plaintiff asserted that the 33-foot easement demand was "irrational and wholly arbitrary"; that the Village's demand was actually motivated by ill will resulting from the Plaintiff's previous filing of an unrelated, successful lawsuit against the Village; and that the Village acted either with the intent to deprive Plaintiff of her rights or in reckless disregard of her rights.

The District Court dismissed the lawsuit pursuant to <u>Federal Rule of Civil Procedure 12(b) (6)</u> for failure to state a cognizable claim under the Equal Protection Clause. Relying on Circuit precedent, the Court of Appeals for the Seventh Circuit reversed,

---

[8] Library of Congress http://thomas.loc.gov/cgi-bin/bdquery/z?d095:SN02493:@@@D&summ2=m&

holding that a plaintiff can allege an equal protection violation by asserting that state action was motivated solely by a " 'spiteful effort to "get" him for reasons wholly unrelated to any legitimate state objective.' " It determined that Plaintiff's complaint had alleged the claim properly. The Supreme Court granted certiorari to determine whether the Equal Protection Clause gives rise to a cause of action on behalf of a "class of one" where the plaintiff did not allege membership in a class or group. The Supreme Court affirmed the Court of Appeal's decision. The court held:

> Our cases have recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. See *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923); *Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty.*, 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989). In so doing, we have explained that " '[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.' " *Sioux City Bridge Co., supra*, at 445, 43 S.Ct. 190 (quoting *Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 350, 352, 38 S.Ct. 495, 62 L.Ed. 1154 (1918)). Id. Supra at 564.

This case is very similar to *Village of Willowbrook*. There is history of litigation between the parties and the complaint alleges that one of the reasons for terminating Plaintiff's right to access the heliport was the failure to drop a pending lawsuit. Cmpl. ¶49. Mr. Roth states that the relationship between the parties in this action has been tense. MR Aff ¶30. The first action was also the result of defendant's excluding plaintiffs from using the heliport in 2004. APH and NYHC reached a settlement agreement. There

is currently a lawsuit in state court for violation of the settlement agreement. MR Aff. ¶27-36.

Finally, it should be noted that the class-on-one theory is applicable even in the case in which more that one person has been discriminated against. The Court clarified this point:

> We note that the complaint in this case could be read to allege a class of five. In addition to Grace and Thaddeus Olech, their neighbors Rodney and Phyllis Zimmer and Howard Brinkman requested to be connected to the municipal water supply, and the Village initially demanded the 33-foot easement from all of them. The Zimmers and Mr. Brinkman were also involved in the previous, successful lawsuit against the Village, which allegedly created the ill will motivating the excessive easement demand. Whether the complaint alleges a class of one or of five is of no consequence because we conclude that the number of individuals in a class is immaterial for equal protection analysis. P. 564

## 2.  Plaintiffs have properly pleaded a claim for violation of Due Process

Significantly, a deprivation of due process, in and of itself, constitutes irreparable injury. *See Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.); *Bray v. New York*, 2005 U.S. Dist. LEXIS 21748, *26 (S.D.N.Y. 2005).

NYHC's due process claim stems from the New York Department of Transportation's ("NYDOT") and the Hudson River Park Trust's ("HRPT")[9], as the successor-in-interest to the NYDOT. Under the permit agreement the NYDOT abdicated its constitutional duties by delegating responsibility for operating the W. 30th Street Heliport to APH and authorizing APH to implement a discriminatory rate increase for use

---

[9] The HRPT is comprised of George E. Pataki, Michael Bloomberg, and Scott Stringer. Its Board of Directors includes Charles E. Dorkey (Chairman), Daniel L. Doctoroff (Vice-Chairman), Bernadette Castro, Denise M. Sheehan, Theodore Roosevelt IV, Diana L. Taylor, Joseph B. Rose, Henry J. Stern, Georgette Mosbacher, Adrian Benepe, Julie Nadel, Lawrence B. Goldberg, Esq., and Franz Leichter.

of the heliport without providing the public, including NYHC, with a meaningful opportunity to be heard and present objections to the increase.

APH admits that it was required to give notice of its proposed rate increase to the public and to the HRPT. Clearly, the purpose to give notice is to afford the public- and those impacted by the proposed increase- the opportunity to be heard. However, APH failed to provide <u>any</u> opportunity, let along a meaningful opportunity, for the pubic – and those impacted- to be heard and present objections to the rate increase,[10] a deprivation of due process, which, in and of itself, constitutes irreparable injury.

NYHC's due process argument is meritorious. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 314 (1950); *See also Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 14 (1978) ("The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing'"). Notice "does not comport with constitutional requirements when it does not advise the [affected party] of the availability of a procedure for protesting [the proposed action]." *Memphis Light,* 436 U.S. at 14-15 (notice from utility company that service would be discontinued if overdue payment was not made within a certain time did not comport with due process, as "[n]o mention was made of a procedure for the disposition of a disputed claim"). Indeed, "the right to some

---

[10] The NYDOT (and the HRPT, as the successor-in-interest to the permit agreement) is also liable for a due process violation in that it permitted APH to implement a rate increase without providing the public, including NYHC with a meaningful opportunity to be heard and present objections to the rate increase in violation of due process.

kind of prior hearing is paramount." *Board of Regents v. Roth*, 408 U.S. 564, 569-71 (1972).

It is not disputed that APH implemented its rate increase without a public hearing. The public, including NYHC, had no meaningful opportunity to be heard and present objections to the rate increase. As discussed in this memorandum: (1) APH's rate increase action meets the "state action" requirement for a due process violation; (2) NYHC has a property interest entitled to due process action; and (3) APH's rate increase action deprived NYHC of its property interest without due process of law, thereby causing irreparable injury to NYHC.

### a. NYHC has a property interest entitled to due process protection.

Defendants claim that plaintiffs have not been deprived of any property rights. However, plaintiff NYHC was an authorized user of the heliport as the HRPT had authorized their use of the heliport. (MR Aff Exhibit B).

NYHC has a property interest in the operation of its business at the W. 30th St. Heliport sufficient to invoke constitutional procedural due process protection. *See Women's Med. Prof. Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006) ("due process protects an interest in the continued operation of an existing business"); *Watson v. Kansas City, Kansas*, 185 F. Supp.2d 1191, 1203 (D. Kan. 2001) (assuming as adequate plaintiffs' allegation of property interest in "the continued operation of their respective business, and business reputation and goodwill without unjustified, unlawful, and abusive interference by government officials for illegitimate reasons"); *United States v. Tropiano*, 418 F.2d 1069, 1076 (2d Cir. 1969) ("The right to pursue a lawful business . . . has long been recognized as a property right within the protection of the Fifth and Fourteenth

Amendments of the Constitution"); *Schwartzberg v. Lefkowitz*, 480 F.Supp. 569, 574 (S.D.N.Y. 1979) ("whatever property interests plaintiffs had in the continued operation of their business . . . would be sufficiently protected by a post-termination hearing"). APH's discriminatory rate increase action was intended to and in fact is injuring NYHC's business and, in that respect, is operating to deprive NYHC of its property interest. *See Associates in Obstetrics & Gynecology v. Upper Merion Township*, 270 F. Supp.2d 633, 65 (E.D. Pa. 2003) (allegations of actions taken "with the intent to harm Plaintiffs' business interests and to restrict their practice of lawful medical procedures" state a claim of substantive due process violation for deprivation of property interest).

### b. APH's Discriminatory Actions Are Depriving NYHC Of Its Property Interest Without Due Process Of Law, Thereby Causing Irreparable Injury to NYHC.

APH's discriminatory rate increase and favoring of plaintiff's competitors are depriving NYHC of its property interest without due process of law in that it adversely impacts NYHC's ability to operate its business. This constitutional violation is causing irreparable injury to NYHC. "At its core, procedural due process requires that individuals 'receive notice and an opportunity to be heard before the Government deprives them of property.'" *Bray v. New York*, 2005 U.S. Dist. LEXIS 21748, *13 (S.D.N.Y. Sept. 30, 2005). As noted above, APH implemented its rate increase without a public hearing. The public, including NYHC, had no meaningful opportunity to be heard and present objections to the rate increase. Accordingly, APH's rate increase action is operating to deprive NYHC of its property interest without due process of law. *See Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314 (1950); *Memphis Light,*

*Gas & Water Division v. Craft*, 436 U.S. 1, 14 (1978); *Board of Regents v. Roth*, 408 U.S. 564, 569-71 (1972).

Significantly, a deprivation of due process, in and of itself, constitutes irreparable injury. *See Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.) ("when an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary"); *Bray v. New York*, 2005 U.S. Dist. LEXIS 21748, *26 (S.D.N.Y. 2005) ("The deprivation of constitutional rights, such as due process, causes irreparable harm.").

Notably, as in *Burton*, the NYDOT (and the HRPT, as the successor-in-interest to the Permit) could have affirmatively required APH to provide notice <u>and a hearing</u> before implement any rate increase. Clearly, if the NYDOT (or the HRPT) were operating the heliport, it would have been required to provide such notice and hearing. It chose, however, not to require APH to do so. As the *Burton* Court stated, "no State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be."

### POINT IV. PLAINTIFFS HAVE STANDING TO BRING THIS ACTION BECAUSE THE OUTCOME WOULD AFFECT THE COMPETITIVE LANDSCAPE OF THE SIGHTSEEING HELICOPTER BUSINESS

Defendants' memorandum states that plaintiff NYHC does not have standing because it had been denied operating rights at the heliport before this action started. They claim that "nothing that happens at the Heliport can cause them any further injury" and the court cannot give them any relief. Defendant APH also claims that the termination of plaintiff's right to operate the helicopter is subject of a state action and that any relief in

that respect would be precluded under the doctrine of "other action pending". Def. Mem.
P.3. Defendants are wrong.

NYHC has standing to bring this action because: 1) the Heliport operation -legally
or illegally- affects the ability to do business of NYHC and its competitive position in the
sightseeing helicopter business. 2) The pending state action is based on the violation of a
settlement agreement between plaintiff and defendant in another action. The termination
gives rises to many issues, some of which are preempted by federal law and should be
heard by this court. 3) To the extent that there is any doubt, New York State Supreme
Court Judge Herman Cahn stated, in response to arguments by APH, that the case before
him had nothing to do with the federal case. (MR Aff. Footnote 2.)

Further NYHC has standing to bring this action because it has a significant stake
in a judicial resolution of the dispute. *See Sierra Club v. Morton*, 405 U.S. 727, 731
(1972). The regulations and arbitrary actions in question, seriously impact New York
Helicopter's current business and imperil its future business. *See Nat'l Helicopter*, 137
F.3d at 87. This court has jurisdiction to hear this case involving matters of federal
statutory and constitutional law under 28 U.S.C. 1331. APH preferential treatment to
some of NYHC's competitors and the operation of the heliport itself has an impact on
NYHC's business. The preferential treatment provides competitors with an unfair
advantage.

The Heliport operation is also a concern for NYHC and not a "vindictive action"
as defendants would like this court to believe. The Permit indicates clearly at section 3
page 4: "Sightseeing operations constitute the major portion of the business conducted at
the premises..." The location of the heliport is the main reason for the existence of this

market. Although tourists can choose between the midtown and downtown heliports the midtown West 30th Street Heliport has a competitive advantage because is more convenient to tourists. About 80% of the hotels are located in midtown and a similar percentage of tourists look for tours in the midtown area. That is why the main business of the heliport is sightseeing operations. MR affidavit ¶33 and 99.

If the heliport is illegal and continues to operate in such an illegal manner it would affect the competitive landscape and continue to impair plaintiff's ability to do business. If the court finds the operation to be legal, then the heliport should be operated in a proper and fair manner, consistent with the equal protection and due process clauses so that plaintiff's competitors do not obtain an undue benefit in the market. Therefore, plaintiff has established clearly his standing to bring this action.

## POINT V.  PLAINTIFFS HAVE STATED A CLAIM UNDER THE AIRLINE DEREGULATION ACT

### A.     APH is a "State Actor" within the meaning of the Airline Deregulation Act.

As previously discussed, *supra*, the connection between APH and the HRPT merges the State's purported public interest with APH's private interest. APH is a "state actor," because its contract with the state agency (HRPT) is not functionally permissive, it is a mandate, albeit handsomely lucrative, by the State to APH to satisfy certain State tourism interests. Defendants' argument is based upon the notion that the contract between APH and the State is a "private" contract. There is nothing "private" about it. Thus, attempts to isolate private contracts from preemption requirements are inapplicable to State contracts.

31

**B.**    **The State's "permit" or "contract" with APH has the force of law and thereby circumvents the preemption by the Airline Deregulation Act.**

In their brief, Defendants urge that a state contract with a private, passenger, air carrier cannot run afoul of the prohibitive language of the Act. "A State, political subdivision of a State or political authority of at least two states, may not enact or enforce a law, regulation or other provision *having the force and effect of law*, related to the price, route or service of an air carrier." (49 U.S.C. Section 41713(b) (1).) However, even without a specific enactment, the State's conduct can contravene the preemption provision of the Act.

The City of Seattle recently attempted to impose additional safeguards, through agreements with the operator, beyond those set forth in the federal Pipeline Safety Act, governing the operation of a hazardous liquid pipeline. *Olympic Pipe Line Company v. City of Seattle*, 437 F.3d 872 (9th Cir. 2006). According to the Court, Seattle was not merely seeking efficient procurement; Seattle was attempting to impose greater regulatory requirements than those authorized under federal law. The fact that Seattle might have attempted to enforce its action through contract, rather than by regulatory enforcement, did not render any such putative contract enforcement immune from the preemptive effect of the federal statute. *Olympic Pipeline Company,* 437 F.3d at 882, FN 26. Moreover, the courts will find implied preemption where State action conflicts with or frustrates the purposes of the federal statute. *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1430, FN 9 (7th Cir. 1996).

Contracts, even between private parties, can create private law that cannot supersede the preemption of the Act. See *United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605, 610-611 (7th Cir. 2000), cert. den. 531 U.S. 1036 (2000). Indeed, the concept

32

of a "state law" relating to an area preempted by federal law need not expressly refer to air carrier rates, routes or services; rather, a claim is preempted if application of the state decision would have a significant economic effect upon airline rates, routes, or services. *JetBlue Airways Corp. Privacy Litigation*, 379 F. Supp.2d 299 (E.D.N.Y. 2005). The concept of freeing the airlines to compete relative to market sources requires the absence not only of laws, rules and ordinances, but also of arbitrary State policies relating to air travel. *Id.*

### C.    An Action Will Lie Where a State Agency Curtails Competition Among Air Carriers.

Where an airline brought an action against the county, the airport commission, and individual members of the commission seeking damages and injunctive relief for the commission's refusal to grant it access to the local airport, and where the effect of such denial was to impede competition, not only was the conduct complained of subject to an action pursuant to the preemption of such conduct by the Act, despite imperfect pleadings, the action would also be deemed to lie pursuant to the Sherman Anti Trust Law. *New York Airlines, Inc. v. Duke's County, Martha's Vineyard Airport Commission*, 623b F. Supp. 1435 (D. Mass. 1985). This is especially true where a potential bidder seeks redress against a political subdivision, as in the case of a ground transportation provider that alleged an exclusive contract with its rival violated its constitutional rights. *Metropolitan Express Services Inc. v. City of Kansas, Missouri*, 23 F.3d 1367 (8th Cir. 1994). See *Airship Industries (UK) Ltd. v. Goodyear Tire & Rubber Co.*, 643 F. Supp. 754 (S.D.N.Y. 1986).

**POINT VI. THIS COURT HAS JURISDICTION TO HEAR ALL THE CLAIMS
IN THIS ACTION BECAUSE THE CONDUCT COMPLAINED OF FALLS
WITHIN THE PURVIEW OF FEDERAL PREEMPTION.**

Defendants make the esoteric argument that if Plaintiffs' grievances might be

remediable, as arbitrary and capricious, pursuant to New York State C.P.L.R. Article 78,

such grievances cannot be remediated in federal court. First, as previously discussed, if

the conduct complained of falls within the purview of federal preemption, the State

cannot grant that relief. Moreover, it is bizarre to suggest that only the states and not the

federal government can grant relief based upon arbitrary and capricious action by a State

government agency. Where that agency [the Hudson River Park Trust] has engaged in

arbitrary and capricious conduct in connection with sole source contracting of federally

preempted activity, based upon non competitive bidding, of course the federal courts may

grant the relief requested. See *KSD, Inc. v. United States*, 72 Fed.Cl. 236 (U.S. Claims

Ct. 2006). See also, *Filtration Development Co., LLC v. United States*, 59 Fed.Cl. 658

(U.S. Claims Ct. 2004).

28 U.S.C. Section 1331 confers original jurisdiction on the federal courts in cases

arising under the Constitution, federal laws, and treaties. Where the subject matter has

been expressly preempted by federal law, the state is prospectively powerless to grant the

relief sought. Cf. *Southern Pacific Transp. Co. v. Public Utilities Commission of the

State of California*, 716 F.2d 1285 (9th Cir. 1983), cert. den., 466 U.S. 936, 104 S.Ct.

1908, 80 L.Ed.2d 457 (1984). Section 1337 grants federal court jurisdiction where

Congress has sought to regulate or protect trade or to protect trade and commerce against

restraints of trade and monopolies. As documented, *supra*, the fact pattern of this case

34

demonstrates the collusive attempt by the State's Hudson River Park Trust, together with Air Pegasus, to restrain trade to the detriment of Plaintiffs.

## CONCLUSION

Based on the foregoing the motion to dismiss the complaint should be denied.

Dated: New York, New York
September 17, 2007

HANTMAN & ASSOCIATES

By:_____

Robert J. Hantman (3947)
1414 Avenue of the Americas Suite 406
New York, New York 10019
Telephone:   (212) 684-3933
Facsimile:   (212) 755-1989
*Attorneys for Plaintiff*
*New York Helicopter Charter, Inc.*
*and Michael Roth.*

35