UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
NEW YORK HELICOPTER CHARTER, INC.
and MICHAEL ROTH individually,

                    Plaintiffs,

          -against-                                Case No. 07-Civ.-4069 (MGC)

AIR PEGASUS HELIPORT, INC.,
HUDSON RIVER PARK TRUST and the
FEDERAL AVIATION ADMINISTRATION,

                    Defendants.
-----------------------------------------------------------x

MEMORANDUM OF LAW BY DEFENDANT
HUDSON RIVER PARK TRUST
IN SUPPORT OF MOTION TO DISMISS

Konner Teitelbaum & Gallagher

By: Michael A. Gould, Esq.
Attorneys for HUDSON RIVER PARK TRUST
462 Seventh Avenue, 12th Floor
New York, New York 10018
212-697-8500

-1-

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| PRELIMINARY STATEMENT |  | 3 |
| STATEMENT OF FACTS |  | 3 |
| THE PARTIES AND THEIR RELATIONSHIP |  | 4 |
| THE PRIOR LITIGATION BETWEEN HRPT AND APH |  | 7 |
| THE INSTANT COMPLAINT |  | 8 |
| ARGUMENT |  |  |
| POINT ONE: | THERE IS NO BASIS FOR FEDERAL JURISDICTION OVER THE SUBJECT MATTER OF THIS ACTION BECAUSE THE AIRLINE DEREGULATION ACT HAS NO APPLICATION TO THE TRUST | 9 |
| POINT TWO: | PLAINTIFF IS NOT ENTITLED TO RELIEF UNDER CPLR ARTICLE 78 AGAINST THE TRUST IN THIS COURT | 13 |
| POINT THREE: | PLAINTIFF'S STATE LAW CLAIMS AGAINST HRPT ARE IN ANY EVENT WITHOUT MERIT AS A MATTER OF LAW. | 16 |
| CONCLUSION |  | 20 |

PRELIMINARY STATEMENT

This Memorandum of Law is submitted on behalf of Defendant HUDSON RIVER PARK

TRUST ("HRPT" or the "Trust") in support of its motion for an order dismissing this action

pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure on the ground

that this Court lacks jurisdiction over the subject matter of the action and that the Complaint fails

to state a claim upon which relief may be granted as a matter of law, and also in support of the

motion by Defendant AIR PEGASUS HELIPORT, INC. ("APH" or "Air Pegasus") for the same

relief. Since APH has previously submitted an extensive memorandum of law, the Trust will not

burden the Court by repeating in detail all of the arguments contained therein, but will focus

primarily on those aspects of the motion that pertain to the Trust. However, the Trust joins in

and incorporates by reference all the arguments made by APH insofar as they relate to the instant

motion.

STATEMENT OF FACTS

In this action, plaintiffs NEW YORK HELICOPTER CHARTER, INC. ("NYHC") and

MICHAEL ROTH, Individually ("Roth") (also collectively referred to as "Plaintiff") seek

various legal and equitable relief as against Air Pegasus and the Trust. Essentially, the Complaint

seeks (a) to invalidate the permit granting APH the right to operate the heliport, described below,

(b) to enjoin APH's operations at the heliport, and (c) to terminate the use of the heliport entirely.

The Complaint also seeks a declaration that the Trust is obligated to open operation of the

heliport to public bidding, that the Trust is required to obtain monthly approval from the Trust's

Board of Directors for all of APH's operations, and to invalidate a 2006 settlement of litigation between HRPT and APH, to which litigation neither NYHC nor Roth were parties.

Although the Plaintiff has amassed a voluminous Complaint, the essential facts relevant to this motion are contained in the documents annexed to the Complaint and may be briefly summarized as follows:

### THE PARTIES AND THEIR RELATIONSHIPS

HRPT is a New York public benefit corporation created by the Hudson River Park Act, 1998 N.Y. Sess. Laws Ch. 592 (S. 7845) (the "Act"), Exhibit "D" to the Complaint. The Trust's status as a public benefit corporation appears at Section 5 of the Act. The Trust's purposes appear at Section 6 of the Act, and essentially consist of planning, designing and constructing the Hudson River Park (the "Park") on the west side of Manhattan between Battery Park and 59th Street, and the performance of all acts incidental to that purpose. HRPT is the successor in interest to the New York State Department of Transportation (the "NYDOT"), which had previously controlled, *inter alia*, the land and improvements known as the West 30th Street Heliport (the "Heliport"), located at West 30th Street and the Hudson River in Manhattan, within the Park.

Prior to the legislature's creation of HRPT, the NYDOT had granted APH, a private Delaware corporation, the exclusive right to be the "fixed base operator" of the Heliport, pursuant to an agreement dated March 25, 1996, (the "Permit") which contains the rights and duties of the NYDOT and APH. The Permit is annexed to the Complaint as Exhibit "C." The only parties to the Permit were Air Pegasus and the NYDOT, the Trust's predecessor.

Pursuant to Section 2 of the Permit, the Permit has a five-year term, which term expired

on the fifth anniversary of its commencement date, i.e., in May 2001.[1]  However, Section 2 also

provides for continued operation of the Heliport subsequent to 2001 as follows:

> The term of this Agreement shall automatically renew for successive
> terms of one month each unless canceled by either party upon thirty
> (30) days written notice.

Section 3 of the Permit grants Air Pegasus the right to name designated sightseeing

operators at the Heliport, subject to HRPT's approval:

> The Operator [Air Pegasus] or any other aircraft operator shall
> conduct sightseeing operations only upon the prior written
> approval of [HRPT's predecessor] of (i) the sightseeing operator
> and its aircraft and procedures and (ii) the terms of any agreement
> between [Air Pegasus] and any such sightseeing operator, which
> approval shall not be unreasonably withheld.

Despite its forty pages and 257 separate paragraphs, the Complaint fails to allege how and

when NYHC became a designated sightseeing operator at the Heliport.  Paragraph 48 simply

alleges that NYHC is a New York corporation and that its president, plaintiff Michael Roth, is

licensed by the FAA.  Paragraph 49 alleges that NYHC has been "improperly discriminated

against and arbitrarily denied operating rights since May 6, 2007," but fails to allege whether

APH ever designated NYHC as a sightseeing operator.

In fact, APH had granted NYHC the "non-exclusive right" to conduct charter tours from

the Heliport, in a settlement agreement dated April 28, 2005, in a case entitled *New York*

---

[1]Although the Permit is dated March 25, 1996, its term
did not actually commence until May 1996.

*Helicopter Charter, Inc. vs. Air Pegasus Heliport, Liberty Helicopters, Inc., and Hudson River Park Trust*, New York County Index No. 603773/2004. Said settlement agreement, which is annexed hereto, further grants APH the right to terminate NYHC's operations at the Heliport, without notice or opportunity to cure, upon NYHC's defaulting in the terms of said settlement agreement.

Section 4 of the Permit grants Air Pegasus the right to set charges and fees for its designated operators' use of the Heliport. Although HRPT is entitled to notice of changes of the various fees, Section 4 does not grant HRPT approval rights regarding such fees:

> The Schedule of Charges covering the use of the Heliport is attached hereto, made a part hereof and marked Exhibit "B." The Operator [Air Pegasus] shall have the right, from time to time to amend any item of such Schedule of Charges, to make increases or decreases therein and to add or delete additional items thereto upon fifteen (15) days prior notice to Public and to the Department [of Transportation]. The Operator shall have the responsibility to collect from each and every operator of an aircraft using the Heliport. . . . The Department shall have no responsibility for the collection or payment of such charges.

Thus, the Permit grants Air Pegasus the right to fix the fees or charges that it imposes on users of the Heliport, subject only to HRPT's right to receive notice of such fees. Although Section 34 of the Permit provides that Air Pegasus' services and pricing shall be "fair, reasonable and non-discriminatory," the Permit does not grant HRPT the right to approve or reject Air Pegasus' fees.

More important for purposes of this litigation, the Permit expressly and unambiguously prohibits the Plaintiff, or any other designated sub-operator, from enforcing any rights or remedies under the Permit. Section 50 of the Permit provides, in pertinent part:

> This Agreement . . . constitutes the entire Agreement of the parties
> on the subject matter hereof, may not be changed, modified,
> discharged or extended except by written instrument duly executed
> by the Department and the Operator [Air Pegasus], and *shall not
> confer upon any person or entity other than the parties hereto any
> rights or remedies hereunder.* (Emphasis added.)

### THE PRIOR LITIGATION BETWEEN HRPT AND APH

In 2005, HRPT conducted an audit of APH's books and records. That audit was undertaken at the recommendation of the State Comptroller to obtain verification of the revenue reported by APH – upon which a portion of APH's fees to HRPT depended – in order to determine if APH had paid all money owed to HRPT.

Based upon information developed during the audit, in January 2006, HRPT commenced an action entitled *Hudson River Park Trust vs. Air Pegasus Heliport, Inc., Air Pegasus New York, Inc., and Alvin S. Trenk*, New York County Index No. 600035-2006 (the "Audit Action"), alleging that APH had improperly excluded certain income from reported revenue, and that, as a result, APH had failed to pay HRPT the percentage of such revenue required by the Permit. Plaintiff was not a party to the Audit Action. A copy of the Complaint in the Audit Action is annexed as Exhibit "F" to the Complaint in this action.

The audit was eventually completed, and as a result of negotiations between APH and HRPT, the Audit Action was settled and discontinued. See Exhibit "B" to the Complaint. Since the Plaintiff was not a party to the Audit Action, and had no role of any kind in it, it was not a signatory to the either the stipulation of settlement or discontinuance.

THE INSTANT COMPLAINT

Most of the Complaint does not seek relief against the Trust but is rather directed to APH. The First, Second and Third Causes of Action are against APH only, and claim various alleged due process and equal protection violations. In an effort to establish some basis for federal jurisdiction, the Fourth Cause of Action, against APH and HRPT, alleges that APH's imposition of fees is preempted by the Airline Deregulation Act, 49 U.S.C. §41713; the Fifth Cause of Action alleges that APH's charging $10.00 per passenger and other actions is, for some undefined reason, "preempted by federal law".

The Sixth Cause of Action alleges that the Trust "was required to put the permit out for bid as of March 25, 2001" and failed to do so; the Seventh Cause of Action alleges that a vote of the Trust's Board of Directors was required for every extension of the Permit, presumably every thirty days. The Eighth and Ninth Causes of Action seek to invalidate the settlement of the Audit Action described above, to which Plaintiff was not a party, because Plaintiff alleges that the settlement was "arbitrary and capricious" and also required approval by HRPT's Board of Directors. The Tenth and Eleventh Causes of Action seek to close the Heliport entirely, alleging that no heliport may operate east of the bulkhead line, and that APH's use of the Heliport is not properly "grandfathered."

ARGUMENT

POINT ONE

THERE IS NO BASIS FOR FEDERAL JURISDICTION OVER THE
SUBJECT MATTER OF THIS ACTION BECAUSE THE
AIRLINE DEREGULATION ACT HAS NO APPLICATION TO THE TRUST

As indicated above, in an attempt to create a basis for federal jurisdiction which does not

exist, Plaintiff alleges that various actions by APH and, by extension, the Trust, violate the

Airline Deregulation Act, 49 U.S.C. §41713, (the "ADA"). This claim is without merit because

the ADA has no application to either the Trust or APH.

The ADA provides, at Section 41713(b) thereof, that "a State, political subdivision of a

State or political authority of at least 2 States may not enact or enforce a law, regulation, or other

provision having the force and effect of law, relating to a price, route, or service of an air carrier

that may provide air transportation under this subpart." [Emphasis added].

The term "State," in turn, is defined at Section 41713(a) of the ADA as "a State, the

District of Columbia, and a territory or possession of the United States."

Thus, in order to maintain an action under the ADA, the Plaintiff must allege and prove

that the various acts of which it complains, e.g., HRPT's failure to remove APH as operator of

the Heliport, HRPT's failure to "put out" the Heliport to private bidding, HRPT's purported

failure to obtain board approval for the Permit every thirty days, or to prohibit the allegedly

improper fees charged by APH, were acts performed by the State of New York or a political

subdivision of the State of New York. If the Plaintiff cannot establish that the allegedly wrongful

actions were committed by "a state," as that term is defined in the ADA, then the ADA, which

prohibits only certain state actions, does not and cannot apply. In fact, Plaintiff cannot do so

because HRPT is a public benefit corporation, separate and distinct from the State of New York;

it is neither the State of New York nor a political subdivision of the State of New York, as a

matter of law.

It is well-established in New York that "public benefit corporations are not political

subdivisions of the State." See *Methodist Hospital of Brooklyn vs. State Insurance Fund,* 102

A.D.2d 367, 377, 479 N.Y.S.2d 11 (1st Dept. 1984), *aff'd,* 4 N.Y.2d 365 (1985).  See also

*Lancaster Development, Inc. vs. Power Authority of State of New York, et. al.,* 145 A.D.2d 806,

535 N.Y.S.2d 654 (3rd Dept. 1988), *leave to appeal denied,* 74 N.Y.2d 612, 547 N.Y.S.2d 846

(1989), in which the plaintiff, which had bid on a power project, brought an Article 78

proceeding against the Power Authority of the State of New York, a public benefit corporation.

Affirming the Supreme Court's dismissal of the proceeding, the Appellate Division specifically

noted the special nature of a public benefit corporation:

> We hold that [the respondent], as a public benefit corporation,
> created for the general purpose of performing functions essentially
> governmental in nature, is *not* a State agency, but rather enjoys, at
> least for some purposes, an existence separate and apart from the
> State, its agencies and political subdivisions (see, *Grace & Co. v.
> State Univ. Const. Fund,* 44 N.Y.2d 84, 88), and is an independent
> and autonomous public corporation that is able to function with a
> freedom and flexibility not permitted an ordinary State board,
> department or commission [citations omitted].  145 A.D.2d 806.
> [Emphasis added.]

See also, *Kadish v. Roosevelt Raceway Associates, L.P.,* 183 A.D.2d 874, 584 N.Y.S.2d

592 (2nd Dept. 1992), in which the plaintiff sued the Industrial Development Agency, a public

benefit corporation, its lessee, Roosevelt Raceway Associates, L.P., and other defendants,

pursuant to §123-b of the State Finance Law,  regarding the validity of a lease.  In affirming

dismissal of the suit, the Court held: ". . . there is no statutory authority which confers standing upon a taxpayer to bring an action against the Industrial Development Agency, a public benefit corporation." 183 A.D.2d at 875. See also, *Matter of Madison Sq. Garden, L.P. v. NY Metropolitan Transportation Authority, et al.* 19 A.D.2d 284 (1st Dept. 2005).

Indeed, applying these precedents, the Supreme Court of New York County recently examined the relationship between Air Pegasus and its designated sub-operators, as well as HRPT's status as a public benefit corporation, and specifically held that the Trust is <u>not</u> a state actor. In *Freefall Express, Inc. vs. Hudson River Park Trust, Air Pegasus Heliport, Inc., Air Pegasus of New York, Inc. and Liberty Helicopters, Inc. (N.Y.)*, New York County Index No. 602901-2006, plaintiff, a designated operator of the Heliport, alleged that HRPT had violated Article 7-A of the New York State Finance Law, which allows private citizens to challenge the misappropriation or waste of state funds by New York State or its agencies. Granting the Trust's motion to dismiss that action, the Court (Rosalyn Richter, J.) held as follows:

> . . . the Appellate Division, First Department, has held that an action under Article 7-A may not be maintained against a public benefit corporation. In Madison Square Garden v. New York Metropolitan Transit Authority, 19 A.D.3d 284, 286 (1st Dept. 2005), the Court concluded that the petitioners could not sue the Metropolitan Transit Authority, a public benefit corporation, "because the MTA is separate from the State." Because HRPT is a public benefit corporation distinct from the State, Freefall cannot maintain an Article 7-A action against it. Thus, HRPT's cross-motion to dismiss the complaint is granted.

In another action involving the Trust, the Supreme Court of New York County reached a similar result earlier this year in *Pier 59 Studios, L.P. vs. Hudson River Park Trust, et. al.*, New

York County Index No. 107837-2006.[2]  In that action, Pier 59 asserted three causes of action, one

of which claimed that HRPT had violated State Finance Law §123-b, the same statute as was the

basis of *Freefall Express, supra.*  Granting HRPT's motion for summary judgment, the Court

(Shirley Werner Kornreich, J.) held:

> The court agrees that State Finance Law §123-b does not apply to
> the Trust, as it is a public benefit corporation and its funds are not
> state funds.  General Construction Law §66(4) defines a public
> benefit corporation as "a corporation organized to construct or
> operate a public improvement wholly or partly within the state, the
> profits from which inure to the benefit of this or other states, or to
> the people thereof." *Public benefit corporations are "not identical*
> *to the State or any of its agencies, but rather enjoy...an existence*
> *separate and apart from the State, its agencies and political sub-*
> *divisions." John Grace & Co., Inc. v. State University Construction*
> *Fund,* 44 N.Y.2d 84 (1978). [Other citations omitted, emphasis
> added.]

Therefore, since the Trust is neither the State nor a political subdivision of a State as

required by the ADA, the ADA has no application to this case.

Moreover, even if the Trust were somehow to be found to be a "state actor", the ADA

would nevertheless be inapplicable because the statute only prohibits a state or subdivision

thereof from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and

effect of law" regarding pricing, routes or services of an air carrier. The Complaint manifestly

fails to allege any facts which violate this prohibition.

The only contract between the Trust and Air Pegasus is the Permit (annexed to the

Complaint as Exhibit "C"), which grants Air Pegasus control of operations at the Heliport.  The

Permit is not a law, it is not a regulation, and it has no force of law.  It is a private contract

---

[2]Copies of the *Freefall Express, Inc.,* and *Pier 59 Studios, L.P.,*
decisions, which are unpublished, are annexed hereto.

between the Trust's predecessor and Air Pegasus. See, *American Airlines v. Wolens*, 513 U.S. 219, 229, n. 5 (1995), discussed at pp. 18-19 of APH's memorandum of law. And, equally important, the Permit does not control pricing, routes or services of air carriers. Indeed, the acts of which the Plaintiff complains have nothing to do with pricing, routes, or services of air carriers.

Accordingly, the ADA has no application to HRPT, a public benefit corporation which has not enacted or enforced any law or regulation prohibited the statute. Since the Complaint alleges no other federal claim against HRPT, and since APH has shown that there is no basis for Plaintiff's alleged constitutional claims against it, there is no basis for federal jurisdiction over the subject matter of this action.

POINT TWO

PLAINTIFF IS NOT ENTITLED TO RELIEF UNDER
CPLR ARTICLE 78 AGAINST THE TRUST IN THIS COURT

Since there is no basis for federal jurisdiction as a matter of law, the remaining claims asserted under state law must be dismissed as well. *Motorola Credit Corp. v. Uzan,* 388 F.3d 39, 56 (2d Cir. 2004). Moreover, as discussed in Point IV of APH's memorandum of law, all of the remaining claims asserted by Plaintiff against HRPT must also be dismissed because they seek redress pursuant to the New York State Civil Practice Law and Rules ("CPLR") Article 78 ("Proceeding against Body or Officer") which is not within the purview of this Court. Article 78 supersedes and incorporates the former writs of certiorari, mandamus, and prohibition, and permits certain parties to compel a public body to perform a ministerial act, to prevent the actions

of a public body in a proceeding for prohibition, or to enjoin arbitrary or capricious

determinations by public bodies.

The relief sought in this action, in which the Plaintiff seeks to enjoin the Trust from

acting in various ways that the Plaintiff claims are prohibited, or to compel the Trust to act in

certain ways which the Plaintiff alleges are required by law, would be available in state court, if

at all, only under Article 78. Regardless of whatever substantive merit such claims may have –

and HRPT submits that there is none – this Court lacks jurisdiction to grant relief for such

claims.

As APH cogently demonstrates at pp. 23-25 of its memorandum of law, it is well-

established that federal courts lack jurisdiction to grant relief under Article 78. In *Birmingham*

*vs. Ogden*, 70 F.Supp.2d 353, 370 (S.D.N.Y. 1999), for example, a police officer brought suit

against the police chief and city, claiming, *inter alia*, that his dismissal violated due process. The

U.S. District Court (McMahon, J.), held that the plaintiff's due process claim could survive a

motion to dismiss only if New York law did not provide a procedure to remedy arbitrary acts.

Article 78 of the CPLR, however, provides such a procedure:

> Plaintiff has no claim for denial of due process because the
> availability of an Article 78 proceeding constitutes an adequate
> post-deprivation remedy for any of the alleged due process
> violations, or for all of them taken together. *Hellenic Am.*
> *Neighborhood Action Comm. v. City of New York*, 101 F.3d 877,
> 880 (2nd Cir. 1996) (citing *Hudson v. Palmer*, 468 U.S. 517,
> 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) ... plaintiff, having failed
> to take advantage of [Article 78], "can find little comfort in the
> general rule that §1983 allows plaintiffs with federal or constitutional
> claims to sue in federal court without first exhausting judicial or
> administrative remedies." *Hellenic Am. Neighborhood Action*
> *Comm.*, 101 F. 3d at 881 ... There is no constitutional violation
> when the state affords an adequate post-deprivation remedy for

a random, arbitrary deprivation of property or liberty. *Zinermon v. Burch*, 494 U.S. 113, 132, 110 S.Ct. 975, 108 L.Ed.2d 100 [other citations omitted].

Moreover, as Judge Cote held in *Morningside Supermarket Corp. v. New York State Department of Health,* 432 F. Supp. 334, 346 (S.D.N.Y. 2006),

> It is doubtful. . . that claims under Article 78 are even amenable to a federal district court's supplemental jurisdiction. Three district courts in this Circuit have recently concluded that Article 78 claims brought in federal court "must be dismissed for lack of subject matter jurisdiction, as New York State has not empowered the federal courts to consider such claims." *Blatch ex. rel. Clay v. Hernandez*, 360 F.Supp.2d 595, 637 (S.D.N.Y. 2005); see also *Beckwith v. Erie County Water Auth.*, 413 F.Supp.2d 214, 226 (W.D.N.Y. 2006); *Cartagena v. City of New York*, 257 F.Supp.2d 708, 710 (S.D.N.Y. 2003).

Judge Cote also observed that even where there is an independent basis to allow exercise of supplemental jurisdiction, there are compelling reasons for federal courts to decline to exercise such jurisdiction over Article 78 proceedings:

> Because accepting supplemental jurisdiction over such claims requires a federal court to "usurp the statutory authority bestowed upon the New York state courts," *Adler v. Pataki*, 204 F. Supp.2d 384, 396 (N.D.N.Y. 2002) (citation omitted), "federal courts are loath to exercise jurisdiction over Article 78 claims." *Birmingham v. Ogdan* 70 F.Supp.2d 353, 372 (S.D.N.Y. 1999)."

Therefore, for this additional reason, the Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Causes of Action, all of which seek relief against HRPT in the nature of mandamus or prohibition pursuant to CPLR Article 78, must be dismissed.

POINT THREE

PLAINTIFF'S STATE LAW CLAIMS AGAINST HRPT
ARE IN ANY EVENT WITHOUT MERIT AS A MATTER OF LAW.

Although as demonstrated above, this Court need not and should not reach the merits of

Plaintiff's various state law claims against HRPT, they are in any event baseless as a matter of

law.

First, Plaintiff lacks standing as a matter of law to maintain an Article 78 proceeding

against HRPT, and may not obtain Article 78 relief to compel acts which are discretionary or to

enforce the provisions of the Permit. In *Sightseeing Tours of America, Inc. vs. Air Pegasus

Heliport, Inc.*, ___ A.D.3d ___ (1st Dept. 2007), a copy of which is annexed hereto, the Appellate

Division, First Department recently held that a similarly situated operator at the Heliport, which

sought to compel HRPT to reject and prohibit APH from imposing the identical passenger fee

increase about which Plaintiff now complains, lacked standing to maintain an Article 78

proceeding against the Trust. The Appellate Division also affirmed the Supreme Court's

decision that mandamus to compel may not be granted to compel an act which involves the

exercise of judgment or discretion, such as passing upon APH's fees. Finally, the Court affirmed

the Supreme Court's finding that sub-operators at the Heliport have no right to maintain any

action as third-party beneficiaries of the Permit because Section 50 of the Permit itself expressly

and unambiguously prohibits any non-party, such as the Plaintiff in this case, from enforcing any

rights or remedies thereunder.

In addition to the lack of standing, Plaintiff's purported Article 78 claims are

substantively without merit. For example, Plaintiff seeks to compel HRPT to terminate APH's

presence at the Heliport, claiming that its operations are invalid either under the Act or the Permit. There is no basis for such relief.

Although operating a heliport is not a "Park Use," as defined in Section 3(g) and (h) of the Act, APH is permitted to continue to operate the Heliport under a "grandfather" clause contained at Section 3(g)(i), which provides:

> "Permitted Use" means. . .uses permitted under any lease, permit, license or other instrument in effect upon the effective date of this act, whether or not a prohibited use under this act, but only pursuant to the terms of the instrument and only for the term thereof or pursuant to any extension according to the terms thereof if, but only if, the option to extend is exercised solely by and is a contractual right of the lessee, permittee, licensee or other contractual user, and subject to the deadlines for the removal or relocation of unacceptable governmental uses under subdivision nine of section seven of this act. (See Complaint, Exhibit "D.")

Accordingly, the Heliport falls squarely within the provision of Section 3(g)(i), inasmuch as it is a use: (1) under a lease or permit, i.e., the Permit; (2) the lease or permit was effect on the effective date of the Act, i.e., the Permit is dated March 25, 1996, some two years prior to the effective date of the Act; and (3) Air Pegasus conducts its operations pursuant to the terms of the instrument and *automatic* extensions thereof. The Permit is, in fact, the only contractual instrument between the Trust and Air Pegasus, and Air Pegasus' operations at the Heliport are in conformity with the Permit.

Section 2 of the Permit provides that after the initial expiration date the Permit "shall automatically renew for successive terms of one month each unless canceled by either party upon thirty (30) days written notice." [Emphasis added.] The renewal clause is not "exercisable," *per se*, by either the Trust or Air Pegasus: renewal is automatic, barring cancellation by either party.

Contrary to Plaintiff's contention, there is nothing in the Act which requires the Trust to exercise its right to terminate the Permit. To take the Plaintiff's argument to its logical conclusion, the Permit would have terminated in 2001 and not be subject to any extension, ever, merely because neither party can "extend" it, an obviously illogical result which would be completely contrary to the plain meaning and intention of the Permit. Moreover, any decision to renew the Permit would be discretionary, and thus not subject to an order of mandamus.

In fact, the Heliport remains at the site only because it is "grandfathered," and the "grandfather" rights granted under Section 3(i)(iv) of the Act are limited to the current Heliport operations, pursuant to the Permit only. NYHC's attempt to terminate Air Pegasus' Permit rights, if granted, would therefore effectively end all helicopter operations at the site.[3]

Moreover, Section 3 of the Act prohibits sightseeing operations in the Park, and Section 9(i) of the Act prohibits park areas east of the bulkhead to be used for commercial purposes. Consequently, any future heliport in the Park must be relocated west of the bulkhead and cannot include any sightseeing or other tourism or recreational flights. As a result, given the restrictions on heliport operations and locations in the Act, as well as the ongoing development of the Park, competitive bidding for such operations under a new agreement at the current location is prohibited.

---

[3] Apart from the lack of analytical merit to this argument, since Plaintiff admittedly operated at the Heliport for some period of time without ever objecting that the Heliport was illegal under the Act, its present claim that the Trust has been illegally allowing the Heliport to continue in operation since 2001 rings hollow indeed.

Plaintiff's effort to challenge the 2006 the Settlement Agreement between the Trust and APH of litigation to which Plaintiff was not a party is similarly without merit as a matter of law. HRPT's decision as to whether to settle litigation and on what terms and conditions was a manifestly discretionary act which may not be challenged in an Article 78 proceeding. Moreover, paragraph 14 of the Settlement Agreement plainly provides that "No third parties shall have any rights under this Agreement." Finally, as a stranger to the litigation and to the Trust, Plaintiff has no right to assert any claim that the Settlement Agreement is void because it was not approved by the Trust's directors. And, in any event, no such requirement exists.

CONCLUSION

As demonstrated above and in the memorandum of law submitted on behalf of APH, this lawsuit is without merit as a matter of law. This Court lacks jurisdiction over the subject matter of the action, which requires dismissal of not only the federal claims but the ancillary state law claims as well. In any event, the state law claims are all procedurally and substantively defective as a matter of law. Accordingly, HRPT's motion to dismiss this action in its entirely, and each and every cause of action asserted against it in the Complaint, should be granted.

Dated: New York, New York
        October 1, 2007

                                    Konner Teitelbaum & Gallagher

                                    By: Michael A. Gould, Esq.
                                    Attorneys for Defendant
                                        HUDSON RIVER PARK TRUST
                                    462 Seventh Avenue, 12th Floor
                                    New York, New York 10018
                                    212-697-8500

Of Counsel:    Brian P. Gallagher, Esq.
               Eliot Evans, Esq.

APR 29 2005 01:31P                                    2123616406                                              page 2

04/29/2005 11:27 FAX 5168290851          HOWARD R. BIRNBACH                      973 669 8960      ☒003
                                                                                                 P.03

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT is made on the 28th day of April, 2005 between: (i) Air Pegasus Heliport, Inc. ("APH"), a New York corporation having an office at 11 Hillside Avenue, Bernardsville, New Jersey 07924; and (ii) New York Helicopter Charter, Inc. ("NYH").

WHEREAS, APH is the fixed base operator of the West 30th Street Heliport in New York (the "Heliport") pursuant to a Permit (the "Permit") with the New York State Department of Transportation, the predecessor of the Hudson River Park Trust ("HRPT"), dated March 25, 1996; and

WHEREAS, the Permit reserves to HRPT the right to approve any helicopter operator engaged in sightseeing from the Heliport; and

WHEREAS, APH maintains a separate terminal facility (the "Trailer") which is used principally for corporate and charter helicopter operations; and

WHEREAS, NYH conducts both charter flights and charter tours, which the HRPT considers the same as sightseeing tours, from the Heliport; and

WHEREAS, NYH has submitted an application to APH to become an approved operator of helicopters by the HRPT, notwithstanding APH's position that approval is not required for NYH's charter tour operations;

WHEREAS, NYH has filed a lawsuit in the Supreme Court of the State of New York, County of New York entitled *New York Helicopter Charter, Inc. v. Air Pegasus Heliport, Liberty Helicopters, Inc. and Hudson River Park Trust* (Index Number 603773/04) (the "Lawsuit"); and

WHEREAS, APH and NYH have agreed to settle the claims in the Lawsuit that NYH has filed against APH;

NOW, THEREFORE, based on and in consideration of the foregoing premises, and in consideration of the mutual covenants set forth herein, APH and NYH agree as follows:

1.    **NYH's Rights.** NYH shall be granted a non-exclusive right to continue to conduct charter tours from the Heliport provided it is not in default of any term of this Agreement and subject to approval of the HRPT in accordance with the terms of the Permit. NYH shall have the right to conduct its charter tours solely from the Trailer.

2,    **Payments to APH.** NYH shall pay APH on a monthly basis, by no later than the tenth day of each calendar month, the following charges incurred during the previous month:

(i)    Customary and usual heliport charges for landings, parking, fuel, off-ops (also known as late ops), and SAFE Fees at APH's then current rates which are subject to change from time to time in APH's sole discretion; and

(ii)    A passenger fee computed at the rate of $15.00 for every 10 charter tour passengers that the NYH flies, with the number of passengers rounded to the next higher integral multiple of 10 (such payment shall be accompanied by a report certifying the passenger count for the period for which payment is submitted).

3.    **Compliance With Rules.** NYH shall comply with all of APH's and the HRPT's rules, regulations and procedures as may exist or to be established from time to time. NYH agrees to not sell tickets, collect payment, solicit or loiter on the Heliport grounds, in the Trailer, in the Heliport parking lot, or on the sidewalk in front of the Heliport or elsewhere in the Hudson River Park, or otherwise interfere with or attempt to divert or distract other helicopter operators' customers.

4.    **Limitations on Operations.** NYH shall be subject to the following limitations: (i) it shall only conduct charter tour flights on Saturdays, Sundays and Federal holidays as defined in 5 U.S.C §6103; (ii) it shall conduct not more than 24 charter tour flights over the course of any given weekend and not more than 12 charter tour flights on any given Federal holiday. In the event that a Federal holiday falls on either a Friday or a Monday, then NYH shall

2

be allowed to conduct up to 36 charter tour flights over the three-day weekend; and (iii) it shall
conduct not more than 1,200 charter tour flights per calendar year.

5.      **HRPT Approval.** APH has submitted, on NYH's behalf, an application to the
HRPT for approval of NYH as a charter tour/sightseeing operator from the Heliport which is
pending. NYH agrees to indemnify APH from any and all claims, suits or demands of any kind,
including legal fees and costs, which arise out of or are related to NYH's operations at the
Heliport.

6.      **Default.** In the event that NYH defaults in any of its obligations under this
Agreement, then APH shall have the right, without notice or an opportunity to cure, to terminate
NYH's rights to conduct any operations at the Heliport.

7.      **General Release of APH and NYH.** NYH, its successors and assigns, hereby
releases and forever discharges APH, its employees, agents, shareholders, directors, officers,
successors and assigns (collectively, the "Releasees") from any and all debts, actions, causes of
action, suits, accounts, covenants, contracts, agreements, damages, and any and all claims,
demands and/or liabilities whatsoever of every name and nature, whether directly or indirectly,
personally or derivatively through others, and whether known or unknown to, or suspected or
unsuspected by NYH EXCEPT for claims and rights that are preserved under this Settlement
Agreement. Subject to this exception, this Release includes any and all claims asserted in the
Lawsuit against the Releasees, and any claims NYH has or may have against the Releasees as of
the date of this Settlement Agreement, or ever had against the Releasees from the beginning of
the world through the execution date of this Settlement Agreement.

8.      **Confidentiality.** The parties agree that the terms of this Settlement Agreement
shall be maintained in confidence by NYH and shall not be revealed by NYH to any person or
entity that is not a party to this Settlement Agreement. NYH shall not deliver any

3

communication regarding this Settlement Agreement to any third party, to the public, or to the media, other than the statement that "the matter has been settled."

9. **Completeness of Agreement.** This Agreement contains all of the terms and conditions agreed upon by the parties with reference to the subject matters contained herein. No other agreement, oral or otherwise, will be considered to exist or to bind any of the parties. No representative of any party to this Settlement Agreement had, or has, any authority to make any representation or promise not contained in this Settlement Agreement, and each of the parties to this Settlement Agreement acknowledges that such party has not executed this Settlement Agreement in reliance upon any such representation or promise. This Settlement Agreement cannot be modified except by a written instrument signed by all parties.

10. **Severability.** If any portion or provision of this Settlement Agreement is held unconstitutional, invalid, or unenforceable by any court of competent jurisdiction, the remainder of the Settlement Agreement will be considered severable, will not be affected, and will remain in full force and effect.

11. **Voluntary Execution.** The parties acknowledge that they have each thoroughly read this Agreement, understand it, and is entering into it of its own free will.

12. **Governing Law; Jurisdiction.** This Agreement will be interpreted and construed for all purposes under the laws of the State of New York without regard to its conflicts of laws principles, and all disputes arising under or out of this Settlement Agreement will be brought in courts of competent jurisdiction located within the State of New York. The parties consent to the personal and exclusive subject matter jurisdiction of the Courts of the State of New York in connection with any and all disputes arising out of this Settlement Agreement.

13. **Legal Counsel.** The parties all acknowledge that each has been represented by legal counsel throughout these proceedings and that, by this Settlement Agreement, each has

APR 29,2005 01:31P                                2123616406                                    page 6

04/29/2005 11:28 FAX 5168290661          HOWARD R. BIRNBACH              973 669 8960      P.07
                                                                         ☑007

been advised, in writing, of his right to consult legal counsel prior to signing this Settlement
Agreement. Each party further acknowledges that, to the extent it has wished to avail itself of
that right, it has done so.

14.  **Construction.** This Settlement Agreement is the product of negotiation by the
parties and all parties' counsel participated in the drafting and revision of this Settlement
Agreement. Therefore, this Settlement Agreement shall not be construed or interpreted more
strictly against any party based on that party's counsel having drafted this Settlement Agreement.

15.  **No Waiver.** The failure of any party to insist upon the strict performance of any
of the provisions of this Settlement Agreement, or to exercise any of the rights afforded under
this Settlement Agreement, shall in no way constitute a waiver of any subsequent default of the
same or similar nature or a waiver of that party's right to insist on strict performance in the
future.

16.  **Attorneys' Fees.** If any party to this Settlement Agreement brings an action or
counterclaim against any other party to this Settlement Agreement for breach of this Settlement
Agreement, or any other rights preserved by this Settlement Agreement, including a claim for
non-payment of fees and charges contemplated by paragraph 2 of this Agreement, the prevailing
party shall be entitled to recover, in addition to all other damages and remedies, all reasonable
attorneys' fees and costs incurred in connection therewith.

17.  **Dismissal of Claims Against APH and the HRPT.** Simultaneous with the
execution of this Settlement Agreement, NYH shall cause all claims that it has asserted in the
Lawsuit against APH to be dismissed with prejudice and all claims that it has asserted against the
HRPT to be dismissed without prejudice.

18.  **Duplicate Originals.** This Settlement Agreement may be executed in
counterparts, with each counterpart being equally effective.

5

APR-29-2005  15:14    LENTZ-GENGARO    2123616406    973 669 6960    P.01
APR 29,2005 01:32P

04/29/2005 11:28 FAX 5166780051    HOWARD R. BIRNBACH    973 669 6960    P.03

19.    **Facsimile Signatures.** Facsimile signatures shall be as effective as original

signatures.

WHEREFORE, the parties have set their hands and seals as of the date first written

above.

AIR PEGASUS HELIPORT, INC.

By: _____
        Abigail S. Trenk, President

NEW YORK HELICOPTER CHARTER, INC.

By: _____
        Michael Roth, President

Z:\WP51\DATA\LE-LN\Trenk, Steve\NYHCs\Lease - Approved - NYH-Final_1.doc

6

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:    IAS PART 24
-------------------------------------x
FREEFALL EXPRESS, INC.,

             ·Plaintiff,

      -against-                 DECISION AND ORDER
                              Index No. 602901-06
HUDSON RIVER PARK TRUST, AIR PEGASUS  Motion Sequence No. 1
HELIPORT, INC., AIR PEGASUS OF NEW
YORK, INC. and LIBERTY HELICOPTERS,
INC. (N.Y.),

              Defendants.
-------------------------------------x
ROSALYN RICHTER, J.:

    Plaintiff Freefall Express, Inc. ("Freefall") is involved in
the aviation business and utilizes the West 30th Street Heliport in
Manhattan.  Defendant Hudson River Park Trust ("HRPT") is a public
benefit corporation that operates and maintains Hudson River Park,
where the Heliport is located.  Defendant Air Pegasus Heliport,
Inc. ("Air Pegasus") is the sole and exclusive fixed base operator
of the Heliport pursuant to a March 25, 1996 agreement between Air
Pegasus and HRPT ("the Agreement").  Defendant Air Pegasus of New
York, Inc. ("APNY") is a company that is connected to Air Pegasus.
Defendant Liberty Helicopters, Inc. (N.Y.)("Liberty") provides
helicopter tours and charters at the Heliport.

    Under the Agreement, Air Pegasus may collect fees and charges
for the use of the Heliport and must pay to HRPT a certain
percentage of its gross receipts.  In this action, Freefall alleges
that Air Pegasus, APNY and Liberty are engaged in a continuing
scheme to defraud HRPT of revenues generated at the West 30th Street
Heliport in Manhattan.  Freefall maintains that through a series of

side agreements, some of which were purportedly hidden form HRPT,
the corporate defendants have enabled Air Pegasus to divert funds
from HRPT.    Freefall contends that despite learning about the
allegedly fraudulent scheme, HRPT has allowed Air Pegasus to
continue to operate the Heliport.

In the first cause of action, brought under Article 7-A of the
State Finance Law, Freefall contends that HRPT's inaction has
caused the wrongful expenditure, misappropriation and waste of
state funds and property.[1] The second cause of action alleges that
Air Pegasus, APNY and Liberty have violated General Business Law §
349.    In the third cause of action, Freefall contends that the
corporate defendants' side agreements have resulted in Freefall's
being charged excessive rates for using the Heliport.    The fourth
cause of action alleges that Air Pegasus has improperly charged
security fees but has not used the funds collected for security
purposes.

In this motion, Freefall seeks a preliminary injunction
enjoining defendants from continuing to operate pursuant to the
various agreements and from diverting funds from HRPT.    It is well-
settled that in order to obtain preliminary injunctive relief, the
movant must show that it would be irreparably harmed if the
injunction is not granted.    Here, Freefall's motion does not

---

[1] Although the complaint does not explicitly refer to Article
7-A of the State Finance Law, it is clear from the parties' papers
that the first cause of action is brought pursuant to this law.

2

contain any showing whatsoever that it would suffer irreparable harm. Indeed, those words are not even mentioned in the motion papers. Thus, the motion for a preliminary injunction must be denied. *See Matter of Schapira v. Grunberg*, 30 A.D.3d 345 (1st Dept. 2006)(since the petitioners made no showing of irreparable harm, there was no basis for issuing an injunction). In addition, the motion should be denied because Freefall does not ask to maintain the *status quo*, but rather seeks the ultimate relief in this action. *Putter v. City of New York*, 27 A.D.3d 250 (1st Dept. 2006)(injunction denied where "[p]laintiffs clearly did not seek to maintain the *status quo*, but rather sought the ultimate relief in their action").

HRPT's cross-motion to dismiss the action against it is granted. The only claim in the complaint pled against HRPT is the first cause of action under Article 7-A of the State Finance Law. However, the Appellate Division, First Department has held that an action under Article 7-A may not be maintained against a public benefit corporation. In *Madison Square Garden v. New York Metropolitan Transit Authority*, 19 A.D.3d 284, 286 (1st Dept. 2005), the Court concluded that the petitioners could not sue the Metropolitan Transit Authority, a public benefit corporation, "because the MTA is separate from the State". Because HRPT is a public benefit corporation distinct from the State, Freefall cannot maintain an Article 7-A action against it. Thus, HRPT's cross-motion to dismiss the complaint is granted. As a result,

3

Freefall's motion for a preliminary injunction under the State Finance Law is moot. Accordingly, it is

ORDERED that Freefall's motion for a preliminary injunction is denied; and it is further

ORDERED that HRPT's cross-motion to dismiss the complaint is granted and the Clerk shall enter judgment accordingly; and it is further

ORDERED that the remaining parties are directed to appear for a preliminary conference in Part 24 on January 3, 2007 at 10:00 a.m.

This constitutes the decision and order of the Court.

November 17, 2006

Justice Rosalyn Richter

4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X

PIER 59 STUDIOS, L.P.,

               Plaintiff,

      -against-

HUDSON RIVER PARK TRUST, NEW YORK STATE
DEPARTMENT OF TRANSPORTATION, THOMAS J.
MADISON, JR., NEW YORK STATE OFFICE OF
PARKS, RECREATION AND HISTORIC
PRESERVATION, BERNADETTE CASTRO, NEW
YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION, DENISE M.
SHEEHAN, CHARLES DORKEY, III, DANIEL L.
DOCTOROFF, THEODORE ROOSEVELT, IV,
JOSEPH B. ROSE, HENRY J. STERN, GEORGETTE
MOSBACHER, JULIE NADEL, and ADRIAN
BENEPE,

                   Defendants.
------------------------------------------------------------------X

HUDSON RIVER PARK TRUST,

               Third-Party Plaintiff,

      -against-

CHELSEA PIERS, L.P.,

               Third-Party Defendant.
------------------------------------------------------------------X

**DECISION & ORDER**

Index No. 107837/06

FILED

APR 23 2007

NEW YORK
COUNTY CLERK'S OFFICE

Third-Party Index No. 590883/06

SHIRLEY WERNER KORNREICH, J.

     Motion sequences 2, 3 and 4 are hereby consolidated for disposition.

I.    *Motions before the Court*

     This action involves plaintiff's claims that defendants failed to maintain the piers

underlying the premises plaintiff sublets and violated State Finance Law §123-b.  Defendants

Hudson River Park Trust ("Trust"), and the members of its board of directors ("Board")[1] now move in motion sequence 3 for summary judgment dismissing the complaint for: (1) failure to state a cause of action; and 2) failure to comply and to allege compliance with the notice of claim procedure prescribed by §11 of the Hudson River Park Trust Act ("Act"). The Trust and the Board move in motion sequence 4 to serve a second amended answer, adding a statute of limitations defense to plaintiff's third cause of action, and for summary judgment on the proposed defense. In motion sequence 2, the New York State Office of Parks, Recreation and Historic Preservation ("State Parks"), State Parks Commissioner Bernadette Castro, the New York State Department of Environmental Conservation ("DEC"), DEC Commissioner Denise M. Sheehan, the New York State Department of Transportation ("DOT") and DOT Commissioner Thomas J. Madison, Jr. (collectively "State defendants"), move to dismiss the complaint on the following grounds: improper joinder of the State, failure to join a necessary party, statute of limitations, equitable estoppel, laches, and failure to state a cause of action under the State Finance Law.[2]

II.     *Factual Background*

  A. *Facts*

   The Act became effective on September 8, 1998.[3]  In June 1994, prior to passage of the

---

[1] The Trust's Board ("Board") is composed of the individual defendants, Bernadette Castro, Denise Sheehan, Charles Dorkey II, Daniel L. Doctoroff, Theodore Roosevelt IV, Joseph B. Rose, Henry J. Stern, Georgette Mosbacher, Julie Nadel, Lawrence B. Goldberg, Franz Leichter and Adrien Benepe (collectively "Board Members").

[2] In its reply memorandum of law, the State defendants withdrew the branch of their motion based on lack of personal jurisdiction. Bernadette Castro and Denise Sheehan join in the State's motion in their capacities as State Commissioners.

[3] 1998 Session Laws of N.Y. Ch. 592.

Act, Chelsea Piers, L.P. ("Chelsea Piers") leased piers 59, 60, 61 and 62 from the DOT ("Prime Lease"). It is undisputed that the Prime Lease obligates Chelsea Piers to maintain the piers. In October 1994, also prior to the Act, Chelsea Piers subleased portions of pier 59 to plaintiff, Pier 59 Studios, L.P. ("Pier 59" or "plaintiff")("Sublease"). The Sublease has been amended by several written agreements, which added additional space to Pier 59's Sublease, including the first floor and a corridor on pier 59 and Room 203 at pier 62 ("Premises"). The complaint alleges that Pier 59 has invested over $20,000,000.00 to create a "premier fashion and photography studio that includes a dining facility."

This is the fourth related action that has been brought before this court. The initial action relating to alleged overcharges paid by Pier 59 to Chelsea Piers, Index No. 601211/04 (the "Initial Action"), also involves claims alleging damages to the Premises and failure to maintain pier 59. In the Initial Action, on June 16, 2005, this court granted a motion on consent of all parties dismissing Pier 59's complaint against the State and DOT. The order stated that "[a]ll parties agree that the overlandlord is the Hudson River Park Trust." However, the cause of action dismissed sought a declaratory judgment declaring that DOT had no right to construction performed by Pier 59. It did not involve the claims made against DOT in this action. Discovery is complete in the Initial Action and summary judgment motions are pending.

The Act defines Hudson River Park as the park land bordering the Hudson River between Battery Park and 59th Street in Manhattan ("Park"). Section 3(a) of the Act provides that fee title to the land in the Park held by the State prior to the Act shall remain with the State, but upon the Act's effective date, authority over the State's land in the Park other than underwater lands shall be exercised by State Parks, while authority over the State's underwater lands in the Park shall be exercised by DEC. Section 3(b) of the Act directs the State and New York City ("City")

3

to expeditiously enter into agreements with the Trust granting it a possessory interest in the Park. The parties agree that pursuant to §3(b) of the Act, DEC and State Parks conveyed a 99-year lease of the Park to the Trust. Section 5 of the Act provides that the Trust is a public benefit corporation.

The Act's stated purpose is to authorize the Trust to "design, develop, operate and maintain" the Park, using revenues generated within the Park, financing from the City and State "as necessary," and "available federal funds." The Act declares that among the purposes to be served by the legislation is the planning and developing of the Park consistent with encouraging "park uses," allowing "limited park/commercial uses," "promoting and expanding public access to the Hudson River," encouraging "water-based recreation, " boosting tourism, and providing for the "health, safety and welfare of the public" using the Park's facilities. Pier 59's Sublease is apparently mentioned in §3(g)((iv) of the Act, which authorizes "studio facilities" on pier 59.

The Act further provides as follows:

> The trust shall have the rights, powers, responsibilities and duties set forth in this act, subject to the limitations set forth herein and it shall replace the New York state department of transportation and the New York state urban development corporation, and the wholly owned subsidiary of said corporation, known as the Hudson river park conservancy, in their authority over the planning, design, construction, operation and maintenance of the park. Upon coming into existence of the trust, ... the New York state urban development corporation, the Hudson river park conservancy and the New York state department of transportation shall have no further responsibility for or authority over the park, and the Hudson River Park conservancy shall be dissolved. Upon the coming into existence of the trust, the trust shall succeed to all contracts, leases, licenses and other legal obligations respecting the park to which its predecessors are party at or after the effective date of the act....

Act, §5.

Among the specifically enumerated powers of the Trust, are: the rights to plan, develop, construct, operate and maintain the Park; to enter into contracts, including customary trade

4

credits; to conduct meetings and hearings; to procure insurance; to prepare and approve an annual budget for its operations; to develop a financing plan; to work with the City and State to develop programming for recreational and revenue-producing uses of the Park; to bring or defend actions; to grant leases, licenses and concessions for periods of less than thirty years; to adopt and amend rules, regulations and orders; and to appoint officers, employees and consultants. Significantly, the Trust has the power to "receive rents. . . generated within the park," and the Act grants the Trust "exclusive title to all rents ... paid to it pursuant to any lease...."

On October 15, 2003, Chelsea Piers and the Trust executed a letter agreement,[4] in which the Trust agreed to provide Chelsea Piers with an annual rent credit of up to $500,000.00 per year for five years ("Rent Credit") for "costs incurred in connection with undertaking the needed pier repair and replacement work identified by HPA," the Trust's engineering consultant. The Rent Credit agreement requires Chelsea Piers to submit plans and specifications for the work and to document its expenditures in order to receive the Rent Credit. The record is silent as to the Trust's reason for authorizing a $2,500,000.00 Rent Credit for pier repairs that the Trust insists are Chelsea Piers' obligation under the Prime Lease.

B.    *Complaint*

The instant complaint contains three causes of action:  private nuisance (1st cause of action); public nuisance (2nd cause of action); and violation of the State Finance Law §123-b (3rd cause of action). The nuisance causes of action are predicated on alleged damages to the Premises, described in the complaint as "cracks in the concrete floors..., roof leaks in the ceilings

---

[4] *See* Supplemental Affirmation of Brian P. Gallagher, dated November 20, 2006, Ex. A.

and warping of steel beams and other damages" caused by "the severely degraded state of the wooden pylon foundations, cement supporting joists beneath Pier No. 59 and decaying and rotten structural steel beams supporting the over-structures." The complaint asserts that these conditions are dangerous, require immediate maintenance, repair and/or replacement, that Pier 59 has suffered an interference with use and enjoyment of the Premises and diminution in its value, that the conditions have "continuously worsened to date" and that there is "an imminent and substantial danger that the Studio will be further and irreparably damaged." Pier 59 alleges that its personnel, employees, clients, guests, invitees and members of the public frequent the Park in the vicinity of pier 59 and that there is an imminent and substantial danger that pier 59 will collapse. Paragraph 45 of the complaint alleges that defendants "have failed to cause to be performed the necessary and required maintenance, repair and replacement of the substructure and superstructure of Pier No. 59...."

C.    *Summary Judgment*

In support of their motion for summary judgment, defendants have not submitted any proof regarding the condition of pier 59 or its maintenance. There is no affidavit, deposition testimony, or expert report to contradict Pier 59's allegations of the existence of dangerous conditions.

Pier 59, in response, has submitted an affidavit by its principal, Federico Pignatelli, in which he verifies the allegations of the complaint, adding that Pier 59 has 18 years left under the Sublease, that it has invested $20,000,000.00 in the Premises, that it employs over 100 people and allows hundreds more to work at the Premises, that Pier 59's investment is in jeopardy due to the failure to maintain pier 59 and that "if the pier structures continue to degrade at the rate that they have over the last years, a tragic event could occur...."

6

Pier 59's opposition papers also include an affidavit, sworn to on February 15, 2006, by David R. Robinson, a civil engineer employed by Ocean and Coastal Consultants Engineering, P.C., who states that he started evaluating the conditions of pier 59 in 1989. Mr. Robinson avers that pier 59 has needed repairs since 1999, the year after the Act became effective. He does not specify what those repairs are or whether they are likely to cause the collapse of the pier. In two letters, dated September 29, 2004 and May 3, 2005, attached to his affidavit, Mr. Robinson states that his company made investigations of pier 59, but could not correlate the deficiencies in the substructure of pier 59 with the cracks in the concrete floor of the Premises. In the earlier letter, Mr. Robinson opines that it appeared that few repairs had been made since 1991, when Goodkind and O'Dea prepared a report suggesting that there were deficiencies in the substructure, which, if they had not been repaired, would cause concern. The second letter states that cracks had worsened between September 29, 2004 and May 3, 2005. Mr. Robinson's affidavit also lists certain areas of pier 59 that he identifies as meriting immediate reinspection and evaluation.

### 1. First and Second Causes of Action for Private and Public Nuisance

The elements of a private nuisance are an invasion of an interest in the private use and enjoyment of land that is intentional and unreasonable, negligent or reckless, or actionable under rules governing liability for abnormally dangerous conditions or activities. *Copart Industries, Inc. v. Consolidated Edison Co. of N.Y.*, 41 N.Y.2d 564 (1977). A nuisance may be either intentional, reckless or negligent because the term describes the consequences of the conduct and the inconvenience to others, rather than a specific sort of actionable conduct. *Id.* at 569. A nuisance is intentional when the actor acts for the purpose of causing an invasion of the use and enjoyment of another's land, or knows that it is resulting or is substantially certain to result from

7

his conduct. *Id.* at 571.

The difference between a public and a private nuisance is that a public nuisance is an offense against the state, which offends public morals, interferes with use by the public of a public place or endangers or injures the property, health, safety or comfort of a considerable number of persons. *Id.* at 567-568. A public nuisance is subject to prosecution by the government and may be brought by an individual only where an individual suffers special damages not suffered by the general public. *Id.* at 568.

The court disagrees with movants' contentions that Pier 59 failed to allege a substantial interference with the use of its property because it has not suffered an interruption of its business, or that Pier 59 has not alleged physical damages. The complaint alleges that there are some physical damages and a danger that pier 59, in which plaintiff has invested $20,000,000.00, might collapse. The law of nuisance does not require Pier 59 to wait until the pier collapses to bring suit. Rather, a cause of action for nuisance will lie where it is alleged that the damage is substantially certain to result from a defendant's conduct. *Id.* at 571.

Similarly, the complaint alleges facts supporting a claim for a public nuisance. The complaint, as well as the affidavit submitted by Mr. Pignatelli, allege that pier 59 is used by a considerable number of persons, including a bar and restaurant and a Golf Club on the first floor, as well as Pier 59's clients, guests and invitees. And, the Act makes clear that public use of the Park, which includes the Premises, is to be encouraged and promoted by the Trust. Pier 59 contends that its Premises have been physically damaged, a special damage not suffered by the general public.

On a motion for summary judgment, the burden is upon the moving party to make a *prima facie* showing of entitlement to summary judgment as a matter of law. *Zuckerman v. City*

8

*of New York*, 49 N.Y.2d 557, 562 (1980); *Friends of Animals, Inc. v. Associated Fur Mfrs., Inc.*,

46 N.Y.2d 1065, 1067 (1979). A failure to make such a *prima facie* showing requires a denial of

the summary judgment motion, regardless of the sufficiency of the opposing papers. *Ayotte v*

*Gervasio*, 81 N.Y.2d 1062, 1063 (1993).

The allegations of public use, physical damage to the Premises, and potential substantial

damages to the Premises, are sufficient to make out claims for public and private nuisance. *See*

*Copart, supra*. The court rejects the Trust's argument that it has no responsibility to maintain the

piers as a matter of law. Moreover, the Trust's failure to present any proof regarding the

condition of Pier 59's Premises mandates denial of the motion for summary judgment. The Trust

is obligated by law to maintain the Park. It cannot escape liability for a nuisance, if it exists,

simply because it has delegated the responsibility to Chelsea Piers. In *Putnam v. Stout*, 38

N.Y.2d 607, 617-618 (1976), the Court of Appeals listed various factors that underlie the

responsibility of a lessor who covenants to make repairs:

> First, the lessor has agreed, for a consideration, to keep the premises in repair;
> secondly, the likelihood that the landlord's promise to make repairs will induce
> the tenant to forego repair efforts which he otherwise might have made; thirdly,
> the lessor retains a reversionary interest in the land and by his contract may be
> regarded as retaining and assuming the responsibility of keeping his premises in
> safe condition; finally, various social policy factors must be considered: (a) tenants
> may often be financially unable to make repairs; (b) their possession is for a limited
> term and thus the incentive to make repairs is significantly less than that of a landlord;
> and (c) in return for his pecuniary benefit from the relationship, the landlord could
> properly be expected to assume certain obligations with respect to the safety of the
> others.

In this case, the Trust is required by the Act to maintain the Park for the benefit and

protection of the public, a more compelling incentive than rent or profit. The fact that Chelsea

Piers also is required to maintain the Premises does not mean that the Trust lacks control.

Indeed, the record is barren of evidence that the Trust lacks such control. The affidavit of the

Board's President, Connie Fishman, which states that none of the Board Members "have any direct responsibility or participation in the day-to-day operations of the Trust, let alone maintenance of the piers," does not negate the Trust's statutory duty for maintenance and protection of the public. The Trust's claim that it delegated its responsibility to Chelsea Piers can be tested in the third-party action.

On the other hand, Pier 59 has not stated a claim against the Board Members. "[I]ndividual directors and officers may not be subject to liability absent the allegation that they committed separate tortious acts." *DeCastro v. Bhokari*, 201 A.D.2d 382, 383 (1st Dept. 1994); *Mendez v. City of New York*, 259 A.D.2d 441 (1st Dept. 1999); *Konrad v. 136 E. 64th St. Corp.*, 246 A.D.2d 324, 326 (1st Dept. 1998). In this case, other than conclusory allegations that the Board Members acted for improper personal and political motives, on which the complaint does not elaborate, there are no contentions that they engaged in conduct, tortious or otherwise. The only allegations that mention the Board Members by name are the allegations that they are Members of the Board. As a result, the complaint must be dismissed against the Board Members for failure to state a cause of action.

The State defendants also claim that they cannot be held responsible for the alleged nuisance as they are out of possession and control of the Premises. A landowner who has leased his property may be liable for injuries on the basis of a contract or covenant to keep the premises in repair. *Putnam, supra* at 618. However, "[t]he owner of land ceases to be liable in negligence for a dangerous condition when the ownership of the premises or possession and control pass to another before the injury is sustained." *New York Telephone Co. v. Mobil Oil Corp.*, 99 A.D.2d 185, 187 (1st Dept. 1984).

The Act clearly provides that upon its enactment, the DOT "shall have no further

10

responsibility for or authority over the park." This absolves the DOT and its commissioner, Thomas J. Madison, Jr., of any liability to maintain Pier 59's Premises. In addition, pursuant to the Act, State Parks and DEC, who still own the fee to part of the Park, leased their interests to the Trust for 99 years. The lease requires the Trust to maintain the Park. Therefore, State Parks and DEC are out of possession and control of the Premises, as well.

Swords v. Edgar, 59 N.Y. 28 (1874), cited by Pier 59, has been highly criticized. Moreover, it is distinguishable because there the timbers of the pier were rotten and unsafe before the lease was executed. There is no allegation here that pier 59 was unsafe at the time of the Act, or that its current alleged deficiencies began before the Trust took over maintenance of the Park. Mr. Robinson's affidavit and letters speculate but do not create an issue of fact as to whether the problems of which Pier 59 now complains predated the Trust's 99-year lease or the Act. Consequently, the second and third causes of action are dismissed against DOT, its Commissioner Thomas J. Madison, Jr., State Parks, its Commissioner Bernadette Castro, DEC and its Commissioner Denise M. Sheehan and the Board Members.

   2.    *Third Cause of Action under State Finance Law §123-b & Motion to Amend*

State Finance Law ("SFL") §123-b(1) provides that:

> any person, who is a citizen taxpayer, whether or not such person is or may be affected or specially aggrieved by the activity herein referred to, may maintain an action for equitable or declaratory relief, or both, against an officer or employee of the state who in the course of his or her duties has caused, is now causing, or is about to cause a wrongful expenditure, misappropriation, misapplication, or any other illegal or unconstitutional disbursement of state funds or state property, except that the provisions of this subdivision shall not apply to the authorization, sale, execution or delivery of a bond issue or notes issued in anticipation thereof by the state or any agency, instrumentality or subdivision thereof or by any public corporation or public benefit corporation.

Although Section 123-b does not prohibit any acts, it confers standing on taxpayers to

11

challenge contravention of a rule of law enunciated elsewhere. *Matter of Sierra Club v. Palisades Interstate Park Commission*, 99 A.D.2d 548 (2d Dept.), *lv. denied* 63 N.Y.2d 604 (1984). Thus, Pier 59 claims that the Rent Credit is illegal because it violates §7(h)(2) of the Act. That section states that the "trust shall not provide direct financial assistance to attract, expand or retain a business within the park." Further, Pier 59 alleges that the Rent Credit violates the State Constitution, Art VII, § 7, which provides that no money shall be paid out of the state treasury or any of its funds, or any of the funds under its management, "except in pursuance of an appropriation by law...."

The Trust and Board contend that section 123-b is inapplicable to them, as the Trust is not the State or a State agency and the Board Members are not officers or employees of the State or a State agency. All defendants urge that the Rent Credit does not involve specifically identified State funds. The State defendants also argue that the statute only applies to fiscal activities of the State, which are not implicated in its decision not to interfere with the maintenance of the Premises or the Rent Credit.

The court agrees that State Finance Law §123-b does not apply to the Trust, as it is a public benefit corporation and its funds are not state funds. General Construction Law §66(4) defines a public benefit corporation as "a corporation organized to construct or operate a public improvement wholly or partly within the state, the profits from which inure to the benefit of this or other states, or to the people thereof." Public benefit corporations are "not identical to the State or any of its agencies, but rather enjoy ... an existence separate and apart from the State, its agencies and political subdivisions." *John Grace & Co., Inc. v. State University Construction Fund*, 44 N.Y.2d 84 (1978). *Accord Matter of Lancaster Development, Inc. v. Power Authority*, 145 A.D.2d 806 (3d Dept. 1988); *Kadish v. Roosevelt Raceway Assoc.*, 183 A.D.2d 874 (2d

12

Dept. 1992). *See also Matter of Madison Square Garden v. New York M.T.A.*, 19 A.D.3d 284 (1st Dept. 2005) (public authority cannot be sued under §123-b because it is separate from State).

However, the court recognizes, as Pier 59 argues, that *John Grace & Co., Inc., supra,* mandates a particularized inquiry to determine whether a specific public benefit corporation is merely an alter ego of the State. An examination of the features of the Act leads to the conclusion that the Trust is in fact separate from the State. Even though the Act provides for audit oversight by the State and City comptroller and prohibits Trust alienation of the Park, it has significant autonomy in its activities. The Trust's powers are broad, with the exception of the right to alienate park land, incur debt and own real property.[5]

Additionally, under rules of statutory construction, the subjection of the Trust to some parts of the State Finance Law (separate bidding for contracts for plumbing, HVAC and electrical work, and limits on the types of investment vehicles the Trust may utilize), without reference to §123-b, compels a conclusive inference that the Legislature intended to exclude the Trust from the application of §123-b. *Golden v. Koch*, 49 N.Y.2d 690, 694 (1980) (where statute describes particular situations in which it applies, irrefutable inference must be drawn that what is omitted was intended to be omitted or excluded), *citing* McKinney's Cons Laws of NY, Book 1, Statutes, §240.

Finally, the Rent Credit is not identifiable State funds. The Act provides that the Trust

---

[5]  In *John Grace & Co., id.*, where the purpose of the public benefit corporation, the State University Construction Fund, was construction, its construction contracts had to be approved by the State comptroller, which was a significant interference with its major function. Yet the Court of Appeals held that the public benefit corporation was autonomous enough to be shielded from §123-b.

13

has exclusive title to all rents paid to it under any lease. Accordingly, the rents it receives (or does not receive) do not belong to the State. Pier 59's argument that there is no other way to challenge the Rent Credit is not availing. In *Matter of Post Corp. v. Robert Moses*, 10 N.Y.2d 199, 204-205 (1961), the Court of Appeals rejected a similar taxpayer's argument on the ground that the Triborough Bridge and Tunnel Authority had to report and was subject to investigation by the City and State comptrollers, the Mayor of the City, and the chairmen of the State Senate finance committee and the Assembly ways and means committee. Likewise, the Trust is required to submit an annual financing plan to the Governor, the speaker of the Assembly, the temporary president of the Senate, the State comptroller, the Mayor of the City, the speaker of the City Council, the City comptroller, and three City community boards. As in *Matter of Post Corp.*, there is financial oversight over the Trust. Accordingly, the third cause of action is dismissed against all defendants for failure to state a cause of action and the motion by the Trust and Board to amend their answer to assert a statute of limitations defense to the third cause of action is denied as moot.

### D.   Notice of Claim and Statute of Limitations

Section 11 of the Act provides that:

In an action against the trust founded upon a tort, (a) a notice of claim shall be required as a condition precedent to the commencement of an action or special proceeding against the trust or any officer, appointee or employee thereof, and the provisions of section 50-e of the general municipal law shall govern the giving of such notice and (b) the complaint shall contain an allegation that at least 30 days have elapsed since the demand, claim or claims upon which the action is founded were presented to a member of the trust's board of directors and to the trust's secretary and that the trust has neglected or refused to make an adjustment or payment thereof for 30 days after such presentment. No action shall be commenced more than one year after the cause of action therefor shall have accrued....

Pier 59 did not serve a notice of claim on the Trust and the complaint does not state that

14

30 days have elapsed since such notice was presented. In addition, more than a year has elapsed since Pier 59's claims accrued. Nonetheless, this action need not be dismissed.

It is well settled that in an action for injunctive relief, compliance with the provisions of §50-e are excused. *Stanton v. Town of Southold*, 266 A.D.2d 277, 278 (2d Dept. 1999); *Baumler v. Town of Newstead*, 198 A.D.2d 777 (4th Dept. 1993); *Dutcher v. Shandaken*, 97 A.D.2d 922, 923 (3d Dept. 1983) (injunctive relief to abate flooding nuisance). The reference in §11 to a 30 day period for the Trust to "make an adjustment or payment" supports the view that the condition precedent applies to actions for money damages and not injunctive relief. Pier 59's complaint only prays for injunctive relief.

Moreover, an equitable claim for continuing nuisance "accrues anew every day." *Stanton, id.*; *Condello v. Town of Irondequoit*, 262 A.D.2d 940, 941 (4th Dept. 1999)(rejecting application of General Municipal Law §§ 50-e and 50-i to continuing torts); *State v. Schenectady Chemicals, Inc.*, 103 A.D.2d 33, 37 (3d Dept. 1984)("nuisance action continually accrues each day of the wrong"). Accordingly, the Trust's motion to dismiss the first and second causes of action based upon the provisions of §11 of the Act is denied.

The remaining contentions of the parties have been considered and have been found to be without merit. Accordingly it is

ORDERED that the motion to dismiss by defendants New York State Department of Transportation, Commissioner Thomas J. Madison, Jr., New York State Office of Parks, Recreation and Historic Preservation, Commissioner Bernadette Castro, New York State Department of Environmental Conservation, and Commissioner Denise M. Sheehan is granted and the complaint is dismissed with prejudice as against said defendants; and it is further

ORDERED that the motion for summary judgment dismissing the complaint by Hudson

15

River Park Trust, Bernadette Castro, Denise M. Sheehan, Charles Dorkey, III, Daniel

L. Doctoroff, Theodore Roosevelt IV, Joseph B. Rose, Henry J. Stem, Georgette Mosbacher,

Julie Nadel, Lawrence B. Goldberg, Franz Leichter and Adrian Benepe is granted with respect to

the third cause of action against Hudson River Park Trust, denied with respect to the first and

second causes of action against Hudson River Park Trust, and is granted in full with respect to

the individual movants; and it is further

ORDERED that the motion by Hudson River Park Trust and its Board Members to

amend its answer is denied as moot; and it is further

ORDERED that the Clerk is directed to enter judgment accordingly and to sever the

remainder of the action, which shall continue.

Dated: April 12, 2007                    ENTER:

J.S.C.

FILED

APR 23 2007

NEW YORK
COUNTY CLERKS OFFICE

16

Tom, J.P., Friedman, Sullivan, Buckley, Kavanagh, JJ.

1063        Sightseeing Tours of America,              Index 107779/06
                 Inc., et al.,
                    Petitioners-Appellants,

            Helicopter Flight Services, Inc.,
                    Intervenor-Petitioner-Appellant,

                    -against-

            Air Pegasus Heliport, Inc., et al.,
                    Respondents-Respondents.

————————————

Robertson, Freilich, Bruno & Cohen, L.L.C., Newark, NJ (Jennifer
A. Leighton of counsel), for Sightseeing Tours of America, Inc.
and Liberty Helicopters, Inc., appellants.

Law Offices of Paul A. Lange, LLC, Stratford, CT (Paul A. Lange
of counsel), for Helicopter Flight Services, Inc., appellant.

Leon Friedman, New York, for Air Pegasus Heliport, Inc.,
respondent.

Konner Teitelbaum & Gallagher, New York (Michael A. Gould of
counsel), for Hudson River Park Trust, respondent.

————————————

        Order, Supreme Court, New York County (Rosalyn Richter, J.),

entered November 21, 2006, which, in a proceeding by petitioners

helicopter tour operators to compel respondent Hudson River Park

Trust (the Trust) to, inter alia, investigate and enjoin

respondent heliport concessionaire Air Pegasus Heliport, Inc.

(APH) from imposing higher fees for petitioners' use of the

heliport, granted the Trust's and APH's motions to dismiss the

petition, unanimously affirmed, without costs.

        The Hudson River Park Act (L 1998, ch 592 [S 7845]) (the

Act), created the Trust, a public benefit corporation to, inter

                              81

alia, "encourage, promote and expand public access to the Hudson
river, promote water-based recreation, and enhance the natural,
cultural, and historic aspects of the Hudson river" (§ 2[b]),
"plan, design, develop, construct, operate and maintain the park"
(§ 6[a]), and "provide for the health, safety and welfare of the
public using [the park's] facilities" (§ 7[1][b]).  Since the
public does not have any protected interest in helicopter
sightseeing at given rates, and since the protection of
petitioners' pecuniary interests is not encompassed by any of the
Act's purposes, petitioners lack standing to compel the Trust's
performance of its asserted duty under the Act to investigate and
approve the subject fee increase (see Matter of Transactive Corp.
v New York State Dept. of Social Servs., 92 NY2d 579, 587 [1998];
see also New York State Assn. of Criminal Defense Lawyers v Kaye,
269 AD2d 14, 16-17 [2000], affd on other grounds 96 NY2d 512
[2001]; Hunts Point Term. Prod. Coop. Assn., Inc. v New York City
Economic Dev. Corp., 36 AD3d 234, 245-246 [2006], lv denied
[2007]), where, as discussed below, they do not claim that the
fee increases are discriminatory.

In any event, assuming standing, the petition, which sounds
in mandamus to compel, was correctly dismissed absent any
reference to any statute, rule, regulation or case law requiring
the Trust to conduct an investigation of APH's pricing practices

82

at the request of an interested party (*see Iocovello v City of New York*, 272 AD2d 201 [2000], *lv dismissed* 95 NY2d 879 [2000] [decision not to conduct an investigation a matter of discretion for which mandamus to compel does not lie]), or other showing of a clear legal right to the relief sought (*see Matter of Council of City of N.Y. v Bloomberg*, 6 NY3d 380, 388 [2006]). We reject petitioners' argument that a duty to investigate and approve is inherent in the Trust's statutory duty to maintain the park and the public trust. Again, the public has no inherent right to helicopter services at a given rate, and the increase affects not the public trust or health, welfare and safety, but only petitioners' economic interests. Nor does it avail petitioners that the Trust might possess a right under the permit governing its relationship with APH to veto fees that are not "fair, reasonable and nondiscriminatory," where the permit expressly prohibits a nonparty from asserting any right or remedy thereunder. Finally, there is no merit to petitioners' claim that the Trust arbitrarily reversed its position regarding review and oversight of APH's fee schedule. Documentary evidence demonstrates that the Trust has always maintained that APH's permit does not give the Trust approval rights over the proposed rate increases, which were contemplated by all relevant contracts, except to insure that rates are nondiscriminatory,

i.e., applied equally to all users.  It appears that the Trust

did in fact determine that the subject rate increase is

nondiscriminatory.

THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

ENTERED:  MAY 15, 2007

*Catherine O'Hagan Wolfe*

CLERK

84