# EXHIBIT A

Hudson River Park Trust

Report on Schedule of Fees and Charges

of

Air Pegasus Heliport, Inc.

Permit No. XW507

For the period April 1, 2001 to March 31, 2005

Report of Debra A. Cutler, CPA, CFE

October 31, 2006

.

.

# Table of Contents

INTRODUCTION ........................................................................................................................1

SCOPE OF ENGAGEMENT .....................................................................................................3

FINDINGS ...................................................................................................................................3

WORK PERFORMED ...............................................................................................................5

A. PERCENTAGE FEE ............................................................................................................7
   *1. APH Gross Receipts ("Cash Basis")*...............................................................................7
   *2. APH Earned Revenue ("Accrual Basis")* ........................................................................8
   *3. Customer Billing*............................................................................................................9
   *4. Amounts billed to Liberty*............................................................................................10
   *5. Aviation Fuel*...............................................................................................................11
   *6. Analytical Review of Amounts Due to the Trust* ...........................................................13
B. USE CHARGES–HELICOPTER FLIGHT SERVICES AND NEW YORK HELICOPTER .......................14
C. UNREPORTED PERCENTAGE FEES RELATING TO CONSULTANT AGREEMENT AND ARBITRATOR
DETERMINATION .................................................................................................................16
D. RELATED PARTIES ...........................................................................................................17
E. ACCOUNTING AND COMPUTER DEFICIENCIES .........................................................................19
F. VENDING MACHINES .........................................................................................................19
G. SELECTED CUSTOMERS .....................................................................................................20
H. SALES AND FUEL TAX ......................................................................................................22
   *1. Sales tax collected from APH customers* .....................................................................23
   *2. Other fuel taxes paid by APH to the fuel vendor* .........................................................23
I. PROCEDURES PERFORMED AT LIBERTY ..............................................................................23
   *1. Use Charge* ..................................................................................................................24
   *2. Consulting Agreement Payments*..................................................................................25
   *3. Fuel Surcharge*............................................................................................................25
J. PERMIT FEE......................................................................................................................25

OPEN ITEM ...............................................................................................................................26

EXHIBITS:

    I.   SUMMARY OF APH MONTHLY FEES AND CHARGES/NUMBER OF OPERATIONS

    II.   SUMMARY OF REVENUE EARNED

    III.   CUSTOMER RECEIPTS REPORTED TO THE TRUST

    IV.   CUSTOMER DISCOUNTS (2002 – 2005)

    V.   INFORMATION PROVIDED

## Introduction

Air Pegasus Heliport, Inc., ("APH")[1] operates the West 30th Street Heliport (the "Heliport") in New York City pursuant to a Permit[2] with Hudson River Park Trust (the "Trust"). The Permit provides the Operator certain usage and operation rights including a landing, parking and storage area for owned, public and sightseeing aircrafts and the storage and sale of aviation fuel.

Under the terms of the Permit, fees and charges payable to the Trust are subject to three separate monthly calculations as follows: (i) a basic monthly permit fee increased by 5% (non compounded) on each annual anniversary of the Commencement Date ("Permit Fee"), (ii) a percentage fee equivalent to a percentage of gross receipts[3] ("Percentage Fee"), and (iii) a use charge computed at the rate of $15.00 per every ten sightseeing passengers, with the number of passengers rounded up to the next higher integral multiple of 10, in connection with approved sightseeing operations ("Use Charge").

Sightseeing operations constitutes a significant portion of the business at the Heliport. In May 1996, APH entered into an agreement ("the Sightseeing Agreement") with Liberty Helicopter Tours, Inc. ("Liberty") which granted Liberty the exclusive right to conduct sightseeing operations from the Heliport and certain related use and occupancy rights in

---

[1] APH (the "Operator") is currently owned by Abigail Trenk and Phyllis Enterprises, LLC. Alvin S. Trenk ("Mr. Trenk"), the Operator's representative, transferred his interest in APH to Phyllis Enterprises during 2001.

[2] Permit No. XW507 (the "Permit") between the New York State Department of Transportation (the "State") and APH, dated March 26, 1996, was subsequently assigned to the Trust.

[3] In determining the Percentage Fees APH pays to the Trust, three tiers of percentages are applied to gross receipts as follows: 10% of APH gross receipts for amounts in excess of $250,000 to and including $1,000,000, 11% for amounts in excess of $1,000,000 to and including $2,000,000, and 12% for all amounts over $2,000,000. Gross receipts are defined in the Permit as all monies paid for services rendered for landing, take-off and parking, "and all monies paid to the Operator for sales made or services rendered at or from the Heliport regardless of when or where the order therefore is received at the Heliport and any other revenues of any type arising out of or in connection with the Operator's operations at the Heliport....." Gross receipts exclude taxes imposed by law which are separately stated to and paid by the customer and directly payable to the taxing authority by the Operator. Gross receipts also exclude "charges for fuel and maintenance services supplied to the Operator's own aircraft or aircraft which the Operator has leased or chartered for personal use (which are not leased or chartered to others)."

connection therewith.[4] Among other things, the Sightseeing Agreement provided for prescribed discounts ("contractual rates") for landing, parking, and fuel, different from the published rates ("Schedule of Charges").[5] The Sightseeing Agreement, which we understand was approved by the State as provided for in the Permit, was to expire under its terms in May 2001 commensurate with the expiration of the initial term of the Permit.[6]

In December 1996, Liberty entered into a consulting agreement (the "Consulting Agreement")[7] with APNY d/b/a Pegasus Aviation,[8] Drew E. Schaefer, Pamela Schaefer and Sightseeing Tours of America, Inc. ("STA").[9] Under the terms of the Consulting Agreement, Liberty paid APNY a 5% share of Liberty's gross revenue attributable to sightseeing at the Heliport and at any heliport within 20 miles of the Heliport. The Consulting Agreement included a restrictive covenant clause whereby, for as long as APH or any of its affiliates shall be the fixed based operator of the Heliport, Liberty and its principals agreed not to acquire or operate a heliport or conduct sightseeing operations within a certain radius of the Heliport. Such Consulting Agreement also provided that a default of the Sightseeing Agreement (between Liberty and APH) would also constitute a default of the Consulting Agreement (between Liberty and APNY). At the same time,

---

[4] Liberty also conducts sightseeing, charter and air taxi helicopter services from two other locations, Wall Street, in downtown Manhattan and Paulus Hook, New Jersey.

[5] In March 2000, Liberty began charging its sightseeing customers a "fuel surcharge" of $2.00 per passenger. Liberty paid Air Pegasus of New York, Inc ("APNY') a 40% commission on the fuel surcharge until November 2004 when APH directed Liberty to pay the fuel surcharge to APH in all future periods. In December 2004, APH paid the Trust its' 12 percent Percentage Fee of $12,268.30 for the fuel surcharge that was allegedly erroneously remitted to APNY.

[6] Prior to and including the period from April 1, 2001, to July 25, 2003, we understand that the Trust was not informed that Liberty was billed at lower rates (what has been described as the "full discount" rate by the arbitrator) than provided for in the Sightseeing Agreement. On July 25, 2003, APH changed its fee structure to Liberty increasing its rates to its current Schedule of Charges ("full retail"). As a result, a fee dispute arose between APH and Liberty. By a Consent Order effective July 25, 2003, Liberty commenced paying full retail rates. In early 2004, an arbitrator was appointed. Liberty informed us they ceased paying full retail rates in June 2004. Subsequently, Liberty paid monthly amounts recommended by the arbitrator which we understand was 50% of the difference between contractual and full discount. In April 2005, the Sightseeing Agreement was modified by an arbitration decision which APH is challenging on appeal. The arbitrator's decision, among other matters, included (i) a modification to the exclusivity clause, (ii) reduction of the 5% rate paid to APNY to 3.5%, (iii) established rates for various future services billed by APH to Liberty, and (iv) settled prior billing disputes regarding overpayment of charges.

[7] We understand that the Trust was not aware of the Consulting Agreement until 2004.

[8] APNY is effectively owned and controlled by Mr. Trenk.

[9] STA is the parent company of Liberty. Mr. Trenk, through an affiliated entity, Trenk Partners, L.P., is a minority shareholder of STA and was its former Chairman and Chief Executive Officer.

APH and Liberty amended the Consulting Agreement[10] to, among other things, extend the term of the sightseeing exclusivity provision to make it commensurate with the automatic monthly renewal term provided for in the Permit ("First Modification Agreement") and add a restrictive covenant clause whereby, for as long as Liberty was paying a 5% share of its gross revenues to APNY pursuant to the Consulting Agreement, APH agreed not to acquire or operate a heliport or to conduct sightseeing business within a certain radius of the Heliport.

## Scope of Engagement

I have been retained by Konner Teitelbaum & Gallagher ("KTG") on behalf of the Trust, pursuant to its rights under the Permit to perform procedures regarding APH books and records for the period commencing April 1, 2001 to March 31, 2005 ("Relevant Period") to evaluate whether APH has reported and remitted its fees and charges in accordance with the terms of the Permit.[11] I, and others working under my supervision, commenced our engagement in April 2005, and shortly thereafter, in May 2005, we were denied access to certain books and records of APH and another entity effectively owned and controlled by Mr. Trenk.[12] We resumed our engagement in July, 2006 at the offices of Meisel, Tuteur & Lewis, P.C. ("MTL"), APH's independent accountants.[13]

## Findings

Based on the work performed, we identified the following items and areas of concern:

- $539,020 of unreported Percentage Fees[14]

---

[10] We understand that the Trust was not aware of the amendments to the Consulting Agreement.

[11] KTG requested that the Relevant Period for the Percentage Fee due on the Trust under the Consulting Agreement commence in January 1996 to January 2006. In addition, the draft report of the Trust's prior accountant dated April 29, 2002 included the two-year period ended March 31, 2001. The Trust fiscal year is March 31.

[12] Under the terms of the Permit, the Trust is permitted access to "any records and books of account of any company which is owned or controlled by the Operator, or which owns or controls the Operator, if said company performs services, similar to those performed by the Operator under the Agreement, anywhere in the Port of New York."

[13] In addition to the Scope of Engagement as described above, I filed an affidavit dated July 27, 2005, relating to our limited access to certain books and records. Subsequent to our retention, litigation has commenced between the Trust and APH.

[14] Amount consists of $462,387 of Percentage Fees relating to payments made to APNY from 1996 through 2005 and $76,633 related to monies being retained by APH as a result of the Liberty arbitration that APH is challenging on appeal.

3

- For the period April 1, 2001 to July 25, 2003 APH invoiced Liberty at full discount rates which are less than the contractual rates in the Sightseeing Agreement. The differential in rates would result in significant Percentage Fees due the Trust.[15]

- Related parties having transactions with APH other than Liberty and APNY. We noted in the course of our engagement, that there were a number of other entities also owned or controlled by Mr. Trenk,[16] in some instances also bearing the name "Pegasus." We were able to conclude, based on information provided by APH, that apart from APNY, such entities do not appear to have conducted operations out of the Heliport that would be subject to the Permit's Percentage Fee provision. However, we could not reach such a conclusion with regard to Air Pegasus Enterprises, Inc.'s operations. We are currently awaiting additional information from Liberty.

- Certain deficiencies in APH's accounting and computer systems

- Discounts are given to certain customers[17]

- For certain months, US Helicopter was charged a flat monthly fee for landing and parking, instead of the rates from the Schedule of Charges

- Argos Capital received certain discounts; however this customer was not included on the Discounted Customer Report ("DCR"). CSC Transport received discounts that were not included on the DCR.

- Monies received from vending machines located at the Heliport are not included in gross receipts reported to the Trust, therefore no Percentage Fees on such receipts are paid to the Trust

- In certain instances, the Liberty aircraft number in the daily flight log did not agree with the aircraft number in the Heliport's ops transaction journal

---

[15] We are not aware of any written agreement between Liberty and APH that supports the full discount rates. We are not aware when this arrangement was effective. In addition, the Trust has informed us that they had no knowledge of this issue prior to the receipt of the Arbitrator's 2005 decision.

[16] Air Pegasus Corporation, Air Pegasus Enterprises, Inc., Air Pegasus Heliport, LLC, Air Pegasus Ventures, Inc., Trenk Enterprises, Inc., Trenk Enterprises, LLC, Trenk Partners, L.P., and Phyllis Enterprises, LLC.

[17] Section 34(b)(3) of the Permit states "except for sightseeing operations which require Department approval pursuant to Section 3, charge fair, reasonable and non-discriminatory prices for each unit of sales or services provided that the Operator may make reasonable and non-discriminatory discounts, rebates or other similar types of price reductions to volume purchasers in connection with the landing, taking off and parking of aircraft." In March 2006, APH responded to the Trust's inquiry regarding customer discounts. APH quantified the discounts for the period 2002-2005 which aggregated approximately $423,000. The Percentage Fee at 12 percent is approximately $51,000. APH has informed us that some of the discounts (totaling approximately $20,000) were approved by the Port Authority of New York and New Jersey prior to the Permit. It is our understanding that the discounts were primarily granted to these customers for a promise of increased volume.

4

- Operations related to aircraft number 691S was listed in the daily flight logs as both Print International and Zip Aviation. The same pilot was listed for all of the operations.

- The APH monthly Deposit Cash Sheet ("DCS") prepared by Ms. Cardinal, CFO do not include all bank deposits

## Work Performed

Our engagement included inspecting the books and/or records of APH, Liberty and other entities controlled or affiliated with Mr. Trenk. We visited the Heliport, APH corporate offices in Bernardsville, New Jersey and Liberty corporate offices in Linden New Jersey, had discussions with Mr. Trenk, Abigail Trenk, Thomas Yessman, accounting personnel at APH and Liberty. We obtained and read APH accountants' audited and review reports and tax returns during the Relevant Period.[18] We also met and had discussions with MTL and had discussions with APH's outside counsel, Christopher Gengaro, Esq. of Lentz & Gengaro ("L&G")

In May 2005, we were provided with APH sales related records and other accounting documents. When we resumed our engagement in July 2006, APH provided us access to its financial statements, general ledgers, tax returns and additional accounting documents. A complete list of documents we had access to is provided in Exhibit V.

APH maintains its books and records under the accrual basis of accounting.[19] The Percentage Fee is calculated using the cash basis of accounting.[20] APH reports to the Trust, on a monthly basis, all of its revenue earned (accrual basis), gross receipts collected (cash basis), number of operations ("Ops"), and sightseeing passenger counts.

We performed the following procedures for the Relevant Period in connection with APH's reporting to the Trust.

---

[18] MTL issued a draft review report for year ended December 31, 2004.

[19] APH fiscal year is December 31.

[20] In a letter dated November 8, 1996 to Mr. Richard Morris at the State, Ms. Cardinal specified that "gross receipts means cash collected. Percentage Fees are based on cash collected monthly (revenue cash actually received.)." In a response to Ms. Cardinal dated December 24, 1996 from Mr. Joseph A. Barnes at the State, he stated "The monthly report will include the amount of the month's cash receipts and the month's sales but it is understood that there is no direct correlation between the two amounts."

5

- Obtained a general understanding of APH's accounting and billing procedures

- Reviewed cash receipts received by APH to determine that amounts collected were reported to the Trust

- Tested and reviewed APH customer billing by reference to the daily flight logs, Schedule of Charges, ops transaction journals and sales journals to determine that the transaction was properly billed

- Compared the annual gallons of APH fuel sales to fuel purchases where the information was available to determine that fuel sales were properly recorded[21]

- Evaluated whether amounts related to the Heliport recorded by Liberty as an expense were similarly recorded by APH as revenue

- Requested a listing of APH customers receiving discounts since our procedures indicated that certain customers were being charged less than the amounts stated on the Schedule of Charges

- Reviewed the Percentage Fee and Permit Fee calculations

- Tested Liberty's accounting records used to report the Use Charge and fuel surcharge to APH to determine such amounts have been properly reported

- Reviewed the tax returns and certain books and records of related entities to determine the nature of transactions, if any, with APH

During the Relevant Period, APH reported total fees and charges (Percentage Fees, Use Charges, and Permit Fee) to the Trust of $2,704,409 and 116,945 Ops by year as follows:

**Summary of Annual Fees and Charges/Number of Ops**
**For the period April 1, 2001 to March 31, 2005[22]**

| Trust Year | Reported | | | | |
| | Percentage Fee | Use Charge | Permit Fee | Total Fees & Charges | # of Ops |
|---|---|---|---|---|---|
| 2002 | $   269,344 | $   98,210 | $   152,513 | $   518,067 | 24,089 |
| 2003 | 363,952 | 111,810 | 157,607 | 633,369 | 25,863 |
| 2004 | 356,337 | 151,815 | 165,303 | 673,455 | 28,943 |
| 2005 | 505,102 | 203,400 | 171,016 | 879,518 | 38,050 |
| Total | $ 1,494,735 | $   565,235 | $   646,439 | $ 2,704,409 | 116,945 |

---

[21] 2001 fuel invoices could not be located and for 2005 our testing included January to March 2005.

[22] Exhibit I contains monthly amounts for the respective years.

6

A. Percentage Fee

1. APH Gross Receipts ("Cash Basis")

The Percentage Fee is calculated based on APH's collected gross receipts, net of adjustments for certain taxes and credit card fees.[23] The total net gross receipts reported by APH to the Trust during the Relevant Period were $14,187,546 compared with cash receipts per APH bank statements of $18,306,118.

In order to determine whether APH was reporting its gross receipts properly to the Trust, we reconciled the deposits per the APH checking bank statements to amounts reported to the Trust.[24] All receipts from customers are deposited into the checking account. Ms. Cardinal prepares a monthly DCS for the checking account which is the basis for reporting gross receipts.[25]

We obtained the monthly DCS for the Relevant Period and accumulated the cash receipts totaling $17,199,411 including credit card fees of $65,244. We then compared the DCS total to the cash receipts per the bank statements ($18,306,118). A significant portion of the difference of $1,106,707 was investigated and resolved.[26]

A summary of the monthly DCS and reconciliation of the information reported to the Trust during the Relevant Period is as follows:

<u>Reconciliation of Cash Received per DCS</u>
<u>to Amounts Reported to the Trust[27]</u>

| | |
|---|---:|
| Total Cash Received per DCS | $17,199,411 |
| Less: Non-customer receipts: | |
| Liberty Use Charges | (564,291) |
| Other | (185,920) |
| Total non customer receipts | (750,211) |
| Total Customer Receipts | $16,449,200 |
| Less: credit card fees | (65,244) |
| Less: sales & fuel tax | (922,801) |
| Less: Liberty reserve[28] | (1,273,609) |
| Total net cash receipts | $14,187,546 |

## 2. <u>APH Earned Revenue ("Accrual Basis")</u>

In addition to reporting gross receipts to the Trust, APH also reports revenue earned
(accrual basis of accounting). A summary of revenue earned by APH for the Relevant
Period, net of the amounts related to the Liberty reserve, is as follows:[29]

Summary of Revenue Earned by APH[30]
April 1, 2001 through March 31, 2005

| | Total | Nine months 2001 | Year end 2002 | Year end 2003 | Year end 2004 | Three months 2005 |
|---|---:|---:|---:|---:|---:|---:|
| Landing | $ 7,258,697 | $ 719,368 | $ 1,349,010 | $ 1,819,505 | $ 2,734,384 | $ 636,430 |
| Fuel[31] | 5,251,034 | 930,707 | 935,657 | 1,089,925 | 1,860,921 | 433,824 |
| Off-ops | 2,985,925 | 404,050 | 747,230 | 767,300 | 897,545 | 169,800 |
| Parking | 2,074,950 | 274,455 | 485,950 | 473,654 | 679,945 | 160,946 |
| Miscellaneous | 1,215,255 | 48,806 | 79,941 | 86,608 | 793,646 | 206,054 |
| Reserve-Liberty | (2,437,699) | — | — | (726,150) | (1,264,436) | (447,113) |
| Total net revenue | $ 16,348,162 | $ 2,377,386 | $ 3,597,788 | $ 3,311,042 | $ 5,702,005 | $ 1,159,941 |

---

[27] Exhibit III contains the monthly amounts by year.

[28] The arbitrator ordered APH to re-pay Liberty $635,000 of the $1,273,609 in three equal installments on
November 29, 2004, December 10, 2004 and January 10, 2005. See Amounts Paid to Liberty section of
this report.

[29] This table reflects information obtained from the monthly reporting to the Trust except for two instances
in 2004 (May and December). APH 2004 general ledger reserve account reflects a year end adjustment
reducing the reserve balance it previously reported to the Trust in the amount of $867,026. In addition the
May 2004 reserve balance in the general ledger is $187,938 and the two monthly APH statements reflect
reserves as follows: for the period May 1-12, 2004 the reserve amount is $81,202 and for the period May
13-31, 2004 the reserve amount is $223,699. To our knowledge APH did not send revised monthly
statements for May 2004 and December 2004 to reflect the reserve amounts recorded in the general
ledger. In addition, in 2004 APH also recorded a bad debt expense of $496,783 reflecting the SAFE fees
it billed Liberty. The SAFE fees are included in miscellaneous.

[30] Exhibit II contains the monthly amounts by year.

[31] Fuel amounts include sales tax revenue collected from customers.

### 3. Customer Billing

In order to ascertain that APH was properly invoicing its customers, we tested and reviewed APH daily flight logs, Schedule of Charges, ops transaction journals and sales journals during the Relevant Period.

Schedule of Charges are published periodically stating the applicable fees based on the aircraft type and fuel charges. During the Relevant Period, there were three schedules published dated effective July 15, 2000, November 15, 2001 and January 15, 2004.[32] Section 4 of the Permit states:

> The Operator shall have the right, from time to time to amend any item of such Schedule of Charges, to make increases or decreases therein and to add or delete additional items thereto upon fifteen (15) days prior notice to Public and this Department.

APH's revenue is comprised of landings, fuel sales, off ops,[33] parking, and miscellaneous revenue items (fuel surcharge, Security and Facility Enhancement ("SAFE fee")[34] and Liberty trailer rent.) There is no parking charge for the first 15 minutes; it is included in the landing fee. After the first 15 minutes, there is an hourly parking fee.

Fuel prices change more frequently than the other charges. During the Relevant Period, fuel rates were published in the Schedule of Charges.[35] We were informed by APH that the current fuel price is not always reflected on the Schedule of Charges. Customers are notified about fuel price changes through signs at the fuel pump. Sales tax is charged where applicable.

A daily flight log is maintained in order to invoice customers. Information from the daily flight logs is entered into the computer to produce the ops transaction journal. The ops transaction journal indicates the prices charged to the customer for the various services,

---

[32] Since inception of the Permit there was only one Schedule of Charges prior to the Relevant Period, effective May 13, 1996.
[33] The off-ops charge is for landings outside of regular hours. Regular hours are Monday through Friday, 7am through 7pm, and Saturday and Sunday, 11am through 7pm.
[34] Effective January 2004, the SAFE fee is charged on each operation other than to Liberty and three others customers, Broadcast Helicopters, Heliflite and Cablevision).
[35] The November 15, 2001 Schedule of Charges obtained from APH contained a handwritten amount for fuel charges.

9

including fuel purchases, if any. Certain information maintained in the computer system is then used to generate invoices to customers. We selected entries from the daily flight logs and compared them to the ops transaction journal and the Schedule of Charges. Minor differences were noted.

Certain customers received rates discounted from the Schedule of Charges. We requested a listing of discounts given to customers and received a DCR (2002-2005).[36] Based on our limited price testing, the majority of the discounts granted to customers appeared on this report.

4. Amounts billed to Liberty

The sightseeing operation conducted by Liberty at the Heliport was a significant component of APH revenue during the Relevant Period. Therefore, we compared the annual billings recorded by APH to the amounts recorded by Liberty and reconciled the significant differences due to a dispute that arose between the parties.[37] Beginning July 26, 2003, APH billed Liberty based on the then current Schedule of Charges.[38] Through May, 2004, Liberty paid these increased rates. In June, 2004, Liberty informed us that they adjusted its payments to amounts between their contractual discount and full discount and remitted a revised amount. APH, in order to record their revenues from

---

[36] Included herein as Exhibit IV is information from the document. This document was not a contemporaneously maintained document during the Relevant Period.

[37] APH billing amounts were obtained from the "Sales History Report by Customer" for the respective year. Liberty amounts were obtained from the general ledger printouts received during our site visit.

[38] Liberty was billed at full discount from the beginning of the Relevant Period, April 1, 2001 through July 25, 2003. The contractual rates provide for a 50% discount from the Schedule of Charges, while the full discount rates provide for discounts on landing and parking of 66.6% and 85%, respectively. For fuel, the contractual discount is $.50 per gallon. The full discounted price on fuel is cost plus $.88 plus sales tax. In August 2002, the contractual cost for fuel was $3.25, while the discounted price was $2.35. We were not provided with any amendments to the Sightseeing Agreement which would provide for the full discount rates. For the calendar year 2001 and 2002 we estimated that the Percentage Fee due to the Trust for the difference between the contractual rate and the full discount rate for landing and parking was approximately $120,000. For calendar year 2002 we estimated that the Percentage Fee due to the Trust for fuel based on the pricing differential was approximately $20,000. Due to APH's change in billing to Liberty at the Schedule of Charges rates in July 2003 we are not able to quantify the Percentage Fee due to the Trust for the difference between full discount and contractual rates for 2003 and thereafter. It is our understanding that APH continues to invoice Liberty at the Schedule of Charges rates subsequent to the Relevant Period.

10