EXHIBIT B

## SETTLEMENT AGREEMENT

THIS Settlement Agreement is entered into on the 22nd day of November, 2006 between Air Pegasus Heliport, Inc. ("APH"), Air Pegasus of New York, Inc. ("APNY") and the Hudson River Park Trust ("HRPT").

WHEREAS, APH is the fixed base operator of the West 30th Street Heliport in New York (the "Heliport") pursuant to a Permit (the "Permit") with the New York State Department of Transportation, a predecessor of the Hudson River Park Trust ("HRPT"), dated March 25, 1996; and

WHEREAS, pursuant to the Permit, APH is obligated to pay, among other things, a percentage of its gross receipts, as that term is defined in the Permit, to the HRPT the ("Percentage Fee"); and

WHEREAS, pursuant to the Permit, the HRPT has the right to inspect certain books and records of APH; and

WHEREAS, the HRPT commenced an inspection of APH's books and records in early 2005 (the "Audit"); and

WHEREAS, APH filed a declaratory judgment action against the HRPT in the Supreme Court of the State of New York entitled *Air Pegasus Heliport, Inc. v. Hudson River Park Trust*, Index Number: 60251/05 (the "APH DJ Action") pursuant to which APH sought, among other things, judicial resolution of the breadth and scope of the HRPT's audit rights under the Permit; and

WHEREAS, APNY is a party to a Consulting Agreement between Liberty Helicopter Tours, Inc. (NY) ("Liberty"), APNY and others dated December 31, 1996 (the "Consulting Agreement") pursuant to which APNY is entitled to receive 5% of Liberty's gross receipts

related to its sightseeing operations conducted from the West 30th Street Heliport (the "Heliport") and all heliports within 20 mile of the Heliport. A copy of the Consulting Agreement is attached as Exhibit A; and

WHEREAS, the Consulting Agreement was modified by an Arbitrator Determination Regarding Various Issues dated April 8, 2005 (the "Arbitrator Determination") which, among other things, reduced the payment due to APNY under the Consulting Agreement from 5% to 3.5%. A copy of the Arbitrator Determination is attached as Exhibit B; and

WHEREAS, the HRPT has filed a lawsuit against APH, APNY and Alvin S. Trenk ("Trenk") in the Supreme Court of the State of New York entitled *Hudson River Park Trust v. Air Pegasus Heliport, et al.*, Index Number: 600035/06 (the "HRPT Action") pursuant to which the HRPT seeks, among other things, to recover certain sums it alleges were due to it from APH under the Permit. The APH DJ Action and the HRPT Action shall be referred to collectively as the "Litigations;" and

WHEREAS, the HRPT has alleged in the HRPT Action that it is owed a Percentage Fee of all of the consulting fee payments that APNY has received from Liberty under the Consulting Agreement, as modified by the Arbitrator Determination, which are related to Liberty's sightseeing operations conducted from the Heliport (the "APNY Consulting Fee Payment Claim"); and

WHEREAS, the HRPT concedes that it is not owed any Percentage Fee of consulting fee payments that APNY has received from Liberty which are related to Liberty's sightseeing operations conducted from heliports other than the West 30th Street Heliport; and

WHEREAS, none of the parties has admitted any fault, wrongdoing or liability in connection with the Litigations or otherwise; and

2

WHEREAS, the parties have agreed to settle the claims asserted in the Litigations, pursuant to the terms and conditions of this Settlement Agreement.

NOW, THEREFORE, based on and in consideration of the foregoing premises, and in consideration of the mutual covenants set forth herein, APH, APNY and the HRPT agree as follows:

1.    **Payment to HRPT.** Simultaneously with execution hereof, APH shall pay HRPT $462,387.00 (the "Payment"). The parties agree that the Payment is in full and complete satisfaction of the APNY Consulting Fee Payment Claim through January 31, 2006. Upon execution hereof, APH shall also pay to the HPRT such additional amounts as may be owed to the HRPT pursuant to Section 2(a) below for the period from February 1, 2006 through October 31, 2006. Such payment by APH will be accepted by the HRPT subject to HRPT's inspection and audit rights set forth in Section 2(b) below.

2.    **Clarification of Permit Terms.**

(a)    *Gross Receipts.* APH, APNY, and the HRPT agree that the term "gross receipts" as used in Section 6(b) of the Permit shall include all payments that APNY receives pursuant to the Consulting Agreement, as modified by the Arbitrator Determination, related to Liberty's sightseeing operations conducted only from the West 30th Street Heliport.

(b)    *Inspection Rights.* APH, APNY and the HRPT agree that the HRPT's inspection and audit rights as set forth in Section 7 of the Permit shall extend to APNY and shall be deemed to provide the HRPT with access to all financial information of APH and APNY including, without limitation, all expense records of each.

3

3       **Completion of Audit/Status of APH.**

(a)     *HRPT Acknowledgments.*  The HRPT hereby acknowledges that (i) the Audit (which was at issue in the APH DJ Action) has been completed; (ii) APH and APNY (and other entities from which the auditors requested information and documents) fully cooperated with the auditors by providing them with all requested information and documents; (iii) it has no knowledge that APH is in violation of any of the provisions of the Permit and, accordingly, APH is in good standing with the HRPT; (iv) APH shall have the right to submit a response to the final version of the Auditor's Report which shall be attached to the Report; and (v) it is the HRPT's interpretation of the Hudson River Park Act that no operator other than current permitee can be allowed to operate the West 30th Street Heliport. The HRPT shall not use the Litigations as a basis for disqualifying APH from any HRPT Request for Proposal ("RFP") and APH shall have the right to respond to any such RFP.

(b)     *APH Acknowledgments.*  Inasmuch as pursuant to the Hudson River Park Act, no operator other than current permitee can operate the West 30th Street Heliport, APH acknowledges that: (i) the issuance of an RFP by the HRPT for development and operation of a new heliport at a location other than the current location at West 30th Street (a "New Heliport") is consistent with the HRPT's statutory obligations under the Hudson River Park Act; (ii) Section 48 of the Permit does not provide APH with any greater rights than any other third party responder to an RFP; and (iii) a termination of the Permit by the HRPT in connection with the physical construction of a New Heliport that occurs pursuant to an RFP: (x) will not be deemed a prohibited termination of the Permit under Section 48 thereof, and (y) is acknowledged by APH to be in accordance with the HRPT's rights under the Permit.

4

4.     Releases.

        (a)     APH and APNY, their employees, agents, shareholders, directors, officers, successors and assigns, including Alvin S. Trenk, Abigail S. Trenk and Steven L. Trenk (collectively, the "APH Releasors") hereby release and forever discharge the HRPT, its employees, agents, shareholders, directors, officers, successors and assigns (collectively, the "HRPT Releasees") from any and all claims made by them in the APH DJ Action.

        (b)     HRPT, its employees, agents, shareholders, directors, officers, successors and assigns (collectively, the "HRPT Releasors") hereby release and forever discharge APH and APNY, their employees, agents, shareholders, directors, officers, successors and assigns, including Alvin S. Trenk, Abigail S. Trenk and Steven L. Trenk (collectively, the "APH Releasees") from: (i) any and all claims made by the HRPT in the HRPT Action; and (ii) any and all claims based on information and documents provided during the Audit; and (iii) any and all claims now actually known to HRPT. Notwithstanding the foregoing, this release shall not apply to, and shall not be deemed to release: (x) any claims that arise out of information or documentation requested by the auditors in connection with and during the course of the Audit but was not provided to them; or (y) any claims arising from fraud by APH, APNY, or any of their respective principals, officers, directors, or shareholders including, without limitation, Alvin S. Trenk, Steven L. Trenk, or Abigail S. Trenk.

        5.     Completeness of Agreement.   Except for the Permit, this Settlement Agreement contains all of the terms and conditions agreed upon by the parties with reference to the subject matters contained herein. No other agreement, except for the Permit, oral or otherwise, will be considered to exist between or to bind the parties hereto. No representative of any party to this Settlement Agreement had, or has, any authority to make any representation or promise not

5

contained in this Settlement Agreement, and each of the parties to this Settlement Agreement acknowledges that such party has not executed this Settlement Agreement in reliance upon any such representation or promise. This Settlement Agreement cannot be modified except by a written instrument signed by all parties.

6.    **Severability.** If any portion or provision of this Settlement Agreement is held unconstitutional, invalid, or unenforceable by any court of competent jurisdiction, the remainder of the Settlement Agreement will be considered severable, will not be affected, and will remain in full force and effect.

7.    **Voluntary Execution.** The parties acknowledge that they have each thoroughly read this Agreement, understand it, and is entering into it of its own free will.

8.    **Governing Law; Jurisdiction.** This Agreement will be interpreted and construed for all purposes under the laws of the State of New York without regard to its conflicts of laws principles, and all disputes arising under or out of this Settlement Agreement will be brought in courts of competent jurisdiction located within the State of New York. The parties consent to the personal and exclusive subject matter jurisdiction of the Courts of the State of New York in connection with any and all disputes arising out of this Settlement Agreement.

9.    **Legal Counsel.** The parties all acknowledge that each has been represented by legal counsel throughout these proceedings and that, by this Settlement Agreement, each has been advised, in writing, of his right to consult legal counsel prior to signing this Settlement Agreement. Each party further acknowledges that, to the extent it has wished to avail itself of that right, it has done so.

10.    **Construction.** This Settlement Agreement is the product of negotiation by the parties and all parties' counsel participated in the drafting and revision of this Settlement

Agreement. Therefore, this Settlement Agreement shall not be construed or interpreted more strictly against any party based on that party's counsel having drafted this Settlement Agreement.

11.    **No Waiver.** The failure of any party to insist upon the strict performance of any of the provisions of this Settlement Agreement, or to exercise any of the rights afforded under this Settlement Agreement, shall in no way constitute a waiver of any subsequent default of the same or similar nature or a waiver of that party's right to insist on strict performance in the future.

12.    **Discontinuance of Litigations.** Simultaneous with the execution of this Settlement Agreement, APH, APNY, Trenk and the HRPT shall cause all claims that they have asserted in the Litigations to be discontinued witprejudice.

13.    **Duplicate Originals.** This Settlement Agreement may be executed in counterparts, with each counterpart being equally effective.

14.    **Binding Effect; No Third Party Beneficiaries.** This Agreement binds only the signatories hereto, none of whom have acted in any representative capacity or on behalf of any third party or other entity. No third parties shall have any rights under this Agreement.

15.    **Facsimile Signatures.** Facsimile signatures shall be as effective as original signatures.

[Balance of page intentionally left blank]

7

WHEREFORE, the parties have set their hands and seals as of the date first written above.

AIR PEGASUS HELIPORT, INC.

By: _____
Abigail S. Trenk, President

AIR PEGASUS OF NEW YORK, INC.

By: _____
Alvin S. Trenk, President

HUDSON RIVER PARK TRUST

By: _____
Connie Fishman, President

_____
Alvin S. Trenk, Individually, as to Section 4, only

_____
Abigail S. Trenk, Individually, as to Section 4, only

_____
Steven L. Trenk, Individually, as to Section 4, only

8

EXHIBIT C

723 P02    DEC 13 '99  13:13

'Termit No. XW307'

## AGREEMENT

AGREEMENT, dated as of the 25th day of March 1996, by and between The New York State Department of Transportation and its successors or assigns (hereinafter referred to as "the Department" or the "State"), an agency of the State of New York having an office at Hunter's Point Plaza, 47-40 21st Street, Long Island City, New York 11101, and AIR PEGASUS HELIPORT, INC., a corporation organized under the laws of the State of Delaware, having an office at 25-3 Vreeland Road, Suite 201, Florham Park, New Jersey 07932 (hereinafter referred to as the "Operator" or the "permittee"), whose representative is Alvin S. Trenk.

WITNESSETH, That:

The Department and the Operator for and in consideration of the promises and mutual agreements hereinafter contained, hereby agree as follows:

Section 1.    Space

The Department hereby grants to the Operator certain privileges, as hereinafter described, at the West 30th Street Heliport (sometimes hereinafter referred to as the "Heliport"), in the Borough of Manhattan, City and State of New York, for use, occupancy and operation as hereinafter provided, in the following described areas:

Portions of the marginal way, bulkhead and river between West 29th Street and West 30st Street as shown on Exhibit "A" attached hereto and made a part hereof; subject to such state of facts as an accurate survey may reveal. Together with the exclusive right to use of the fixtures, improvements and other property of the Department located thereon, the said space, fixtures, equipment, improvements, bulkhead, bulkhead level decking and piling, buildings, structures, other property of the Department and all other space including the lands under water at the Heliport collectively referred to as "the Premises" subject to such incidental use by the State as the State may from time to time determine necessary. Provided, however, such use by the State shall not be so extensive as to substantially impact or limit permitted uses by the Operator.

Section 2.    Term

The term of this Agreement shall commence on the Commencement Date which shall be the date on which the Department first has unencumbered right to the use and occupancy of the Premises. The

723 P03    DEC 13 '99  13:13

Department shall fix such date, which date shall be at the
Department's sole discretion by delivery of a notice of
termination to the present permittee at the Premises.  Provided,
however, if such Commencement Date has not been fixed by March
18, 1996, then upon notice by the Operator, which notice may be
given any time after March 18, 1995, the Department shall, within
three (3) days of such notice by the Operator, be obligated to
deliver the notice of termination to the present permittee.
Unless sooner terminated or revoked as herein provided, the term
of the Agreement shall expire on and the Expiration Date shall be *2001*
the day preceding the FIFTH anniversary of the Commencement Date.
The term of this Agreement shall automatically renew for
successive terms of one month each unless cancelled by either
party upon thirty (30) days written notice.  Further, it is
understood and agreed by and between the parties that the
Operator shall not be entitled ,and waives any claims' to
relocation benefits provided under state or federal laws.

Section 3.    Rights of User

The Operator shall use and operate the Premises as a public
heliport for the following purposes only and for no other purpose
whatsoever. Use of the permit premise for each of the categories
of uses set forth in sub-paragraphs (a) to (e) below shall be in
accordance with a site plan submitted by the Operator for
approval by the Department within sixty (60) days of the
Commencement Date, which Plan may be amended from time to time
upon application of the Operator.  The site plan shall be a
drawing which locates within the Premises each of the areas of
use described below:

(a) for the storage of cargo and materials and supplies of a
nonhazardous nature; and for business, sales including but not
limited to vending machines, souvenirs, pilot and aviation
supplies, operations and administrative offices in connection
with the operations at the Heliport;

(b) as passenger lounges and waiting rooms;

(c) as a Landing Area for owned aircraft, public aircraft,
charter and sightseeing aircraft; and for the storage of aviation
fuel and for the sale, dispensing and delivery of such fuel to
and into aircraft.  When the uses set forth in sub-paragraph (d)
below are fully utilized, the area set forth for uses described
in this sub-paragraph may be used for the parking and storage of
aircraft but shall be subordinate at all times to use as a Public
Landing Area;

2

#0021948.05
99999-00111

723 P24    DEC 13 '99  13:13

(d) for the parking and storage of aircraft and for the
performance of minor maintenance on aircraft. Without limiting
the generality of any other term or provision hereof, it is
hereby specifically understood that the Operator shall have no
right under this Agreement to use the area set aside for uses
described in this sub-paragraph (d) and that set aside for uses
described in sub-paragraph (c) when the area set aside for uses
described in this sup-paragraph (d) is fully utilized for the
parking and storage or for the performance of minor maintenance
if, as a result of such storage, maintenance or parking, fewer
than two pads are available for the landing of helicopters.  The
Operator's rights of user as to the areas set aside for uses
described in sup-para's (b), (c) and (d) shall be non-exclusive;
and

(e) for the transportation of persons by any mode of
transportation to and from the Premises, primarily for the
convenience of persons using the Heliport or other services of
the Operator.

        Within thirty (30) days of the Commencement Date and
upon any application to amend the site plan the Operator shall
provide the Department with a certificate of a professional civil
engineer with structural expertise, licensed in the State of New
York, stating that the Premises are structurally safe and
suitable for the specific use(s) proposed at the locations
indicated in the site plan.  The required certificate must be
approved by the Department before occupancy will be authorized.
The engineer shall be required to inspect the Premises and
provide the Department in a written report, as part of the
certificate, evidence that he has inspected the properties
including sub and super structures, as well as the basis of the
evaluation on the suitability for the proposed use.  If the
execution of this certificate requires the repair or
rehabilitation of any area of the Premises and the permittee
desires to use said areas, the permittee will make all required
repairs prior to using said areas.  In the event the Operator
elects to forgo use of said areas by not making repairs, there
shall be a pro rata reduction in the Permit Fee based on the
number of square feet which are no longer usable.  In the event
that the certificate states that all or a substantial portion of
the Premises may not be used as a Heliport, Operator may
terminate this Agreement with no further liability to the
Department or the Operator.

        It is hereby expressly understood and agreed that the
only Aircraft which the Operator and other aircraft operators may
operate to, at and from the Heliport pursuant to the terms of

3

this Agreement shall be aircraft which do not exceed a gross
take-off weight of 60,000 pounds as certified by the Federal
Aviation Administration.

Without limiting the generality of any other term or
provision thereof the Operator understands and agrees that it
shall not itself nor shall it permit any other aircraft operator
to conduct flight training operations (primary or advanced) at
the Heliport other than recurrent training of pilots operating
primarily at or from the Heliport, without express approval of
the Department. In addition to the right to operate the Premises
for the purposes heretofore set forth in this Section 3, the
parties agree that sightseeing operations constitute the major
portion of the business conducted at the Premises. The Operator
or any other aircraft Operator shall conduct sightseeing
operations only upon the prior written approval of the Department
of (i) the sightseeing operator and its aircraft and procedures,
and (ii) the terms of any agreement between the Operator and any
such sightseeing operator, which approval shall not be
unreasonably withheld.

Section 4.    Schedule of Charges and Collections

The Schedule of Charges covering the use of the
Heliport is attached hereto, made a part hereof and marked
Exhibit "B". The Operator shall have the right, from time to
time to amend any item of such Schedule of Charges, to make
increases or decreases therein and to add or delete additional
items thereto upon fifteen (15) days prior notice to Public and
the Department.

The Operator shall have the responsibility to
collect from each and every operator of an aircraft using the
Heliport, other than the Operator, its employees and guests, and
shall retain and keep as its own those amounts collected as
charges which are in effect under the rate schedule or this or
other written agreements for such use at the time of use thereof.
The Department shall have no responsibility for the collection
or payment of such charges.

Section 5.    Services by the Operator

(a)  The Operator shall perform the work and furnish
the services usually performed or furnished by a fixed base
operator in connection with the operation of a public heliport
facility. Without limiting the generality of the foregoing

4

obligations, the Operator shall furnish at its own expense the following services and equipment at the Heliport:

(1)  In connection with the arrival or departure of aircraft at or from the Heliport, the Operator shall man and monitor, for the purpose of receiving requests and for transmitting operations advisories to aircraft requesting the same, the following radio frequency: 123.05 megacycles (VHF), and/or such other authorized frequency as may be designated from time to time by the Department or other the appropriate governmental authority.

(2)  Upon the landing of any aircraft at the Heliport, where the pilot of such aircraft desires to park, the Operator shall direct such aircraft to an assigned parking space and shall assist in the spotting of the aircraft, in securing the aircraft and shall provide for the removal of luggage therefrom.

(3)  During the period that aircraft are parked in the area to which they have been assigned by the Operator, the Operator shall make periodic inspections of the aircraft and of the parking area to ascertain that such aircraft are adequately secured and to ascertain that no unauthorized person or persons are loitering in the parking area.  If at any time, based on forecasts issued by the Weather Bureau, adverse weather conditions involving high velocity winds can be reasonably anticipated, the Operator will so inform the pilot or owner if reasonably possible.

(4)  In connection with the departure of aircraft from the Heliport, upon request by the pilots, the Operator shall assist with the removal of wheel chocks, control locks and other security devices.

(5)  The Operator will provide an office for the purpose of performing the necessary clerical activities connected with the collection of fees and advisories related to aircraft movements.  The Operator shall furnish, install and maintain the radio equipment necessary to monitor the frequency set forth in subparagraph (1) hereof and shall furnish, install and maintain wind indicating equipment.

(6)  The Operator shall maintain a lounge where aircraft passengers and crew may obtain shelter prior to or after flight and which shall contain reasonable facilities for the preparation and filing of flight plans and the fulfillment of other preflight requirements by pilots.  The Operator shall maintain telephone service for the purpose of contacting the

5