Hudson River Park Trust


Report on Schedule of Fees and Charges

of

Air Pegasus Heliport, Inc.

Permit No. XW507


For the period April 1, 2001 to March 31, 2005


---

Report of Debra A. Cutler, CPA, CFE

October 31, 2006

---

# Table of Contents

INTRODUCTION .................................................................................................. 1

SCOPE OF ENGAGEMENT ................................................................................... 3

FINDINGS ............................................................................................................ 3

WORK PERFORMED ............................................................................................ 5

  A. PERCENTAGE FEE ......................................................................................... 5
    *1. APH Gross Receipts ("Cash Basis")*............................................................. 7
    *2. APH Earned Revenue ("Accrual Basis")*..................................................... 7
    *3. Customer Billing*......................................................................................... 8
    *4. Amounts billed to Liberty*........................................................................... 9
    *5. Aviation Fuel*.............................................................................................. 10
    *6. Analytical Review of Amounts Due to the Trust* ........................................ 11
  B. USE CHARGES-HELICOPTER FLIGHT SERVICES AND NEW YORK HELICOPTER ..... 13
  C. UNREPORTED PERCENTAGE FEES RELATING TO CONSULTANT AGREEMENT AND ARBITRATOR
  DETERMINATION ................................................................................................ 14
  D. RELATED PARTIES ........................................................................................ 16
  E. ACCOUNTING AND COMPUTER DEFICIENCIES .................................................. 17
  F. VENDING MACHINES ..................................................................................... 19
  G. SELECTED CUSTOMERS ................................................................................. 19
  H. SALES AND FUEL TAX ................................................................................... 20
    *1. Sales tax collected from APH customers* ................................................... 22
    *2. Other fuel taxes paid by APH to the fuel vendor* ....................................... 23
  I. PROCEDURES PERFORMED AT LIBERTY ............................................................ 23
    *1. Use Charge*................................................................................................. 23
    *2. Consulting Agreement Payments*................................................................ 24
    *3. Fuel Surcharge*........................................................................................... 25
  J. PERMIT FEE.................................................................................................... 25

OPEN ITEM ........................................................................................................ 26

EXHIBITS:

    I.   SUMMARY OF APH MONTHLY FEES AND CHARGES/NUMBER OF OPERATIONS

    II.   SUMMARY OF REVENUE EARNED

    III.   CUSTOMER RECEIPTS REPORTED TO THE TRUST

    IV.   CUSTOMER DISCOUNTS (2002 – 2005)

    V.   INFORMATION PROVIDED

## Introduction

Air Pegasus Heliport, Inc., ("APH")[1] operates the West 30th Street Heliport (the "Heliport") in New York City pursuant to a Permit[2] with Hudson River Park Trust (the "Trust"). The Permit provides the Operator certain usage and operation rights including a landing, parking and storage area for owned, public and sightseeing aircrafts and the storage and sale of aviation fuel.

Under the terms of the Permit, fees and charges payable to the Trust are subject to three separate monthly calculations as follows: (i) a basic monthly permit fee increased by 5% (non compounded) on each annual anniversary of the Commencement Date ("Permit Fee"), (ii) a percentage fee equivalent to a percentage of gross receipts[3] ("Percentage Fee"), and (iii) a use charge computed at the rate of $15.00 per every ten sightseeing passengers, with the number of passengers rounded up to the next higher integral multiple of 10, in connection with approved sightseeing operations ("Use Charge").

Sightseeing operations constitutes a significant portion of the business at the Heliport. In May 1996, APH entered into an agreement ("the Sightseeing Agreement") with Liberty Helicopter Tours, Inc. ("Liberty") which granted Liberty the exclusive right to conduct sightseeing operations from the Heliport and certain related use and occupancy rights in

---

[1] APH (the "Operator") is currently owned by Abigail Trenk and Phyllis Enterprises, LLC. Alvin S. Trenk ("Mr. Trenk"), the Operator's representative, transferred his interest in APH to Phyllis Enterprises during 2001.

[2] Permit No. XW507 (the "Permit") between the New York State Department of Transportation (the "State") and APH, dated March 26, 1996, was subsequently assigned to the Trust.

[3] In determining the Percentage Fees APH pays to the Trust, three tiers of percentages are applied to gross receipts as follows: 10% of APH gross receipts for amounts in excess of $250,000 to and including $1,000,000, 11% for amounts in excess of $1,000,000 to and including $2,000,000, and 12% for all amounts over $2,000,000. Gross receipts are defined in the Permit as all monies paid for services rendered for landing, take-off and parking, "and all monies paid to the Operator for sales made or services rendered at or from the Heliport regardless of when or where the order therefore is received at the Heliport and any other revenues of any type arising out of or in connection with the Operator's operations at the Heliport....." Gross receipts exclude taxes imposed by law which are separately stated to and paid by the customer and directly payable to the taxing authority by the Operator. Gross receipts also exclude "charges for fuel and maintenance services supplied to the Operator's own aircraft or aircraft which the Operator has leased or chartered for personal use (which are not leased or chartered to others)."

connection therewith.[4] Among other things, the Sightseeing Agreement provided for prescribed discounts ("contractual rates") for landing, parking, and fuel, different from the published rates ("Schedule of Charges").[5] The Sightseeing Agreement, which we understand was approved by the State as provided for in the Permit, was to expire under its terms in May 2001 commensurate with the expiration of the initial term of the Permit.[6]

In December 1996, Liberty entered into a consulting agreement (the "Consulting Agreement")[7] with APNY d/b/a Pegasus Aviation,[8] Drew E. Schaefer, Pamela Schaefer and Sightseeing Tours of America, Inc. ("STA").[9] Under the terms of the Consulting Agreement, Liberty paid APNY a 5% share of Liberty's gross revenue attributable to sightseeing at the Heliport and at any heliport within 20 miles of the Heliport. The Consulting Agreement included a restrictive covenant clause whereby, for as long as APH or any of its affiliates shall be the fixed based operator of the Heliport, Liberty and its principals agreed not to acquire or operate a heliport or conduct sightseeing operations within a certain radius of the Heliport. Such Consulting Agreement also provided that a default of the Sightseeing Agreement (between Liberty and APH) would also constitute a default of the Consulting Agreement (between Liberty and APNY). At the same time,

_____

[4] Liberty also conducts sightseeing, charter and air taxi helicopter services from two other locations, Wall Street, in downtown Manhattan and Paulus Hook, New Jersey.

[5] In March 2000, Liberty began charging its sightseeing customers a "fuel surcharge" of $2.00 per passenger. Liberty paid Air Pegasus of New York, Inc ("APNY") a 40% commission on the fuel surcharge until November 2004 when APH directed Liberty to pay the fuel surcharge to APH in all future periods. In December 2004, APH paid the Trust its' 12 percent Percentage Fee of $12,268.30 for the fuel surcharge that was allegedly erroneously remitted to APNY.

[6] Prior to and including the period from April 1, 2001, to July 25, 2003, we understand that the Trust was not informed that Liberty was billed at lower rates (what has been described as the "full discount" rate by the arbitrator) than provided for in the Sightseeing Agreement. On July 25, 2003, APH changed its fee structure to Liberty increasing its rates to its current Schedule of Charges ("full retail"). As a result, a fee dispute arose between APH and Liberty. By a Consent Order effective July 25, 2003, Liberty commenced paying full retail rates. In early 2004, an arbitrator was appointed. Liberty informed us they ceased paying full retail rates in June 2004. Subsequently, Liberty paid monthly amounts recommended by the arbitrator which we understand was 50% of the difference between contractual and full discount. In April 2005, the Sightseeing Agreement was modified by an arbitration decision which APH is challenging on appeal. The arbitrator's decision, among other matters, included (i) a modification to the exclusivity clause, (ii) reduction of the 5% rate paid to APNY to 3.5%, (iii) established rates for various future services billed by APH to Liberty, and (iv) settled prior billing disputes regarding overpayment of charges.

[7] We understand that the Trust was not aware of the Consulting Agreement until 2004.

[8] APNY is effectively owned and controlled by Mr. Trenk.

[9] STA is the parent company of Liberty. Mr. Trenk, through an affiliated entity, Trenk Partners, L.P., is a minority shareholder of STA and was its former Chairman and Chief Executive Officer.

2

APH and Liberty amended the Consulting Agreement[10] to, among other things, extend the term of the sightseeing exclusivity provision to make it commensurate with the automatic monthly renewal term provided for in the Permit ("First Modification Agreement") and add a restrictive covenant clause whereby, for as long as Liberty was paying a 5% share of its gross revenues to APNY pursuant to the Consulting Agreement, APH agreed not to acquire or operate a heliport or to conduct sightseeing business within a certain radius of the Heliport.

## Scope of Engagement

I have been retained by Konner Teitelbaum & Gallagher ("KTG") on behalf of the Trust, pursuant to its rights under the Permit to perform procedures regarding APH books and records for the period commencing April 1, 2001 to March 31, 2005 ("Relevant Period") to evaluate whether APH has reported and remitted its fees and charges in accordance with the terms of the Permit.[11] I, and others working under my supervision, commenced our engagement in April 2005, and shortly thereafter, in May 2005, we were denied access to certain books and records of APH and another entity effectively owned and controlled by Mr. Trenk.[12] We resumed our engagement in July, 2006 at the offices of Meisel, Tuteur & Lewis, P.C. ("MTL"), APH's independent accountants.[13]

## Findings

Based on the work performed, we identified the following items and areas of concern:

- $539,020 of unreported Percentage Fees[14]

---

[10] We understand that the Trust was not aware of the amendments to the Consulting Agreement.

[11] KTG requested that the Relevant Period for the Percentage Fee due on the Trust under the Consulting Agreement commence in January 1996 to January 2006. In addition, the draft report of the Trust's prior accountant dated April 29, 2002 included the two-year period ended March 31, 2001. The Trust fiscal year is March 31.

[12] Under the terms of the Permit, the Trust is permitted access to "any records and books of account of any company which is owned or controlled by the Operator, or which owns or controls the Operator, if said company performs services, similar to those performed by the Operator under the Agreement, anywhere in the Port of New York."

[13] In addition to the Scope of Engagement as described above, I filed an affidavit dated July 27, 2005, relating to our limited access to certain books and records. Subsequent to our retention, litigation has commenced between the Trust and APH.

[14] Amount consists of $462,387 of Percentage Fees relating to payments made to APNY from 1996 through 2005 and $76,633 related to monies being retained by APH as a result of the Liberty arbitration that APH is challenging on appeal.

3

- For the period April 1, 2001 to July 25, 2003 APH invoiced Liberty at full discount rates which are less than the contractual rates in the Sightseeing Agreement. The differential in rates would result in significant Percentage Fees due the Trust.[15]

- Related parties having transactions with APH other than Liberty and APNY. We noted in the course of our engagement, that there were a number of other entities also owned or controlled by Mr. Trenk,[16] in some instances also bearing the name "Pegasus." We were able to conclude, based on information provided by APH, that apart from APNY, such entities do not appear to have conducted operations out of the Heliport that would be subject to the Permit's Percentage Fee provision. However, we could not reach such a conclusion with regard to Air Pegasus Enterprises, Inc.'s operations. We are currently awaiting additional information from Liberty.

- Certain deficiencies in APH's accounting and computer systems

- Discounts are given to certain customers[17]

- For certain months, US Helicopter was charged a flat monthly fee for landing and parking, instead of the rates from the Schedule of Charges

- Argos Capital received certain discounts; however this customer was not included on the Discounted Customer Report ("DCR"). CSC Transport received discounts that were not included on the DCR.

- Monies received from vending machines located at the Heliport are not included in gross receipts reported to the Trust, therefore no Percentage Fees on such receipts are paid to the Trust

- In certain instances, the Liberty aircraft number in the daily flight log did not agree with the aircraft number in the Heliport's ops transaction journal

---

[15] We are not aware of any written agreement between Liberty and APH that supports the full discount rates. We are not aware when this arrangement was effective. In addition, the Trust has informed us that they had no knowledge of this issue prior to the receipt of the Arbitrator's 2005 decision.

[16] Air Pegasus Corporation, Air Pegasus Enterprises, Inc., Air Pegasus Heliport, LLC, Air Pegasus Ventures, Inc., Trenk Enterprises, Inc., Trenk Enterprises, LLC, Trenk Partners, L.P., and Phyllis Enterprises, LLC.

[17] Section 34(b)(3) of the Permit states "except for sightseeing operations which require Department approval pursuant to Section 3, charge fair, reasonable and non-discriminatory prices for each unit of sales or services provided that the Operator may make reasonable and non-discriminatory discounts, rebates or other similar types of price reductions to volume purchasers in connection with the landing, taking off and parking of aircraft." In March 2006, APH responded to the Trust's inquiry regarding customer discounts. APH quantified the discounts for the period 2002-2005 which aggregated approximately $423,000. The Percentage Fee at 12 percent is approximately $51,000. APH has informed us that some of the discounts (totaling approximately $20,000) were approved by the Port Authority of New York and New Jersey prior to the Permit. It is our understanding that the discounts were primarily granted to these customers for a promise of increased volume.

4

- Operations related to aircraft number 691S was listed in the daily flight logs as both Print International and Zip Aviation. The same pilot was listed for all of the operations.

- The APH monthly Deposit Cash Sheet ("DCS) prepared by Ms. Cardinal, CFO do not include all bank deposits

## Work Performed

Our engagement included inspecting the books and/or records of APH, Liberty and other entities controlled or affiliated with Mr. Trenk. We visited the Heliport, APH corporate offices in Bernardsville, New Jersey and Liberty corporate offices in Linden New Jersey, had discussions with Mr. Trenk, Abigail Trenk, Thomas Yessman, accounting personnel at APH and Liberty. We obtained and read APH accountants' audited and review reports and tax returns during the Relevant Period.[18] We also met and had discussions with MTL and had discussions with APH's outside counsel, Christopher Gengaro, Esq. of Lentz & Gengaro ("L&G")

In May 2005, we were provided with APH sales related records and other accounting documents. When we resumed our engagement in July 2006, APH provided us access to its financial statements, general ledgers, tax returns and additional accounting documents. A complete list of documents we had access to is provided in Exhibit V.

APH maintains its books and records under the accrual basis of accounting.[19] The Percentage Fee is calculated using the cash basis of accounting.[20] APH reports to the Trust, on a monthly basis, all of its revenue earned (accrual basis), gross receipts collected (cash basis), number of operations ("Ops"), and sightseeing passenger counts.

We performed the following procedures for the Relevant Period in connection with APH's reporting to the Trust.

---

[18] MTL issued a draft review report for year ended December 31, 2004.
[19] APH fiscal year is December 31.
[20] In a letter dated November 8, 1996 to Mr. Richard Morris at the State, Ms. Cardinal specified that "gross receipts means cash collected. Percentage Fees are based on cash collected monthly (revenue cash actually received.)." In a response to Ms. Cardinal dated December 24, 1996 from Mr. Joseph A. Barnes at the State, he stated "The monthly report will include the amount of the month's cash receipts and the month's sales but it is understood that there is no direct correlation between the two amounts."

Case 1:07-cv-04069-MGC    Document 34-2    Filed 12/31/2007    Page 8 of 41

- Obtained a general understanding of APH's accounting and billing procedures

- Reviewed cash receipts received by APH to determine that amounts collected were reported to the Trust

- Tested and reviewed APH customer billing by reference to the daily flight logs, Schedule of Charges, ops transaction journals and sales journals to determine that the transaction was properly billed

- Compared the annual gallons of APH fuel sales to fuel purchases where the information was available to determine that fuel sales were properly recorded[21]

- Evaluated whether amounts related to the Heliport recorded by Liberty as an expense were similarly recorded by APH as revenue

- Requested a listing of APH customers receiving discounts since our procedures indicated that certain customers were being charged less than the amounts stated on the Schedule of Charges

- Reviewed the Percentage Fee and Permit Fee calculations

- Tested Liberty's accounting records used to report the Use Charge and fuel surcharge to APH to determine such amounts have been properly reported

- Reviewed the tax returns and certain books and records of related entities to determine the nature of transactions, if any, with APH

During the Relevant Period, APH reported total fees and charges (Percentage Fees, Use Charges, and Permit Fee) to the Trust of $2,704,409 and 116,945 Ops by year as follows:

**Summary of Annual Fees and Charges/Number of Ops**
**For the period April 1, 2001 to March 31, 2005[22]**

| Trust Year | Percentage Fee | Use Charge | Permit Fee | Total Fees & Charges | # of Ops |
|---|---|---|---|---|---|
| | | | Reported | | |
| 2002 | $ 269,344 | $ 96,210 | $ 152,513 | $ 518,067 | 24,089 |
| 2003 | 363,952 | 111,810 | 157,607 | 633,369 | 25,863 |
| 2004 | 356,337 | 151,815 | 165,303 | 673,455 | 28,943 |
| 2005 | 505,102 | 203,400 | 171,016 | 879,518 | 38,050 |
| Total | $ 1,494,735 | $ 563,235 | $ 646,439 | $ 2,704,409 | 116,945 |

---

[21] 2001 fuel invoices could not be located and for 2005 our testing included January to March 2005.

[22] Exhibit I contains monthly amounts for the respective years.

6

A. Percentage Fee

1. APH Gross Receipts ("Cash Basis")

The Percentage Fee is calculated based on APH's collected gross receipts, net of adjustments for certain taxes and credit card fees.[23] The total net gross receipts reported by APH to the Trust during the Relevant Period were $14,187,546 compared with cash receipts per APH bank statements of $18,306,118.

In order to determine whether APH was reporting its gross receipts properly to the Trust, we reconciled the deposits per the APH checking bank statements to amounts reported to the Trust.[24] All receipts from customers are deposited into the checking account. Ms. Cardinal prepares a monthly DCS for the checking account which is the basis for reporting gross receipts.[25]

We obtained the monthly DCS for the Relevant Period and accumulated the cash receipts totaling $17,199,411 including credit card fees of $65,244. We then compared the DCS total to the cash receipts per the bank statements ($18,306,118). A significant portion of the difference of $1,106,707 was investigated and resolved.[26]

A summary of the monthly DCS and reconciliation of the information reported to the Trust during the Relevant Period is as follows:

---

[23] APH deducted credit card fees in reporting its gross cash receipts. The Permit does not contain a specific exclusion for credit card fees.

[24] Since we were initially denied access to APH's general ledgers, we were not able to determine what, if any, other bank accounts existed. In addition, during our site visit to Bernardsville in May 2005, we were only provided APH deposit slips and denied access to original bank statements. In July 2006, upon recommencement of our engagement, we gained access to APH's original bank statements and general ledgers. Upon review of the general ledgers, we identified a Wachovia money market ("WMM") account. We reviewed the WMM statements to ascertain that there was no unreported sales activity.

[25] The DCS contains two columns; accounts receivable and non-accounts receivable. The accounts receivable column is subject to the Percentage Fee and the non-accounts receivable column is not. We noted that the non-accounts receivable column does not include all of the cash deposits that are not accounts receivable. APH indicates that the DCS was not designed to identify all bank deposits.

[26] The composition of the unidentified cash receipts on the DCS is primarily for money market transfers ($300,000), Liberty escrow ($550,000) and loans and transfers from affiliated entities ($295,000).

7

<u>Reconciliation of Cash Received per DCS</u>
<u>to Amounts Reported to the Trust</u>[27]

| | |
|---|---:|
| Total Cash Received per DCS | $17,199,411 |
| Less: Non-customer receipts: | |
|     Liberty Use Charges | (564,291) |
|     Other | (185,920) |
| Total non customer receipts | (750,211) |
| Total Customer Receipts | $16,449,200 |
| Less: credit card fees | (65,244) |
| Less: sales & fuel tax | (922,801) |
| Less: Liberty reserve[28] | (1,273,609) |
| Total net cash receipts | $14,187,546 |

## 2. APH Earned Revenue ("Accrual Basis")

In addition to reporting gross receipts to the Trust, APH also reports revenue earned
(accrual basis of accounting). A summary of revenue earned by APH for the Relevant
Period, net of the amounts related to the Liberty reserve, is as follows:[29]

**Summary of Revenue Earned by APH[30]**
**April 1, 2001 through March 31, 2005**

| | Total | Nine months 2001 | Year end 2002 | Year end 2003 | Year end 2004 | Three months 2005 |
|---|---:|---:|---:|---:|---:|---:|
| Landing | $ 7,258,697 | $ 719,368 | $ 1,349,010 | $ 1,819,505 | $ 2,734,384 | $ 636,430 |
| Fuel[31] | 5,251,034 | 930,707 | 935,657 | 1,089,925 | 1,860,921 | 433,824 |
| Off-ops | 2,985,925 | 404,050 | 747,230 | 767,300 | 897,545 | 169,800 |
| Parking | 2,074,950 | 274,455 | 485,950 | 473,654 | 679,945 | 160,946 |
| Miscellaneous | 1,215,255 | 48,806 | 79,941 | 86,808 | 793,646 | 206,054 |
| Reserve-Liberty | (2,437,699) | - | - | (726,150) | (1,264,436) | (447,113) |
| Total net revenue | $ 16,348,162 | $2,377,386 | $3,597,788 | $3,511,042 | $5,702,005 | $1,159,941 |

---

[27] Exhibit III contains the monthly amounts by year.

[28] The arbitrator ordered APH to re-pay Liberty $635,000 of the $1,273,609 in three equal installments on November 29, 2004, December 10, 2004 and January 10, 2005. See Amounts Paid to Liberty section of this report.

[29] This table reflects information obtained from the monthly reporting to the Trust except for two instances in 2004 (May and December). APH 2004 general ledger reserve account reflects a year end adjustment reducing the reserve balance it previously reported to the Trust in the amount of $867,026. In addition the May 2004 reserve balance in the general ledger is $187,938 and the two monthly APH statements reflect reserves as follows: for the period May 1-12, 2004 the reserve amount is $81,202 and for the period May 13-31, 2004 the reserve amount is $223,699. To our knowledge APH did not send revised monthly statements for May 2004 and December 2004 to reflect the reserve amounts recorded in the general ledger. In addition, in 2004 APH also recorded a bad debt expense of $496,783 reflecting the SAFE fees it billed Liberty. The SAFE fees are included in miscellaneous.

[30] Exhibit II contains the monthly amounts by year.

[31] Fuel amounts include sales tax revenue collected from customers.

3. Customer Billing

In order to ascertain that APH was properly invoicing its customers, we tested and reviewed APH daily flight logs, Schedule of Charges, ops transaction journals and sales journals during the Relevant Period.

Schedule of Charges are published periodically stating the applicable fees based on the aircraft type and fuel charges. During the Relevant Period, there were three schedules published dated effective July 15, 2000, November 15, 2001 and January 15, 2004.[32] Section 4 of the Permit states:

> The Operator shall have the right, from time to time to amend any item of such Schedule of Charges, to make increases or decreases therein and to add or delete additional items thereto upon fifteen (15) days prior notice to Public and this Department.

APH's revenue is comprised of landings, fuel sales, off ops,[33] parking, and miscellaneous revenue items (fuel surcharge, Security and Facility Enhancement ("SAFE fee")[34] and Liberty trailer rent.) There is no parking charge for the first 15 minutes; it is included in the landing fee. After the first 15 minutes, there is an hourly parking fee.

Fuel prices change more frequently than the other charges. During the Relevant Period, fuel rates were published in the Schedule of Charges.[35] We were informed by APH that the current fuel price is not always reflected on the Schedule of Charges. Customers are notified about fuel price changes through signs at the fuel pump. Sales tax is charged where applicable.

A daily flight log is maintained in order to invoice customers. Information from the daily flight logs is entered into the computer to produce the ops transaction journal. The ops transaction journal indicates the prices charged to the customer for the various services,

---

[32] Since inception of the Permit there was only one Schedule of Charges prior to the Relevant Period, effective May 13, 1996.

[33] The off-ops charge is for landings outside of regular hours. Regular hours are Monday through Friday, 7am through 7pm, and Saturday and Sunday, 11am through 7pm.

[34] Effective January 2004, the SAFE fee is charged on each operation other than to Liberty and three others customers, Broadcast Helicopters, Heliflite and Cablevision).

[35] The November 15, 2001 Schedule of Charges obtained from APH contained a handwritten amount for fuel charges.

including fuel purchases, if any. Certain information maintained in the computer system is then used to generate invoices to customers. We selected entries from the daily flight logs and compared them to the ops transaction journal and the Schedule of Charges. Minor differences were noted.

Certain customers received rates discounted from the Schedule of Charges. We requested a listing of discounts given to customers and received a DCR (2002-2005).[36] Based on our limited price testing, the majority of the discounts granted to customers appeared on this report.

4. Amounts billed to Liberty

The sightseeing operation conducted by Liberty at the Heliport was a significant component of APH revenue during the Relevant Period. Therefore, we compared the annual billings recorded by APH to the amounts recorded by Liberty and reconciled the significant differences due to a dispute that arose between the parties.[37] Beginning July 26, 2003, APH billed Liberty based on the then current Schedule of Charges.[38] Through May, 2004, Liberty paid these increased rates. In June, 2004, Liberty informed us that they adjusted its payments to amounts between their contractual discount and full discount and remitted a revised amount. APH, in order to record their revenues from

---

[36]Included herein as Exhibit IV is information from the document. This document was not a contemporaneously maintained document during the Relevant Period.

[37]APH billing amounts were obtained from the "Sales History Report by Customer" for the respective year. Liberty amounts were obtained from the general ledger printouts received during our site visit.

[38] Liberty was billed at full discount from the beginning of the Relevant Period, April 1, 2001 through July 25, 2003. The contractual rates provide for a 50% discount from the Schedule of Charges, while the full discount rates provide for discounts on landing and parking of 66.6% and 85%, respectively. For fuel, the contractual discount is $.50 per gallon. The full discounted price on fuel is cost plus $.88 plus sales tax. In August 2002, the contractual cost for fuel was $3.25, while the discounted price was $2.35. We were not provided with any amendments to the Sightseeing Agreement which would provide for the full discount rates. For the calendar year 2001 and 2002 we estimated that the Percentage Fee due to the Trust for the difference between the contractual rate and the full discount rate for landing and parking was approximately $120,000. For calendar year 2002 we estimated that the Percentage Fee due to the Trust for fuel based on the pricing differential was approximately $20,000. Due to APH's change in billing to Liberty at the Schedule of Charges rates in July 2003 we are not able to quantify the Percentage Fee due to the Trust for the difference between full discount and contractual rates for 2003 and thereafter. It is our understanding that APH continues to invoice Liberty at the Schedule of Charges rates subsequent to the Relevant Period.

Liberty for financial statement purposes, established a reserve to reduce revenue by the disputed amounts.[39]

As a result of the increased rates charged, Liberty, under protest, remitted $1,273,609 to APH. APH initially held the disputed increase differential in an APH escrow account pending the arbitrator's decision. APH was ordered to re-pay Liberty approximately $635,000 in three equal installments. The installments were repaid on November 29, 2004, December 10, 2004 and January 10, 2005.[40]

The balance of the monies received from Liberty, $638,609 was retained by APH and no Percentage Fee has been paid to the Trust through the date of this report. Based on our inquiry dated September 7, 2006, APH counsel responded as follows:

> This amount remains at risk pending the outcome of the New Jersey appeal because in the event of a remand to the trial court, Liberty could recoup all the "overpayments," the payments it made in excess of fully discounted rates under the Consent Order.

Applying the 12 percent Percentage Fee on gross receipts that APH has received from Liberty, relating to the Arbitrator Determination, under appeal by APH, the Trust is due $76,633.

5. Aviation Fuel

To determine whether the fuel gallons sold per the daily flight logs were reasonably recorded, we selected customer fuel purchases and traced the gallons sold to the fuel tickets prepared by the APH attendant. The fuel ticket is a two-part ticket. APH retains one copy of the fuel ticket and gives the other copy to the customer. On the fuel testing performed, we identified a limited number of insignificant differences between the daily flight log and the fuel tickets.

---

[39] APH notified the Trust in a letter dated October 27, 2003 from Joann Cardinal to Karen Jennings that a reserve was being set up which represents "the difference between the earlier rates and the ones effective July 25. This is what we are calling the 'Reserve.' Obviously, if we are successful in defending those increased rates, we will report the results to you and pay the corresponding fees due."

[40] Since APH did not pay the Trust a Percentage Fee on any of the Liberty reserve amounts held in escrow they did not have to adjust the Percentage Fee for the $635,000 that were returned to Liberty.

Since Liberty is APH's largest customer, for the month of June, 2004, we tested whether the total fuel gallons sold per the APH daily logs agreed to the invoices rendered to Liberty. We determined the total June 2004 fuel purchased by Liberty from the daily logs was 24,408.8 gallons. The number of gallons invoiced was 24,456.7, resulting in a difference of 51.9 gallons (more gallons invoiced then recorded in the daily logs). This difference was not considered significant.

We also performed analyses to determine if the total annual amount of fuel gallons purchased was reasonable compared to the total annual gallons sold. We obtained vendor fuel invoices and summarized fuel gallons purchased for the years 2002 through 2004 and for the first quarter of 2005. We could not test 2001 as APH counsel represented that the fuel invoices could not be located.[41] The total fuel gallons purchased were then compared to fuel gallons sold for the respective periods.

The following table indicates fuel sales and purchases (in $) by calendar year:

|  | 2005[42] | 2004 | 2003 | 2002 |
|---|---|---|---|---|
| Sales | $433,824 | $1,715,344 | $1,006,700 | $867,468 |
| Purchases | 211,012 | 805,540 | 440,165 | 401,236 |
| Gross profit | $222,812 | $ 909,804 | $ 566,535 | $466,232 |

The following table indicates fuel sales and purchases (in gallons) by calendar year:

|  | 2005[43] | 2004 | 2003 | 2002 |
|---|---|---|---|---|
| Sales | 106,127 | 459,095 | 320,944 | 315,112 |
| Purchases | 106,627 | 462,326 | 323,568 | 316,775 |
| Difference | (500) | (3,231) | (2,624) | (1,663) |

Based on our procedures, fuel purchases approximated fuel sales for the years 2002 through 2004 and for the first quarter 2005, allowing for changes in the fuel inventory during the respective period.

---

[41] We located the December 2001 invoice in the 2002 group of fuel invoices.
[42] Represents first quarter of 2005.
[43] Ibid.

12

a. Fuel Purchases

During our visit to Bernardsville in May 2005, we were initially provided faxed fuel invoices for 2003 and 2004 although we had requested invoices for the entire Relevant Period.[44] In July 2006, at APH's independent accountant's office, we were provided with original fuel invoices for 2002 and faxed fuel invoices for January 2005 through March 2005. The fuel invoices for 2001 could not be located.

b. Fuel Deliveries

APH has one 8,000 gallon fuel tank[45] used for the sale of jet fuel. Fuel is purchased from Bell Petroleum and delivered by Mystic Fuel Oil usually 1-2 times per week when the tank is approximately one-half empty. It is not unusual for a sightseeing ship to purchase fuel several times a day.[46] To account for fuel gallons purchased and sold, APH performs a daily roll forward of the gallons in the tank starting with the ending gallons of the previous day, less sales, plus purchases, if any, resulting in an ending balance. This computed balance is then compared to the tank gauge. We understand that differences are investigated.

6. Analytical Review of Amounts Due to the Trust

APH's independent accountants, MTL, annually prepare an analytical review procedure ("ARP") worksheet for the Percentage Fees and Permit Fees due the Trust.[47] This worksheet includes a conversion of the accrual revenue reported in the APH financial statements to the gross receipts collected. Permit Fees are then added to Percentage Fee calculation to tally the total fees due the Trust excluding the Use Charges since the Use

---

[44] Per discussion with Ms. Cardinal, commencing in 2003 the vendor faxes the fuel invoices in order to receive quicker payment and no original invoices or statements are received. Delivery slips supplied by the carrier are attached to the fuel invoices. In addition, Ms. Cardinal receives a monthly report of fuel delivered prepared by the Heliport

[45] Section 15 of the Permit indicates that there were 2 storage fuel systems having a total capacity of 11,000 gallons at the Heliport. We learned from the Trust, through the New York State Department of Environmental Conservation, that in 1996 APH purchased a new tank and there is only one 8,000 gallon tank at the Heliport. During our fieldwork at the Heliport, we observed that helicopters fueled from one tank. Because of safety restrictions, we were not able to visit the fuel tank area.

[46] We were informed that according to FAA regulations, a ship cannot take-off with less than 20% of a tank. Due to weight restrictions, a ship normally cannot have more than 40% of a tank.

[47] We were not permitted to take a copy of the ARP.

13

Charge is not an expense of APH but rather a pass through of monies collected from Liberty. The ARP was then compared to the Trust expense recorded in the APH general ledger to determine the reasonableness of the amounts due to the Trust.

We performed an independent test of the MTL ARP for the calendar years 2001 to 2004 by agreeing the amounts per the ARP to the APH financial statements and general ledgers provided. As a result of the MTL ARP test, we forwarded certain questions to L&G through KTG. We also had a conference call with MTL, Ms. Cardinal, KTG, and L&G. We received responses to all of our inquiries.

For 2001 to 2004 we were able to reconcile the difference between the gross receipts reported to the Trust (cash basis) and sales per APH financial statements (accrual basis).[48] APH 2004 financial statements reflect Percentage Fees totaling $733,298 compared to its reporting of Percentage Fees to the Trust of $465,775. The difference of $267,523 reflects a contingent liability due the Trust if APH is successful in its appeal relating to the Liberty arbitration.[49]

B. Use Charges-Helicopter Flight Services and New York Helicopter

During the Relevant Period, sightseeing Use Charges, as required under Section 6(b) of the Permit, were not collected, reported, or remitted to the Trust timely in connection with two of APH's alleged sightseeing operations customers – Helicopter Flight Services ("HFS") and New York Helicopter ("NYH").[50] The Trust requested that we test the passenger counts tabulated by APH. We inquired of APH as to their methodology for

---

[48] Sales per APH financial statements exclude the sales tax revenue collected from customers.

[49] For financial statement purposes APH informed us that "Because APH continues to challenge the Arbitrator's Determination on appeal, it could, if it is successful, ultimately collect some or all of the "reserve". Thus it accrues, as a contingent liability to the HRPT, 12% of the reserve as of December 31, 2004." The 2004 Percentage Fee accrual of $267,523 appears to represent the total Liberty reserve of $2,857,612 ($726,150-2003 and $2,131,462-2004) less the payments to Liberty of $635,000 at 12 %.

[50] APH's position is that these two operators are not conducting sightseeing operations rather they conduct "charter tours on a reservation basis only", letter dated July 21, 2006 from Christopher Gengaro, Esq. to Brian Gallagher, Esq. Use Charges paid to the Trust for these two operators were paid under protest.

determining passenger counts and learned that APH did not maintain the documents necessary to test such payments.[51]

Alternatively, we summarized the annual billings by year for both HFS and NYH from

C. Unreported Percentage Fees Relating to Consultant Agreement and Arbitrator Determination

We are advised by KTG that the Trust is entitled to payment, pursuant to the gross revenue provision under Section 6(b) of the Permit, in connection with the 5% consulting payments made by Liberty to APNY under the Consulting Agreement.[53] No amounts have been remitted to the Trust from inception of the Consulting Agreement. KTG requested we calculate the Percentage Fee due the Trust through January 2006, based on Liberty's monthly gross revenues. The amount of Percentage Fee due totals $462,387.

Summarized below are the payments made under the Consulting Agreement, the gross receipts paid by Liberty that were retained by APH relating to the overpayment of operational charges at the Heliport, and the related 12 percent unreported Percentage Fee.

### Unreported Percentage Fees at 12%
### For the period January 1996 to January 2006

| Year[55] | Consulting Agreement-APNY | | Gross Receipts Retained by APH | | Total |
|---|---|---|---|---|---|
| | Consulting Payments[54] (1) | Trust Percentage Fee (2) | APH reserve (3) | Trust Percentage Fee (4) | Trust Percentage Fee (5)=(2)+(4) |
| 2006 | $ 315,412 | $ 37,849 | | | $ 37,849 |
| 2005 | 556,919 | 66,830 | | | 66,830 |
| 2004 | 456,544 | 54,785 | $274,409 | $ 32,929 | 87,714 |
| 2003 | 325,332 | 39,040 | 364,200 | 43,704 | 82,744 |
| 2002 | 241,269 | 28,952 | | | 28,952 |
| 2001 | 389,479 | 46,737 | | | 46,737 |
| 2000 | 459,021 | 55,083 | | | 55,083 |
| 1999 | 476,271 | 57,153 | | | 57,153 |
| 1998 | 369,989 | 44,399 | | | 44,399 |
| 1997 | 211,545 | 25,385 | | | 25,385 |
| 1996 | 51,448 | 6,174 | - | - | 6,174 |
| Total | $3,853,229 | $462,387 | $638,609 | $76,633 | $539,020 |

---

[53] In January 2006, the Trust brought an action against APH including a claim for a percentage share of the payments received by APNY under the Consulting Agreement. This lawsuit has been stayed by the consent of the parties while the parties engage in settlement negotiations. APH and APNY dispute that the Trust is entitled to a Percentage Fee on the Consulting Agreement payments.

[54] The Arbitrator reduced the Percentage Fee on the Consulting Agreement from 5% to 3.5% effective April 2005.

[55] Year is from May to April, except 1996 which year is from January to April, and 2006 which year is from May 2005 through January 2006.

D. Related Parties

In addition to APNY, we identified eight entities owned or controlled by Mr. Trenk and his family members, either directly or through other entities that had transactions with APH or performed similar operations.[56] The only transaction that appears to have derived revenue in connection with the Operator's operations at the Heliport was the Consulting Agreement payments made by Liberty to APNY except for one open item as set forth below.

For APNY, we requested general ledgers, tax returns and original bank statements for 2003 through 2005.[57] For 2003, we were informed that there were no general ledgers maintained and were provided with a statement of cash inflows and outflows. For 2004 and 2005, we reviewed the APNY general ledgers for items that appeared to be of a related party nature or related to Liberty. Items noted were subsequently addressed and resolved.

We were also provided with the 2003 and 2004 corporate income tax returns for APNY,[58] (the 2005 corporate income tax return had not yet been prepared). We were provided with internally prepared income statements for 2004 and 2005 and trial balances for 2002 through 2005 indicating the various balance sheet accounts of APNY.

We also reviewed the original bank statements of APNY for the years 2003 through 2005. A significant amount of the deposits were receipts from Liberty. The other receipts were either not significant or we obtained support sufficient to determine that the receipt

---

[56] In our initial request for information dated April 25, 2005 we requested a "list of any and all transactions between Mr. Alvin Trenk, Ms. Abigail Trenk and Air Pegasus or any other subsidiary or affiliate owned by Mr. Trenk or Ms. Trenk, including but not limited to Pegasus Aviation, Air Pegasus of New York, and Pegasus Holding Corporation." APH did not provide a response to our request until we recommended our engagement in July 2006 and had access to the general ledgers of APH and APNY. We requested access to six of the eight entities in addition to APNY. In response to our inquiry, APH counsel expressly represented that Phyllis Enterprises, LLC does not receive any revenue relating to the Heliport operations except from its interest in APH and management fees from APNY. Based on this representation we did not request access to this entity's books and records. We also did not request access to Trenk Partners, LLP. APH disagrees that any of these related entities named above performs any operations similar to those performed by the Operator.

[57] APNY books and records are maintained by another accounting firm located in New Jersey.

[58] APNY corporate tax return lists business activity as rental and sales of small aircrafts.

17

### E. Accounting and Computer Deficiencies

Our procedures were not designed to review and report on the effectiveness of APH's accounting and computer systems, and therefore, would not necessarily discover all matters that might be considered deficiencies. However, during the performance of our limited procedures, we noted the following accounting and computer deficiencies:

- The number of operations in the daily flight log is reconciled to the number of operations in the ops transaction journal, but there is no further reconciliation to the various sales journals produced. The current computer system does not allow corrections to be made to a day that has already been processed. Accordingly, there may be more operations in the sales journals than that particular day's daily flight log because of corrections from prior days' billings.

- Due to a computer truncation problem, sales invoices and several computer reports are missing the first digit or reflect an incorrect first digit for amounts in excess of 10,000. For example, in the Daily Sales Analysis, the fuel gallons for January and February 2005 were listed as 19,763.2 and 25,636.6, respectively, when the gallons should have been listed as 29,763.2 and 35,635.6, respectively. For March 2005, fuel gallons were listed as 20,728.3, when they should have been listed as 40,728.3. We understand that this problem has existed for some time. We also understand that the current computer accounting and billing system at the Heliport has not been updated for quite some time.

- APH staff will copy over the daily flight log if the original flight log is not easily readable. However, APH does not retain the original daily flight log in such instances.

- At the conclusion of the year, APH produces hard copies of the computer reports and deletes the electronic files from their computer system. As a result, there is no back-up for prior years' transactions other than the printed reports.

### F. Vending Machines

During our site visit at the Heliport, we observed that there are vending machines. The Permit requires that vending machine gross receipts be included in the Percentage Fee. In response to our written request, Ms. Cardinal replied on July 19, 2006 stating:

> The vending machines have been at the Heliport since 2002 or 2003, and are owned by Answer Vending, Inc. In 2001 there was one vending machine at APH. Around 2002 or 2003, that machine was removed and replaced with 2 beverage machines and a snack machine. APH receives a percentage of the monies collected.

These monies are not recorded as revenue, but are used to periodically purchase lunches for the APH staff.

We were also informed that the vending machine fee received by APH for March 2006 was $165.31. We did not request APH to quantify the total vending machine revenue collected due to the insignificant amounts involved.

### G. Selected Customers

Highlighted below are five APH customers that we performed further analysis based on the results of our procedures. Four of the five customers received discounts of which two did not appear of the DCR and one customer's information did not agree to the DCR. The remaining customer was selected because its' name contained the word "Pegasus."

### 1. US Helicopter ("USH")

In 2002 USH had two different billing arrangements with APH. For the months of January, March and November, 2002, we noted that APH billed USH on an individual landing basis. From April through August 2002, regardless of the number of landings, USH was invoiced a flat charge of $500 per month.

We computed what the Schedule of Charges should have been based on the landing fee at the time of $125. For the period April through August 2002, we noted an under-billing of $3,375 (difference between the flat fee and the Schedule of Charges.) The underpayment to the Trust is 12% of 3,375 or $405. In addition, this customer did not appear on the DCR.

### 2. Zip Aviation ("Zip")/Wings/Print International ("Print")

We tested the February and March 2005 daily flight logs to determine if the same aircraft number appeared for the above companies, as we understand that all of these companies are under common control. We noted that 691S was listed as both a Print and Zip aircraft number, in the daily flight log indicating that at a minimum, Print and Zip appear to be under common control. The February 24, 2005 daily control log, ops #41, identified the customer as Zip/Wings.

We noted that Print was billed a flat fee of $500/month regardless of the number of landings or the time parked. Per the DCR, Print receives a flat monthly fee for parking on what is represented to be an unused landing spot on the barge. Pursuant to the Trust's request, we analyzed what the potential Percentage Fees would be to the Trust if Print were billed on an undiscounted basis.

We selected February 2005 for such analysis. The difference for the month of February 2005 in gross billings had Print been billed on an undiscounted basis would have been $180. The amount due to the Trust at 12% would be $21.60. Since there is no report produced by APH which indicates total hours parked in a month, it would be a time consuming task to determine month by month, using the daily flight logs, what the additional fees, if any, would have been had Print been billed utilizing the Schedule of Charges.

3. CSC Transport ("CSC")/Cablevision

We were informed by APH counsel that CSC is related to Cablevision. We selected two transactions with CSC and noted that the discounts identified on the DCR did not agree with APH customer billing. We noted the following pricing discrepancies for these two operations:

| I. | Ops # | 8855 | | II. | Ops # | 9146 |
|---|---|---|---|---|---|---|
| | Date: | 2/15/05 | | | Date: | 2/17/05 |
| | Ship # | 401CV | | | Ship # | 401CV |
| | Ship type: | S76 | | | Ship type: | S76 |
| | In: | 06:50 | | | In: | 09:12 |
| | Out: | 06:54 | | | Out: | 09:17 |

Per ops transaction journal:
Off ops charge: $300 (should be $400)
Landing charge: $100 (should be $125)

Per ops transaction journal:

Landing charge: $100 (should be $125)

4. Argos Capital ("Argos")

Per our review of APH's sales invoices, we noted that Argos was being charged landing fees of $32.50. This appears to be a 50% discount from the $65 landing price per the

21

Schedule of Charges. Argos was not listed on the DCR.[61] The total Argus Capital billings during the Relevant Period were approximately $24,000.

5. Pegasus Global Helicopters, Corp. ("Pegasus Global")

We researched the name on the internet and found that this entity provides sightseeing tours in NYC. They appear to be located in Linden, New Jersey. We noted that Pegasus Global landed at the Heliport, but it appears they did not provide sightseeing operations from 30th Street. In response to our inquiry, APH Counsel advised that this entity is not affiliated or related to APH. We also reviewed the Sales History Report and determined the amount of revenue collected from Pegasus Global during the Relevant Period was insignificant.

H. Sales and Fuel Tax

APH reports sales and fuel tax to the Trust as reductions from gross cash receipts to determine amounts subject to Percentage Fees.[62] During the Relevant Period these taxes amounted to approximately $923,000. APH computes this deduction by obtaining information from the "monthly tax report"[63] and the fuel vendor invoices. We tested the propriety of the sales and fuel tax deductions reported by APH to the Trust by reviewing APH sales and use tax returns and fuel invoices. Sales and fuel tax is comprised of two elements:

- sales tax collected from APH customers
- other fuel taxes paid by APH to the fuel vendor (e.g. excise tax).[64]

---

[61] In August 2004, Liberty began managing Argos Capital. When this occurred APH no longer billed Argos directly, instead billings were invoiced to Liberty.

[62] In the letter dated November 8, 1996 to the New York State Department of Transportation APH stated that all current taxes including but not limited to, sales tax, road tax, gross receipts tax and spill tax will be deducted from the current month's cash receipts.

[63] The monthly tax report indicates sales tax charged to customers for fuel sales.

[64] APH pays various taxes to the fuel vendor upon purchase of fuel. Only the sales tax component paid to the vendor is deductible on the quarterly sales tax return.

### 1. Sales tax collected from APH customers

We obtained APH's Quarterly NYS Sales & Use Tax Return: Retail Sales of Motor Fuel Tax Returns ("Sales Tax Return") prepared by Ms. Cardinal for the reporting years 2001 through 2005, as well as the fourth reporting quarter of 2000.[65] We tested the information reported on the March through May 2003 Sales Tax Return to determine if the amount agreed to the deduction reported to the Trust. The component of sales tax that is paid to the vendor is recorded in a prepaid fuel tax general ledger account. As part of sales tax recalculation, we compared the general ledger detail for prepaid fuel taxes (account #23800) to the amount reported on the Sales Tax Return. A difference of $395.46 was noted (approximately the amount of one fuel invoice). We also compared the amounts in the prepaid fuel tax account to selected fuel invoices from Bell Petroleum. We then compared the amounts in APH's Monthly Tax Report to the tax due per the Sales Tax Returns. Insignificant exceptions were noted during our procedures.

### 2. Other fuel taxes paid by APH to the fuel vendor

We obtained a summary of Bell Petroleum invoices from January, 2001 through December, 2005, prepared by Ms. Cardinal at our request. This summary lists invoices by number, date and other fuel tax amounts (e.g. road tax and excise tax).

We compared, on a test basis, Bell Petroleum fuel taxes to the schedule provided. Invoices were made available to us for the period December 2001 through March 2005, other than invoices from June through August 2003. No exceptions were noted.

Having determined that the sales tax collected from the customers and fuel tax paid to the vendor were reasonable, we conclude that the amounts deducted from gross cash receipts as reported to the Trust appear to be reasonably stated during the Relevant Period.

### I. Procedures Performed At Liberty

Liberty pays APH Use Charges on a monthly basis based on sightseeing passenger counts. These amounts are then reported and remitted to the Trust. Under the 1996 Agreement between Liberty and APH, APH and the Trust have the right to examine,

---

[65] NYS Sales & Use Tax Return: Retail Sales of Motor Fuel are prepared for reporting quarters ended May, August, November and February.

inspect or audit Liberty's records. APH informed us that they have never chosen to do so. On May 23-24, 2005, we visited Liberty's offices in Linden, NJ to perform certain tests of their accounting sales records to evaluate if the proper amounts are being paid to APH. We selected certain months for testing during 2004 and 2005. Our procedures were designed to test (i) the passenger counts (identified as "pax" counts) computed for the use fee, (ii) the Consulting Agreement payments made to APNY and (iii) the fuel surcharge.

We received a response from Liberty pursuant to our request to identify all payments made to Trenk related entities. Liberty provided an excel spreadsheet setting forth payments made by STA/Liberty from 1998 to April 2005, although payments dated back to 1996.[66] Payments made to three entities and two individuals are summarized as follows:

| Entity Paid | Payments | Category |
|---|---|---|
| 1. Air Pegasus Heliport, Inc. | $12,718,449 | Landing, parking, fuel, trailer rental, use fee, and fuel surcharge |
| 2. APNY | 3,720,289 | % of gross revenue payments on sightseeing income and fuel surcharge (including Wall Street Heliport) |
| 3. Trenk Enterprises | 869,400 | Compensation for Alvin Trenk as Chairman and CEO of STA |
| 4. Abigail Trenk and Brian Tolbert | 10,709 | Commissions for charters from the Heliport |
| Total | $17,318,847 | |

1. Use Charge

In order to test the Liberty pax counts, we accumulated the number of passengers for the days selected for testing from source documents and agreed them to monthly summaries. We also agreed the monthly use fee to a copy of the check sent to APH. The monthly pax counts were also agreed to the amounts reported to the Trust (only sightseeing passengers from the Heliport are subject to the pax fee.)

---

[66] Liberty supplemented the original spreadsheet by providing us additional information for years 1996 and 1997.

Liberty prepares monthly internal financial reports which include pax counts and monthly revenue. For the months that were tested, we also agreed the pax counts and monthly revenue to the internal financial reports. We noted insignificant differences.

## 2. Consulting Agreement Payments

We tested the Consulting Agreement payments Liberty made to APNY by obtaining Liberty's income statements for 2001 to April 2005 and re-computing the 30th Street and Wall Street sightseeing payment.[67] The total amount of consulting payments for the 30 Street location for the period January 1996 to January 2006 was $3,853,229 of which we tested approximately $1,689,000 (44%). This amount was then compared to the expense paid to APNY in Liberty's general ledger, noting insignificant differences in each year.

## 3. Fuel Surcharge

We recomputed one month's fuel surcharge and agreed it to a copy of the check paid to APNY. As mentioned and summarized above, we received a spreadsheet listing payments made to Trenk entities. We added the fuel surcharges for the years 2000 through 2004 from the general ledger print outs we received to reconcile to the above spreadsheet. We identified an immaterial difference. As discussed previously all of the Percentage Fees on the fuel surcharges paid to APNY, from inception through November 2004, were subsequently remitted to the Trust.

## J. Permit Fee

A monthly permit fee is invoiced to APH, increased by 5% (non compounded) on each annual anniversary of the Permit. During the Relevant Period such fees totaled $646,439. We tested the annual billings and determined the amount during the Relevant Period was reasonable.

---

[67] Although the Trust is not entitled to a Percentage Fee on Wall Street, the payments included fees relating to this location and therefore were included in our test.

**Open Item**

As discussed above, there is one open item. We could not form any conclusion on the information provided for Air Pegasus Enterprises, Inc. relating to its receipt of approximately $565,000 from Liberty for lease of a helicopter during the Relevant Period as we are awaiting additional information from Liberty regarding these receipts.

Debbie A. Cutler, CPA, CFE
October 31, 2006

26

# Exhibit 1

**Air Pegasus Heliport, Inc.**
**Monthly Detail of Fees and Charges/Number of Operations**
**April 1, 2001 - March 31, 2002**

| Month | Total | Permit Fees | | | Percentage Fees | | | Use Charges | | | # of Ops |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | (1)=(4)+(7)+(10) | Date (2) | Invoice # (3) | Amount (4) | Date (5) | Invoice # (6) | Amount (7) | Date (8) | Invoice # (9) | Amount (10) | (11) |
| April | $ 52,424 | 4/2/2001 | 159 | $ 12,242 | 6/14/2001 | 205 | $ 25,662 | 6/14/2001 | 205 | $ 14,520 | 3,265 |
| May | 37,742 | 5/3/2001 | 183 | 12,242 | 7/5/2001 | 239 | 12,345 | 7/5/2001 | 239 & 240 | 13,155 | 3,219 |
| June | 39,646 | 5/29/2001 | 190 | 12,242 | 7/28/2001 | 256 | 16,634 | 7/28/2001 | 256 | 10,770 | 2,849 |
| July | 59,323 | 7/2/2001 | 225 | 12,242 | 8/23/2001 | 284 | 34,706 | 8/23/2001 | 284 | 12,375 | 3,200 |
| August | 55,678 | 7/19/2001 | 242 | 12,242 | 2/15/2002 | 379 | 29,561 | 2/15/2002 | 379 | 13,875 | 3,135 |
| September | 39,992 | 9/1/2001 | 269 | 12,242 | 2/15/2002 | 380 | 22,485 | 2/15/2002 | 380 | 5,265 | 1,469 |
| October | 41,062 | 10/1/2001 | 287 | 12,242 | 2/15/2002 | 381 | 28,415 | 2/15/2002 | 381 | 405 | 541 |
| November | 30,111 | 11/1/2001 | 301 | 12,242 | 2/8/2002 | 376 | 14,659 | 2/8/2002 | 376 | 3,210 | 1,009 |
| December | 36,386 | 11/21/2001 | 318 | 12,242 | 2/8/2002 | 377 | 18,624 | 2/8/2002 | 377 | 5,520 | 1,423 |
| January | 48,960 | 12/24/2001 | 350 | 12,242 | 3/29/2002 | 435 | 33,268 | 3/29/2002 | 435 | 3,450 | 1,119 |
| February | 32,357 | 1/23/2002 | 362 | 12,242 | 3/29/2002 | 436 | 14,625 | 3/29/2002 | 436 | 5,490 | 1,119 |
| March | 38,777 | 2/22/2002 | 383 | 12,242 | 3/29/2002 | 437 | 18,360 | 3/29/2002 | 437 | 8,175 | 1,741 |
| Adjustment | 5,616 | 12/1/2002 | 311 | 5,616 * | | | | | | | |
| Total | $ 518,068 | | | $ 152,514 | | | $ 269,344 | | | $ 96,210 | 24,089 |

* This amount represents a portion of invoice IVC 000311 in the amount of $8,160. The balance of $2,544.50 is allocated to the following year.

Page 1 of 4

EXHIBIT I

## Air Pegasus Heliport, Inc.
## Monthly Detail of Fees and Charges/Number of Operations
## April 1, 2002 - March 31, 2003

| Month | Total | Permit Fees | | | Percentage Fees | | | Use Charges | | | # of Ops |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | (1)=(4)+(7)+(10) | Date (2) | Invoice # (3) | Amount (4) | Date (5) | Invoice # (6) | Amount (7) | Date (8) | Invoice # (9) | Amount (10) | (11) |
| April | $ 52,973 | 4/1/2002 | 66 | $ 12,242 | 9/1/2002 | 202 | $ 32,601 | 9/1/2002 | 202 | $ 8,130 | 2,019 |
| May | 29,143 | 5/1/2002 | 91 | 12,242 | 9/1/2002 | 203 | 9,431 | 9/1/02 & 11/1/02 | 203 & 281 | 7,470 | 2,085 |
| June | 43,101 | 6/1/2002 | 109 | 12,242 | 11/1/2002 | 282 | 23,464 | 11/1/2002 | 282 | 7,395 | 2,179 |
| July | 51,063 | 7/1/2002 | 127 | 12,242 | 7/1/2002 | 349 | 31,021 | 7/1/2002 | 349 | 7,800 | 2,159 |
| August | 49,975 | 8/1/2002 | 174 | 12,242 | 8/1/2002 | 350 | 26,843 | 8/1/2002 | 350 | 10,890 | 2,627 |
| September | 46,688 | 9/1/2002 | 201 | 12,242 | 9/1/2002 | 351 | 25,701 | 9/1/2002 | 351 | 8,745 | 2,217 |
| October | 64,436 | 10/1/2002 | 254 | 12,242 | 10/1/2002 | 352 | 41,709 | 10/1/2002 | 352 | 10,485 | 2,438 |
| November | 67,450 | 11/1/2002 | 280 | 12,242 | 11/1/2002 | 353 | 42,398 | 11/1/2002 | 353 | 12,810 | 2,524 |
| December | 60,814 | 11/1/2002 | 310 | 12,752 | 2/26/2003 | | 32,702 | 2/26/2003 | | 15,360 | 2,671 |
| January | 61,826 | 1/1/2003 | 327 | 12,752 | 1/1/2003 | 385 | 42,429 | 1/1/2003 | 385 | 6,645 | 1,562 |
| February | 48,757 | 2/1/2003 | 356 | 12,752 | 2/1/2003 | 440 | 29,300 | 2/1/2003 | 440 | 6,705 | 1,449 |
| March | 48,990 | 3/26/2003 | 474 | 13,262 | 3/31/2003 | 492 | 26,353 | 3/31/2003 | 493 | 9,375 | 1,933 |
| Adjustment | 2,545 | 12/1/2002 | 311 | 2,545 * | | | | | | | |
| Adjustment 9/02-11/02 | 1,530 | 11/1/2002 | 309 | 1,530 | | | | | | | |
| Adjustment | 4,084 | 2/12/2003 | 380 | 4,084 | | | | | | | |
| Total | $ 633,369 | | | $ 157,607 | | | $ 363,952 | | | $ 111,810 | 25,863 |

* This amount represents a portion of invoice IVC 000311 in the amount of $8,160. The balance is allocated to the following year.

EXHIBIT I

### Air Pegasus Heliport Inc.
### Monthly Detail of Fees and Charges/Number of Operations
### April 1, 2003 - March 31, 2004

| Month | Total (1)=(4)+(7)+(10) | Permit Fees | | | Percentage Fees | | | Use Charges | | | # of Ops |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| April | $ 50,392 | 4/7/2003 | 405 | $ 12,752 | 4/1/2003 | 561 | $ 27,500 | 4/1/2003 | 561 | $ 10,140 | 1,930 |
| May | 34,560 | 8/16/2003 | 955 | 13,262 | 5/1/2003 | 562 | 12,538 | 5/1/2003 | 562 | 8,760 | 1,905 |
| June | 39,236 | 6/6/2003 | 498 | 13,262 | 6/1/2003 | 615 | 17,094 | 6/1/2003 | 615 | 8,880 | 2,056 |
| July | 71,791 | 7/1/2003 | 532 | 13,262 | 9/1/2003 | 645 | 46,379 | 9/1/2003 | 645 | 12,150 | 2,787 |
| August | 51,295 | 8/1/2003 | 567 | 13,262 | 8/1/2003 | 650 | 24,143 | 8/1/2003 | 650 | 13,890 | 2,661 |
| September | 62,928 | 9/1/2003 | 595 | 13,262 | 9/1/2003 | 682 | 39,211 | 9/1/2003 | 683 | 10,455 | 2,142 |
| October | 61,659 | 10/1/2003 | 619 | 13,262 | 10/1/2003 | 680 | 33,112 | 10/1/2003 | 681 | 15,285 | 2,906 |
| November | 63,002 | 11/1/2003 | 651 | 13,262 | 11/1/2003 | 705 | 32,955 | 11/1/2003 | 706 | 16,785 | 2,886 |
| December | 63,614 | 12/1/2003 | 665 | 13,262 | 2/25/2004 | 742 | 31,947 | 2/25/2004 | 742 | 18,405 | 3,004 |
| January | 71,886 | 1/1/2004 | 685 | 13,784 | 1/1/2004 | 768 | 47,362 | 1/1/2004 | 768 | 10,740 | 1,890 |
| February | 60,851 | 2/1/2004 | 729 | 13,784 | 2/1/2004 | 797 | 34,062 | 2/1/2004 | 797 | 13,005 | 2,348 |
| March | 37,138 | 3/1/2004 | 752 | 13,784 | 5/5/2004 | 843 | 10,034 | 5/5/2004 | 843 | 13,320 | 2,428 |
| | 1,021 | 8/16/2004 | DEBITT0000017 | 1,021 | | | | | | | |
| | 4,084 | 12/1/2003 | 684 | 4,084 | | | | | | | |
| Total | $ 673,455 | | | $ 165,303 | | | $ 356,337 | | | $ 151,815 | 28,943 |

Page 3 of 4

EXHIBIT I

**Air Pegasus Heliport, Inc.**
**Monthly Detail of Fees and Charges/Number of Operations**
**April 1, 2004 - March 31, 2005**

| Month | Total | Permit Fees | | | Percentage Fees | | | Use Charges | | | # of Ops |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | (1)=(4)+(7)+(10) | Date (2) | Invoice # (3) | Amount (4) | Date (5) | Invoice # (6) | Amount (7) | Date (8) | Invoice # (9) | Amount (10) | (11) |
| April | $ 58,182 | 4/1/2004 | 876 | $ 14,294 | 4/1/2004 | 873 | $ 26,098 | 4/1/2004 | 873 | $ 17,790 | 3,089 |
| May | 89,221 | 5/1/2004 | 801 | 13,783 | 8/4/2004 | 951 | 61,113 | 8/4/2004 | 951 | 14,325 | 2,955 |
| June | 26,759 | 7/1/2004 | 914 | 14,294 | 7/1/2004 | 1018 | - | 7/1/2004 | 1018 | 12,465 | 3,213 |
| July | 89,250 | 7/1/2004 | 1019 | 14,294 | 7/30/2004 | 1017 | 58,216 | 7/30/2004 | 1017 | 16,740 | 3,283 |
| August | 66,165 | 8/1/2004 | 919 | 14,294 | 8/2/2004 | 1020 | 37,216 | 8/2/2004 | 1020 | 14,655 | 3,305 |
| September | 65,358 | 9/2/2004 | 961 | 14,294 | 9/1/2004 | 1074 | 36,064 | 9/1/2004 | 1074 | 15,000 | 3,015 |
| October | 82,715 | 10/1/2004 | 989 | 14,294 | 2/15/2005 | 1145 | 49,656 | 2/15/2005 | 1145 | 18,765 | 3,632 |
| November | 57,970 | 11/1/2004 | 1042 | 14,294 | 2/17/2005 | 1148 | 24,026 | 2/17/2005 | 1148 | 19,650 | 3,453 |
| December | 119,705 | 12/1/2004 | 1078 | 14,294 | 2/16/2005 | 1147 | 81,621 | 2/16/2005 | 1147 | 23,790 | 3,815 |
| January | 73,265 | 12/30/2004 | 1102 | 14,294 | 1/3/2005 | 1179 | 46,701 | 1/3/2005 | 1179 | 12,270 | 2,215 |
| February | 63,903 | 1/31/2005 | 1123 | 14,294 | 2/28/2005 | 1206 | 33,964 | 2/28/2005 | 1206 | 15,645 | 2,867 |
| March | 71,608 | 3/2/2005 | 1156 | 14,294 | 3/31/2005 | 1207 | 38,159 | 3/31/2005 | 1207 | 19,155 | 3,208 |
| | 10,918 | | | | 12/24/2004 None | | 12,268 | 2/18/2005 CREDIT00000111 | | (1,350) | |
| | 2,115 | | | | | | | 2/23/2005 | | 2,115 | |
| | 2,385 | | | | | | | 4/15/2005 NYH | | 2,385 | |
| **Total** | $ 879,518 | | | $ 171,016 | | | $ 505,102 | | | $ 203,400 | 38,050 |

Page 4 of 4

EXHIBIT I

**Exhibit 2**

Air Pegasus Heliport, Inc.
Monthly Detail of Revenue Earned
April 1, 2001 through March 31, 2005

| | Total | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **9 Months 2001** | | | | | | | | | | | | | |
| Landing | $ 719,368 | | | | $ 105,254 | 106,796 | 97,045 | 105,629 | 99,002 | 51,044 | 22,797 | 51,296 | $ 80,505 |
| Parking | 274,455 | | | | 32,092 | 33,505 | 33,165 | 34,965 | 29,370 | 38,104 | 13,662 | 24,314 | 35,278 |
| Off-Ops | 404,050 | | | | 53,650 | 62,800 | 56,450 | 61,250 | 45,800 | 28,450 | 14,150 | 34,200 | 47,300 |
| Fuel (w/ sales tax) | 930,707 | | | | 130,640 | 138,214 | 130,723 | 166,417 | 147,456 | 86,330 | 34,752 | 47,538 | 48,637 |
| Miscellaneous | 48,806 | | | | 5,000 | 5,306 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 |
| Total - 2001 | $ 2,377,386 | | | | $ 326,636 | $ 346,621 | $ 322,883 | $ 373,761 | $ 327,128 | $ 209,428 | $ 90,861 | $ 162,848 | $ 217,220 |
| **2002** | | | | | | | | | | | | | |
| Landing | $ 1,349,010 | $ 71,442 | $ 76,431 | $ 91,264 | $ 115,231 | $ 118,599 | $ 137,524 | $ 113,290 | $ 123,863 | $ 122,498 | $ 135,690 | $ 124,063 | $ 119,115 |
| Parking | 485,950 | 28,139 | 24,645 | 31,694 | 48,384 | 43,564 | 50,301 | 36,548 | 48,365 | 45,095 | 50,395 | 43,566 | 35,254 |
| Off-Ops | 747,230 | 46,200 | 45,100 | 44,750 | 70,300 | 72,300 | 85,340 | 62,000 | 63,300 | 71,300 | 70,500 | 64,240 | 51,500 |
| Fuel (w/ sales tax) | 935,657 | 34,174 | 41,813 | 57,638 | 71,811 | 69,922 | 91,172 | 91,653 | 116,826 | 89,966 | 94,943 | 92,126 | 83,793 |
| Miscellaneous | 79,941 | 5,500 | 6,900 | 6,900 | 7,000 | 6,816 | 7,000 | 7,400 | 7,000 | 6,500 | 6,000 | 6,500 | 6,525 |
| Total - 2002 | $ 3,597,788 | $ 185,455 | $ 194,889 | $ 231,966 | $ 312,726 | $ 311,200 | $ 371,337 | $ 311,291 | $ 359,354 | $ 335,359 | $ 357,528 | $ 330,495 | $ 296,187 |
| **2003** | | | | | | | | | | | | | |
| Landing | $ 1,819,505 | $ 85,500 | $ 74,110 | $ 97,048 | $ 96,566 | $ 102,307 | $ 111,700 | $ 160,900 | $ 215,385 | $ 178,945 | $ 237,527 | $ 224,650 | $ 234,867 |
| Parking | 473,654 | 27,277 | 23,072 | 36,082 | 28,228 | 41,784 | 36,641 | 47,573 | 45,626 | 47,394 | 56,826 | 38,789 | 44,362 |
| Off-Ops | 767,300 | 42,800 | 35,100 | 53,000 | 48,000 | 56,100 | 70,400 | 78,900 | 70,700 | 76,100 | 96,700 | 68,700 | 70,800 |
| Fuel (w/ sales tax) | 1,089,925 | 53,134 | 52,008 | 70,585 | 68,990 | 76,011 | 85,546 | 118,797 | 126,495 | 93,663 | 109,264 | 116,963 | 118,469 |
| Miscellaneous | 86,808 | 6,520 | 6,500 | 6,050 | 6,000 | 12,613 | 7,000 | 8,025 | 7,000 | 6,500 | 7,050 | 6,500 | 7,050 |
| Reserve | (726,150) | | | | | | | | (190,735) | (97,007) | (131,832) | (146,859) | (159,697) |
| Total - 2003 | $ 3,511,042 | $ 215,231 | $ 190,790 | $ 262,765 | $ 247,784 | $ 288,815 | $ 311,287 | $ 414,195 | $ 274,471 | $ 305,595 | $ 375,515 | $ 308,743 | $ 315,851 |
| **2004** | | | | | | | | | | | | | |
| Landing | $ 2,734,384 | $ 152,427 | $ 185,925 | $ 193,458 | $ 242,817 | $ 233,328 | $ 241,699 | $ 226,045 | $ 219,490 | $ 206,755 | $ 285,492 | $ 264,508 | $ 282,440 |
| Parking | 679,945 | 26,939 | 30,319 | 36,858 | 54,048 | 54,643 | 70,993 | 63,340 | 59,835 | 60,008 | 84,156 | 77,010 | 62,146 |
| Off-Ops | 897,545 | 45,700 | 59,100 | 60,000 | 80,325 | 82,500 | 93,100 | 86,500 | 69,700 | 70,800 | 101,100 | 84,120 | 64,300 |
| Fuel (w/ sales tax) | 1,860,921 | 73,673 | 93,278 | 103,669 | 134,402 | 146,134 | 182,473 | 202,695 | 182,096 | 145,368 | 183,890 | 197,208 | 215,935 |
| Miscellaneous | 793,646 | 13,925 | 23,075 | 60,773 | 79,275 | 72,925 | 72,420 | 70,268 | 69,205 | 65,300 | 92,540 | 82,000 | 91,980 |
| Reserve | (1,264,436) | (95,820) | (113,190) | (155,858) | (202,657) | (187,938) * | (181,907) | (201,086) | (208,711) | (176,736) | (187,879) | (193,000) | 640,706 |
| Total - 2004 | $ 5,702,005 | $ 216,494 | $ 278,547 | $ 298,860 | $ 388,210 | $ 401,592 | $ 478,778 | $ 447,762 | $ 391,615 | $ 371,495 | $ 559,299 | $ 511,846 | ######### |
| **3 Months 2005** | | | | | | | | | | | | | |
| Landing | $ 636,430 | $ 177,415 | $ 218,925 | $ 240,090 | | | | | | | | | |
| Parking | 160,946 | 40,114 | 58,936 | 61,896 | | | | | | | | | |
| Off-Ops | 169,800 | 49,800 | 54,200 | 65,800 | | | | | | | | | |
| Fuel (w/ sales tax) | 433,824 | 122,049 | 145,341 | 166,434 | | | | | | | | | |
| Miscellaneous | 206,054 | 58,104 | 70,215 | 77,735 | | | | | | | | | |
| Reserve | (447,113) | (95,820) | (152,758) | (198,535) | | | | | | | | | |
| Total - 2005 | $ 1,159,941 | $ 351,662 | $ 394,859 | $ 413,420 | | | | | | | | | |

* APH two invoices for May 2004 sent to the Trust reflected reserves of $81,202 (May 1-12) and $223,699 (May 13-31). This amount reflects the journal entry that was recorded in APH general ledger.
** The amount reported to the Trust was $226,320. We adjusted this amount for a year end journal entry identified in APH general ledger in the amount of $867,026.

EXHIBIT 11

**Exhibit 3**

Air Pegasus Heliport, Inc.
Monthly Detail of Customer Receipts Reported to the Trust
April 1, 2001 through March 31, 2005

| | Total | April | May | June | July | August | September | October | November | December | January | February | March |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2002** | | | | | | | | | | | | | |
| Customer receipts | $2,993,118 | $256,026 | $313,177 | $290,387 | $390,798 | $330,952 | $218,153 | $263,447 | $190,314 | $182,850 | $299,493 | $132,993 | $164,528 |
| Less non-customer cash receipts | 97,074 | 18,465 | 15,167 | 18,126 | 12,625 | 13,794 | 60 | | 10,003 | 4,830 | 423 | 3,094 | 487 |
| Less sales tax & fuel tax | 102,861 | 23,711 | 25,882 | 24,854 | 31,110 | 26,912 | 13,680 | 5,127 | 7,051 | 8,711 | 6,752 | 8,026 | 11,645 |
| Net cash receipts - 2002 | $2,701,183 | $213,850 | $272,128 | $247,407 | $347,063 | $290,246 | $204,413 | $258,320 | $173,260 | $169,309 | $292,318 | $121,873 | $152,996 |
| **2003** | | | | | | | | | | | | | |
| Customer receipts | $3,924,141 | $304,428 | $303,043 | $326,235 | $360,787 | $288,194 | $258,399 | $411,548 | $417,938 | $231,144 | $365,120 | $293,117 | $274,188 |
| Less non-customer cash receipts | 241,766 | 20,087 | 1,645 | 33,961 | 33,265 | 1,374 | 7,750 | 14,746 | 19,559 | 28,991 | 35 | 39,024 | 41,289 |
| Less sales tax & fuel tax | 191,109 | 12,664 | 13,919 | 16,525 | 17,314 | 24,141 | 16,997 | 17,652 | 17,549 | 19,635 | 11,514 | 9,927 | 13,292 |
| Net cash receipts - 2003 | $3,491,266 | $271,677 | $287,479 | $275,749 | $310,208 | $262,679 | $233,652 | $379,150 | $380,760 | $272,518 | $355,571 | $244,166 | $219,607 |
| **2004** | | | | | | | | | | | | | |
| Customer receipts | $4,818,993 | $240,137 | $322,609 | $260,433 | $505,237 | $453,343 | $483,209 | $462,686 | $483,744 | $463,459 | $521,386 | $351,587 | $271,163 |
| Less non-customer cash receipts | 165,139 | | | 10,402 | 17,956 | 12,150 | 14,175 | 10,455 | 23,430 | 17,530 | 18,405 | 10,763 | 13,732 |
| Less sales tax & fuel tax | 206,879 | 10,970 | 14,517 | 16,525 | 23,519 | 20,506 | 15,562 | 19,357 | 19,850 | 20,001 | 12,477 | 15,635 | 17,560 |
| Less Liberty reserve | 1,019,166 | | | | | | 97,007 | 131,852 | 146,859 | 159,697 | 95,820 | 41,338 | 155,858 |
| Net cash receipts - 2004 | $3,427,809 | $229,167 | $291,921 | $233,506 | $463,792 | $229,932 | $356,465 | $301,022 | $293,605 | $266,231 | $394,684 | $283,851 | $83,613 |
| **2005** | | | | | | | | | | | | | |
| Customer receipts | $5,397,915 | $455,546 | $612,903 | $275,581 | $632,626 | $420,238 | $346,911 | $481,165 | $236,573 | $777,513 | $473,413 | $231,855 | $363,591 |
| Less non-customer cash receipts | 246,232 | 13,320 | 17,775 | | 26,840 | 16,740 | 14,655 | | | 60,094 | 63,516 | 13,825 | 18,807 |
| Less sales tax & fuel tax | 331,952 | 21,608 | 24,541 | 30,940 | 21,790 | 31,333 | 22,978 | 29,752 | 33,441 | 36,038 | 20,664 | 24,999 | 26,791 |
| Less Liberty reserve | 254,443 | 202,657 | (83,854) | 181,907 | (47,267) | | | | | | | | |
| Net cash receipts - 2005 | $4,565,288 | $217,484 | $653,441 | $62,734 | $625,263 | $372,165 | $309,278 | $451,413 | $203,132 | $680,181 | $389,173 | $283,031 | $317,993 |

Exhibit III

**Exhibit 4**

**Air Pegasus Heliport, Inc.**
**Customer Discounts (2002 - 2005)**

| Customer | Landing/parking | Off-Ops | Fuel | SAFE fee | Parking fee | Reason |
|---|---|---|---|---|---|---|
| 1. Aetna | 20% | | | | | Granted pre-1986 by PANYNJ |
| 2. AOL | | | .25/gallon | | | Promise of increased volume |
| 3. Broadcast | 50% | | .50/gallon | None | | Previously operated by Liberty |
| 4. Cablevision | | | .25/gallon | None | | Promise of increased volume |
| 5. Cantagree | | $100 | | | | Promise of increased in off-ops business |
| 6. Cigna | 20% | | | | | Granted pre-1986 by PANYNJ |
| 7. Helilite | | | | None | | Promise of priority use of Heliport |
| 8. Honeywell | 20% | | | | | Promise of increased volume |
| 9. Hover Views | | $100 | .25/gallon | | | Promise of increased volume |
| 10. Integrated | | $100 | | | | Promise of increased volume |
| 11. NY State | | 50% | No tax | | None | Government agency |
| 12. Print Int'l | | | | | Flat fee | For utilizing unused landing spot on barge |
| 13. Travelers | 20% | | | | | Granted pre-1986 by PANYNJ |
| 14. Wall Street | | | .25/gallon | | | Granted pre-1986 by PANYNJ |
| 15. Zip | 50% | | | | | Promise of increased volume |

EXHIBIT IV

**Exhibit 5**

**Documents Provided and or Reviewed**

**APH Documents**[*]
1. Accounts receivable aging
2. Accounts receivable distribution to general ledger report
3. Accounts receivable open items purge report
4. Bank deposit slips-2003 and 2004
5. Bank statements
6. Cash receipts report
7. Corporate Book
8. Customer invoices (as selected)
9. Customer list
10. Daily flight logs
11. Daily sales analysis
12. Deposit Control Sheets
13. Discounted Customer Report 2002-2005
14. Draft review financial statements December 31 2004 and December 31, 2003
15. Financial statements December 31, 2003 (review) and December 31, 2002 (audit)
16. Financial statements December 31, 2002 and December 31, 2001 (audit)
17. Fuel invoices- except 2001
18. Fuel tickets
19. General ledgers
20. Monthly tax report except 2002
21. Monthly landing reports
22. NYS Sales & Use Tax Return, 2001 – 2005, and the 4th Quarter of 2000
23. Ops transaction journals
24. Sales history reports
25. Sales journals
26. Tax return-Form 1120S for the years ended December 31, 2001 – 2004
27. Trial balances
28. Various internal worksheets relating to sales and fuel taxes

**Other documents**
1. APNY general ledgers (2004 – 2005), Form 1120S (2003 – 2004), income statements (2004 – 2005), balance sheet trial balance (2002 – 2005) and bank statements (2003 – 2005)
2. APH Monthly Reports to the Trust for the Relevant Period
3. Form 1120S; 2001 – 2004 for:
     i.  Air Pegasus Corporation
     ii. Air Pegasus Enterprises, Inc.
     iii. Air Pegasus Ventures, Inc.
4. Form 1040, Sch C. for Alvin Trenk; 2001 – 2004
5. Form 1120S for Trenk Enterprises, Inc., 2001

---

[*] APH documents were for the Relevant Period unless otherwise noted

Exhibit V

**Other documents (continued)**

6. Permit No. XW307 – Agreement dated March 25th, 1996, between New York State Department of Transportation and Air Pegasus Heliport, Inc.
7. Agreement dated May 1996 between Air Pegasus Heliport, Inc. and Liberty Helicopter Tours, Inc.
8. First Modification to Agreement (dated May 1996) to be effective as of December 31, 1996.
9. Consulting Agreement dated December 31, 1996 between Liberty Helicopter, Inc. and Air Pegasus of New York, Inc.
10. Superior Court of New Jersey Law Division: Union County Docket Number: UNN – L – 2713 – 03, Air Pegasus of New York, Inc., a Delaware corporation, and Air Pegasus Heliport, Inc., a Delaware corporation, Plaintiffs, vs. Liberty Helicopter Tours, Inc., a New York corporation, Defendant, Order, dated July 25th, 2003
11. Arbitration and Monitor Agreement dated June 2nd, 2004 between Sightseeing Tours of America, Inc. and Air Pegasus of New York, Inc.
12. Arbitrator Determination (Re: Claims against the Accounting firm of Lawlor, O'Brien & Chervenak) dated December 8, 2004, In Re: Arbitration & Monitor Agreement Dated June 2, 2004
13. Arbitrator Determination Regarding Various Issues dated April 8, 2005, In Re: Arbitration & Monitor Agreement dated June 2, 2004
14. Response by the Trust to the draft audit report issued by the State of New York, Office of the State Comptroller dated October 15, 2004
15. Audit report of the State of New York, Office of the State Comptroller of the Trust's systems of internal controls dated January 4, 2005
16. Follow-up audit report to the Trust by the State of New York, Office of the State Comptroller dated April 6, 2006
17. Monthly HRPT Percentage Fee and Use Charges Invoices and Permit Fee Invoices for the period April 2001 to March 2005 for the Relevant Period
18. APH monthly reports to the Trust for the Relevant Period and subsequent monthly reports through May 31, 2006
19. Draft auditor's report dated April 29, 2002 prepared by Citrin Cooperman & Company, LLP relating to Hudson River Park Trust- Schedule of Additional Rents Due Under a Lease between Hudson River Park Trust, and Air Pegasus Heliport, Inc. for the period April 1, 1999 to March 31, 2001
20. Various correspondence relating to this engagement between APH, HRPT, KTG, Lentz & Gengaro, and Kramer, Love & Cutler LLP

**Liberty Documents**

1. STA financial statements for the year ended December 31, 2001
2. STA Form 1120 for years ended December 31, 2002 and 2001
3. Stockholder Report as of April 30, 2005
4. Schedule of Trenk Related Payments
5. Various Liberty general ledger print-outs and other accounting documents