# Thomas P. DiNapoli
## COMPTROLLER



Audit Objectives ............................. 2

Audit Results - Summary ................. 2

Background ..................................... 3

Audit Findings and
    Recommendations ...................... 3

Carrier Charges ................................ 3
Revenue ........................................... 4
Business Environment ...................... 5
*Recommendations* ........................... 6

Audit Scope and Methodology ....... 6

Authority ........................................ 7

Reporting Requirements ................ 7

Contributors to the Report ............ 7

Appendix A - Auditee Response .... 8

Appendix B - State Comptroller's
    Comments on Auditee
    Response .................................. 25

OFFICE OF THE
NEW YORK STATE COMPTROLLER

DIVISION OF STATE
GOVERNMENT ACCOUNTABILITY

# HUDSON RIVER PARK TRUST

# WEST 30TH STREET HELIPORT REVENUE OPERATIONS

# Report 2006-S-75

## AUDIT OBJECTIVES

Our objectives were to determine whether the West 30th Street Heliport manager charged carriers the appropriate fees, and accurately reported and remitted the appropriate revenues to the Hudson River Park Trust.

## AUDIT RESULTS - SUMMARY

The West 30th Street Heliport (Heliport), located in Manhattan, is one of three public heliports in New York City. It is managed by Air Pegasus Heliport, Inc. (Pegasus), pursuant to an agreement (Permit) with the Hudson River Park Trust (Trust).

Heliport revenues are derived primarily from helicopter landings, parking, fuel, and other associated charges. Under its Permit with the Trust, Pegasus is required to remit a basic monthly Permit fee and an additional fee equal to a percentage of its gross receipts. During our audit period, Pegasus reported $11.5 million in total revenue and paid $1.9 million to the Trust.

Our audit could not determine whether Pegasus charged all customer carriers appropriate fees because it gave discounts to select carriers without the benefit of a formal written discount policy. We also note that, during the course of the audit, the Trust effectuated a settlement with Pegasus relating to revenues being received by a Pegasus-related entity which had not previously been reported to the Trust.

According to its Permit, Pegasus must provide services on a fair, equal, and non-discriminatory basis to all carriers at the Heliport. Pegasus also has the right, pursuant to the Permit, to offer discounts to carriers within this framework. However, we found that Pegasus offered discounts to at least four of the dozens of carriers at the Heliport,

totaling $109,000 during the audit period, but these discounts were given without the benefit of a formal written discount policy thereby negating our ability to determine either their propriety or fairness. If the posted fees had been charged, Pegasus would have had to remit at least an additional $11,000 to the Trust. [Pages 3-4]

We also found that Pegasus correctly remitted the basic monthly Permit fee. However, as noted, there were significant revenues Pegasus did not initially include in its determination of gross receipts. These revenues were being paid by one of the carriers at the Heliport to a Pegasus-related entity under the terms of a "consulting agreement" entered into between the parties. As far as we could determine on audit, no consulting services were ever provided in connection with this agreement. The agreement called for the carrier to make payments to the Pegasus-related entity based upon the carrier's revenues attributable to its sightseeing business conducted from the Heliport. Payments to the Pegasus-related entity under this consulting agreement totaled $5.57 million over the period 1997 through July 2006. After the Trust asserted a right to a portion of these payments under the Permit and the commencement of litigation between the Trust and Pegasus, these parties entered into a settlement agreement pursuant to which Pegasus paid the Trust in accordance with the Permit its share of these moneys (in the amount of $462,387) and agreed to pay the Trust its appropriate share of any future payments associated with the consulting agreement. [Pages 4-5]

Our audit found that some of the additional fees that Pegasus imposed on carriers were questionable. [Pages 5-6]

Our audit report contains three recommendations.

This report, dated December 21, 2007, is available on our website at: http://www.osc.state.ny.us   Add or update your mailing list address by contacting us at: (518) 474-3271 or
Office of the State Comptroller
Division of State Government Accountability
110 State Street, 11th Floor
Albany, NY 12236

## BACKGROUND

The West 30th Street Heliport (Heliport), located in Manhattan at 30th Street and the Hudson River, is one of three public heliports in New York City. It is managed by Air Pegasus Heliport, Inc. (Pegasus), pursuant to an agreement (Permit) with the New York State Department of Transportation in 1996. The Permit was later assumed by the Hudson River Park Trust (Trust), a New York State/New York City partnership created by the New York State Legislature in 1998 to design, develop, operate, and maintain Hudson River Park. The original contract ran for five years, expiring in 2001. Since then, Pegasus has been operating the Heliport under an automatic renewal provision as provided for in the original agreement.

The Heliport hosts thousands of helicopter landings and take-offs each year. Most of the carriers using this facility are either sightseeing, corporate, or charter operators. Heliport revenues are derived primarily from helicopter landing, parking, fuel, and other associated charges. For the period January 1, 2004 to March 31, 2006, Pegasus reported $11.5 million in total revenue collections and paid $1.9 million to the Trust.

The Trust is responsible for ensuring that Pegasus complies with the terms of the Permit and operates the Heliport in an efficient and effective manner.

## AUDIT FINDINGS AND RECOMMENDATIONS

### Carrier Charges

The Heliport Permit requires Pegasus to provide services on a fair, equal, and non-discriminatory basis to all carriers, and to charge carriers non-discriminatory fees for landings, parking, and fuel. All fees must be posted publicly at the Heliport. While the Trust does not have to approve the fees, Pegasus is required to file a list of its fees with the Trust and pay the Trust a percentage of all fees collected. The Permit also allows Pegasus to offer discounts to carriers within the above-noted framework. We observed that Pegasus did publicly post its basic fees and filed them with the Trust. However, we found Pegasus offered discounts to at least four of the dozens of carriers using the Heliport without any formal discount policy in place, thereby negating our ability to determine either their propriety or fairness.

Helicopter activity is recorded via daily activity logs at the Heliport, noting all helicopter take-offs and landings. We observed 47 helicopter landings and take-offs, and then matched the observation times to the postings in the activity logs. We also compared the activity logs with invoices issued to carriers to determine whether the appropriate amounts were charged based on the fee schedules in place and the noted activities.

We selected one day during each month of our audit period and compared the first 10 log entries per day (133 in total, as certain days selected had fewer than 10 entries) with the corresponding invoices to verify whether the helicopter landing and take-off information was reported accurately on the invoices and whether the appropriate rates were charged. We found no discrepancies when comparing

these documents with the times recorded for the landings and take-offs. However, when we checked the rates charged on these sampled invoices to the published rate schedules, we found that lower fees than posted (discounts) were charged to at least four carriers at the Heliport during the audit period. Two carriers received 20-percent discounts for parking and landing, one received a 50-percent discount for landing, and the fourth received a reduced flat rate for monthly parking.

According to Pegasus, it offered discounts or other types of price reductions to volume customers in connection with the landing or parking of helicopters. However, because Pegasus did not have a written policy describing the type or quantity of discounts to be given, and the level of business volume required in order for these carriers to receive these discounts, we could not determine whether discounts were offered in a fair and non-discriminatory manner. The discounts received by the three carriers receiving percentage discounts during 2005 totaled $59,945. If Pegasus had not provided the above discounts, it would have had to pay the Trust an additional $6,000.

Pegasus charged the fourth carrier a fixed rate of $500 per month for unlimited landings and parking. During our audit period, this carrier was charged $13,500 for parking. However, based on recorded activity, if the posted fees were charged, it would have paid $62,205 to Pegasus and Pegasus would have had to remit an additional $4,900 to the Trust.

Pegasus claimed that it made this deal with this specific carrier because it was willing to utilize what Pegasus characterized as an undesirable space due to its remote location and size. However, when we queried several other carriers, they told us that they would have been more than willing to use that parcel of the Heliport for that price.

Trust officials could not tell us what Pegasus' policy was regarding discounts. However, they noted that all Pegasus discounts were discontinued in 2006 after their inquiries in response to complaints from carriers. We recommend the Trust require that Pegasus, to the extent it offers any discounts in the future, do so in accordance with a written policy that is submitted to the Trust. We also recommend that the Trust evaluate whether any such future discounts are applied fairly and meet the intent of the Permit.

## Revenue

The Permit requires Pegasus to remit a basic monthly permit fee to the Trust to manage and operate the Heliport. In addition, Pegasus must pay a fee equal to a percentage of its gross receipts that generally ranges from 10 to 12 percent based on the monthly activity at the Heliport. "Gross receipts" is defined in the Permit as all monies paid to Pegasus by its carriers for the landing and parking of helicopters, and any other revenues arising out of Heliport operations. We selected a random sample of 25 invoices and traced associated payments to detailed general ledger accounts to determine the proper recording thereof, and found no discrepancies. Further, we verified, based on the revenues it reported to the Trust, that Pegasus calculated the appropriate percentage fee during our audit period.

We were advised during the audit that there were significant revenues that Pegasus did not initially include in its determination of gross receipts. This matter had also been brought to the Trust's attention in 2004 at which time it began pursuing recovery of its share of these revenues. In November 2006, Pegasus and the Trust entered into a settlement agreement

with respect to these revenues. The settlement agreement provided for the payment of the Trust's share of these revenues for the period 1997 through 2006, and Pegasus' promise to pay the Trust its share of any such future revenues.

### Consulting Agreement

According to the Permit, any revenue relating to Heliport operations or earned by the Heliport management company by virtue of its position must be reported to the Trust. On December 30, 1996, a Pegasus-related entity entered into a "consulting agreement" with the Heliport's sightseeing carrier. Among other terms, the consulting agreement called for the carrier to pay to the Pegasus-related entity 5% of its monthly gross revenues attributable to its sightseeing business conducted from the Heliport and from within 20 miles of any "restricted heliport" (as defined in the agreement). Because these revenues derived from or were related to Heliport operations, the Trust believed that they constituted "gross receipts" from which it was entitled to a share under the Permit.

Based on information provided to us by the sightseeing carrier for the period 1997 through July 2006, the carrier paid $5.57 million in consulting fees to the Pegasus-related entity in accordance with above consulting agreement. We determined that, had these payments been included in the revenue figures reported to the Trust, Pegasus would have paid the Trust an additional $557,317.

After the Trust asserted a right to these payments, litigation ensued between the parties. Ultimately, the Trust was allowed to audit the books of the Pegasus-related entity with respect to these payments, and subsequently Pegasus and the Trust negotiated a settlement of the matter, pursuant to which Pegasus agreed to include the disputed fees in its calculation of gross receipts under the Permit; and to pay $462,387 to the Trust in November 2006. The settlement agreement also stipulated that Pegasus would report future fee amounts of this type, if any, and pay the appropriate percentage to the Trust.

### Business Environment

The Trust is responsible for ensuring that Pegasus complies with Permit terms and operates the Heliport in a productive manner. However, our audit found that some of the additional fees that Pegasus imposed on carriers were questionable. For example, Pegasus initiated a Safety and Facility Enhancement (SAFE) fee following September 11, 2001, which we were told would provide increased security and related improvements to the Heliport. This fee was assessed on all carriers at an amount equal to $25 per each helicopter landing. During our audit period, this amount totaled $562,245. Based on our testing, we conclude that the appropriate percentage of collected fees went to the Trust. However, Pegasus could not show us any facility enhancements or improvements that it funded with SAFE fee collections. Pegasus discontinued the SAFE fee in May 2006.

However, shortly thereafter, Pegasus increased its parking and landing fees and imposed new fees on carriers including the initiation of a per-passenger fee, which ranged from $10 to $30 per passenger, per flight, departing from or arriving at the Heliport. These new fees reportedly caused the Heliport's sightseeing carrier to leave in protest and expand its operations at the Downtown Heliport for a few days.

In light of the specific requirements of the Permit, we believe the Trust has a

responsibility to ensure Pegasus is operating the Heliport in an appropriate manner and in conformance with Permit provisions. We observed that the Trust's oversight of Heliport operations consisted primarily of verifications of information provided by Pegasus and was for the most part conducted off-site. While we note that the Trust took prompt and appropriate action upon learning of many of the issues discussed in this report, we believe the Trust would benefit from more active, on-site monitoring of Heliport activities, designed to increase the likelihood of uncovering irregularities or instances of noncompliance with Permit requirements. While we were on-site at the Heliport, carriers actively sought us out to bring certain issues to our attention.

Trust officials believe that they have actively and aggressively monitored Heliport operations. They cite as examples of their oversight the audit they performed of Heliport operations in 2002 of calendar year 2000 and 2001 operations, as well as their aggressive activities since 2004. These activities include following up on carrier complaints and initiating a lawsuit to audit Pegasus books to determine whether it had been receiving its appropriate share of Heliport revenues.

The current Permit with Pegasus, as well as the governing statutes, does not allow the Trust to re-bid the contract for Heliport management at the current location. However, Trust officials informed us they are looking for a new location for the Heliport on the west side of Manhattan and have been discussing relocation issues with both the State and City. Once it finds a new location, we recommend the Trust solicit competitive bids from a sufficient number of potential Heliport operators to ensure the delivery of quality services and the best possible financial return to the Trust.

### Recommendations

1. Take appropriate measures to complete and execute the re-bid process for the Heliport at its new location.

2. Require Pegasus to prepare formal written policies pertaining to any future discounts, including the basis of such discounts, and monitor Pegasus to ensure discounts are applied uniformly to all carriers.

3. Recommendation deleted. (Our prior audit recommendation pertaining to reviewing discounts was deleted based on agency responses to our draft audit report.)

4. Monitor periodically all aspects of Heliport operations, including revenue collections, compliance with posted fees, and the business climate enjoyed by Heliport carriers. As necessary, take appropriate corrective actions.

### AUDIT SCOPE AND METHODOLOGY

We conducted our audit in accordance with generally accepted government auditing standards. The objectives of our audit were to determine whether Pegasus charged carriers the appropriate fees, and accurately reported and remitted appropriate amounts to the Trust based on provisions in the Permit. This audit covered the period from January 1, 2004 to July 31, 2006.

To accomplish these objectives, we observed landing and take-off times for helicopters, reviewed activity logs maintained at the Heliport as well as invoices, fee schedules, the Permit, and contracts between Pegasus and selected carriers. We reviewed a random sample of carrier billing invoices issued by Pegasus for the audit period; analyzed accounts receivable records; and reconciled

cash collection amounts per heliport records to bank deposits, tax returns, and available certified financial statements. In addition, we assessed the accuracy of the monthly revenue reports submitted to the Trust; reviewed documentation pertaining to allegations made by Heliport carriers; and interviewed Trust, Pegasus, and Heliport officials as well as certain carriers using the Heliport.

In addition to being the State Auditor, the Comptroller performs certain other constitutionally and statutorily mandated duties as the chief fiscal officer of New York State. These include operating the State's accounting system; preparing the State's financial statements; and approving State contracts, refunds, and other payments. In addition, the Comptroller appoints members to certain boards, commissions and public authorities, some of whom have minority voting rights. These duties may be considered management functions for purposes of evaluating organizational independence under generally accepted government auditing standards. In our opinion, these functions do not affect our ability to conduct independent audits of program performance.

## AUTHORITY

This audit was performed according to the State Comptroller's authority as set forth in Article X, Section 5, of the State Constitution; and Section 7, paragraph 12, of the Hudson River Park Act.

## REPORTING REQUIREMENTS

We provided a draft of this report to Trust and Pegasus officials for their review and comment. Their comments were considered in preparing this report, and are included as Appendix A. The Exhibits referred to in Appendix A are available upon request. Appendix B contains State Comptroller's comments which address certain points in the Trust's and Pegasus' response.

In response to our draft report, Trust officials reiterated their belief that they have provided continuous comprehensive oversight of Pegasus' Heliport Operations. They cite the discontinuance of carrier discounts and their negotiated settlement with Pegasus as proof of such oversight. They also believe that our calculated underpayment of Consulting Agreement fees is incorrect based on actual carrier activity at the Heliport.

Pegasus officials responded that the audit team did not adequately take into account the information they provided to us regarding carrier complaints and lawsuits and the background events leading up to such. They assert that they have managed the Heliport effectively and efficiently in compliance with contract requirements.

Within 90 days of the final release of this report, as required by Section 170 of the Executive Law, the Trust shall report to the Governor, the State Comptroller, and the leaders of the Legislature and fiscal committees, advising what steps were taken to implement the recommendations contained herein, and, if not implemented, the reasons therefor.

## CONTRIBUTORS TO THE REPORT

Major contributors to this report include William Challice, Frank Patone, Anthony Carbonelli, Salvatore D'Amato, Anthony Carlo, Ira Lipper, Unal Sumerkan, and Sue Gold.

## APPENDIX A - AUDITEE RESPONSE



Hudson River Park Trust

October 18, 2007

William P. Challice
Audit Director
Office of the State Comptroller
123 William Street
New York, N.Y. 10038

           Re:  West 30th Street Heliport Revenue Operations
                 OSC Report 2006-S-75

Dear Mr. Challice:

       This letter, together with the enclosed comments and annexed documents from Air Pegasus Heliport, is in response to the above referenced New York State Comptroller's (OSC) draft audit report and in furtherance of our discussions and prior correspondence concerning same. We appreciate OSC's meeting with us and allowing us to offer comments along the way as you conducted your audit and developed the draft report over the past 1½ years. However, as we have previously advised, we continue to take exception to a number of misimpressions and inaccuracies in the draft report. We strongly believe that the draft report simply does not fairly nor accurately address the Trust's oversight of the heliport nor does it fully acknowledge the Trust's substantive efforts over the past three years to investigate and address the under-reporting of gross receipts or our pursuant and recovery of all such monies from the heliport operators. Indeed, the draft report gives the impression that but for the State Comptroller's involvement, the Trust would not have collected its share of the 5% Consulting Fees and that the disputed discounts would still be in place. Nothing could be further from the truth. We strongly urge that the final report (and record) be corrected to reflect these comments.

       As we have discussed previously, the Hudson River Park Act (the "Act") restricts future heliport operations in Hudson River Park to corporate, government and emergency use only; tourism and recreational flights are expressly prohibited. The Act also generally prohibits commercial operations in the Park east of the bulkhead. Nonetheless, as we have explained, the ongoing operations at the existing heliport (which is east of the bulkhead), including the tourism flights, are authorized at this time pursuant to Section 3(i)(iv) of the Act which allows for the continuation of uses authorized under leases, permits and other occupancy agreements that were

Pier 40, 2nd Fl., West St. @ W. Houston St., New York, NY 10014  Phone: 212-627-2020  Fax: 212-627-2021

       \* See State Comptroller's Comments on page 25.

existing at the time of passage of the Act but only in accordance with the terms of such agreements. The current Permit for the heliport between Air Pegasus and the State dates back to 1996 (the "Permit") and was in effect at the time of passage of the Act. Pursuant to the Act, the Trust is now the Permittor under the Permit. In addition to an initial five year term (which ended in May 2001), the Permit provides the operator a continuing right to operate pursuant to a 30 day automatic renewal provision. The Trust has the right under the Permit to terminate when the premises are needed for park development. Thus, until the Trust is ready to proceed with such development, the Act allows for the continuation of existing heliport operations at the current location in accordance with the terms of the existing Permit. Indeed, given the Act's mandate that, to the extent practicable, the Park's operating costs are to be funded through revenues generated within the Park, continued operation of the existing heliport until that portion of the Park is needed for park development and the heliport is relocated is in the Park's fiscal interest, separate and apart from the continuing corporate and governmental need for a west side heliport.

However, the right granted under Section 3(i)(iv) of the Act is a limited one as it is restricted to the current operations pursuant to the existing Permit. Further, as noted above, Section (9)(i) of the Act prohibits park areas east of the bulkhead to be used for commercial use. Consequently, any future heliport in the park must be relocated to west of the bulkhead and cannot include any sightseeing or other tourism/recreational flights. Given the restrictions on heliport operations and locations in the Act as well as the ongoing park development work, competitive bidding of such operations under a new agreement at the current location is prohibited. That being said, as we have previously advised, we are actively working with the City and the State on the preparation and issuance of an RFP for relocation and development of the west side heliport.

## AUDIT RESULTS - SUMMARY

The draft audit focuses on two aspects of the heliport's revenue reporting and operational practices, to wit, accounting for the 5% Consulting Fee and application of APH's discount policy. Despite the impression given in the draft report both issues were identified and addressed by the Trust with APH well before the State Comptroller initiated its audit in April 2006. As you have noted in your draft audit, the Heliport Permit entitles the Trust to a percentage of gross receipts arising out of the heliport operations, in addition to a base monthly fee and a per passenger fee on all sightseeing operations. As we have previously commented, as part of its regular review of the various payments from APH, the Trust routinely checks the backup documentation for all such payments and has made and continues to make inquiry of APH, as needed, for explanations of any questions we may have regarding such payments. In addition, the Trust's initial audit of the heliport's operations in 2002 did not find any irregularities or substantive issues with the heliport gross revenue reporting or payments to the Trust during such period.

However, as is abundantly clear from the Trust's January 4, 2006 complaint in its litigation against APH and its related parties (a copy of which was previously provided to your office), neither the State nor the Trust was advised or otherwise aware (until November 2004)

2

that APH entered into an agreement with Liberty Helicopter in December 1996 amending the terms of the May 1996 sightseeing agreement or that, at that same time, Air Pegasus of New York (APNY) and Liberty Helicopter entered into a separate Consulting Agreement which provided APNY with a 5% share of Liberty's gross receipts, including from revenues derived from operations at the Heliport. Given that such parties did not disclose the existence of the December 1996 agreements and that payments from such agreements did not flow through APH (and were not included on its books and records), regular review and periodic audits of APH's books and records did not reveal (nor ever would have revealed) the additional stream of income related to the heliport. Notwithstanding any documents that may have since come to light, it was only through Liberty's disclosure of the existence of such agreements at the end of 2004 that the Trust became aware of 8 years of such payments.

As soon as the Trust became aware of the existence of Amended Sightseeing Agreement and the Consulting Agreement in November 2004, we promptly and thoroughly reviewed such agreements and put APH on notice that Section 6(b) of the Permit entitled the Trust to a share of the 5% fee paid by Liberty to Air Pegasus New York (APNY) equal to that portion of the fee that derives from sightseeing flights out of the West 30th Street heliport and we demanded a full accounting and payment of a share of all such percentage fees. We subsequently notified APH and others, in December 2004, that we intended to conduct an audit to determine the extent of payments due the Trust pursuant to Section 6 of the Permit. Clearly, the Trust and APH were not in agreement as to the import of the December 1996 Agreements or the Trust's entitlement to a share of the 5% payments that were made by Liberty to APNY. As is noted in APH's comments submitted herewith, APH and its principals strenuously maintained throughout the Trust's investigation and the subsequent litigations that the 5% payments did not derive from heliport operations and therefore were not subject to the Permit's gross revenue provision and, further, that Trust had limited audit rights under the Permit which did not extend to APH expenses or other related company records. When APH and APNY continued to resist the Trust's efforts to gain access to all related APH and APNY records, we subsequently sought to terminate the Permit in July 2005. In response to the Trust's termination notice, APH brought suit and obtained a preliminary injunction from the New York State Supreme Court, which accepted APH/APNY's narrow reading of the Trust's audit rights under the 1996 Permit. In turn, the Trust instituted the January 2006 litigation mentioned above to recover its share of the 5% payments. After lengthy negotiations, APH, APNY and its principals subsequently provided the Trust's auditors with full access to their books and records in all the Trenk-owned companies in the summer of 2006. Indeed, once complete, the Trust shared its auditor's findings with your office last year well before the release of your initial draft revenue report this past March.

In November 2006, following completion of the Trust's audit of all such companies, APH, APNY and the Trust settled their claims and dismissed their respective complaints, with APH paying the Trust its full share of all monies received by APNY under the Consulting Agreement. In fact, the settlement agreement was executed in the State Comptroller's office following our meeting last November regarding the security portion of the State Comptroller's heliport audit and we provided the Comptroller's office with copies of such agreement at that time. The difference between the amount that APH paid the Trust to date respecting the 5%

3

consulting fees and the amount identified in your draft report relates to revenue generated from Liberty Helicopter's Downtown Heliport operations and not from the West 30th Street facility. Given that such additional sums do not arise out of or otherwise relate to the West 30th Street operations, the Trust is not entitled under the Permit's "gross receipts" provision to a share of such revenue. Consequently, the settlement amount contained in our November 2006 Settlement Agreement (and not the figure set forth in your draft report) reflects the total amount that was due the Trust from such 5% payments through January 2006.

Moreover, contrary to the impression set forth in the draft report, the forest of correspondence and pleadings that the various sightseeing operators have submitted in the past three years (since the Trust began its investigation into the claims of underreporting) does not reflect any "lack of involvement" on the part of the Trust. Rather, the prolific letter writing campaign engaged in by the heliport parties is simply indicative of the fractured and sometimes hostile relationship between APH and most of the sightseeing operators at the heliport, primarily Liberty. As we have previously advised, the principals of APH hold a minority shareholder interest in Sightseeing Tours of America ("STA"), Liberty Helicopters' parent company, and have been in active litigation with other STA shareholders for the past several years regarding such ownership interest.

Considerable time is also spent in the draft report on APH's discount policies. The Permit allows APH to provide discounts to its customers. As the draft report acknowledges, there is no obligation under the Permit that APH obtain the Trust's approval prior to implementing any such discounts. All that is required is that APH charge "fair, reasonable and nondiscriminatory prices" for its services for each unit of sales or services, provided that the Operator may make reasonable and non-discriminatory discounts, rebates or other similar types of reduction to volume purchasers in connection with the landing, taking off and parking of aircraft." (Permit Section 34(b); emphasis in original).

Concerns regarding APH's discount practice were first raised by heliport customers in late January 2006 as part of their complaints of unfair and/or discriminatory practices regarding APH's proposed rate. The Trust promptly responded, asking APH to refrain from imposing the rate increase to give the Trust time to review the complaints about the rate increase and charges of unfair practices. The Trust also requested that APH provide (a) an explanation for the revised rates, (b) a comparison of the amount and types of rates charged at the West 30th Street heliport with the rates charged by the Downtown and East 34th Street Heliports, and (c) a copy of APH's discount policy or procedures, or in the absence of a written policy, an explanation for how rates are set and discounts provided to customers of the Heliport. By letter dated March 13, 2006, APH replied that although it only provided a limited number of discounts over the years, to avoid any further issue concerning such practice it would cease providing any further discounts at all. Thus, contrary to the suggestion in the draft report, the Trust closely evaluated the rate increase and discount complaints which directly resulted in an end to all discounts and a significant delay in the implementation of such rate increase (which APH was entitled to impose under the Permit). Further, the "calculation" of what "would have been owed the Trust had APH not provided discounts to certain heliport customers is entirely speculative and at odds with the

4

APH's rights and obligation under the Permit. As the State Comptroller may recall, the New York Supreme Court, in two separate decisions, rejected the unfair and discriminatory practices claims by the heliport customers and dismissed their suits which had sought to enjoin imposition of the rate increase. The Appellate Division upheld such rulings earlier this year (Copies of such decisions were previously provided to your office).

## AUDIT- RECOMMENDATIONS

1.      **"Take appropriate measures to complete and execute the re-bid process for the Heliport at its new location."** – As we have discussed in detail above, we have been actively working with the City and the State on relocation issues and have prepared a draft RFP for development that is under review.

2.      **"Require Pegasus to prepare formal written policies pertaining to any discounts, including the basis of such discounts, and monitor Pegasus to ensure discounts are applied uniformly to all carriers."** – As we have discussed, currently APH does not have a discount practice or policy, having ended all discounts last year. In the future, should APH seek to provide any discounts, the Trust will look to have APH provide a written policy as to any such discounts.

3.      **"Review the circumstances surrounding the discounts noted in this report. If they were offered without basis or support, recoup the $11,000 owed to the Trust had appropriate fees been charged to the carriers which received the discounts."** – As noted above, the Trust does not agree with the draft report's conclusion that APH is obligated under the Permit to pay any additional monies to the Trust in connection with the previous discounts.

4.      **"Periodically monitor all aspects of Heliport operations including revenue collections, compliance with posted fees, and the business climate enjoyed by Heliport carriers. As necessary, take appropriate corrective actions."** -The Trust will continue, as it has to date, to monitor the heliport operations and respond, as needed, to compliance or other operational or reporting issues.

While, as noted above, we do not agree with a number of the impressions, suggestions, assertions and/or conclusions set forth in the draft report, we nonetheless, greatly appreciate the opportunity to review and comment on it. We request that you carefully consider our comments and revise the draft report accordingly. As always, please feel free to contact either Laurie Silberfeld or me if you have any questions or wish to discuss this matter further.

Sincerely,

Connie Fishman

5

COMMENTS OF AIR PEGASUS HELIPORT, INC.
TO REPORT ON WEST 30TH STREET HELIPORT REVENUE OPERATIONS
(REPORT 2006-S-75)

Air Pegasus Heliport, Inc. ("APH") has received the draft of the Report on West 30th Street Heliport Revenue Operations (Report 2006-S-75) (the "Draft Report"). APH previously submitted detailed comments and corrections to the prior version of the Draft Report (identified as the Discussion Document). In APH's response to the Discussion Document it requested that a second Discussion Document be issued and a second meeting be held, before a Draft Report is issued. Those requests were ignored. Instead, the New York State Auditors elected to distribute a Draft Report.

Unfortunately, as APH had feared, its corrections and comments were largely ignored and the Draft Report continues to contain numerous factual errors and inaccurate conclusions. Indeed, it appears clear that the auditors do not even understand basic details about APH's corporate structure and operation of the Heliport. Thus, after receiving the Draft Report, APH again requested a meeting before providing its responses so that the auditors could have the benefit of all the facts and correct its errors before APH submitted its comments. For reasons that are not clear to APH, the auditors refused to meet. APH again urges the auditors to meet to ensure that an accurate report is ultimately submitted.

The Draft Report contains two primary conclusions regarding revenue: (1) if APH had not provided certain discounts to a handful of customers, it would have paid the HRPT an additional $11,000; and (2) Liberty Helicopters, Inc. (NY)'s ("Liberty") payment of a 5% consulting fee to its 23% shareholder (not APH, but a wholly separate and independent entity, Air Pegasus of New York, Inc. ("APNY")), which was established in the early 1990s in lieu of profit distributions to the shareholder, should have been included in APH's revenue. Had it been included, APH would have owed the HRPT an additional $557,317 between 1997 and July 2006. The audit period was January 1, 2004 through March 31, 2006. No explanation is provided for why the Draft Report expands the scope of the period for this one area only.

The consulting fee, as explained previously and as explained again in detail herein, was not paid and has never been paid to APH and it has absolutely nothing whatsoever to do with APH's operations at the Heliport. Rather, it was paid pursuant to a separate Consulting Agreement to APNY and pre-exists the Permit by many years. The near complete disregard of the separate corporate existence of APNY is reminiscent of the tactics, including malicious and false accusations that Liberty has employed for years against APH, blurring the distinction between APH, APNY and Alvin S. Trenk in an attempt to treat them as though they are all one nefarious entity.[1]

The Draft Report also completely ignores the Settlement Agreement between APH and the HRPT and the significant events that led to that amicable resolution. Most significantly, in what appears to be a purposeful effort to find fault with both APH and the HRPT, the Draft

---

[1] In mid-August 2007, Liberty sought, as part of discovery in a New Jersey lawsuit, drafts of audit reports and documents related thereto. The New Jersey Court has denied Liberty's request at this time finding that such documents are not relevant given the current posture of the case. APH is extremely concerned that the rush to release the New York State Audit Report while it remains replete with numerous material errors, is designed to assist Liberty by making the audit report and APH's response public. It appears that the auditors are not independent but are being influenced by Liberty.

Report ignores the fact that the HRPT conducted a thorough and intensive independent audit of APH for the period April 1, 2001 through March 31, 2005[2], which included the review of books and records of a multitude of other entities. The HRPT's independent auditor, Deborah A. Cutler, CPA, CFE of Kramer, Love & Cutler, LLP, issued a comprehensive report on October 31, 2006 (the "Audit Report"), a copy of which the HRPT provided to the Comptroller's Office.[3] The Audit Report addressed all of the issues identified in the Draft Report including discounts and the alleged under-reporting of income that Liberty paid to APNY pursuant to the APNY/Liberty Consulting Agreement.

Based on that Audit Report, the HRPT entered into a Settlement Agreement with APH dated November 22, 2006 (the "Settlement Agreement"). A copy of the Settlement Agreement is attached as **Exhibit 1**. In the Settlement Agreement, which the HRPT executed *after* the Audit Report was issued and with full knowledge of the Audit Report, the HRPT acknowledged that:

    (a)    APH fully cooperated with the auditors by providing them with all requested information and documents;

    (b)    the HRPT has no knowledge that APH is in violation of any of the provisions of the Permit;

    (c)    APH is in good standing with the HRPT.

Instead of providing a balanced and objective explanation of the background between APH and the HRPT, the Draft report instead irresponsibly and without any factual basis concludes that the HRPT has been remiss in its oversight responsibilities of APH and did not vigorously pursue its rights. The corollary conclusion, of course, is that APH was thereby able to divert revenue from the HRPT. These bald conclusions, which echo Liberty's assertions, are completely unsupported and insupportable, as more fully explained below.

Against this backdrop, APH sets forth its response to the issues identified in the Draft Report.

    1.    **Consulting Fee Payment.** The Draft Report accuses APH of impropriety in connection with a consulting fee that Liberty paid to APNY. The Draft Report defines "Pegasus" as Air Pegasus Heliport, Inc., the operator of the West 30th Street Heliport. *See* Draft Report at 1. It then erroneously states that "On December 30, 1996, Pegasus entered into a consulting agreement with the Heliport's sightseeing carrier [Liberty]." *See* Draft Report at 5. It then states that the consulting agreement required the 5% consulting fee be paid to a "Pegasus-related entity, instead of to Pegasus directly." *See* Draft Report at 5. The Draft report therefore concludes that these payments should have been included in APH's revenues and reported to the HRPT.

The statements are blatantly and demonstrably false. This error is particularly egregious because the *exact same error* appeared in the Draft Report and was called to the auditors' attention by APH in its written response to that document. Nevertheless, the Draft Report

---

[2] Although the Audit Report states it was for the period April 1, 2001 through March 31, 2005, APH in fact provided detailed documentation through January 2006.
[3] If you require a copy of the Audit Report, please advise.

2

Report ignores the fact that the HRPT conducted a thorough and intensive independent audit of APH for the period April 1, 2001 through March 31, 2005[2], which included the review of books and records of a multitude of other entities. The HRPT's independent auditor, Deborah A. Cutler, CPA, CFE of Kramer, Love & Cutler, LLP, issued a comprehensive report on October 31, 2006 (the "Audit Report"), a copy of which the HRPT provided to the Comptroller's Office.[3] The Audit Report addressed all of the issues identified in the Draft Report including discounts and the alleged under-reporting of income that Liberty paid to APNY pursuant to the APNY/Liberty Consulting Agreement.

Based on that Audit Report, the HRPT entered into a Settlement Agreement with APH dated November 22, 2006 (the "Settlement Agreement"). A copy of the Settlement Agreement is attached as **Exhibit 1**. In the Settlement Agreement, which the HRPT executed *after* the Audit Report was issued and with full knowledge of the Audit Report, the HRPT acknowledged that:

      (a)    APH fully cooperated with the auditors by providing them with all requested information and documents;

      (b)    the HRPT has no knowledge that APH is in violation of any of the provisions of the Permit;

      (c)    APH is in good standing with the HRPT.

Instead of providing a balanced and objective explanation of the background between APH and the HRPT, the Draft report instead irresponsibly and without any factual basis concludes that the HRPT has been remiss in its oversight responsibilities of APH and did not vigorously pursue its rights. The corollary conclusion, of course, is that APH was thereby able to divert revenue from the HRPT. These bald conclusions, which echo Liberty's assertions, are completely unsupported and insupportable, as more fully explained below.

Against this backdrop, APH sets forth its response to the issues identified in the Draft Report.

      1.    **Consulting Fee Payment.** The Draft Report accuses APH of impropriety in connection with a consulting fee that Liberty paid to APNY. The Draft Report defines "Pegasus" as Air Pegasus Heliport, Inc., the operator of the West 30th Street Heliport. *See* Draft Report at 1. It then erroneously states that "On December 30, 1996, Pegasus entered into a consulting agreement with the Heliport's sightseeing carrier [Liberty]." *See* Draft Report at 5. It then states that the consulting agreement required the 5% consulting fee be paid to a "Pegasus-related entity, instead of to Pegasus directly." *See* Draft Report at 5. The Draft report therefore concludes that these payments should have been included in APH's revenues and reported to the HRPT.

The statements are blatantly and demonstrably false. This error is particularly egregious because the *exact same error* appeared in the Draft Report and was called to the auditors' attention by APH in its written response to that document. Nevertheless, the Draft Report

---

[2] Although the Audit Report states it was for the period April 1, 2001 through March 31, 2005, APH in fact provided detailed documentation through January 2006.
[3] If you require a copy of the Audit Report, please advise.

repeats the error. Either the auditors are sloppy, incompetent, or are simply doing Liberty's bidding, instead of acting in an independent, fair and impartial manner, which is a requirement for any *bona fide* audit.

Once again, since the auditors seem not to have understood it the first time:

The Consulting Agreement was entered into by Air Pegasus of New York, Inc. when it was Liberty's 23% shareholder. APH (which you define as Pegasus) is *not* a party to it. APNY and APH are separate and independent entities. An additional copy of the Consulting Agreement is attached as **Exhibit 2.**

A brief background of the consulting fee, which was provided in APH's response to the Draft Report but was ignored, is necessary for a complete understanding of this issue.

        (a)   <u>Background.</u>  Alvin S. Trenk co-founded Liberty with Drew Schaefer ("Schaefer") in or about 1990. Since its inception, Trenk has owned approximately 23% of the outstanding shares of Liberty (and later its newly formed parent company, Sightseeing Tours of America, Inc. ("STA")) and Schaefer (or later his ex-wife) owned approximately 35% of the shares. Trenk's shares were owned from the outset by APNY, a corporation that was formed years before APH was formed.

In order to protect APNY as a minority shareholder, Trenk and Schaefer agreed that Liberty would pay APNY 5% of Liberty's gross revenues related to sightseeing <u>from all heliports within 20 miles of West 30th Street</u>, which was to be an advance against profit distributions. This arrangement was memorialized in a letter agreement between APNY (not APH, which did not even exist at that time) and Liberty dated March 8, 1994 (the "1994 Letter Agreement"), long before the Permit was entered into with the HRPT. A copy of the 1994 Letter Agreement is attached as **Exhibit 3.** The 1994 Letter Agreement provides, in relevant part, as follows:

> Liberty shall pay to [APNY] a sum equal to five (5%) percent of Liberty's monthly gross revenues attributable to its sightseeing business conducted <u>from the Heliport</u>. All such sums due hereunder shall be paid monthly by Liberty to Pegasus no later than the tenth (10th) day following the end of each calendar month. For any period for which Liberty pays dividends to its shareholders, it shall have the right to take credit against any such dividends paid to Pegasus the amounts paid hereunder as a percentage of gross revenues for the same period for which such dividends were paid.

The 1994 Letter Agreement predates the Permit and was in effect when APH's predecessor operated the West 30th Street Heliport under the auspices of the Port Authority. It remained in effect at the time the Permit was entered into with the Department of Transportation (the "Department"), and was modified slightly by a letter agreement dated May 9, 1996 (**Exhibit 4**), which remained in effect until the end of 1996. Both the Port Authority and the Department were aware of APNY's ownership interest in Liberty and that APNY was receiving the 5% consulting fee. In fact, that ownership interest is specifically referenced in the Permit. *See*

3

ultimately filed in revised form with the Court, that the HRPT first questioned APH regarding the 5% Consulting Fee. Attached as **Exhibit 6** is the November 23, 2004 letter from Laurie Silberfeld, General Counsel to the HRPT, which first raised the Consulting Fee as an issue and specifically referenced Rubino's emails and the draft affidavit.

(i)    Reason for Liberty's Attack.

In late 2002, Trenk learned that Schaefer was misappropriating funds from Liberty. He ultimately determined, by employing a forensic accountant and subsequently confirmed by a court-appointed accountant, that Schaefer had bilked Liberty out of approximately $4,000,000. Trenk met with Mario Cuomo, who is of counsel with Willke Farr and a mutual acquaintance of Trenk and Schaefer, in an effort to resolve the dispute without litigation. Those efforts were unsuccessful and Trenk instituted a lawsuit against Schaefer and others in the Superior Court of New Jersey, Chancery Division seeking, among other things, to recoup the funds improperly paid to Schaefer or on his behalf. A few months later, APH and APNY instituted a separate lawsuit against Liberty in the Superior Court of New Jersey, Law Division, for, in general, breach of contract. Cuomo's law firm, Willke Farr, represented Schaefer and the other defendants. Immediately after the first lawsuit was filed, Liberty's shareholders voted in secret to remove Trenk as President and CEO of Liberty.

Liberty, throughout these lawsuits and continuing through today, has sought to use its political influence to terminate APH's right to operate the Heliport. Liberty's counsel, Daniel Rubino, employed this powerful threat to force Trenk to agree to arbitrate both of the New Jersey lawsuits. In a letter dated June 11, 2004, Rubino wrote:

Toward that end, we are prepared to pursue the following action:

2.    Schedule meetings with the HRPT and others to explore and pursue open bidding rights to the West 30th Street Heliport….

A copy of Rubino's letter is attached as **Exhibit 7**.

Trenk knew that because of the powerful politically connected allies that Schaefer had on his team, the threat to the Heliport was real. Rather than jeopardize APH's 25 year relationship as operator of the Heliport, Trenk signed the arbitration agreement.

On April 8, 2005, the arbitrator that Trenk was forced to accept, James Ortenzio, issued a Determination. A copy of the Determination is attached as **Exhibit 8**. The Determination improperly changed material contractual terms by reducing the Consulting Fee from 5% to 3.5% and requiring Liberty to pay it only with respect to sightseeing operations from the West 30th Street and Downtown Manhattan heliports. Liberty also conducts operations out of Jersey City, New Jersey (which is within 20 miles of the Heliport and therefore subject to the Consulting Agreement), but Ortenzio simply re-wrote the contract and ruled that Liberty was not required to pay the Consulting Fee with respect to those operations. The Arbitrator's Determination also potentially voided Liberty's restrictive covenant suspiciously allowing Liberty to compete with APH in operating a heliport in the New York area for the first time.

5

Trenk appealed the trial court's confirmation of the Arbitrator's Determination. The Appellate Division reversed the arbitrator's decision, and restored the parties to the pre-arbitration position.

As a result of Trenk's investigation, which uncovered Schaefer's misconduct, and the lawsuits, APH/Trenk and Liberty/Schaefer have been essentially at war with each other. It is crystal clear that Liberty and Schaefer seek the complete and total destruction of APH and Trenk, and want to usurp control of the Heliport for themselves. In fact, Rubino wrote to the HRPT on January 7, 2005 and, after reminding the HRPT that Mario Cuomo and he both represent Liberty, specifically asked to meet with the HRPT to establish a "direct relationship between the HRPT and Liberty." A copy of Rubino's January 7, 2005 letter is attached as **Exhibit 9**.

The submission of the irrelevant draft affidavit in the NYH Lawsuit and Rubino's November 19, 2004 email triggered the HRPT audit, Liberty's first gambit to cause the HRPT to terminate APH's Permit.

(c)     The HRPT Audit. As Liberty calculated, the HRPT commenced an audit of APH in early 2005. By letter dated April 25, 2005, the HRPT's auditing firm, Kramer, Love & Cutler, L.L.P., demanded access to 19 categories of documents. A copy of the April 25, 2005 letter is attached as **Exhibit 10**. The document request included all manner of irrelevant documentation such as APH's "Minutes of meetings of the Board of Directors;" and "all "transactions between Mr. Alvin Trenk, Ms. Abigail Trenk and Air Pegasus or any other subsidiary or affiliate owned by Mr. Trenk or Ms. Trenk, including but not limited to Pegasus Aviation, Air Pegasus of New York, and Pegasus Holding Corporation." The audit expanded from there. The documents the HRPT auditors sought went well beyond those which the HRPT was entitled to inspect under the Permit and litigations ensued.

(i)     The Terms of the Permit. In addition to a basic monthly fee, the Permit requires APH to pay the HRPT 10% of its gross receipts between $250,000 and $1,000,000; 11% of its gross receipts between $1,000,000 and $2,000,000; and 12% of its gross receipts over $2,000,000 (the "Percentage Payment"). *See* Permit at §6(b).

The term "gross receipts" is defined in the Permit as follows:

> The term "gross receipts" shall include all monies paid for services rendered beginning on the Commencement Date and ending on the Termination Date to the Operator [APH] for the landing, take-off and parking of aircraft at the Heliport (including all fees as set forth in paragraph (c) hereof) and all other monies paid to the Operator [APH] for sales made or services rendered at or from the Heliport regardless of when or where the order therefore is received at the Heliport and any other revenue of any type arising out of or in connection with the Operator's operations at the Heliport'....

*See* Permit at §6(b).

6

The Permit also requires APH to maintain certain records in connection with its operation of the Heliport and the HRPT is granted the right to audit these required, but limited, records. The records that APH is required to maintain and the scope of the audit by the HRPT of *those* required records are clearly defined by the Permit, as follows:

> A system of books, records and accounts…as may be adequate and appropriate for the recording with respect to the Heliport of:
>
> (a)     sightseeing passenger counts;
>
> (b)     all arrival and departures of aircraft (regardless of whether a fee is charged therefore) which must include:
>
>> (i)     all of APH's aircraft operations;
>> (ii)     times and dates of all arrivals and departures;
>> (iii)     type and registration number of all arriving and departing aircraft;
>> (iv)     the time of parking and storage of all aircraft; and
>> (v)     the charges incurred by each aircraft during its stay at the Heliport;
>
> (c)     all transactions pertaining to APH's flight operations (if any); and
>
> (d)     the dispensing of aviation fuel and the fuel charges.

*See* Permit at §7(c).

These record-keeping requirements and audit rights under Section 7(c) of the Permit are logically limited to allow the HRPT to verify APH's gross receipts because APH's Percentage Fee payments are a function of APH's gross receipts only. *See* Permit at §6(b). Only records pertaining to monetary receipts and traffic at the Heliport are required, and APH is required to allow an audit of only those records. Under the Permit, the HRPT does not have the power to audit any other records of APH. And it certainly has no right to audit or inspect records from other entities including Trenk's personal financial statements, tax and other personal information. APH's expenses, debts, disbursements and profits also are entirely irrelevant to the amount it pays the HRPT.

The HRPT auditors, therefore, went far beyond the scope of the Permit and sought documents that do not have anything whatsoever to do with the gross receipts that APH received in connection with its operation of the Heliport or the Percentage Fee due to the HRPT under the Permit.

7

(ii)    The APH/HRPT Lawsuits. As a result of what APH considered to be substantial overreaching, APH initially declined to provide all the documents that the HRPT's auditor's sought. The HRPT, therefore, sent APH a Notice of Default dated July 1, 2005. A copy of the Notice of Default is attached as **Exhibit 11**.

APH then filed a lawsuit against the HRPT seeking a declaration that the HRPT's audit rights under the Permit were limited, as defined above. APH sought and obtained a preliminary injunction against the HRPT. The New York Supreme Court found that APH was likely to succeed on the merits of its claim that the HRPT's audit rights were limited by the specific Permit terms. A copy of Justice Richter's August 23, 2005 Order Decision and Order granting APH a Preliminary Injunction is attached as **Exhibit 12**.

APH then filed a summary judgment motion. The HRPT filed a separate lawsuit against APH, APNY and Trenk alleging, among other things, that the Consulting Fee payment that Liberty had been paying to APNY was subject to the percentage fees under the Permit.

APH and the HRPT then agreed to stay both of the lawsuits and entered settlement discussions. During those discussions, APH, APNY and Trenk voluntarily allowed the HRPT's auditors complete and unfettered access to all the documents and information they sought notwithstanding the fact that the New York Supreme Court had preliminarily ruled in APH's favor regarding the limited scope of the HRPT's audit rights. A complete list of all the documents that were provided to the HRPT's auditors is attached to the Audit Report as Exhibit V.

During the course of the audit, the HRPT's auditors repeatedly requested additional information and documentation from an ever expanding list of entities that have nothing whatsoever to do with the West 30th Street Heliport. APH and all these separate and independent entities fully and completely cooperated with the auditors, opening all the books and records the auditors requested for their review.

The settlement discussions took approximately ten months. The HRPT's Audit was completed and a final report was issued on October 31, 2006. Shortly thereafter, APH, APNY and the HRPT entered into a comprehensive Settlement Agreement that resolved all the outstanding issues between APH, APNY and the HRPT. The HRPT specifically acknowledged in that Settlement Agreement that:

(i)    APH fully cooperated with the auditors by providing them with all requested information and documents;

(ii)    the HRPT has no knowledge that APH is in violation of any of the provisions of the Permit;

(iii)    APH is in good standing with the HRPT.

(d)    Settlement of Consulting Fee Issue. In order to settle the issue regarding the Consulting Fee, APH and APNY agreed to include the Consulting Fee as part of the gross

8

receipts subject to the percentage fee under the Permit *retroactive* to May 1996, the date of the Permit. APH, APNY and the HRPT's auditors all agreed that the percentage fee due for the period May 1996 through January 31, 2006 was $462,387. *See* Settlement Agreement at ¶1. APH remitted this amount by wire transfer to the HRPT on November 27, 2006. The percentage fee for the period February 1, 2006 through November 30, 2006 was paid by December 31, 2006 in the amount of $41,624.00. *See* Settlement Agreement at ¶1.

It is unclear why the Draft Report calculates the amount due to the HRPT related to the Consulting Fee is $557,317. *See* Draft Report at p. 2. It may be that the New York State auditors erroneously included consulting fee payments that Liberty paid based on its sightseeing operations from the Downtown Manhattan Heliport, which the HRPT has agreed have nothing whatsoever to do with West 30th Street. In fact, the requirement that Liberty pay the Consulting Fee on all it sightseeing operations conducted anywhere within 20 miles of the West 30th Street Heliport is substantial evidence that the consulting fee is unrelated to APH's operations at West 30th Street, and constitutes an independent agreement between Liberty and its shareholder, APNY, for independent consideration. The correct and audited amount of percentage fees on the Consulting Agreement for the period May 1996 through January 31, 2006 is $462,387. The Draft Report is simply wrong.

In addition, in order to resolve the disputes with the HRPT, APH and APNY have agreed to include all future Consulting Fee payments that APNY receives from Liberty related to West 30th Street sightseeing operations in its calculation of the Percentage Fee due to the HRPT under the Permit. *See* Settlement Agreement at ¶2(a).

(e)    Implications of Settlement. At the meeting among APH, the HRPT and the Comptroller's Office on April 2, 2007, it was suggested that by agreeing to the settlement and including the Consulting Fee payments as gross receipts subject to percentage fees, APH and APNY had somehow conceded that they had committed some wrongdoing and owed those funds to the HRPT. Nothing could be further from the truth and the assertion is defamatory.

Litigants settle lawsuits all the time, for a multitude of reasons. In this case, APH has enjoyed 25 years of amicable relations with the HPRT and its predecessors that have been mutually beneficial and profitable.

It is noteworthy that in the 25 years of successful operation of the Heliport, not a single complaint was filed against APH until Trenk uncovered Schaefer's misconduct and Liberty/Schaefer retaliated with its campaign of false and malicious allegations designed to destroy APH's rights to continue to operate the Heliport. Indeed, up until that time, the relationship between Trenk and Schaefer and APH and Liberty was amicable and peaceful.

As set forth above, APH and APNY firmly believe, and have never deviated from their position, that the HRPT is not entitled to any percentage fees on the Consulting Fee. APH and APNY, however, were not willing to risk the potential loss of the right to operate the Heliport. They could certainly foresee the possibility that they could win the battle regarding the Consulting Fee (they had already obtained a preliminary injunction), but lose the war by having the HRPT simply attempt to terminate the Permit on thirty days notice.

In order to avoid any risk, and recognizing that the relationship with the HRPT had, up until Liberty's muckraking, been mutually beneficial and respectful, and also

9

recognizing the vagaries of the litigation process, APH and APNY elected to settle all the disputes and re-establish a peaceful relationship with the HRPT. As part of that global resolution, APH and APNY agreed to include the consulting fees it received from Liberty related to Liberty's sightseeing operations from West 30th Street in APH's gross receipts subject to the percentage fees. The Settlement Agreement also specifically provides that "none of the parties has admitted any fault, wrongdoing or liability in connection with the Litigations or otherwise."

Under these circumstances, it is outrageous for the auditors to conclude or imply that APH engaged in any wrongdoing or diversion of funds whatsoever. Equally outrageous is the conclusion that the HRPT was somehow remiss in its oversight duties.

In short, APH and the HRPT engaged in a nearly two year battle that included two lawsuits and an extremely thorough and comprehensive audit that far exceeded the scope of the audit that the New York State Auditors have conducted. There is no basis for the New York State Auditors to reach conclusions at variance with those reached by the HRPT's auditors and to second guess the HRPT's decision to enter the Settlement Agreement.

**2. Discounts/Customer Relationships.** The Draft Report also spends considerable time on APH's discount policies and criticizes the "environment" at the Heliport which has led to customer complaints. To our knowledge, there were no more than a handful of complaints out of hundreds of heliport customers, all of which were made or instigated by Liberty and began after litigation between Liberty and APH began. The Draft Report identifies several discounts that were provided to customers of the Heliport. It does not, however, identify the customers that received discounts. The Report concludes that APH should remit $11,000 to the HRPT representing the percentage fee that would have been paid to the HRPT had the discounts not been provided. This conclusion is flawed.

The Permit that governs the relationship between APH and the HRPT specifically allows APH to grant discounts to customers. *See* Permit at §34(b). APH has no obligation under the Permit to obtain the HRPT's approval of its discounts.

The issue of discounts was specifically addressed in the independent Audit Report commissioned by the HRPT. Those auditors reviewed every single discount that had been provided over the four year audit period Some of the discounts had been granted years before the Permit was executed and were considered "grandfathered." Others were provided to operators who had or who promised increased volume. A grand total of 15 customers (exclusive of Liberty) out of hundreds of total customers received discounts during the four year audit period.

The issue of discounts was first raised by Heliport customers in January 2006 in connection with the complaints of two or three customers (out of hundreds of total customers), regarding APH's proposed rate increases. At the HRPT's request, APH delayed implementation of its new Schedule of Charges to afford the HRPT time to review the complaints. After review, the HRPT requested various information regarding the new rates as well as APH's discount policy.

APH responded promptly. APH provided the HRPT with a copy of a letter it had previously sent to the Eastern Region Helicopter Council ("ERHC"), the largest industry trade

10

group in the Metropolitan New York Area. A copy of APH's letter to the ERHC dated February 7, 2006 is attached as **Exhibit 13**. In the letter, APH conclusively demonstrates that the fees and charges at the West 30th Street Heliport, even after the first rate increase in two years, are competitive with, and often less expensive than, the fees and charges at the two other New York City Heliports. The two or three letters are from disgruntled customers inspired by Liberty. The vast majority of heliport customers have never raised any complaints. The criticism regarding the "environment" at the heliport should therefore be deleted as there is no factual basis for such a conclusion and it is defamatory.

The Draft Report also points out that no formal written discount policy was in effect. The fact is that because so few discounts were provided, a formal policy was never necessary nor required. However, in order to avoid any future issues regarding discounts, APH simply discontinued all discounts to all customers, regardless of volume. The sole exception to this rule is Liberty, whose discounts are memorialized in the approved Sightseeing Agreement and the Arbitrator's Decision. It is both ironic and suspect that Liberty, the biggest beneficiary of discounted rates, is also the most vocal in complaining about legitimate rate increases and discounts granted to others.

The HRPT, therefore, carefully and closely considered APH's rate increases and the issue of discounts. Its review resulted in the voluntarily termination of all discounts and a resolution of this minor issue by APH. The Draft Report's "calculation" of approximately $11,000 that would have been due to the HRPT had APH not provided discounts (which is *de minimis* in the context of over seven million dollars APH has paid to the HRPT and the Department under the Permit) is entirely speculative and completely ignores the fact that APH had a contractual right, under the Permit, to provide discounts. There is no basis for the discussion of discounts.

Finally, also noteworthy is the fact that Liberty and Helicopter Flight Services, Inc. ("HFS"), the two primary companies that raised complaints regarding APH's new Schedule of Charges, filed lawsuits against APH and the HRPT alleging unfair and discriminatory pricing practices at the Heliport. The New York Supreme Court dismissed Liberty's and HFS's claims with prejudice, finding that they failed to state a cognizable cause of action. The November 17, 2006 decision of the New York State Supreme Court are attached as **Exhibit 14**. The Comptroller's Office should not give credence to claims that the Court found devoid of merit.

3.     **Other Errors.**

The Draft Report also contains other errors. The Draft Report states that APH is required to remit a basic monthly permit fee and an additional fee equal to a percentage of its gross receipts. Draft Report at page 2. The Draft Report fails to mention that under the Permit APH also pays a use fee calculated based upon the number of sightseeing passengers. Additionally, the Draft Report states that when APH instituted a passenger fee, Liberty, a sightseeing carrier who operates at the Heliport, left in protest and returned upon a temporary stay of the new rates by the Courts This is totally misleading. What actually occurred is that APH filed a motion to dismiss Liberty's lawsuit. That motion was granted. The New York Court found that Liberty's claims had no merit and dismissed its Complaint with prejudice.

11

**4.    Conclusion.**

The Draft Report contains numerous factual mistakes, misleading statements, and erroneous conclusions that must be corrected. It is noteworthy that the HRPT's independent team of professional, certified accountants reviewed thousands of documents over the course of a year and found nothing of note, other than the debatable issue of the consulting fee which the HRPT and APH resolved amicably. APH has undergone several audits prior to the HRPT's audit, none of which disclosed any significant issues.

The New York State auditors, in contrast, requested only a fraction of the documents that the HRPT's auditors reviewed and somehow manage to conclude that APH diverted funds and engaged in other misconduct.

Under these circumstances, and in light of Liberty's involvement in the audit process, in the event that the Draft Report is not substantially revised and corrected, APH can only conclude that the Comptroller's Office has chosen to accept the outrageously false allegations of Liberty (whose mission is to destroy APH), and to disregard the conclusions of the HRPT's team of independent auditors and the HRPT itself which, based on its auditor's report, agreed that APH had _not violated the Permit and is in good standing._

LENTZ & GENGARO
Attorneys for Air Pegasus Heliport, Inc.

By: _____
Christopher T. Gengaro

Dated: October 18, 2007

12

## APPENDIX B - STATE COMPTROLLER COMMENTS ON AUDITEE RESPONSE

1. We have revised the Final Audit Report (Report) to reflect the comments of Trust officials, whose response to the Draft Audit Report (Draft) incorporated the comments of Pegasus as well. Essentially, these comments centered on two issues presented in the Draft: (i) the characterization of certain revenues which the Trust and Pegasus, by their settlement agreement effectuated on November 22, 2006, resolved to treat as gross receipts under the terms of the Permit; and (ii) the characterization of certain discounts accorded by Pegasus during the period as potentially entitling the Trust to additional payments from Pegasus. The information and documentation provided by the Trust and Pegasus in response to our audit suggested that our findings in regards to these issues did not adequately address all of the circumstances surrounding them and, therefore, we have modified such findings and associated recommendations from the Report. Accordingly, we believe that the Report adequately addresses the concerns raised by the Trust and Pegasus.