UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NEW YORK HELICOPTER CHARTER, INC. and          :
MICHAEL ROTH individually

                                               :    07 Civ. 4069 (MGC)
                          Plaintiffs

                                               :

        -against-                              :

                                               :    **DECLARATION
AIR PEGASUS HELIPORT, INC, HUDSON RIVER             OF LEON FRIEDMAN**
PARK TRUST and the FEDERAL AVIATION            :
ADMINISTRATION

                                               :
                          Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       LEON FRIEDMAN, an attorney duly admitted to the courts of the state of New

York, declares under penalties of perjury.

      1.    I am one of the attorneys for defendant Air Pegasus Heliport, Inc.. one of

         the defendants in this action. I make this declaration in support of a motion

         to dismiss. I am fully familiar with the facts recited herein.

      2.    Attached as Exhibit 1 is a copy of the Amended Complaint in this action,

         which compares the Amended Complaint with the original complain filed

         in this action, indicating what paragraphs and new and which were

         contained in the original complaint.

      3.    Attached as Exhibit 2 is a copy of the Permit dated March 25, 1996, issued

         by the New York State Department of Transportation to Air Pegasus

         Heliport, Inc.

Dated: New York, N.Y.
      January 18, 2008

EXHIBIT 1

COMPARISON CHART BETWEEN ORIGINAL
COMPLAINT AND AMENDED COMPLAINT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
NEW YORK HELICOPTER CHARTER INC., and
MICHAEL ROTH, individually,                                    Case No. 07 Civ. 4069(MGC)

                              Plaintiffs,

        -against-                                              **AMENDED COMPLAINT**

AIR PEGASUS HELIPORT, INC., and
HUDSON RIVER PARK TRUST

                              Defendants.
-----------------------------------------------------------X

        New York Helicopter Charter Inc., ("hereafter referred to as "NYH or NYHC" or "New York

Helicopter"), and Michael Roth, individually, by their undersigned attorneys, for their complaint,

allege as follows:

## INTRODUCTION

        1.       Essentially, this case involves selective, arbitrary, irrational and discriminatory

policies implemented by defendants, a public heliport operator and the entity in charge of the

heliport on behalf of the State for the benefit of Air Pegasus Heliport Inc ("APH"). to the detriment

of New York Helicopter Charter Inc. ("NYH"), -a helicopter company- , Michael Roth and the

public.

        2.       The discriminatory practices were followed by the denial of heliport landing rights to

NYH.

        3.       These acts interfere with the operation of interstate air transportation, interstate

commerce and free competition and violate plaintiffs' equal protection right to have the same access

to a public service as others in the same situation[1].

---

[1]     In addition to the foregoing Plaintiff also believe there is a claim for violations of the antitrust law
        which, as pointed out by the court should be the subject of a separate action.

## PARTIES

4.     Plaintiff New York Helicopter Charter, Inc. is a New York corporation with its principal place of business in New York whose President, Michael Roth, is licensed by the Federal Aviation Administration.

5.     NY Helicopters' charter flights involve interstate travel as its helicopters take off in one state and land in other states thereby involving interstate commerce. NYH's customers include, but are not limited to business people, the public, tourists, and celebrities such as Calvin Klein and Ian Schrager.

6.     NYH has been improperly discriminated against and arbitrarily denied operating rights at the West 30th Street Heliport since May 6, 2007, for among other reasons, refusing to drop a pending State lawsuit, complaining to the HRPT regarding APH's activities, and for joining in with other helicopter operators in complaints to APH.

7.     Plaintiff Michael Roth, in his individual capacity, is a resident of New York and a naturalized citizen of the United States whose rights have been violated and who has been arbitrarily and wrongfully discriminated against as referred to above and whose wrongful ouster from the illegal Heliport is causing damage to him, his employees, his customers and the public consumer.

8.     Roth's and NY Helicopters' rights to utilize the West 30th Street Heliport have been terminated to accommodate Zip Aviation LLC, who has been sponsored by APH and granted privileges and opportunities not afforded other tour and sightseeing operators in spite of problems with the Federal Aviation Administration ("FAA").

9.     Defendant Air Pegasus Heliport, Inc. ("APH"), incorporated in May, 1996, is a Delaware corporation with its principal place of business in New Jersey.

10.    APH is the sole and exclusive fixed base operator (the "FBO") at the Heliport pursuant to a March 25, 1996 Agreement (the "Permit" attached hereto as "Ex. C") with the New York Department of Transportation (the "DOT"), which the HRPT later assumed.

11.    The Permit expired, by its terms, on March 24, 2001.

2

12.     Defendant Hudson River Park Trust (the "HRPT") is a New York public benefit corporation that was created by the Hudson River Park Act ("HRP Act") in 1998.

13.     The HRPT was intended to be a "partnership between New York State and City," and was charged by the legislature "with the design, construction and operation of the five-mile Hudson River Park."

14.     The heliport is located at West 30th Street, New York, New York.

15.     By the terms of its own enabling legislation, the heliport should have been shut down, effective March 21, 2001.  However, it is still being operated illegally and to the detriment of plaintiffs and the public by The Hudson River Park Trust ("HRPT"),[2] by way of a contrived month-to-month permit to its "favorite son," Air Pegasus Heliport.

16.     There have been numerous complaints regarding the operation of the heliport including various letters written to the HRPT by users and numerous public officials, including but not limited to the former New York State Comptroller Alan G. Hevesi, Assemblyman Richard Brodsky, previous officials from the New York State Attorney General's Office and others.[3]

17.     HRPT continues to illegally operate the heliport and delegates many of its governmental responsibilities for operating said heliport to the quasi-governmental APH, which operates the heliport in an arrogant, unreasonable, unfettered and, above all, discriminatory manner

---

[2]  The HRPT is comprised of Eliot Spitzer (Governor), Michael R. Bloomberg (Mayor), and Scott Stringer (Manhattan Borough President).  It is governed by a 13-member Board of Directors, five (5) of whom are appointed by the Governor, five (5) are appointed by the Mayor and three (3) are appointed by the Manhattan Borough President.

The Board of Directors is currently comprised of Diana Taylor (Chair), Daniel L. Doctoroff (Vice-Chairman), Carol Ash (Commissioner, New York State Office of Parks, Recreation & Historic Preservation), Peter Grannis (Commissioner, New York State Department of Environmental Conservation), Theodore Roosevelt IV, Diana L. Taylor (Superintendent of Banks, State of New York), Joseph B. Rose, Henry J. Stern, Georgette Mosbacher, Adrian Benepe (Commissioner, New York City Department of Parks & Recreation), Julie Nadel, Lawrence B. Goldberg, Esq. and Franz Leichter, Esq.

[3]  A request for declaratory relief regarding the operation of the Heliport was filed in state court on December 13, 2007 by Friends of the Hudson River Park, Chelsea Waterside Park Association, Hells Kitchen Neighborhood association and others against HRPT, APH and Liberty Helicopters index No. 07116581.

3

that interferes with and adversely impacts on interstate commerce, contravenes applicable federal regulations, and violates the plaintiffs' constitutional rights to substantive and procedural due process and equal protection under the law. [4]

18.     APH's contract with the Hudson River Park Trust ("HRPT"),[5] or predecessors,[6] the Port Authority of New York and New Jersey and then the New York Department of Transportation ("NYDOT"), – has lasted almost thirty (30) years without competitive bidding.

19.     This situation is a stark contrast to that prevailing at the other two heliports in Manhattan, one located on the East Side at 34th Street and the other one downtown.[7]

20.     In addition, APH is operating illegally on a "subterfuge" month-to-month permit extension.

21.     APH's method of operation[8] and fees having no correlation to APH's costs of operation, result in New York Helicopters' receiving treatment different from, and less favorable than, its competitors, and constitute an unreasonable burden on NYH and the public as well as unfair interference with interstate commerce.

---

[4]  While there is a case pending in the Supreme Court, New York County, the issues raised therein are sufficiently distinct and arise out of a "settlement agreement", and alleged overcharges and although preliminary relief was denied the case is proceeding and the State Court Judge specifically is aware of and referred to the pending federal case in his decision. Which was sent by defendant APH to the Court by letter dated October 30, 2007?

[4]  The Port Authority of New York and New Jersey sued APH for recovery of diverted funds in 1998 which case was settled in 2005 and, upon information and belief, the DOT may still be entitled to funds from APH.

[5]  The Port Authority of New York and New Jersey and the NYDOT.

[7]  The other heliports are located on the East Side at 34th Street and the East River, which is operated by Atlantic Aviation pursuant to a permit with the New York City Economic Development Corporation and the Downtown Manhattan Heliport operated by the Port Authority of New York and New Jersey, neither of which are operated in the same discriminatory manner as APH operates the West 30th Street Heliport pursuant to a lease agreement with the New York City Economic Development Corporation, neither of which is charging the $10 per passenger fee as does APH, which, fee, while not struck down by a State Appellate Court in a different case, by a different plaintiff, is being challenged here on other grounds.

[8]  Threatening charter and sightseeing operators that if they complain to HRPT or APH they will be refused privileges, discriminating in charges, demanding that existing lawsuits be dropped as a condition of operating, unreasonable limited take offs and landings and wrongfully discriminating against operators.

4

Case 1:07-cv-04069-MGC    Document 34    Filed 12/31/2007    Page 5 of 45

22.     APH's fare increase and ouster of NYH, without a hearing, is in violation of "procedural due process and equal protection," such that APH is receiving a "windfall" of over two million dollars per year.

23.     The discriminatory manner in which HRPT has chosen to enforce New York State regulations exceeds the scope of the limited authority that federal aviation law grants to "municipal proprietors" like HRPT, violates the commerce clause and is preempted by federal law.

24.     HRPT's entire authority to regulate interstate airspace rests upon a "municipal proprietor" exemption in federal aviation law, an exemption for which the Second Circuit has already ruled that HRPT qualifies.

25.     This exemption, however, does not grant *carte blanche* authority.

26.     To the contrary, "the proprietor exception allows municipalities to promulgate *reasonable, nonarbitrary and non-discriminatory* regulations of noise and other environmental concerns at the local level."

27.     Discriminatory regulations, of the sort that HRPT and APH have implemented here, are unreasonable, arbitrary, and thus beyond the scope of the proprietor exemption.  As a result, they are preempted by federal aviation law.

28.     In addition to being preempted by federal law, the discriminatory nature of these regulations renders them an "exercise of power without any reasonable justification in the service of a legitimate governmental objective," precisely the standard that courts apply to recognize violations of constitutional due process and equal protection.

29.     A number of plaintiffs' competitors have been given preferential treatment.

30.     Plaintiffs have been subject to arbitrary, unfair and unreasonable discrimination, culminating in their recent ouster from operating at the Heliport.

31.     The Heliport operation -legally or illegally- affects NYH's ability to do business, its competitive position in the sightseeing helicopter business, and impacts on the consuming public.

32.     In addition, APH and HRPT have entered into a contrived "Settlement Agreement," which should be declared and ordered null and void and contrary to public policy.

5

33.     The operation of the West 30th Heliport, in violation of federal and state law, is affecting the competitive landscape in the sightseeing and charter helicopter business.

34.     The Downtown Manhattan Heliport is operated by the Port Authority of New York and New Jersey. However, the West 30th Heliport is the most convenient location for the customers of the sightseeing and charter helicopter business and is the only heliport which operates twenty four (24), hours a day, seven (7), days a week.

35.     As reflected herein, it is alleged that the Hudson River Park Trust (the "HRPT") is violating federal and state law and its own by-laws in connection with the operation of the West 30th Street Heliport, located on Hudson River Park property on Manhattan's West Side in the face of damning findings by the HRPT's own auditor (Ex. A ), that the exclusive fixed base operator (the "FBO") of the Heliport, Air Pegasus Heliport, Inc. ("APH"), concealed millions of dollars in operating revenue and gave discounts to certain preferred helicopter operators in violation of its permit, for which the HRPT should have immediately terminated APH.

36.     Instead, the HRPT irrationally settled its dispute with APH over these and other abuses – and on extremely favorable terms to APH – exonerating APH of any wrongdoing despite evidence to the contrary.

37.     A report of the Office of New York State Comptroller dated December 21, 2007: Hudson River Park Trust West 30th Street Heliport Revenue Operations Report 2006-s-75 available at www.osc.state.ny.us stated: "our audit could not determine whether Pegasus charged all customer carriers appropriate fees because it gave discounts to select carriers without the benefit of a formal written discount policy." "Our audit found that some of the additional fees that Pegasus imposed on carriers were questionable"

38.     Indeed, under the terms of the settlement (Ex. B), the HRPT went so far as to falsely "acknowledge" that it "has no knowledge that APH was in violation of any of the provisions of the Permit and, accordingly, APH is in good standing with the HRPT." Settlement Agreement at 4.

39.     In so doing, the HRPT violated its inherent statutory duties and fiduciary obligations to the public to resolve financial disputes on rational and reasonable terms that protect the public

6

interest. Additionally, the HRPT had an obligation to remove parties who engaged in wrongdoing in violation of their government contracts.

40.     While the HRPT's violations of the law are to APH's benefit and to the detriment of the public and New York Helicopters, the wrongdoing did not end there.

41.     For more than a decade, pursuant to APH's 1996 permit to operate the Heliport (Ex. C), APH has generated substantial revenues operating a heliport out of which is utilized by tourist, charter and recreational sightseeing helicopter operators.

42.     The Hudson River Park Act (the "HRP Act") (Ex. D), enacted in 1998, barred sightseeing helicopter tours but, under a "grandfathering" clause, permitted existing uses – even prohibited ones – if the party under contract could "solely" exercise the "contractual right" to extend the contract. *See* HRP Act at § 3(i), 1998 Sess. Law. Ch. 592 (S. 7845) (McKinney's 1998).

43.     APH had no such unilateral contractual rights here under its contract, which expired by its terms on March 24, 2001, but which has been extended since by agreement of both parties.

44.     Therefore, APH's contract is illegal under the HRP Act, and null and void. Accordingly, no heliport, of any kind, can operate in the current location of the West 30th Street Heliport. The only heliport that can possibly operate out of the Hudson River Park is a "non-tourism/non-recreational" heliport that is situated west of the Park's bulkhead line. *Id.* at §§ 3(g) (v), 7(9) (i).

45.     In any event, even if that provision did not exist, as of March 25, 2006, because APH's contract had been extended for more than five years on a month to month extension, which extended the total term beyond 10 years, the HRPT was required under the HRP Act, to initiate a competitive bid process with respect to this contract to serve as the Heliport's operator by "hold[ing] a public hearing," "solicit[ing]" the views of the public," "publish[ing] notice of the hearing and proposed action in the city record and state register," and "issu[ing] a bid prospectus." *Id.* at § 7(6).

46.     Nevertheless, instead of terminating APH and putting the contract to operate a limited, "non-tourism/non-recreational" heliport out to bid, as the HRP Act requires, the HRPT has








illegally "sole sourced" the operation of this prohibited use to APH, thereby allowing it to maintain its stranglehold over the Heliport.

47.     In 2005, the HRPT commenced an inspection of APH's books and records to determine whether APH had fully and properly reported and remitted the requisite fees and charges to the HRPT pursuant to its contract.

48.     Even though the HRPT was unquestionably authorized to do so, APH promptly filed suit, challenging the breadth and scope of the HRPT's audit rights under the Permit.

49.     After filing its own suit, seeking to recover all unpaid fees improperly withheld by APH, the HRPT also continued its audit.  On October 31, 2006, the HRPT's auditor issued findings of egregious wrongdoing by APH.  These findings included APH's concealment of millions of dollars in operating revenue from the HRPT in an effort to deny the HRPT its share of that revenue.[9]

50.     Perhaps the most egregious finding, and the one most directly damaging to NYH, was that in direct contravention of its contract, APH also gave substantial discounts and price preferences, including non-volume discounts on fuel and landing fees, to certain preferred customers.

51.     This practice of discriminating against NYH and some other operators in favor of other competing operators had no basis in cost, in volume, or in any other economic justification.

52.     By forcing NYH to compete on an unlevel playing field, the HRPT and APH increased NYH's costs, complicated NYH's ability to invest in expanding its business, increased NYH's operating costs, and lost it business to APH's "favored" operators blessed with lower operating costs and now, only recently, has been forced out altogether.

53.     Each of these unfair cost differentials had a direct negative effect on NYH's business, causing it both to lose volume and to lose profits on the customers that it did serve.

---

[9]     For example, between 1996 and 2005, APH diverted $3,853,229 to a "dummy" related entity, Air Pegasus of New York, Inc.  In addition, APH's monthly deposit cash sheets did not include all bank deposits.

8

54.     These lost profits constitute a real, tangible and measurable source of damage to NYH, attributable solely and directly to illegal, discriminatory and unreasonable implementation of regulations at the West 30th Street Heliport.

55.     Incredibly, on November 22, 2006, instead of terminating APH based on these damning findings, the HRPT settled its dispute with APH, and on extremely favorable terms with APH.

56.     Despite its knowledge of APH's serious misconduct, the HRPT agreed, and falsely stated, as part of the settlement, that "it has no knowledge that [APH] is in violation of any of the provisions of the permit and, accordingly, APH is in good standing with the HRPT."

57.     Moreover, notwithstanding that the HRPT is entitled – and, indeed, legally required – to "issue a bid prospectus" seeking proposals to operate the Heliport, the HRPT also "acknowledged" that "no operator other than [APH] can be allowed to operate the Heliport."

58.     In return, APH paid the HRPT a mere $462,387.

59.     Although purportedly in "full and complete satisfaction" of APH's obligation to remit certain monies to the HRPT, this figure fails to account for numerous payments identified by the auditor as having been withheld.  Nor does it include any interest on any of the improperly withheld monies or any costs associated with collection.

60.     Because APH is now permanently ensconced at the Heliport as a result of the irrational settlement offered to it by the HRPT, APH is imposing unfair and unreasonable fees on NYH, and others similarly situated, in an effort to recoup the costs of its settlement, as well as cutting back on NYH's number of flights – until recently ejecting them altogether – to accommodate other preferred parties including Zip Aviation LLC – whose license was initially rejected by the FAA.

61.     This inappropriate delegation of authority has allowed APH, ostensibly a private party, to exert the full governmental authority of HRPT, and thus turned APH into a quasi-governmental actor bound, along with HRPT, by all constitutional, statutory, and regulatory requirements constraining government action.

9

62.     In these ways, the HRPT's arbitrary and capricious decision to settle with APH on such favorable terms to APH has harmed NYH.

## JURISDICTION AND VENUE

63.     The jurisdiction of this Court over the subject matter of this action is predicated on 28 U.S.C. § 1331, as the acts herein alleged arise under the Constitution, laws or treaties of the United States, and 28 U.S.C. § 1337, as the acts herein arise under enactments of Congress regulating commerce and also relate to "due process" and 28 U.S.C 1367.

64.     New York Helicopter has standing to bring this action because it has a significant stake in a judicial resolution of the dispute, and has been adversely affected and discriminated against as detailed herein.

65.     Declaratory relief is appropriate because an actual controversy exists regarding the operation of the Heliport by HRPT and APH.

66.     This Court may also exercise personal jurisdiction over defendants, as they have purposefully committed acts within the State of New York from which these claims arise.

## FACTUAL BACKGROUND

I.     **The Hudson River Park ("the Park")**

67.     The Hudson River Park covers 550 acres on Manhattan's West Side, including 400 acres of open water that have been earmarked for various public activities such as boating, touring, fishing and swimming. *See Friends of Hudson River Park, at* http://www.fohrp.org/fohrp.php?screen=park.

68.     Once completed, the Park will extend from 59th Street to Chambers Street. *See id.* At the heart of the Park lie 13 old maritime piers, which are now being converted into public park spaces, including lawns, gardens, picnic areas, scenic overlooks, playgrounds, ball fields, historic boats, a living museum, research and educational facilities, event space, and eating facilities. *See id.* Additionally, a waterfront esplanade providing room for more active recreation will line the

Case 1:07-cv-04069-MGC Document 142 Filed 02/08/2008 Page 11 of 25

easternmost portion of the land comprising the Park. *See id.* Four miles of tree-shaded lawns and fountains will stand adjacent to the esplanade. *See id.*

69. Pursuant to the HRPT Act, the legislature intended to enhance the ability of New Yorkers to enjoy the Hudson river, one of the state's great natural resources; protect the Hudson river, including its role as an aquatic habitat; promote the health, safety and welfare of the people of the state; increase the quality of life in the adjoining community and the state as a whole; help alleviate the blighted, unhealthy, unsanitary and dangerous conditions that characterize much of the area; and boost tourism and stimulate the economy. HRP Act at § 2(a), 1998 Sess. Law. Ch. 592 (S. 7845) (McKinney's 1998).

70. The legislature also intended for the "creation" of the Park to "encourage, promote and expand public access to the Hudson River, promote water-based recreation, and enhance the natural, cultural, and historic aspects of the Hudson River." *Id.* at § 2(b).

71. To this end, the legislature and executive branch of government further intended to limit commercial activity in the Park.

## II. The Hudson River Park Trust ("HRPT")

72. The HRPT was created to design, construct, operate and maintain the Park subject to the restrictions imposed by the HRP Act. *Id.* at § 5(1).

73. In particular, the legislature mandated that the HRPT:

- provide a place for recreation, reflection, education, and cultural expression for the public;

- be a proper and appropriate steward of the environment;

- cooperate, and to coordinate matters relating to the park, with the federal government, the state and the city of New York as well as with community, environmental, and civic groups;

- accept contributions from philanthropic organizations, foundations, and all other entities or persons for the purpose of advancing the purposes in this act;

- accept appropriations and grants from federal, state and local governments;

11






- receive rents, payments in lieu of taxes, and other revenues generated within the park; and

- use the same solely to improve, operate and maintain the park; and to encourage and support public volunteer activities and participation in the operation of the park.

*Id.* at § 6(b) – (h). (Ex D).

74.    The HRP Act dictates that, upon the HRPT's creation, "the trust shall succeed to all contracts, leases, licenses and other legal obligations respecting the park to which its predecessors are party at or after the effective date of this act." *Id.* at § 5(1).

75.    The HRPT operates pursuant to by-laws which, among other things, require board approval of all "contracts for the general corporate purposes of the Authority which are in excess of one hundred thousand dollars ($100,000)." Hudson River Park Trust By-laws at Art. III, § 3 ("Contracts Requiring Board Approval").

III.    **Provisions of the HRP Act Governing the Operation of a Heliport**

76.    In an effort to limit uses of the Park, the HRP Act stipulates: "[T]he area of the park east of the bulkhead line shall be used *solely for park use and to permit access to permitted uses . . .* ." HRP Act at § 7(9) (i) (emphasis added).

77.    The "bulkhead line" divides the *terra firma* of the Park, which is the "area east of the bulkhead line" from the "Hudson river park estuarine sanctuary," the river section of the Hudson River Park, which is the area west of the bulkhead line. Accordingly, only "park uses" are permitted on the *terra firma* of the park.

78.    A "park use," as defined in the HRP Act, does not include a heliport. *Id.* at § 3(h) (i)-(viii).

79.    Nor does a heliport fall within the definition of a "compatible governmental use." *Id.* at § 3(b).







80.     However, "a *non-tourism/non-recreation* heliport for commercial and emergency transportation use" satisfies the definition of "park/commercial use," and therefore may be operated in the Hudson River Park, but only west of the bulkhead line. *Id.* at § 3(g) (v) (emphasis added).

81.     The fourth category of "permitted use" is a "grandfathering" clause allowing certain uses pre-dating the HRP Act to continue after the HRP Act became effective, *viz*: all uses permitted under any lease, permit, license or other instrument in effect upon the effective date of this Act . . . only pursuant to the terms of the instrument and only for the term thereof or pursuant to any extension according to the terms thereof *if, but only if, the option to extend is exercised solely by and is a contractual right of* the lessee, permittee licensee or other contractual user. *Id.* (emphasis added).

82.     The HRP Act also governs the HRPT's process with respect to awarding certain types of contracts. First, the HRPT must treat as a "significant action . . . any proposed lease, concession arrangement, license or other agreement . . . for a period in excess of ten years." *Id.* at § 7(11). In so doing, the HRPT must:

> a.      hold a public hearing on not less than 30 days' advance public notice;
> (b) solicit and consider the views of Manhattan community boards one, two, and four, the planning commission of the city of New York, the advisory council, elected officials representing communities neighboring the park, and interested groups and individuals, allowing not less than sixty days following the notice of the proposed action for the submission of such views; and (c) publish notice of the hearing and proposed action in the city record and state register.

*Id.* at § 7(6).

83.     In addition, the HRPT must "issue a bid prospectus for any leases, concession agreements, licenses and other agreements which would provide for a total capital investment in the park of no less than one million dollars over the proposed term of the agreement." *Id.* at § 7(11).

84.     The HRP Act requires the "bid prospectus submitted to prospective bidders" to "contain specific information concerning the nature of the capital improvements or equipment to be provided by the successful bidder and shall be provided to community boards one, two and four within the borough of Manhattan." *Id.*

13

85.     When signing the permit/agreement with APH the NYDOT went beyond its authority when it agreed that third parties could not assert any rights under the permit because the NYDOT was acting in a fiduciary capacity on behalf of the public (the beneficiary) when it signed the contract and therefore it could not give up a right it did not possess.

86.     The clause that indicates that the rates should be reasonable and non discriminatory was meant to protect the heliport's users and the public.

87.     Thus, the public and in particularly NYH is entitled to assert the right to non discriminatory policies not only under the commerce clause, due process clause and the equal protection clause but also under the permit.

IV.     **The Heliport**

88.     The Heliport was built more than 50 years ago when a dock at West 30th Street in the Chelsea section of Manhattan was converted into a landing pad for helicopters. [10]

89.     The Heliport is a public heliport that is open seven days a week and has fueling facilities.

90.     A substantial portion of the Heliport's business consists of sightseeing and charter tours.

91.     Since at least 2001, the HRPT has planned to relocate the Heliport. *See Estuarine Sanctuary Management Plan*, dated September 2001, *available at:* http://www.hudsonriverpark.com/pdfs/policies/sanctuary.pdf, at 1-23 ("The current heliport activities will be relocated pursuant to the HRP Act. Under the HRP Act, there are two possible locations on the west side of Manhattan that are permitted for relocation (Piers 72 or 76)."); HRP Act at § 7(9) (i), 1998 Sess. Law. Ch. 592 (S. 7845) (McKinney's 1998) ("Consistent with the





---

[10] Jefferson Siegel, *Heliport on Hudson Still Flying High After 50 Years*, The Villager, (Oct. 18-24 2006), *available at*, http://www.thevillager.com/villager_181/heliportonhudson.html.

14

general project plan, the area of the park east of the bulkhead line shall be used *solely for park use and to permit access to permitted uses.*") (emphasis added).

92.     The FAA Rules and Regulations govern Helicopters' activities vis a vis 135 (Charters), 136 (Sightseeing Tours).

93.     The FAA is primarily responsible for the advancement, safety and regulation of civil aviation, as well as overseeing the development of the air traffic. (*See* www.faa.gov/regulations/ policies).

**V.     APH's Obligations as FBO of the Heliport Pursuant to the Permit**

94.     On March 25, 1996, the DOT, which preceded Defendant HRPT as the State agency overseeing the Heliport, entered into an agreement that provided Defendant APH with the sole and exclusive right to serve as the FBO at the Heliport.

95.     In return for this lucrative right, APH is required, among other things, to pay a monthly fee to the HRPT. Permit at § 6(a).

96.     In addition, APH is required to remit to the HRPT a percentage fee equivalent to ten percent (10%) of its gross receipts for amounts in excess of $250,000, up to and including $1,000,000; a percentage fee equivalent to eleven percent (11%) of APH's gross receipts for amounts in excess of $1,000,000, up to and including $2,000,000; and a percentage fee equivalent to twelve percent (12%) for all amounts over $2,000,000. *Id.* at § 6(b).

97.     APH is also required to pay the HRPT a use charge computed at the rate of $15 per every ten sightseeing passengers. *Id.*

98.     The Permit requires APH to charge fees at the Heliport that are "fair, reasonable and non-discriminatory." *Id.* at § 34(b).

99.     Moreover, APH must "undertake at its own expense to comply with all laws and ordinances and governmental rules, regulations and orders now or at any time during the term of [the Permit] which as a matter of law are applicable to the operations of APH at the Heliport." *Id.* at § 8(a).

93 =

94 =

95 =

96 =

97 =

98 =

99 =

100 =

101 =

new section

100.   The relationship between APH and HRPT is mutually beneficial. They both benefit financially from the relationship.

101.   APH, pursuant to the Permit, has a lucrative monopoly over the operations at the Heliport.

102.   For its part, the HRPT enjoys a steady, significant revenue stream from the operation of the Heliport without having to involve itself in the details of the complicated business of actually operating the Heliport.

103.   Significantly, the operation of the Heliport is traditionally an exclusive function of the state.

104.   Responsibility for the operation of the Heliport lies ultimately, and exclusively, with the NYDOT.

105.   On its website (at www.dot.state.ny.us/info/info.html), the DOT explicitly stated that its functions and duties include "coordinating and assisting in the development and operation of transportation facilities and services for highways, railroads, mass transit systems, ports, waterways, and *aviation facilities*[.]" (emphasis added.)

106.   The DOT, in entering into the Permit with APH, delegated its responsibility to operate the Heliport to APH.

107.   Accordingly, in operating the Heliport pursuant to the Permit, APH can be said to be an arm of the state fulfilling a governmental function and, therefore, a state actor.

108.   APH's Permit expired by its terms on March 24, 2001. *Id.* at § 2.

**VI.    HRPT And APH Are State Actors For Purposes Of The Acts Complained Herein**

109.   The right to operate the heliport and charge customers has its source in state authority because the New York State Department of Transportation, a state agency, was responsible for the Permit and authorized and approved the granting of these rights.

16

110.    The original permit/agreement between the New York State Department of Transportation and APH establishes clearly the public service of the heliport at section 32(a):  "A principal purpose of the Department in the making of this agreement is to have the Heliport operated as a first-class public heliport…"

111.    Since the heliport is "public," as opposed to those owned by corporations and medical facilities, the state is involved in some aspects of the operations.

112.    For example in a letter dated February 9, 2007 [Ex J] HRPT writes to APH about Zip Aviation's failure to comply with the Federal Aviation Administration regulations.

113.    Thus the HRPT acts in a supervisory capacity and approves certain matters related to the operation of the heliport and oversees the compliance with the regulations of the Federal Aviation Administration.

114.    In addition, HRPT oversees the pricing to ensure "that the use of the heliport is afforded in a fair and non-discriminatory manner as mandated by the agreement" as indicated in their own letter attached as Exhibit J.

115.    The requirement that the heliport is afforded in a fair and non-discriminatory manner reasserts the public nature of the heliport and creates the kind of entwinement between the APH and HRPT that makes APH a state actor.

116.    The Hudson River Park Trust has the power to prohibit a charge if it is discriminatory or does not comply with the terms of the permit agreement.

117.    The report of the Office of New York State Comptroller dated December 21, 2007: Hudson River Park Trust West 30th Street Heliport Revenue Operations Report 2006-s-75 available at www.osc.state.ny.us contains further evidence of the entwinement between APH and HRPT the report stated:

> "in light of the specific requirements of the permit we believe that the Trust has a responsibility to ensure Pegasus is operating the Heliport in an appropriate manner and in conformance with permit provisions.
>
> Recommendations include:



17

1.      Take appropriate measures to complete and execute the re-bid
process for the Heliport at its new location
2.      Require Pegasus to prepare written policies regarding discounts
3.      Monitor periodically all aspects of the Heliport operations,
including revenue collections, compliance with posted fees, and the
business climate enjoyed by Heliport carriers. As necessary, take
appropriate corrective actions. [emphasis added] (Ex.G)

118.    Also as evidenced in the letter sent by Christopher Genaro attorney for APH, both

APH and HRPT have "enjoyed a long-standing, mutually beneficial, and respectful relationship over

the course of two and a half decades. Exhibit J.

119.    Furthermore, the entwinement goes beyond the joint efforts in the heliport operations

since HRPT was aware of the discriminatory practices of APH and failed to protect the public.  The

Report  of the Office of New York State Comptroller mentioned above also states at page 5:

The Trust is responsible for ensuring that Pegasus complies with Permit
terms and operates the Heliport in a productive manner.

However, our audit found that some of the additional fees that Pegasus
imposed on carriers were questionable. For example, Pegasus initiated a
Safety and Facility Enhancement (SAFE) fee following September 11,
2001, which we were told would provide increased security and related
improvements to the Heliport....However, Pegasus could not show us any
facility enhancements or improvement that it funded with SAFE fee
collections.

120.    Upon information and belief, among others, the rate increase of $10 per passenger

that followed the SAFE fee, was the result of the fact that APH had to repay HRPT pursuant to a

settlement agreement regarding the monies APH had diverted.

121.    Thus, both parties had an interest in the rate increase and HRPT decided to ignore the

fact that the increase was going to be passed to the consumers.

122.    In addition, the United States Government has exclusive sovereignty of airspace of

the United States.



18

123. For this reason the Federal Aviation Administration regulates helicopter operations and establishes airworthiness standards in 14 CFR part 29 and heliport markings.

124. The letter from Laurie Silberfeld, Vice President and General Counsel of HRPT to APH attached as exhibit I shows that federal approval is required to operate at the heliport:

> "It has come to our attention that the January 10, 2005 ZIP Aviation Operations Specifications manual that you provided in connection with APH's request for Trust authorization to allow ZIP Aviation to conduct sightseeing operations out of the West 30th Street heliport has not been approved by the Federal Aviation Administration ("FAA").........."

**VII. Additionally, the APH Has Been Operating An Unlawful Tourism/Recreational Heliport Since March 25, 2001**

125. Alternatively, even if some sort of heliport were permitted to operate at the Heliport's current location, the operation of a tourism/recreational heliport would be unlawful in any event.

126. As previously explained, the HRP Act does not provide for renewal of a contract that pre-dated the HRP Act unless *"the option to extend is exercised solely by and is a contractual right of* the lessee, permitted, licensee or other contractual user." *Id.* at § 3(i) (iv).

127. The Permit does not include an "option to extend." Instead, its term *automatically* renews "for successive terms of one month each unless cancelled by *either* party upon thirty (30) days written notice." *Id.* at § 2 (emphasis added).

128. Neither the HRPT nor APH has ever cancelled any automatic renewal since the Permit expired on March 24, 2001.

129. Thus, since March 24, 2001, APH has been operating the Heliport on an exclusive basis under a series of automatic month-to-month extensions to which the HRPT has agreed. In this way, Defendants APH and HRPT have repeatedly violated the HRP Act.

130. Upon information and belief, the HRPT never sought board approval for the dozens of extensions of the Permit, as it was required to do. *See* Hudson River Park Trust By-Laws at Art. III, § 3 ("Contracts Requiring Board Approval").

131.   Accordingly, upon information and belief, in agreeing to extend the Permit every month over the past 5 years, the HRPT also has repeatedly violated its own by-laws.

132.   Upon information and belief, the HRPT intentionally failed to seek board approval of these extensions because doing so would have revealed that the Permit was not "grandfathered" under the HRP Act. As previously explained, "grandfathering" of a pre-HRP Act permit was only permitted if, by the permit's terms, the permittee had the sole "option to extend" it. HRP Act at § 3(i), 1998 Sess. Law. Ch. 592.

133.   Even if the Permit's automatic renewal, subject to cancellation by either the APH or the HRPT, satisfied the "grandfathering" clause of the HRP Act, use of the Heliport as a tourism/recreation heliport past the Permit's expiration on March 24, 2001 would *not* be grandfathered. *See id.* § 3(j), ("'Prohibited use' means . . . (vii) any facility for motorized aircraft, including a heliport, except a heliport which is defined as a park/commercial use"); *id* at § 3(g) ("Park/commercial use means . . . (v) a *non-tourism/non-recreation* heliport for commercial and emergency transportation use.") (emphasis added). In this separate and independent respect, the operation of the Heliport as a tourism/recreation heliport since March 25, 2001, has further violated the HRP Act.

134.   Even if the Permit had satisfied the HRP Act's grandfathering clause, operation of the Heliport by APH past March 25, 2006 was unlawful. At that point, APH's Permit had exceeded 10 years.

135.   Moreover, the Permit "provide[s] for a total capital investment in the park of no less than one million dollars." *Id.* at § 7(11).

136.   Accordingly, the HRPT was required to initiate a competitive process with respect to the contract to serve as the FBO for the Heliport by "hold[ing] a public hearing," "solicit[ing]" the views of the public, "publish[ing] notice of the hearing and proposed action in the city record and state register," and "issu[ing] a bid prospectus." *Id.* at §§ 7(6), 7(11).

137.   The HRPT failed to take any of these required steps.

20

138.   Instead, the HRPT simply continued to "sole source" the Heliport's operations to
APH, in violation of the HRP Act.

**VIII.   Defendant HRPT's Arbitrary and Capricious Decision to Settle Its Dispute with APH
on Such Favorable Terms to APH and to Permit APH to Continue to Operate, Rather Than
Terminate APH**

139.   The HRPT's violations of the HRP Act are not limited to continuing the operation of
the Heliport and authorizing APH to permit tourism/recreational flights at the Heliport.

140.   In the face of findings by the HRPT's own auditor of abuses by APH, and
notwithstanding that the State Comptroller was expected to release similar findings imminently, the
HRPT also has arbitrarily and capriciously decided to settle its dispute with APH on very favorable
terms for APH, instead of terminating APH.   In this way, the HRPT has violated its duty to protect
and advance the interests of the people of the State of New York.

141.   In fact, as previously stated the New York State Comptroller recently released a
report dated December 21, 2007: Hudson River Park Trust West 30th Street Heliport Revenue
Operations Report 2006-s-75 (Exhibit G) which confirms APH's mismanagement of the heliport.

**A.     The HRPT's Audit of APH**

142.   In early 2005, the HRPT commenced an inspection of APH's books and records to
determine the accuracy of APH's reporting. Settlement Agreement between APH, Air Pegasus New
York, Inc., and the HRPT, dated Nov. 22, 2006, at 1. Specifically, the HRPT retained Debra Cutler,
CPA, CFE to "evaluate whether APH had reported and remitted fees and charges in accordance with
the terms of the Permit." *See* Debra A. Cutler, *Report on Schedule of Fees and Charges of Air
Pegasus Heliport, Inc.*, October 31, 2006, at 3. (Ex A ).

143.   Among other things, the auditor examined whether APH was properly reporting and
remitting to HRPT monies arising from operations of the Heliport that were paid to an entity related
to APH, Air Pegasus New York ("APNY").

21

144.    Even though the HRPT was fully within its rights in conducting an audit of APH's books and records, APH filed suit in the Supreme Court, New York County, challenging the breadth and scope of the HRPT's audit rights under the Permit.  *Id.*  (Ex E).

145.    On January 5, 2006, the HRPT filed suit against APH and its CEO, Alvin Trenk, alleging that APH had violated the Permit by, among other things, entering into subsidiary agreements without the HRPT's knowledge, consent or prior written approval, and by diverting funds received by APNY that should have been included in APH's reports and payments to the HRPT.  The HRPT's action (Ex F), sought to recover all unpaid fees.  *Id.*

146.    The HRPT also continued its audit, and, on October 31, 2006, Ms. Cutler issued a report of significant wrongdoing on the part of APH. (Ex A).

147.    Repeatedly noting APH's failure to maintain proper records, which complicated her inspection, Ms. Cutler nevertheless was able to reach the following alarming conclusions about APH, among others:

- Over a nine-year period from 1996 through 2005, APH concealed and diverted $3,853,229 to its related entity Air Pegasus of New York, Inc. ("APNY");

- Investigation of $565,000 received by Air Pegasus Enterprises, another APH-related entity, is continuing;

- APH gave discounts and price preferences, including non-volume discounts on fuel and landing fees, to certain preferred customers;

- For a number of months, US Helicopter was charged a flat monthly fee for landing and parking, rather than the fee due under the Schedule of Charges that applied to other operators;

- Zip Aviation, LLC a/k/a Wings a/k/a Print International (collectively, "ZIP") was billed a flat $500 per month regardless of the number of its landings or the amount of time parked;

- APH also disingenuously characterized NY Helicopters and Helicopter Flight Services, another of APH's sightseeing operator customers, as "charter tours on a reservation basis only," and failed to properly collect, report, or remit Sightseeing Use Charges, as required under Section 6(b) of the Permit, in connection with these operators; and

- The APH monthly Deposit Cash Sheet prepared by APH did not include all bank deposits.

*NEW*

148.    More recently, the report of the Office of New York State Comptroller dated December 21, 2007: Hudson River Park Trust West 30th Street Heliport Revenue Operations Report 2006-s-75 revealed at pages 2-4:

149.

> There were significant revenues Pegasus did not include in its determination of gross receipts. These revenues were being paid by one of the carriers at the Heliport to a Pegasus-related entity under the terms of a "consulting agreement" entered into between the parties. As far as we could determine of audit, no consulting services were even provided in connection with this agreement. P. 2

> The Trust is responsible for ensuring that Pegasus complies with the terms of the Permit and operates the Heliport in an efficient and effective manner. P.3

> When we checked the rates charged on these sampled invoices to the published rate schedules, we found that lower fees than posted (discounts) were charged to at least four carriers at the Heliport during the audit period. Two carriers received 20-percent discounts for parking and landing, one received a 50-percent discount for landing, and the fourth received a reduced flat rate for monthly parking. P.4

## B.    The HRPT's Settlement With APH

150.    Based on these findings, the HRPT should have terminated APH. Instead, on November 22, 2006, less than one month after the auditor issued her findings, the HRPT simply settled its dispute with APH and on very favorable terms for APH (Ex B).

151.    For example, among other things, the HRPT stated as part of the settlement that "it has no knowledge that [APH] is in violation of any of the provisions of the permit and, accordingly, APH is in good standing with the HRPT." Settlement Agm't at 4.

152.    The HRPT agreed to this "acknowledgement" despite its *actual* knowledge that APH had committed significant wrongdoing.

153.    The HRPT also stated that "it is the HRPT's interpretation of the Hudson River Park HRP Act that no operator other than [APH] can be allowed to operate the Heliport." *Id.* The HRPT

23

agreed to this acknowledgement despite the fact that, under the HRP Act, it is entitled (and, indeed, required) to "issue a bid prospectus" seeking proposals to operate the Heliport. *See* HRP Act § 7(11).

154.    Finally, the HRPT agreed to "acknowledge that it "shall not use the Litigations as a basis for disqualifying APH from any HRPT Request for proposal ("RFP") and APH shall have the right to respond to any such RFP." Settlement Agm't at 4. (Ex B).

155.    The HRPT agreed to these terms exonerating APH despite its duty to operate the Park in the best interests of the public.

156.    In return for these "acknowledgements," APH paid HRPT $462,387.

157.    This payment purportedly was in "full and complete satisfaction" of the percentage of monies owed from revenues improperly diverted by APH.

158.    However, this figure does not include payments relating to other operators that APH previously withheld from the HRPT. Nor does it include any interest on any of the improperly withheld monies.

159.    In addition to violating its statutory duties, the HRPT's agreement to settle on these terms also violated its own procedures.

160.    As previously explained, the HRPT operates pursuant to by-laws which, among other things, require board approval of all "contracts for the general corporate purposes of the Authority which are in excess of one hundred thousand dollars ($100,000)." Hudson River Park Trust By-Laws at Art. III, § 3 ("Contracts Requiring Board Approval").

161.    Nevertheless, upon information and belief, the HRPT failed to seek board approval of this settlement before binding the HRPT.

162.    For many months prior to the settlement, APH had been imposing unfair and unreasonable fees on users of the Heliport in violation of the Permit. Because of the HRPT's irrational settlement with APH, APH, despite having settled for cents on the dollar, is now continuing to do so in an effort to pass along the costs of settlement to the users of the Heliport.

24

163. In this way, the HRPT's arbitrary and capricious decision to settle with APH on such favorable terms has caused harm to New York Helicopters.

## X. HRPT, APH AND AVE DISCRIMINATED AGAINST NYH AND FAVORED ITS COMPETITORS

164. The permit – agreement does provide that from time to time, APH may amend the schedule of charges at the W. 30th Street Heliport upon fifteen (15) days prior notice to the public and the HRPT – so long as such charges and fees are "fair, reasonable, and non-discriminatory."

165. APH abused their power, with the consent and active participation of HRPT by imposing a new fee, without any legitimate basis or justification, solely for the purpose of funding a settlement with the HRPT based on monies diverted from HRPT by APH.

166. The fee affected selected companies including NHY.

167. The settlement was the result of litigation between APH and the HRPT based on the fact that APH failed to comply with the terms of the permit/agreement and diverted monies payable to HRPT.

168. Although the notice to raise prices was given before the settlement, APH knew that they had to pay back the money they had diverted and needed additional funds for those purposes.

169. On October 31, 2006, the HRPT's auditor had issued findings of egregious wrongdoing by APH.

170. These findings included APH's concealment of millions of dollars in operating revenue from the HRPT in an effort to deny the HRPT its share of that revenue.

171. Perhaps the most egregious finding, and the one most directly damaging to NYH, was that in direct contravention of the permit/agreement APH also gave substantial discounts and price preferences, to certain preferred customers including Zip Aviation Inc.

172. It even went so far as to vouch for Zip Aviation to allow it to operate at the heliport even though Zip did not have the proper approval from the Federal Aviation Administration as shown by exhibit I, to which the HRPT wrote:

25

Further we are troubled by what would appear to be a lack of due diligence on the part of APH in putting forth and vouching for ZIP Aviation in connection with your sightseeing authorization request. Section 8 of the permit obligates APH to undertake its operations in compliance with all applicable laws and requirements and not to conduct any activity at the heliport that requires a permit or other approval without first having obtained such authorization. As an experienced heliport operator, APH should have confirmed the accuracy of the statements and representations set forth in ZIP Aviation's submittal...."

173.    Furthermore, exhibit H contains the handwritten letter dated March 15, 2007 sent by

Abigail Trenk from Air Pegasus to HRPT recommending and vouching for Air Pegasus:

"Dear Laurie:

As per our recent phone conversation, I am writing this letter as a personal recommendation of Itai Shosharani d.b.a Zip Aviation. I have known Itai professionally for well over seven years. He has owned and operated a jet ranger helicopter for his personal business until recently....... He recently purchased a second Jet Ranger and established a helicopter charter..."

174.    Exhibit J is a letter from APH's counsel, Christopher Genaro, to HRPT regarding Zip

Aviation application in which he states:

There is no apparent reason for the HRPT to continue to withhold approval of ZIP. Accordingly, APH hereby requests that the HRPT approve ZIP as a sightseeing operator immediately. APH remains concerned that the HRPT's refusal to issue approval could lead to a lawsuit by ZIP (similar to the New York Helicopter Charter Inc. lawsuit").

175.    The recent report of the Office of New York State Comptroller dated December 21,

2007: Hudson River Park Trust West 30th Street Heliport Revenue Operations Report 2006-s-75 also

mentioned the favoring of some operators:

.....Pegasus charged the fourth carrier a fixed rate of $500 per month for unlimited landings and parking. During our audit period this carrier was charged $13,000 for parking. However, based on recorded activity, if he posted feed were charged, it would have paid $62,205 to Pegasus and Pegasus would have to remit an additional $4,900 to the trust.
Pegasus claimed that it made this deal because this specific carrier was willing to utilize what Pegasus characterized as an undesirable space due to its remote location and size. However, when we queried several other carriers, they told us



26

that they would have been more than willing to use that parcel of the Heliport for that price.  P.4

176.  This practice of discriminating against NYH and some other operators in favor of other competing operators had no rational basis in cost, in volume, or in any other economic justification.

177.  The discounts and price preferences included non volume discounts on fuel and landing fees, parking fees, fuel charges and late operations.

178.  Another clear discrimination was the fact that there is no landing or parking fee for stopping to buy fuel.  However APH would charge NYHC parking fees for fueling.

179.  After Zip Aviation started operating at the heliport APH sent a communication to some helicopter operators indicating that they were prohibited to solicit customers on the park premises.

180.  However. APH allowed Zip Aviation to engage in such solicitation.

181.  By forcing NYH to compete on an unleveled playing field, the HRPT and APH increased NYH's operating costs, complicated NYH's ability to invest in expanding its business, and caused NYH to lose it business to APH's "favored" operators blessed with lower operating costs.

182.  Each of these unfair cost differentials had a direct negative effect on NYH's business, causing it both to lose volume and to lose profits on the customers that it served.

183.  In addition, NYH had to pass part of the cost increase to consumers, who were directly affected by the discriminatory practices.

184.  These lost profits constitute a real, tangible and measurable source of damage to NYH, attributable solely and directly to illegal, discriminatory and unreasonable implementation of regulations at the West 30th Street Heliport.

185.  APH practices in the managing of the Heliport have impaired free competition and have restrained trade which has impacted on the public.

27

186.    The HRPT clearly was aware of the discriminatory and anticompetitive practices with respect to price and the competitive advantages that APH was giving to some users.

187.    The Report on Schedule of Fees and Charges issued by the auditing company hired by HRPT found that some customers received special discounts.

188.    Two of those customers did not appear on the Device Control Register ("DCR") and one of the customer's information did not agree to the DCR.

189.    The remaining customers were selected by the auditors because their name contained the word 'Pegasus'.

190.    This suggests that the HRPT had knowledge or at least reasons to know that APH was favoring some of its business associates, especially ZIP aviation since APH vouched for ZIP even though it did not have the proper authorizations from the Federal Aviation Administration.

191.    HRPT's audit had also previously found that U.S. Helicopter and Zip Aviation were charged $500 per month regardless of the number of landings, and that this specific customer did not appear on the DCR. This was confirmed by the recent report of the State Comptroller as indicated before.

192.    The transactions with Zip Aviation were investigated by the HRPT.

193.    Zip Aviation operations were mixed with other operators.

194.    Specifically the first audit report stated:

> "Zip Aviation: Zip/Wings/Print International…. We tested the February and March 2005 daily flight logs to determine if the same aircraft number appeared for the above companies, as we understand all of these companies are under common control. We noted that 691S was listed as both a Print and Zip aircraft number, in the daily flight log indicating that at a minimum, Print and Zip appear to be under common control. The February 24, 2005 daily control log, ops#41, identified the customer as Zip/Wings. We noted that Print was billed a flat fee of $500/month regardless of the number of landings or the time parked." [emphasis added].

195.    Such agreements and benefits were not allowed since the Permit establishes in section 34(d) that

28

..."the operator shall not itself use the heliport for its own aircraft and shall refrain from entering into continuing contracts or arrangements with third parties for use of the Heliport of for furnishing services covered hereunder when such use by the Operator or contracts or arrangements will have the effect to utilizing to an unreasonable extent the operator's capacity for rendering such services...."

196.    However, APH vouched for Zip Aviation to obtain permission to operate at the heliport for HRPT, even though Zip Aviation had not been approved by the Federal Aviation Administration:

197.    Notwithstanding these findings, the HRPT settled the matter with APH and not only allowed the discrimination to continue but did not object with the price increase since it had a financial interest on it.

198.    APH passed the cost of its improper conduct to some customers -including NYH- by imposing the per passenger fee.

199.    Before the dispute between APH and HRPT there was not a per passenger fee payable to APH while no other heliport in New York charges this fee.

200.    Rather, the operators were only required to pay the HRPT a fee of $15 per 10 passengers or $1.50 per passenger.

201.    The settlement required APH to make payments to the HRPT for monies previously diverted.

202.    Rather than repay these sums from "their own pocket," APH imposed a $10 passenger fee to some operators including NYH.

203.    This change was arbitrary and outrageous and constituted an abuse of APH's position as the fixed based operator of the Heliport and  interfered with New York Helicopters Charter Inc' property interest.

204.    Although there is another heliport downtown and one on the east side – for charters only- , the West 30th Street Heliport has a competitive advantage because it is more convenient to tourists as approximately 80% of the hotels are located in midtown and a the largest percentage of

29

tourists prefer tours from the midtown area which is why the main business of the Heliport is sightseeing operations.

205.    In addition, the West 30th Street Heliport is the only heliport that is open seven days a week twenty four (24), hours a day.

206.    NYH lost presence in midtown had serious business consequences since NYH cannot provide a reasonable explanation to their customers as to why everyone else can operate there but not NYH.

207.    For sightseeing, an operator needs authorization –which NYHC obtained- but for chartering (private work) authorization is not required because the Heliport is for public use.

208.    Helicopters are clearly supposed to be allowed to land at a public heliport. Even though APH ousted NYH from sightseeing operations, it should be allowed to land there for charter operations.

209.    However, NYH cannot use the West 30th street Heliport for sightseeing, charter operations or even for fueling.

210.    As a consequence, NYH's market share has diminished and it has lost a substantial number of customers and customers at West 30th street are paying increased prices.

## FIRST CLAIM
## AGAINST APH AND HRPT FOR
### VIOLATION OF THE EQUAL PROTECTION CLAUSE

211.    Plaintiffs repeat and reallege, as if set forth fully herein, the allegations contained in the previous paragraphs.

212.    The Equal Protection Clause of the Fourteenth Amendment provides, in pertinent part, that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

30

213.    The discrimination against NYH and its ouster from the heliport was motivated by ill will resulting from NYH previous complains regarding APH and HRPT and the previous litigation in which all the parties in this action had been involved.

214.    In fact, NYH operating rights were terminated as retaliation for not dropping a lawsuit that was pending in state court.

215.    APH and HRPT are state actors for purposes of the Fourteenth Amendment.

216.    The disparity in treatment is arbitrary and capricious and serves no legitimate governmental objective.

217.    In providing such discounts and price reductions to certain similarly-situated customers of the Heliport and not to New York Helicopters, APH and HRPT have violated New York Helicopters' rights under the Equal Protection Clause.

218.    NYH has been intentionally treated differently from other similarly-situated helicopter operators by the discriminatory practices of APH which are endorsed by HRPT.

219.    There is no rational basis for the difference in treatment that NYH has received from APH. The discriminatory practices had no basis in cost, volume, or any other economic justification.

220.    In fact, APH subjected NYH to discriminatory and arbitrary practices as retaliation for NYH's involvement in a lawsuit filed by other aggrieved helicopter operators against APH. NYH has suffered real damages as a result of APH's implementation of the discriminatory and arbitrary regulations at the West 30th Street Heliport.

221.    By forcing NYH to compete on an unlevel playing field, the HRPT and APH increased NYH's costs, complicated NYH's ability to expand its business, increased NYH's operating costs, and caused NYH to forfeit business to APH's "favored" operators with lower operating costs, and now, only recently, NYH has been forced out altogether.

222.    Each of these unfair cost differentials had a direct negative effect on NYH's business, causing it both to lose volume and to lose profits on the customers that it did serve.

31

223. The operation of and access to state parks and grounds is a traditional state function; the Hudson River Park is a public park created by the New York State Legislature in the Hudson River Park Act.

224. NYH has a protectable property interest, or legitimate claim of entitlement, in continuing its helicopter business with fair and unbiased access to the public-use West 30th Street Heliport.

225. By reason of the foregoing, New York Helicopters has suffered damages in an amount to be determined at the time of trial.

<u>**SECOND CLAIM**</u>
<u>**AGAINST APH AND HRPT**</u>

<u>**VIOLATION OF SUBSTANTIVE DUE PROCESS**</u>

164

226. Plaintiffs repeat and reallege, as if set forth fully herein, the allegations contained in the previous paragraphs.

227. Plaintiffs have been deprived of his liberty to use the West 30th Street heliport for chartering work. The West 30th Street heliport is a public-use facility. Therefore, unlike sightseeing, chartering work does not require a specific permit. Even if Plaintiffs were not authorized for sightseeing work at the heliport, they should be allowed to land there for chartering work since anyone can land at the heliport for those purposes given the heliport's public nature.

228. Defendants are interfering with plaintiff Michael Roth's right to earn a livelihood.

229. In addition, APH's imposition of the new fee, without any legitimate basis or justification but solely for the purpose of funding its settlement with HRPT, was arbitrary and outrageous and an abuse of its position as the fixed based operator of the Heliport.

165 +

230. As stated supra, New York Helicopters has a cognizable property and liberty interest.

231. APH and HRPT actions constitute an arbitrary and capricious exercise of state power.

232. The ousting of plaintiff from the heliport, and the denial of landing rights even for chartering work and imposition of the new fee constituted state action.

32

233. The deprivation of plaintiffs' rights and liberties has no justifiable governmental objective and is based on political and personal reasons.

234. By reason of the foregoing, Plaintiffs have suffered damages in an amount to be determined at the time of trial.

### THIRD CLAIM

### VIOLATION OF PROCEDURAL DUE PROCESS

#### AGAINST APH AND HRPT

235. Plaintiffs' repeat and reallege, as if set forth fully herein, the allegations contained in the previous paragraphs.

236. On May 17, 2006, APH announced a "new" fee schedule set to take effect on June 5, 2006.

237. The new fee schedule raised fees across the board and imposed a flat $10 per passenger fee.

238. No additional service was provided in connection with the imposition of the new fee.

239. There is no basis or justification for the new fee.

240. The new fee is unfair and unreasonable, and imposed arbitrarily and capriciously.

241. The new fee was imposed solely for the purpose of funding APH's settlement with the HRPT.

242. New York Helicopters has a cognizable property interest in operating at the Heliport on terms that are "fair, reasonable and nondiscriminatory."

243. The imposition of the new fee constituted state action albeit for the benefit of APH.

244. The imposition of the new fee was an exercise of a right or privilege created by the State.

245. APH may fairly be said to be a state actor.

33

161 =    246.    The imposition of the new fee deprived New York Helicopters of its property interest and adversely impacted interstate commerce.

162 =    247.    The deprivation was without due process of law.

163 =    248.    By reason of the foregoing, New York Helicopters has suffered damages in an amount to be determined at the time of trial.

**FOURTH CLAIM
AGAINST HRPT AND APH FOR
VIOLATION OF THE COMMERCE CLAUSE**   NEW

249.    Plaintiffs' repeat and reallege, as if set forth fully herein, the allegations contained in the previous paragraphs.

250.    Under the Commerce Clause, Congress has the power to dictate what aircraft should be permitted to land and take-off from airports in order to promote a nationwide transportation system and to control interstate and foreign air traffic flow.

251.    NYH is a helicopter tour and charter company that regularly participates in interstate travel.

252.    The West 30th Street Heliport is the most conveniently located heliport to majority of hotels and tourists in New York City.

253.    The West 30th Street Heliport is the only heliport in New York City to be open twenty four (24) hours a day, seven (7) days a week.

254.    HRPT and APH, both of which are state actors, imposed excessive fees and restrictions on NYH during its occupancy of the West 30th Street Heliport.

255.    The excessive fees and strict regulations imposed by HRPT and NYH, limiting NYH's hours of operation and number of takeoffs and landings imposed an undue burden on NYH's ability to participate in interstate commerce.

34

256.     On May 6, 2007, NYH was evicted from the 30th Street Heliport by APH.

257.     The eviction by APH was based on the claim that NYH was soliciting customers at the heliport.

258.     However, APH allowed ZIP aviation to solicit customers at the heliport.

259.     As a result of this eviction, the public has been harmed by having fewer helicopter operators to choose from.

260.     The public has also been harmed because NYH has been forced to move to the Downtown Manhattan Heliport, a heliport located at the Southern tip of Manhattan and a significant distance from the main tourist areas.

261.     By prohibiting NYH from operating from the West 30th Street Heliport, its hours of operation have been reduced and NYH has lost almost 35% of its tourist business and almost 90% of its charter business.

## DECLARATORY RELIEF

### FIFTH CLAIM
### PREEMPTION UNDER THE SUPREMACY CLAUSE

262.     Plaintiffs' repeat and reallege, as if set forth fully herein, the allegations contained in previous paragraphs.

263.     Under the Commerce Clause, Congress has the power to dictate what aircraft should be permitted to land and take-off from airports in order to promote a nationwide transportation system and to control interstate and foreign air traffic flow.

264.     The Airline Deregulation Act preempts any state action which relate to the "price, route, or service of an air carrier."

265.     APH's actions in imposing the new fee and providing certain customers of the Heliport with significant discounts and price reductions while not providing such discounts and reductions to other similarly-situated customers are unfair, unreasonable, arbitrary, capricious and blatantly discriminatory.

35

266.   These actions are state actions preempted by Federal Law pursuant to the Supremacy Clause.

**SIXTH CLAIM**
**AGAINST THE HRPT**

**THE HRPT WAS REQUIRED TO PUT**
**THE PERMIT OUT FOR BID AS OF MARCH 25, 2006**

267.   Plaintiffs' repeat and reallege, as if set forth fully herein, the allegations contained in the previous paragraphs.

268.   Even if the Permit had satisfied the HRP Act's grandfathering clause, operation of the Heliport by APH past March 25, 2006 was unlawful.

269.   The HRP Act also governs the HRPT's process with respect to awarding certain types of contracts. First, the HRPT must treat as a "significant action . . . any proposed lease, concession arrangement, license or other agreement . . . for a period in excess of ten years." In so doing, the HRPT must:

> a. hold a public hearing on not less than 30 days' advance public notice; (b) solicit and consider the views of Manhattan community boards one, two, and four, the planning commission of the city of New York, the advisory council, elected officials representing communities neighboring the park, and interested groups and individuals, allowing not less than sixty days following the notice of the proposed action for the submission of such views; and (c) publish notice of the hearing and proposed action in the city record and state register.

270.   In addition, the HRPT must "issue a bid prospectus for any leases, concession agreements, licenses and other agreements which would provide for a total capital investment in the park of no less than one million dollars over the proposed term of the agreement."

271.   The HRP Act requires the "bid prospectus submitted to prospective bidders" to "contain specific information concerning the nature of the capital improvements or equipment to be provided by the successful bidder and shall be provided to community boards one, two and four within the borough of Manhattan."

272.   As of March 25, 2006, APH's Permit had exceeded 10 years.

36

273.    Moreover, the Permit "provide[s] for a total capital investment in the park of no less than one million dollars." *Id.* at § 7(11).

274.    Accordingly, the HRPT was required to initiate a competitive process with respect to the contract to serve as the FBO for the Heliport by "hold[ing] a public hearing," "solicit[ing]" the views of the public, "publish[ing]" notice of the hearing and proposed action in the city record and state register," and "issu[ing] a bid prospectus."

275.    The HRPT failed to take any of these required steps.

276.    Instead, the HRPT simply continued to "sole source" the Heliport's operations to APH.

277.    There is an actual, justiciable controversy over whether the HRPT was required to initiate a competitive process with respect to the contract to serve as the FBO for the Heliport after APH had served as the FBO for 10 years.

278.    Based on the foregoing, Plaintiff now seeks a declaration and order that the HRPT was required to initiate a competitive process with respect to the contract to serve as the FBO for the Heliport after APH had served as the FBO for 10 years; and that the HRPT failed to do so in violation of its statutory duties.

279.    APH is named herein in order to ensure that the Court can afford full relief.

### SEVENTH CLAIM
### AGAINST THE HRPT
### HUDSON RIVER PARK BY-LAWS:

#### THE HRPT WAS REQUIRED TO OBTAIN BOARD APPROVAL
#### OF EVERY EXTENSION OF THE PERMIT

280.    Plaintiffs' repeat and reallege, as if fully set forth herein, the allegations contained in the previous paragraphs.

281.    The HRPT operates pursuant to by-laws which, among other things, require board approval of all "contracts for the general corporate purposes of the Authority which are in excess of one hundred thousand dollars ($100,000)." Hudson River Park Trust By-Laws at Art. III, § 3 ("Contracts Requiring Board Approval").

37

282.   Since March 24, 2001, APH has been operating the Heliport on an exclusive basis pursuant to a series of agreements between the HRPT and APH to extend the Permit on a month-to-month basis.

283.   Each extension of the Permit is "in excess of one hundred thousand dollars ($100,000)." *Id.*

284.   Pursuant to its by-laws, the HRPT was required to obtain board approval of each of these extensions.

285.   Upon information and belief, the HRPT never obtained or even sought board approval for these dozens of extensions of the Permit.

286.   Upon information and belief, the HRPT intentionally failed to seek board approval of these extensions because doing so would have revealed that the Permit was not "grandfathered" under the HRP Act. As previously explained, "grandfathering" of a pre-HRP Act permit was only permitted if, by the permit's terms, the permittee had the sole "option to extend" it. HRP Act at § 3(i), 1998 Sess. Law. Ch. 592.

287.   Based on the foregoing, Plaintiffs now seek a declaration and order that the Permit expired on March 24, 2001; that the HRPT's by-laws required board approval of the numerous month-to-month extensions to which the HRPT has agreed since March 24, 2001; that in failing to obtain those extensions, the HRPT violated its by-laws; and, therefore, the operation of the Heliport is unlawful.

## EIGHTH CLAIM
## AGAINST THE HRPT
## HUDSON RIVER PARK ACT

### THE HRPT'S DECISION TO SETTLE WITH APH ON SUCH FAVORABLE TERMS TO APH AND TO PERMIT APH TO CONTINUE TO OPERATE, RATHER THAN TERMINATE APH, WAS ARBITRARY AND CAPRICIOUS

288.   Plaintiffs' repeat and reallege as if fully set forth herein, the allegations contained in the previous paragraphs.

38

289.  In early 2005, the HRPT commenced an inspection of APH's books and records to "evaluate whether APH had reported and remitted fees and charges in accordance with the terms of the Permit."

290.  Among other things, the auditor examined whether APH was properly reporting and remitting to HRPT monies arising from operations of the Heliport that were paid to an entity related to APH.

291.  Even though the HRPT was fully within its rights in conducting an audit of APH's books and records, APH filed suit in the Supreme Court, New York County, challenging the breadth and scope of the HRPT's audit rights under the Permit. (Ex E).

292.  On January 5, 2006, the HRPT filed suit against APH and its CEO, Alvin Trenk, alleging that APH had violated the Permit by, among other things, entering into subsidiary agreements without the HRPT's knowledge, consent or prior written approval, and by diverting funds received by APNY that should have been included in APH's reports and payments to the HRPT.

293.  HRPT's action sought to recover all unpaid fees.

294.  The HRPT also continued its audit, and, on October 31, 2006, Ms. Cutler issued a report of significant wrongdoing on the part of APH.

295.  Repeatedly noting APH's failure to maintain proper records, which complicated her inspection, Ms. Cutler nevertheless was able to reach the following alarming conclusions about APH, among others:

- Over a nine-year period from 1996 through 2005, APH concealed and diverted $3,853,229 to its related entity Air Pegasus of New York, Inc.;

- Investigation of $565,000 received by Air Pegasus Enterprises, another APH-related entity, is continuing;

- APH gave discounts and price preferences, including non-volume discounts on fuel and landing fees, to certain preferred customers;

- For a number of months, US Helicopter was charged a flat monthly fee for landing and parking, rather than the fee due under the Schedule of Charges that applied to other operators;

39

- Zip Aviation, LLC a/k/a Wings a/k/a Print International was billed a flat $500 per month regardless of the number of its landings or the amount of time parked;

- APH also disingenuously characterized NY Helicopters and Helicopter Flight Services, another of APH's sightseeing operator customers, as "charter tours on a reservation basis only," and failed to properly collect, report, or remit Sightseeing Use Charges, as required under Section 6(b) of the Permit, in connection with these operators; and

- The APH monthly Deposit Cash Sheet prepared by APH did not include all bank deposits.

296. Based on these damning findings, the HRPT should have terminated APH. Instead, on November 22, 2006, less than one month after the auditor issued her findings, the HRPT simply settled its dispute with APH and on extremely favorable terms for APH.

297. For example, among other things, the HRPT stated as part of the settlement that "it has no knowledge that [APH] is in violation of any of the provisions of the permit and, accordingly, APH is in good standing with the HRPT."

298. The HRPT agreed to this "acknowledgement" despite its actual knowledge that APH had committed significant wrongdoing.

299. The HRPT also stated that "it is the HRPT's interpretation of the HRP Act that no operator other than [APH] can be allowed to operate the Heliport." The HRPT agreed to this acknowledgement despite the fact that, under the HRP Act, it is entitled (and, indeed, required) to "issue a bid prospectus" seeking proposals to operate the Heliport.

300. Finally, the HRPT agreed to "acknowledge that it shall not use the Litigations as a basis for disqualifying APH from any HRPT Request for proposal ("RFP") and APH shall have the right to respond to any such RFP."

301. The HRPT agreed to these terms exonerating APH despite its duty to operate the Park in the best interests of the public.

302. In return for these "acknowledgements," APH paid HRPT $462,387.

303. This payment purportedly was in "full and complete satisfaction" of the percentage of monies owed from revenues derived by APH through its consulting agreement with a competitor of NYH, who cooperated and assisted the HRPT in its investigation.

304. However, this figure does not include payments relating to other operators that APH previously withheld from the HRPT. Nor does it include any interest on any of the improperly withheld monies.

305. For many months prior to the settlement, APH had been imposing unfair, unreasonable fees on NYH in violation of the Permit.

306. Because of the HRPT's irrational settlement with APH, APH, despite having settled for cents on the dollar, is now continuing to do so in an effort to pass along the costs of settlement.

307. In this way, the HRPT's arbitrary and capricious decision to settle with APH on such favorable terms has caused NYH harm.

308. Based on the foregoing, Plaintiffs now seek a declaration and order that the HRPT acted arbitrarily and capriciously and abused its discretion by settling its dispute with APH on such favorable terms to APH, and permitting APH to continue operating the heliport, rather than terminating APH.

309. Plaintiffs also seek a judgment annulling the November 22, 2006 settlement agreement between the HRPT and APH, and compelling the HRPT, based on its own auditor's findings and on the findings of the State Comptroller Report Dated December 21, 2007.

310. APH is named herein in order to ensure that the Court can afford full relief.

### NINTH CLAIM
### AGAINST THE HRPT
### HUDSON RIVER PARK BY-LAWS:

#### THE HRPT WAS REQUIRED TO OBTAIN BOARD APPROVAL OF THE SETTLEMENT WITH APH

311. Plaintiffs' repeat and reallege, as if fully set forth herein, the allegations contained in the previous paragraphs.

41

312.   The HRPT operates pursuant to by-laws which, among other things, require board approval of all "contracts for the general corporate purposes of the Authority which are in excess of one hundred thousand dollars ($100,000)." See Hudson River Park Trust By-Laws at Art. III, § 3 ("Contracts Requiring Board Approval").

313.   The HRPT's settlement with APH is "in excess of one hundred thousand dollars ($100,000)." *Id.*

314.   Pursuant to its by-laws, the HRPT was required to obtain board approval of its settlement with APH.

315.   Upon information and belief, the HRPT failed to obtain or even seek board approval of this settlement before binding the HRPT.

316.   Based on the foregoing, Plaintiffs now seek a declaration and order that the HRPT acted arbitrarily and capriciously and abused its discretion by settling its dispute with APH on such favorable terms to APH, and permitting APH to continue operating the Heliport, rather than terminating APH; the HRPT violated its by-laws in failing to obtain board approval of this settlement; and the HRPT violated its inherent statutory duties and fiduciary obligations to the public to resolve financial disputes on rational and reasonable terms that protect the public interest and to remove parties who have engaged in wrongdoing in violation of their government contracts.

317.   Plaintiffs also seek a judgment annulling the November 22, 2006 settlement agreement between the HRPT and APH, and compelling the HRPT, based on its own auditor's findings and on the findings of the State Comptroller Report dated December 21, 2007, which confirm the findings of the HRPT's auditors, to terminate APH's Permit.

**TENTH CLAIM**
**AGAINST THE HRPT AND APH**

**PLAINTIFFS RIGHT TO USE THE HELIPORT SHOULD BE REINSTATED**
**IMMEDIATELY**

318.   Plaintiffs' repeat and reallege, as if set forth fully herein, the allegations contained in the previous paragraphs.

42

319.   NYH has been improperly discriminated against and arbitrarily denied operating rights since May 6, 2007.

320.   Helicopters are supposed to be allowed to land at a public heliport.

321.   NYH cannot use the West 30th Street Heliport for sightseeing, charter operations or even for fueling.

322.   NYH is properly authorized by the Federal Aviation Administration and was approved by the HRPT as a sightseeing operator at the Heliport.

323.   As a consequence, NYH's market share has diminished and it has lost a substantial number of customers.

324.   Based on the foregoing, Plaintiff now seeks a declaration and order that NYH be immediately allowed to operate at the Heliport for sightseeing and chartering work.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs' requests the following relief:

As to First through Fourth Claims:

(1) awarding plaintiffs actual and compensatory damages in an amount to be determined at trial and interest;

(2) rescinding APH's permit;

(3) declaring and ordering that the existing operation of the Heliport is in violation of federal and state law;

(4) enjoining the West 30th Street Heliport, as it presently exists, from any further operation in violation of federal and state law;

(5) awarding Plaintiffs the costs and disbursements of this action, including attorneys' fees; and,

43

(6) awarding such other and further relief as this Court deems just and proper.

As to the Eighth through Tenth Claims:

(1)     declaring and ordering that plaintiff NYH should be allowed to operate at the West 30th Street heliport immediately for chartering and sightseeing work

(2)     declaring and ordering that the Permit expired on March 24, 2001, the Permit's "automatic renewals" do not satisfy the "grandfathering" provision of the HRP Act, the "tourism/recreation use" of the Heliport under the Permit does not satisfy the "grandfathering" provision of the HRP Act, and, therefore, APH's operation of the Heliport is in violation of the HRP Act must immediately cease; plus damages to plaintiffs for its wrongful ouster;

(3)     declaring and ordering that the HRPT was required to initiate a competitive process with respect to the contract to serve as the FBO for the Heliport after APH had served as the FBO for 10 years;

(4)     declaring and ordering that the HRPT was required to obtain, under its by-laws, and failed to obtain, board approval of the extensions of the Permit to which it agreed;

(5)     declaring and ordering that the HRPT acted arbitrarily and capriciously and abused its discretion by irrationally settling its dispute with APH on such favorable terms to APH, and permitting APH to continue operating the Heliport, rather than terminating APH;

(6)     declaring and ordering that the HRPT was required to obtain, under its by-laws, and failed to obtain, board approval of its settlement with APH;

(7)     annulling the November 22, 2006 settlement agreement between the HRPT and APH;

(8)     compelling the HRPT, based on its own auditor's findings and on the findings of the State Comptroller, to terminate APH's Permit;

44

(9)     declaring and ordering those acts complained of in the Sixth Count unconstitutional and a basis for HRPT to terminate APH's contract or for HRPT's operation of the Heliport to be declared and ordered unconstitutional;

(10)    awarding Plaintiffs the costs and disbursements of this action, including attorneys' fees; and

(11)    granting such other and further relief as the Court deems just and proper.

Plaintiffs' demand a jury trial on all issues so triable.

Dated: New York, New York
       December 28, 2007

HANTMAN & ASSOCIATES

By: _____

Robert J. Hantman, Esq. (3947)
1414 Avenue of the Americas, Suite 406
New York, New York 10019
Telephone:   (212) 684-3933
Facsimile:    (212) 755-1989
*Attorneys for Plaintiffs*
*New York Helicopter Charter, Inc.*
*and Michael Roth.*

45