UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
NEW YORK HELICOPTER CHARTER INC., and
MICHAEL ROTH, individually,                                         Case No.07 Civ. 4069(MGC)

                                    Plaintiffs,

    -against-                                                               **AMENDED COMPLAINT
                                                                                 AND JURY DEMAND**


AIR PEGASUS HELIPORT, INC., and
HUDSON RIVER PARK TRUST

                                    Defendants.
----------------------------------------------------------X

        New York Helicopter Charter Inc., ("hereafter referred to as "NYH or NYHC" or

"New York Helicopter"), and Michael Roth, individually, by their undersigned attorneys,

for their complaint, allege as follows:

## <u>INTRODUCTION</u>

        1.        This case arises, *inter alia*, out of the defendants' violation of the

plaintiffs' rights guaranteed under the Equal Protection and Due Process clauses of the

United States Constitution, tortious interference with the plaintiffs' existing contracts and

prospective economic relations, relief pursuant to C.P.L.R. Article 78, and breach of the

public trust.  For all claims plaintiffs' have suffered irreparable injury, have a substantial

likelihood of success, require more than money damages while the equities are in their

favor.

        2.        Essentially, this case involves the selective, arbitrary, irrational,

capricious and discriminatory policies implemented by defendants, a public heliport

operator, Air Pegasus Heliport Inc. ("APH"), and the entity in charge of the West 30th

Street Heliport located on public property, the Hudson River Park Trust ("HRPT"), on

behalf of the State, for the private benefit of Air Pegasus Heliport Inc. to the detriment of

New York Helicopter Charter Inc. ("NYH"), a helicopter company, - with three helicopters and twenty five (25), employees – and its president Michael Roth and the public.

      3.    The discriminatory practices outlined herein were followed by the denial of heliport landing rights – for sightseeing, charter flights and even for refueling-, at a public facility, located on public property, to NYH by APH with the consent, acquiescence and approval of HRPT in order that APH, in part, could eliminate competition and favor certain helicopter operators such as Zip Aviation to unfairly compete as detailed hereafter.

      4.    In addition, upon information and belief, APHs' principal owners have a twenty percent (20%) ownership interest in Liberty Helicopters Inc which also operates out of the West 30th Street Heliport and is a competitor of NYH.

      5.    The acts complained of herein interfere with the operation of interstate air transportation, interstate commerce and free competition and violate plaintiffs' due process and equal protection rights to have the same access to a public service, on public property, as others in a similar situation.[1]

## PARTIES

### New York Helicopter and Michael Roth

      6.    Plaintiff New York Helicopter Charter, Inc. is a New York corporation with its principal place of business in New York whose President, Michael Roth, is licensed by the Federal Aviation Administration.

      7.    NYH's charter flights involve interstate travel as its helicopters take off in one state and land in other states thereby involving interstate commerce. NYH's customers include, but are not limited to business people, tourists, the general public and

---

[1] In addition to the foregoing, Plaintiffs also believe there is a claim for violations of the antitrust law which may be the subject of a separate action.

celebrities such as Calvin Klein and Ian Schrager who has entered into a proposed contract with NYH which is dependent on NYH having the right to land and take-off, from the West 30th Street Heliport as detailed hereafter.

8.    Plaintiff Michael Roth, in his individual capacity, is a resident of New York and a naturalized citizen of the United States whose rights have been violated and who has been arbitrarily and wrongfully discriminated against and whose wrongful ouster from the West 30th Street Heliport is causing damage to him, his employees, his customers and the public consumer and threatens the very existence of NYH since the West 30th Street Heliport is the only heliport open twenty four (24 hrs) hours a day seven (7) days a week and is in close proximity to the majority of tourists and customers for helicopter services – both sightseeing and charters.

**Air Pegasus Heliport Inc.**

9.    Defendant Air Pegasus Heliport, Inc. ("APH") is a Delaware corporation incorporated in May, 1996 with its principal place of business in New Jersey.

10.    APH is the sole and exclusive fixed base operator (the "FBO") at the West 30th Street Heliport ("Heliport" or "West 30th Street Heliport") pursuant to a March 25, 1996 Agreement (the "Permit" attached hereto as "Exhibit A") with the New York Department of Transportation (the "NYDOT"), which the Hudson River Park Trust later assumed.  The Permit expired, by its terms, on March 24, 2001.

11.    The meaning of the term  "Fixed Base Operator" ("FBO") in today's aviation vernacular refers to a business that is located at a permanent and ongoing airport or heliport facility and is a provider of fuel, repairs, aircraft parking, based and transient passenger facilitation, and other aviation services to the public.

12.    There are only three public heliports in New York City: a) the West 30th Street Heliport, whose FBO operator is "Air Pegasus Heliport" ("APH") which is under the control of the Hudson River Park Trust and whose FBO permit, unlike the permits at the two other heliports, has not been competitively bid on for over thirty (30) years as a

3

result of APHs' entrenched political influence b) the East 34th Street Heliport, whose FBO operator is Atlantic Aviation (www.atlanticaviation.com).and c) the Downtown Manhattan Heliport, whose FBO operator is the New York- New Jersey Port Authority.

13.    These heliports are the nexus of the interstate regional helicopter transportation system.  Corporate, private and air carrier (both charter and scheduled) helicopters must use these heliports to provide access into and out of Manhattan from the surrounding region, and commonly include flights originating or terminating in New York, New Jersey, Connecticut, Pennsylvania, Massachusetts, and Delaware.  They effectively provide an "exit" off the national airspace "highway system".

14.    The heliports are used by approximately 200 helicopter companies and at least 900 to 2100 passengers per day, who spend at least $60,000 to $120,000 dollars per day on sightseeing and charter flights.

15.    The Manhattan heliports do not provide regular overnight storage or helicopter maintenance, which requires helicopters to be based remotely and fly to the desired Manhattan heliport each day from the surrounding locations e.g., New Jersey and Connecticut.

16.    Thus, there exists a mutual dependence between the Manhattan heliports and the numerous air tour, aerial photography, Electronic News Gathering, flight training, and aircraft maintenance operations located throughout the surrounding region including New Jersey and Connecticut.

**Hudson River Park Trust**

17.    Defendant Hudson River Park Trust (the "HRPT") is a New York public benefit corporation that was created by the Hudson River Park Act ("HRP Act") in 1998.

18.     The HRPT was intended to be a "partnership between New York State and City," and was charged by the legislature "with the design, construction and operation of the five-mile Hudson River Park."

19.     The HRPT was created to design, construct, operate and maintain the Park subject to the restrictions imposed by the HRP Act.  *Id.* at § 5(1).

20.     The HRP Act dictates that, upon the HRPT's creation, "the trust shall succeed to all contracts, leases, licenses and other legal obligations respecting the park to which its predecessors are party at or after the effective date of this act."  *Id.* at § 5(1).

21.     The HRP Act also governs the HRPT's process with respect to awarding certain types of contracts.  First, the HRPT must treat as a "significant action . . . any proposed lease, concession arrangement, license or other agreement . . . for a period in excess of ten years."  *Id.* at § 7(11).  In so doing, the HRPT must:

> a.     hold a public hearing on not less than 30 days advance public notice; (b) solicit and consider the views of Manhattan community boards one, two, and four, the planning commission of the city of New York, the advisory council, elected officials representing communities neighboring the park, and interested groups and individuals, allowing not less than sixty days following the notice of the proposed action for the submission of such views; and (c) publish notice of the hearing and proposed action in the city record and state register.

*Id.* at § 7(6).

## JURISDICTION AND VENUE

22.     The jurisdiction of this Court over the subject matter of this action is predicated on 28 U.S.C. § 1331, as the acts herein alleged arise under the Constitution, laws or treaties of the United States, and 28 U.S.C. § 1337, as the acts herein arise under enactments of Congress regulating commerce and also relate to "due process" and 28 U.S.C §1367.

23.     New York Helicopter has standing to bring this action because it has a significant stake in a judicial resolution of the dispute, and has been adversely affected and discriminated against as detailed herein.

24.     Declaratory relief is appropriate because an actual controversy exists regarding the operation of the Heliport by HRPT and APH.

25.    This Court may also exercise personal jurisdiction over defendants, as they have purposefully committed acts within the State of New York from which these claims arise and they systematically and continuously do business within the Southern District of New York. .

## FACTS

### I.    The Heliport

26.    The Heliport operated by HRPT and APH is located at West 30th Street, New York, New York.

27.    The Heliport was built more than 50 years ago when a dock at West 30th Street in the Chelsea section of Manhattan was converted into a landing pad for helicopters. [2]

28.    The Heliport is a public heliport and it is the only heliport that is open seven days a week.  It also has fueling facilities.

29.    A substantial portion of the Heliport's business consists of sightseeing tours and charter flights.

30.    Since at least 2001, the HRPT has planned to relocate the Heliport.  *See Estuarine Sanctuary Management Plan*, dated September 2001, *available at: h*ttp://www.hudsonriverpark.com/pdfs/policies/sanctuary.pdf, at 1-23 ("The current heliport activities will be relocated pursuant to the HRP Act.  Under the HRP Act, there are two possible locations on the west side of Manhattan that are permitted for relocation (Piers 72 or 76)."); HRP Act at § 7(9) (i), 1998 Sess. Law. Ch. 592 (S. 7845) (McKinney's 1998) ("Consistent with the general project plan, the area of the park east of the bulkhead line shall be used *solely for park use and to permit access to permitted uses.*") (emphasis added).

---

[2] Jefferson Siegel, *Heliport on Hudson Still Flying High After 50 Years*, The Villager, (Oct. 18-24 2006), *available at*, http://www.thevillager.com/villager_181/heliportonhudson.html.

31.    The FAA Rules and Regulations govern Helicopters' activities vis-à-vis 135 (Charters), 136 (Sightseeing Tours).

32.    The FAA is primarily responsible for the advancement, safety and regulation of civil aviation, as well as overseeing the development of the air traffic. (*See* www.faa.gov/regulations/policies).

33.    There have been numerous complaints regarding the operation of the heliport including various letters written to the HRPT by plaintiff (Exhibit B), users and numerous public officials, including but not limited to the former New York State Comptroller Alan G. Hevesi, Assemblyman Richard Brodsky, previous officials from the New York State Attorney General's Office and others.[3]

34.    HRPT continues to illegally operate the heliport and delegates many of its governmental responsibilities for operating said heliport to the quasi-governmental APH, which operates the heliport in an arrogant, unreasonable, unfettered and, above all, discriminatory manner that interferes with and adversely impacts interstate commerce, contravenes applicable federal regulations, and violates the plaintiffs' constitutional rights to substantive due process, procedural due process and equal protection under the law.[4]

## II. The Permit Agreement

---

[3]    A request for declaratory relief regarding the operation of the Heliport was filed in state court on December 13, 2007 by Friends of the Hudson River Park, Chelsea Waterside Park Association, Hells Kitchen Neighborhood association and others against HRPT, APH and Liberty Helicopters index No. 07116581.

[4]    While there is a case pending in the Supreme Court, New York County, the issues raised therein are sufficiently distinct and arise out of a "settlement agreement" and alleged overcharges and although preliminary relief was denied, the case is proceeding and the State Court Judge specifically is aware of and referred to the pending federal case in his decision. This was sent by defendant APH to the Court by letter dated October 30, 2007.

35.    On March 25, 1996, the DOT, which preceded Defendant HRPT as the State agency overseeing the Heliport, entered into an agreement that provided Defendant APH with the sole and exclusive right to serve as the FBO at the Heliport.

36.    In return for this lucrative right, APH is required, among other things, to pay a monthly fee to the HRPT.  Permit at § 6(a).

37.    In addition, APH is required to remit to the HRPT a percentage fee equivalent to ten percent (10%) of its gross receipts for amounts in excess of $250,000.00, up to and including $1,000,000.00; a percentage fee equivalent to eleven percent (11%) of APH's gross receipts for amounts in excess of $1,000,000.00, up to and including $2,000,000.00; and a percentage fee equivalent to twelve percent (12%) for all amounts over $2,000,000.00.  *Id.* at § 6(b).

38.    APH is also required to pay the HRPT a use charge computed at the rate of $15 per every ten sightseeing passengers.  *Id.*

39.    The Permit requires APH to charge fees at the Heliport that are "fair, reasonable and non-discriminatory."  *Id*. at § 34(b).

40.    Moreover, APH must "undertake at its own expense to comply with all laws and ordinances and governmental rules, regulations and orders now or at any time during the term of [the Permit] which as a matter of law are applicable to the operations of APH at the Heliport."  *Id.* at § 8(a).

41.    The relationship between APH and HRPT is mutually beneficial.  They both benefit financially from the relationship.

42.    APH, pursuant to the Permit, has a lucrative monopoly over the operations at the Heliport.

43.    For its part, the HRPT enjoys a steady, significant revenue stream from the operation of the Heliport without having to involve itself in the details of the complicated business of actually operating the Heliport.

44.    Significantly, the operation of the Heliport is traditionally an exclusive function of the state.

45.    Responsibility for the operation of the Heliport lies ultimately and exclusively with the NYDOT.

46.    On its website (at www.dot.state.ny.us/info/info.html), the DOT explicitly stated that its functions and duties include "coordinating and assisting in the development and operation of transportation facilities and services for highways, railroads, mass transit systems, ports, waterways, and *aviation facilities*[.]" (emphasis added.)

47.    The DOT, in entering into the Permit with APH, delegated its responsibility to operate the Heliport to APH.

48.    Accordingly, in operating the Heliport pursuant to the Permit, APH can be said to be an arm of the state fulfilling a governmental function and, therefore, a state actor.

49.    When signing the permit/agreement with APH, the NYDOT went beyond its authority when it agreed that third parties could not assert any rights under the permit because the NYDOT was acting in a fiduciary capacity on behalf of the public (the beneficiary) when it signed the contract and therefore it could not give up a right it did not possess.

50.    The Permit Agreement indicates that the rates should be reasonable and non discriminatory. This was meant to protect the heliport's users and the public.

51.    Thus, the public, and in particularly NYH, is entitled to assert the right to non-discriminatory policies under the commerce clause, due process clause and the equal protection clause, as well as the Permit Agreement itself.

52.    APH's Permit Agreement expired by its terms on March 24, 2001. *Id.* at § 2.

53.    APH's contract with the HRPT, or predecessors, the Port Authority of New York and New Jersey and then the NYDOT, has lasted almost thirty (30) years without competitive bidding.

54.    This situation is in stark contrast to that prevailing at the other two heliports in Manhattan, one located on the East Side at 34th Street and the other one in downtown.

55.    Moreover, the Permit "provide[s] for a total capital investment in the park of no less than one million dollars." *Id.* at § 7(11).

56.    Accordingly, the HRPT was required to initiate a competitive process with respect to the contract to serve as the FBO for the Heliport by "hold[ing] a public hearing," "solicit[ing]" the views of the public, "publish[ing] notice of the hearing and proposed action in the city record and state register," and "issu[ing] a bid prospectus." *Id.* at §§ 7(6), 7(11).

57.    The HRPT failed to take any of these required steps.

58.    Instead, the HRPT simply continued to "sole source" the Heliport's operations to APH, in violation of the HRP Act.

59.    In addition, APH is operating illegally on a "subterfuge" month-to-month permit extension.

60.    APH's method of operation[5] and fees—having no correlation to APH's costs of operation—result in NYH's receiving treatment different from, and less favorable than, its competitors, and constitute an unreasonable burden on NYH and the public as well as unfair interference with interstate commerce.

---

[5]    APH's method of operation includes threatening charter and sightseeing operators that if they complain to HRPT or APH, they will be refused privileges, discriminating in charges, demanding that existing lawsuits be dropped as a condition of operating, unreasonable limits on takeoffs and landings and wrongfully discriminating against operators.

61.     APH's fare increase and ouster of NYH, without a hearing, is in violation of "procedural due process and equal protection," such that APH is receiving a "windfall" of over two million dollars per year.

### III. Previous Litigation And History Among the Parties

62.     NYH has been improperly discriminated against and arbitrarily denied operating rights at the Heliport since May 6, 2007, for among other reasons, refusing to drop a pending State lawsuit, complaining to the HRPT regarding APH's activities, and for joining in with other helicopter operators in complaints to APH.

63.     There was prior litigation between the parties involved in the action.

64.     In 2004, NYH was forced to file an action against Air Pegasus Heliport, Inc. and others to insure its continued access to the public heliport at West 30th Street in Manhattan. The action entitled *New York Helicopter Charter, Inc. v. Air Pegasus Heliport, Liberty Helicopters, Inc. and Hudson River Park Trust* under index number 603773-04 was settled by Settlement Agreement dated April 28, 2005 (a copy of which Settlement Agreement is annexed hereto as Exhibit "C").

65.     After months of access to the heliport, when NYH attempted to use the heliport on Sunday, May 6, 2007, it was suddenly informed by APH that its rights to utilize the heliport had been "terminated" which is the subject of a separate and distinct  lawsuit

66.     NYHs expulsion from the Heliport since May 6, 2007 has caused tremendous financial damage to NYH as well as to its reputation, and ability to compete with similarly situated helicopter operators which have resulted in injury to its business, reputation and profile that cannot be calculated in money damages alone.

67.     NYH has been trying to mitigate the damages by operating from the Downtown Manhattan Heliport even though this is not the most convenient spot for tourists given that 80% of hotels are located in midtown and the Downtown Heliport has limited hours of operation.

68.     Since the time NYH was operating at the Heliport, APH, with the knowledge and auspices of the HRPT, has been sponsoring and granting privileges to other helicopter companies which have not been afforded to NYH.

69.     Roth and NYH's rights to utilize the West 30th Street Heliport were terminated to accommodate Zip Aviation LLC and other helicopter operators favored by APH.

70.     The right to operate the heliport and charge customers has its source in state authority because the NYDOT, a state agency, was responsible for the Permit Agreement and authorized and approved the granting of these rights.

71.     The original Permit Agreement, which was agreed to by the NYDOT and APH, clearly establishes the public service of the heliport at section 32(a):  "A principal purpose of the Department in the making of this agreement is to have the Heliport operated as a first-class public heliport…"

72.     Since the heliport is "public," as opposed to those owned by corporations and medical facilities, the state is involved in some aspects of the operations.

73.     For example, in a letter dated February 9, 2007 [Exhibit D] HRPT wrote to APH about Zip Aviation's failure to comply with the Federal Aviation Administration regulations.

74.     Thus, the HRPT acts in a supervisory capacity and approves certain matters related to the operation of the heliport and oversees the compliance with the regulations of the Federal Aviation Administration.

75.     In addition, HRPT oversees the pricing to ensure that the use of the heliport is afforded in a fair and non-discriminatory manner as mandated by the agreement.

76.     The requirement that the Heliport is operated in a fair and non-discriminatory manner reasserts the public nature of the heliport and creates the kind of entwinement between the APH and HRPT that makes APH a state actor.

12

77.    The HRPT has the power to prohibit a charge or action if it is discriminatory or does not comply with the terms of the permit agreement.

78.    As will be explained in detail hereafter, APH raised its passenger fees from $1.50 per passenger, which was the original sum payable to the HRPT to $10 per passenger.

79.    This rate increase was enforced only against selected Heliport users including NYH.

80.    For this reason, NYH complained to the HRPT about the discriminatory pricing that was taking place, as evidenced by the letter dated January 26, 2006. (Exhibit E)

81.    The HRPT was aware of the discriminatory pricing, not only from plaintiff's letter, but also from the results from an audit of APH that HRPT conducted as detailed hereafter.

82.    Furthermore, the Office of New York State Comptroller conducted a second audit of APH. The report of the Office of New York State Comptroller dated December 21, 2007: Hudson River Park Trust West 30th Street Heliport Revenue Operations Report 2006-s-75 available at www.osc.state.ny.us contains further evidence of the joint responsibility that HRPT and APH have in the operation of the heliport. It stated:

> "In light of the specific requirements of the permit, we believe that the Trust has a responsibility to ensure Pegasus is operating the Heliport in an appropriate manner and in conformance with permit provisions.
>
> Recommendations include:
>
> 1.    Take appropriate measures to complete and execute the re-bid process for the Heliport at its new location
> 2.    Require Pegasus to prepare written policies regarding discounts

3.    Monitor periodically all aspects of the Heliport operations, including revenue collections, compliance with posted fees, and the business climate enjoyed by Heliport carriers. As necessary, take appropriate corrective actions. [emphasis added] (Exhibit F)

83.    As evidenced in the letter sent by Christopher Gengaro, attorney for APH, both APH and HRPT have "enjoyed a long-standing, mutually beneficial, and respectful relationship over the course of two and a half decades." (Exhibit G)

84.    Nevertheless, the HRPT failed to protect NYH and the public from the discriminatory actions taken by APH.

85.    In the past year, Roth called the HRPT's Vice President and General Counsel, Laurie Silberfeld, at least 12 times to discuss the discriminatory practices. However, he was unable to reach her. A similar situation occurred with Connie Fishman, President of HRPT. From time to time, Roth also sent e-mails to both of them to no avail.

86.    In addition, Roth sent various letters requesting the HRPT intervention during the time the discriminatory actions were taking place and after he was kicked out of the heliport. (Exhibit B).

87.    On May 7th, 2007, the day after plaintiff was ousted from the heliport, Roth sent a letter to the HRPT.  The letter complained that once again, NYH was being denied access to the heliport by APH and requested HRPT's intervention. (Exhibit H).

88.    The HRPT took no action.  In fact, as recently as April 16, 2008, plaintiff sent a letter to HRPT requesting access to the heliport for chartering because NYH was about to lose a contract with Ian Schrager due to its inability to use the heliport.

89.    The HRPT responded by asking plaintiff to contact APH directly even though they were aware of the fact that APH had already denied the request and that this litigation is pending.

90.    Helicopter operators are permitted to land at a public heliport, as it exists for public use.  This includes charter flights, which do not need authorization or a permit

as opposed to sightseeing operations which do.  Yet despite its use of the Heliport for charter flights, NYH still sought and obtained authorization.

91.    As a result, even though APH ousted NYH from sightseeing operations, it should be allowed to land at the West 30th Street Heliport for charter operations.

92.    APH, as the FBO cannot arbitrarily deny NYH's right to land under such conditions as the West 30th Street Heliport is a public heliport in the same way that La Guardia is a public airport. Any private airplane that wants to land in La Guardia calls from airspace and expresses its need for landing and the airport accommodates it.

93.    After the plaintiffs were ousted from the heliport, one of its helicopters attempted to land at the heliport to refuel and for a passenger pick charter and were refused.

94.    The HRPT were advised of this by Mr. Roth and did nothing.

95.    The HRPT has been requested to allow use of the heliport for at least charter operations and has done nothing to intervene.

96.    The fact that the HRPT was a party in the state action requesting a temporary restraining order so that NYH could remain at the heliport reiterated the need for their intervention regarding the discriminatory actions and is further proof that they have been aware of the situation and have refused to act.

97.    As further evidence that the HRPT was aware of the irregularities that were taking place at the West 30th Street Heliport, the Report of the Office of New York State Comptroller also states:

> The Trust (HRPT) is responsible for ensuring that Pegasus complies with Permit terms and operates the Heliport in a productive manner.
>
> However, our audit found that some of the additional fees that Pegasus imposed on carriers were questionable.  For example, Pegasus initiated a Safety and Facility Enhancement (SAFE) fee following September 11, 2001, which we were told would

provide increased security and related improvements to the Heliport....However, Pegasus could not show us any facility enhancements or improvement that it funded with SAFE fee collections. (Report at Page 5)

**IV. The HRPT's Audit of APH**

98.     In early 2005, the HRPT commenced an inspection of APH's books and records to determine the accuracy of APH's reporting.  (Settlement Agreement between APH, Air Pegasus New York, Inc., and the HRPT, dated Nov. 22, 2006, at 1.) Specifically, the HRPT retained Debra Cutler, CPA, CFE to "evaluate whether APH had reported and remitted fees and charges in accordance with the terms of the Permit." *See* Debra A. Cutler, *Report on Schedule of Fees and Charges of Air Pegasus Heliport, Inc.*, October 31, 2006, at 3. (Exhibit J).

99.     Among other things, the auditor examined whether APH was properly reporting and remitting to HRPT monies arising from operations of the Heliport that were paid to an entity related to APH, Air Pegasus New York ("APNY").

100.     Even though the HRPT was fully within its rights in conducting an audit of APH's books and records, APH filed suit in the Supreme Court, New York County, challenging the breadth and scope of the HRPT's audit rights under the Permit. *Id.*  (Ex K).

101.     On January 5, 2006, the HRPT filed suit against APH and its CEO, Alvin Trenk, alleging that APH had violated the Permit by, among other things, entering into subsidiary agreements without the HRPT's knowledge, consent or prior written approval, and by diverting funds received by APNY that should have been included in APH's reports and payments to the HRPT.  The HRPT's action sought to recover all unpaid fees. *Id.*

102.     The HRPT also continued its audit, and, on October 31, 2006, Ms. Cutler issued a report of significant wrongdoing on the part of APH. (Ex J).

103.    Repeatedly noting APH's failure to maintain proper records, which complicated her inspection, Ms. Cutler nevertheless was able to reach the following alarming conclusions about APH, among others:

- Over a nine-year period from 1996 through 2005, APH concealed and diverted $3,853,229 to its related entity APNY;

- Investigation of $565,000 received by Air Pegasus Enterprises, another APH-related entity;

- APH gave discounts and price preferences, including non-volume discounts on fuel and landing fees, to certain preferred customers;

- For a number of months, US Helicopter was charged a flat monthly fee for landing and parking, rather than the fee due under the Schedule of Charges that applied to other operators;

- Zip Aviation, LLC a/k/a Wings a/k/a Print International (collectively, "ZIP") was billed a flat $500 per month regardless of the number of its landings or the amount of time parked;

- APH also disingenuously characterized NY Helicopters and Helicopter Flight Services, another of APH's sightseeing operator customers, as "charter tours on a reservation basis only," and failed to properly collect, report, or remit Sightseeing Use Charges, as required under Section 6(b) of the Permit, in connection with these operators; and

- The APH monthly Deposit Cash Sheet prepared by APH did not include all bank deposits.

104.    More recently, the report of the Office of New York State Comptroller dated December 21, 2007: Hudson River Park Trust West 30th Street Heliport Revenue Operations Report 2006-s-75 revealed at pages 2-4:

> There were significant revenues Pegasus did not include in its determination of gross receipts. These revenues were being paid by one of the carriers at the Heliport to a Pegasus-related entity under the terms of a "consulting agreement" entered into between the parties.  As far as we could determine of audit, no consulting services were even provided in connection with this agreement. P. 2

The Trust is responsible for ensuring that Pegasus complies with the terms of the Permit and operates the Heliport in an efficient and effective manner.P.3

When we checked the rates charged on these sampled invoices to the published rate schedules, we found that lower fees than posted (discounts) were charged to at least four carriers at the Heliport during the audit period.  Two carriers received 20-percent discounts for parking and landing, one received a 50-percent discount for landing, and the fourth received a reduced flat rate for monthly parking.  P.4

## V. HRPT and APH Discriminatory Actions and Favoring of NYH's Competitors

105.    The Permit Agreement does provide that from time to time, APH may amend the schedule of charges at the West 30th Street Heliport upon fifteen (15) days prior notice to the public and the HRPT, so long as such charges and fees are "fair, reasonable, and non-discriminatory."

106.    APH abused their power, with the consent and active participation of HRPT by imposing a new fee, without any legitimate basis or justification, solely for the purpose of funding a settlement with the HRPT based on monies diverted from HRPT by APH.

107.    The fee affected selected companies, including NYH.

108.    The settlement was the result of litigation between APH and the HRPT based on the fact that APH failed to comply with the terms of the Permit Agreement and diverted monies payable to HRPT.

109.    Although the notice to raise prices was given before the settlement, APH knew that they had to pay back the money they had diverted and needed additional funds for those purposes.

110.    On October 31, 2006, the HRPT's auditor had issued findings of egregious wrongdoing by APH.

111.    These findings included APH's concealment of millions of dollars in operating revenue from the HRPT in an effort to deny the HRPT its share of that revenue.

112.    Perhaps the most egregious finding, and the one most directly damaging to NYH, was that in direct contravention of the Permit Agreement, APH also gave substantial discounts and price preferences to certain preferred customers, including Zip Aviation, Inc.

113.    It even went so far as to vouch for Zip Aviation to allow it to operate at the heliport even though Zip did not have the proper approval from the Federal Aviation Administration, to which the HRPT wrote:

> Further we are troubled by what would appear to be a lack of due diligence on the part of APH in putting forth and vouching for ZIP Aviation in connection with your sightseeing authorization request. Section 8 of the permit obligates APH to undertake its operations in compliance with all applicable laws and requirements and not to conduct any activity at the heliport that requires a permit or other approval without first having obtained such authorization.  As an experienced heliport operator, APH should have confirmed the accuracy of the statements and representations set forth in ZIP Aviation's submittal…."

114.    Furthermore, Exhibit I contains the handwritten letter dated March 15, 2007 sent by Abigail Trenk from Air  Pegasus to HRPT recommending and vouching for Air Pegasus:

> "Dear Laurie:
>
> As per our recent phone conversation, I am writing this letter as a personal recommendation of Itai Shosharani d.b.a Zip Aviation.  I have known Itai professionally for well over seven years. He has owned and operated a jet ranger helicopter for his personal business until recently……. He recently purchased a second Jet Ranger and established a helicopter charter…"

115.    Exhibit G is a letter from APH's counsel, Christopher Gengaro, to HRPT regarding Zip Aviation application in which he states:

There is no apparent reason for the HRPT to continue to withhold approval of ZIP. Accordingly, APH hereby requests that the HRPT approve ZIP as a sightseeing operator immediately. APH remains concerned that the HRPT's refusal to issue approval could lead to a lawsuit by ZIP (similar to the New York Helicopter Charter Inc. lawsuit").

116.    The recent report of the Office of New York State Comptroller, dated December 21, 2007, Hudson River Park Trust West 30th Street Heliport Revenue Operations Report 2006-s-75, also mentioned the favoring of some operators:

> …..Pegasus charged the fourth carrier a fixed rate of $500 per month for unlimited landings and parking.  During our audit period this carrier was charged $13,000 for parking. However, based on recorded activity, if the posted fees were charged, it would have paid $62,205 to Pegasus and Pegasus would have to remit an additional $4,900 to the trust.
> Pegasus claimed that it made this deal because this specific carrier was willing to utilize what Pegasus characterized as an undesirable space due to its remote location and size. However, when we queried several other carriers, they told us that they would have been more than willing to use that parcel of the Heliport for that price.  P.4

117.    This practice of discriminating against NYH and some other operators in favor of other competing operators had no rational basis in cost, in volume, or in any other economic justification.

118.    The discounts and price preferences included non-volume discounts on fuel and landing fees, parking fees, fuel charges and late operations.

119.    Another clear discrimination was the fact that there is no landing or parking fee for stopping to buy fuel.  However, APH would charge NYH parking fees for fueling.

120.    After Zip Aviation started operating at the Heliport, APH sent a communication to some helicopter operators indicating that they were prohibited from soliciting customers on the park premises.

121.    However, APH allowed Zip Aviation to engage in such solicitation.

122.    By forcing NYH to compete on an unleveled playing field, the HRPT and APH increased NYH's operating costs, complicated NYH's ability to invest in expanding its business, and caused NYH to lose it business to APH's "favored" operators with lower operating costs.

123.    Each of these unfair cost differentials had a direct negative effect on NYH's business, causing it both to lose volume and to lose profits on the customers that it served.

124.    In addition, NYH had to pass part of the cost increase to consumers, who were directly affected by the discriminatory practices.

125.    APH's practices in the managing of the Heliport have impaired free competition and have restrained trade which has impacted on the public.

126.    The HRPT clearly was aware of the discriminatory and anticompetitive practices with respect to price and the competitive advantages that APH was giving to some users.

127.    The Report on Schedule of Fees and Charges issued by the auditing company hired by HRPT found that some customers received special discounts.

128.    Two of those customers did not appear on the Device Control Register ("DCR") and one of the customer's information did not match up with the DCR.

129.    The remaining customers were selected by the auditors because their name contained the word 'Pegasus'.

130.    This suggests that the HRPT had knowledge or at least reasons to know that APH was favoring some of its business associates, especially ZIP aviation, since APH vouched for ZIP even though it did not have the proper authorizations from the Federal Aviation Administration.

131.    HRPT's audit had also previously found that U.S. Helicopter and Zip Aviation were charged $500 per month regardless of the number of landings, and that this

specific customer did not appear on the DCR.  <u>This was confirmed by the recent report of the State Comptroller as indicated before.</u>

132.    The transactions with Zip Aviation were investigated by the HRPT.

133.    Zip Aviation operations were mixed with other operators.

134.    Specifically the first audit report stated:

"Zip Aviation: Zip/Wings/Print International…. We tested the February and March 2005 daily flight logs to determine if the same aircraft number appeared for the above companies, as we understand all of these companies are under common control.  We noted that 691S was listed as both a Print and Zip aircraft number, in the daily flight log indicating that at a minimum, <u>Print and Zip appear to be under common control</u>. The February 24, 2005 daily control log, ops#41, identified the customer as Zip/Wings.  We noted that Print was <u>billed a flat fee of $500/month regardless of the number of landings or the time parked</u>." [emphasis added]. (Exhibit F)

135.    Such agreements and benefits were not allowed since the Permit establishes in section 34(d) that:

…"the operator shall not itself use the heliport for its own aircraft and shall refrain from entering into continuing contracts or arrangements with third parties for use of the Heliport of for furnishing services covered hereunder when such use by the Operator or contracts or arrangements will have the effect to utilizing to an unreasonable extent the operator's capacity for rendering such services…."

136.    However, APH vouched for Zip Aviation to obtain permission to operate at the heliport for HRPT, even though Zip Aviation had not been approved by the Federal Aviation Administration.

137.    Although there is another heliport downtown and one on the east side (for charters only) the West 30th Street Heliport has a competitive advantage because it is more convenient to tourists as approximately 80% of the hotels are located in midtown

and a the largest percentage of tourists prefer tours from the midtown area which is why the main business of the Heliport is sightseeing operations.

138.    In addition, the West 30th Street Heliport is the only heliport that is open seven days a week, twenty four (24), hours a day.

139.    NYH's lost presence in midtown has had serious detrimental business consequences since NYH cannot provide a reasonable explanation to their customers as to why everyone else can operate out of the Heliport but not NYH.

**VI. Defendant HRPT's Arbitrary and Capricious Decision to Settle Its Dispute with APH on Such Favorable Terms to APH and to Permit APH to Continue to Operate, Rather Than Terminate APH**

140.    The HRPT's violations of the HRPT Act are not limited to continuing the operation of the Heliport.

141.    In the face of findings by the HRPT's own auditor of abuses by APH, and notwithstanding that the State Comptroller was expected to release similar findings imminently, the HRPT also has arbitrarily and capriciously decided to settle its dispute with APH on very favorable terms for APH, instead of terminating APH.  In this way, the HRPT has violated its duty to protect and advance the interests of the people of the State of New York.

142.    In fact, as previously stated, the New York State Comptroller recently released a report dated December 21, 2007: Hudson River Park Trust West 30th Street Heliport Revenue Operations Report 2006-s-75 (Exhibit F) which confirms APH's mismanagement of the heliport.

143.    Based on these findings, the HRPT should have terminated APH.  Instead, on November 22, 2006, less than one month after the auditor issued her findings, the HRPT simply settled its dispute with APH and on very favorable terms for APH. (Exhibit C)

144.    For example, among other things, the HRPT stated as part of the settlement that "it has no knowledge that [APH] is in violation of any of the provisions of the permit and, accordingly, APH is in good standing with the HRPT."  Settlement Agm't at 4.

145.    The HRPT agreed to this "acknowledgement" despite its <u>actual</u> knowledge that APH had committed significant wrongdoing.

146.    The HRPT also stated that "it is the HRPT's interpretation of the HRP Act that no operator other than [APH] can be allowed to operate the Heliport."  *Id.*  The HRPT agreed to this acknowledgement despite the fact that, under the HRP Act, it is entitled (and, indeed, required) to "issue a bid prospectus" seeking proposals to operate the Heliport.  *See* HRP Act § 7(11).

147.    Finally, the HRPT agreed to acknowledge that it "shall not use the Litigations as a basis for disqualifying APH from any HRPT Request for Proposal ("RFP") and APH shall have the right to respond to any such RFP."  Settlement Agm't at 4.

148.    The HRPT agreed to these terms exonerating APH despite its duty to operate the Park in the best interests of the public.

149.    In return for these "acknowledgements," APH paid HRPT $462,387.

150.    This payment purportedly was in "full and complete satisfaction" of the percentage of monies owed from revenues improperly diverted by APH.

151.    However, this figure does not include payments relating to other operators that APH previously withheld from the HRPT.  Nor does it include any interest on any of the improperly withheld monies.

152.    In addition to violating its statutory duties, the HRPT's agreement to settle on these terms also violated its own procedures.

153.    As previously explained, the HRPT operates pursuant to by-laws which, among other things, require board approval of all "contracts for the general corporate

purposes of the Authority which are in excess of one hundred thousand dollars ($100,000)." Hudson River Park Trust By-Laws at Art. III. § 3 ("Contracts Requiring Board Approval").

154.    Nevertheless, upon information and belief, the HRPT failed to seek board approval of this settlement before binding the HRPT.

155.    Notwithstanding these findings, the HRPT settled the matter with APH and not only allowed the discrimination to continue but did not object with the price increase since it had a financial interest in it.

156.    Incredibly the HRPT permitted APH to impose a $10 passenger fee to some operators including NYH.

157.    No other FBO in New York charges this fee.

**FIRST CLAIM**
**AGAINST APH AND HRPT FOR**
**VIOLATION OF THE EQUAL PROTECTION CLAUSE**

158.    Plaintiffs repeat and reallege, as if set forth fully herein, the allegations contained in the previous paragraphs.

159.    Plaintiffs' enjoyment upon terms of equality with all others in similar circumstances of the privilege of pursuing an ordinary calling or trade—for which he is licensed—is an essential part of his rights to liberty and property as guaranteed by the Fourteen Amendment and the Due Process Clause of the United States Constitution.

160.    The discrimination against NYH and its ouster from the heliport was motivated by ill will resulting from NYH's previous complaints regarding APH and HRPT and the previous litigation in which all the parties in this action had been involved.

161.    In fact, NYH's operating rights were terminated as retaliation for not dropping a lawsuit that was pending in state court.

162.    APH and HRPT are state actors.

163.    The disparity in treatment by APH and HRPT concerning NYH's operating rights vis-à-vis its competitors is arbitrary and capricious and serves no legitimate governmental objective.

164.    There is no rational basis for this disparity in treatment.

165.    APH and HRPT have violated NYH's rights by providing favorable treatment, discounts and price reductions to certain similarly-situated customers of the Heliport, but not to NYH.

166.    NYH has been intentionally treated differently from other similarly situated helicopter operators by the discriminatory practices of APH which are endorsed by HRPT.  Therefore, at the very least, either APH and/or HRPT—as effective state entities bestowed with essential governmental functions—are liable to NYH for violating its constitutional rights to equal protection under the law.

167.    There is no rational basis for the difference in treatment that NYH has received from APH.  The discriminatory practices had no basis in cost, volume, or any other economic justification.

168.    NYH has suffered real damages as a result of APH's implementation of the discriminatory and arbitrary regulations at the West 30th Street Heliport.

169.    By forcing NYH to compete on an uneven playing field, the HRPT and APH increased NYH's costs, complicated NYH's ability to invest in expanding its business, increased NYH's operating costs, and caused a significant loss of its business to APH's "favored" operators blessed with lower operating costs.

170.    Each of these unfair cost differentials had a direct negative effect on NYH's business, causing it both to lose volume and to lose profits on the customers that it did serve.

171.    The operation of and access to state parks and grounds is a traditional state function; the Hudson River Park is a public park created by the New York State Legislature in the Hudson River Park Act.

172.    NYH has a protectable property interest, or legitimate claim of entitlement, in continuing its helicopter business with fair and unbiased access to the public-use of the West 30th Street Heliport.

173.    By reason of the foregoing, NYH has and continues to be irreparably injured and has suffered damages in an amount to be determined at the time of trial.

## SECOND CLAIM
## AGAINST APH AND HRPT
## VIOLATION OF DUE PROCESS

174.    Plaintiffs repeat and reallege, as if set forth fully herein, the allegations contained in the previous paragraphs.

175.    Plaintiffs have been deprived of their liberty and right to use the West 30th Heliport.

176.    Plaintiffs' enjoyment upon terms of equality with all others in similar circumstances of the privilege of pursuing an ordinary calling or trade—for which they are licensed—is an essential part of their rights to liberty and property as guaranteed by the Fourteen Amendment and the Due Process Clause.

177.    NYH has a protectable property interest, or legitimate claim of entitlement, in continuing its helicopter business with fair and unbiased access to the public-use West 30th Street Heliport in the same terms and conditions as others in plaintiffs' situation.

178.    Plaintiffs also have a property interest in an entitlement from HRPT and APH to use the West 30th Street heliport for chartering (private) work because the HRPT has virtually no discretion to deny the request.

179.    The West 30th Street Heliport is a public entity.  Unlike sightseeing tours, chartering work does not require a specific permit.  Even if Plaintiffs were not authorized to do sightseeing work at the heliport (which they are), they should be allowed to land

there for chartering work since anyone can land at the heliport for those purposes given the Heliport's public nature.

180.    A helicopter does not need any permit, or any permission at all to do charter work. As long as it is a licensed helicopter it can land at a public heliport. It works like a public parking lot in which it does not require a reservation.

181.    In addition, APH's imposition of a new fee, without any legitimate basis or justification therefore, solely for the purpose of funding its settlement with the HRPT, was arbitrary and outrageous and an abuse of its position as the FBO of the Heliport.

182.    APH and HRPT actions constitute an arbitrary and capricious exercise of state power.

183.    The ouster of plaintiff from the heliport, the denial of landing rights even for chartering work and imposition of the new fee constituted state action.

184.    The deprivation of plaintiffs' rights and liberties has no justifiable governmental objective and is based on political and personal reasons.

185.    By reason of the foregoing, Plaintiffs have been and continue to be irreparably damaged and have suffered damages in an amount to be determined at the time of trial.

## THIRD CLAIM
## VIOLATION OF DUE PROCESS

186.    Plaintiffs repeat and reallege, as if set forth fully herein, the allegations contained in the previous paragraphs.

187.    On May 17, 2006, APH announced a "new" fee schedule scheduled to take effect on June 5, 2006.

188.    The new fee schedule raised fees across the board and imposed a flat $10 per passenger fee.

189.    No additional service was provided in connection with the imposition of the new fee.

190.    There is no basis or justification for the new fee and it was imposed only to some customers and not to others.

191.    The new fee is unfair and unreasonable, and imposed arbitrarily and capriciously.  Moreover, elementary notions of fairness enshrined in constitutional jurisprudence dictate that the Plaintiffs receive fair notice of conduct from state actors that will adversely affect them, especially when of the magnitude of the actions herein.

192.    The new fee was imposed solely for the purpose of funding APH's settlement with the HRPT.

193.    NYH has a cognizable property interest in operating at the Heliport on terms that are "fair, reasonable and nondiscriminatory."

194.    The imposition of the new fee was an exercise of a right or privilege created by the State.

195.    The imposition of the new fee deprived NYH of its property interest and adversely impacted interstate commerce.

196.    The deprivation was without due process of law.

197.    By reason of the foregoing, NYH has been and continues to be irreparably injured and has suffered damages in an amount to be determined at the time of trial.

## FOURTH CLAIM
## TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS AND PROSPECTIVE ECONOMIC RELATIONS

198.    Plaintiffs repeat and reallege, as if set forth fully herein, the allegations contained in the previous paragraphs.

199.    APH and HRPT are aware that Plaintiffs' have contracts or potential contracts with third parties which require Plaintiffs' access to and opportunity to use the public facilities at the West 30th Street Heliport as other helicopter operators are allowed to do.

200.    Notwithstanding this information and repeated requests to both APH and HRPT by Plaintiffs' to allow them use of the West 30th Street Heliport, Defendants' have wrongfully interfered with and continue to interfere with these existing and prospective contracts by refusing Plaintiffs' permission not only for sightseeing but also for charter flights for reasons which are without privilege or legal justification and for reasons which are arbitrary, unreasonable, and capricious in order to favor Zip Aviation.

201.    As the FBO of the West 30th Street Heliport, APH has no right to exclude NYH or any other operator from operating charter flights out of the public West 30th Street Heliport while HRPT has no such right to prevent helicopter charters such as Plaintiffs' from landing and taking off from a public heliport on public property and which uses public funds and services the public.

202.    As a result of APH's and HRPTs malicious and tortious actions, NYH has lost some of its biggest charter clients including Calvin Klein and Ian Schrager among many others.

203.    The damages suffered by NYH greatly exceed $ 250,000.

### FIFTH CLAIM
### RELIEF SOUGHT UNDER NEW YORK C.P.L.R ARTICLE 78

204.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if set forth fully herein.

205.    This court has ancillary jurisdiction to hear claims under Article 78 of the C.P.L.R.

206.    The NYDOT and its successor in interest HRPT abdicated its responsibility and abused its position by:

a.    Totally disregarding the findings of its investigations of APH.  Indeed, under the terms of the settlement (Exhibit C), the HRPT went so far as to falsely "acknowledge" that it "has no knowledge that APH was in violation of any of the

provisions of the Permit and, accordingly, APH is in good standing with the HRPT."

b.      Failing to protect NYH and the public from APH's abuses and discrimination.

c.      Settling a dispute with APH regarding their inappropriate management of the Heliport, discriminatory practices and diversion of funds in terms totally favorable to APH.

d.      Allowing APH to raise its prices in order to raise the money required to repay HRPT for the settlement, arising out of APH's diversion of funds.  Before the settlement, there was only a charge of $1.50 per passenger that was collected by APH and payable to HRPT. After the settlement, APH, with the acquiescence and support of the HRPT, imposed an additional $10 fee per passenger.

e.      Not objecting to the increase in spite of the fact that the permit states that the rates should be reasonable and non discriminatory violating its fiduciary obligation to NYH and the public.

f.      Agreeing that third parties could not assert any rights under the permit when signing the permit/agreement with APH.  The NYDOT (whose successor in interest is the HRPT) went beyond its authority because it was acting in a fiduciary capacity on behalf of the public (the beneficiary) when it signed the contract and therefore it could not give up a right it did not possess.

g.      Failing to initiate a competitive process with respect to the contract pursuant to the HRP Act to serve as the FBO for the Heliport by "hold[ing] a public hearing," "solicit[ing]" the views of the public, "publish[ing] notice of the hearing and proposed action in the city record and state register," and "issu[ing] a bid prospectus."

h.      Failing to obtain board approval for the extension of the permit agreement pursuant to by-laws which, among other things, require board approval of all

"contracts for the general corporate purposes of the Authority which are in excess
of one hundred thousand dollars ($100,000)."  Hudson River Park Trust By-Laws
at Art. III, § 3 ("Contracts Requiring Board Approval").

207.    The actions mentioned in the previous paragraph were arbitrary and
capricious.

208.    HRPT and APH decision to oust NYH from the heliport was arbitrary and
capricious and an abuse of permitted discretion.

209.    HRPT's failure to protect NYH and the public from APH's abuse was
arbitrary and capricious and an abuse of permitted discretion.

210.    NYH should be allowed to resume operations at the heliport.

211.    As a result of defendants' actions, Plaintiffs and the public have been
irreparably harmed.

212.    As a result of the foregoing, NYH has been damaged in an amount to be
determined at trial.

## SIXTH CLAIM
## BREACH OF PUBLIC TRUST

213.    Plaintiffs repeat and reallege the allegations set forth in the preceding
paragraphs as if set forth fully herein.

214.    The HRPT is in breach of the public trust by acting in an arbitrary and
capricious manner and  abdicating its responsibility and fiduciary duty as a public body to
act in a fair and nondiscriminatory manner by :

a.    Totally disregarding the findings of its investigations of APH.  Indeed,
under the terms of the settlement (Exhibit C), the HRPT went so far as to falsely
"acknowledge" that it "has no knowledge that APH was in violation of any of the
provisions of the Permit and, accordingly, APH is in good standing with the
HRPT."

b.      Failing to protect NYH and the public from APH's abuses and discrimination.

c.      Settling a dispute with APH regarding their inappropriate management of the Heliport, discriminatory practices and diversion of funds in terms totally favorable to APH.

d.      Allowing APH to raise its prices in order to raise the money required to repay HRPT for the settlement, arising out of APH's diversion of funds.  Before the settlement, there was only a charge of $1.50 per passenger that was collected by APH and payable to HRPT. After the settlement, APH, with the acquiescence and support of the HRPT, imposed an additional $10 fee per passenger.

e.      Not objecting to the increase in spite of the fact that the permit states that the rates should be reasonable and non discriminatory.

f.      Agreeing that third parties could not assert any rights under the permit when signing the permit/agreement with APH.  The NYDOT (whose successor in interest is the HRPT) went beyond its authority because it was acting in a fiduciary capacity on behalf of the public (the beneficiary) when it signed the contract and therefore it could not give up a right it did not possess.

g.      Failing to initiate a competitive bidding process with respect to the contract pursuant to the HRP Act to serve as the FBO for the Heliport by "hold[ing] a public hearing," "solicit[ing]" the views of the public, "publish[ing] notice of the hearing and proposed action in the city record and state register," and "issu[ing] a bid prospectus."

h.      Failing to obtain board approval for the extension of the permit agreement pursuant to by-laws which, among other things, require board approval of all "contracts for the general corporate purposes of the Authority which are in excess of one hundred thousand dollars ($100,000)."  Hudson River Park Trust By-Laws at Art. III, § 3 ("Contracts Requiring Board Approval").

215.   HRPT had a responsibility to the plaintiffs' and the public to ensure that the heliport was managed in fair terms and in the best interest of the public.

216.   As a result thereof plaintiffs and the public have suffered damages.

## PRAYER FOR RELIEF

As to the First through Fourth Claims, Judgment:

(1)   Declaring that Plaintiffs' may operate out of the West 30th Street Heliport in a nondiscriminatory manner and on equal terms and conditions as all other helicopter operators for sightseeing on a full time basis such as all other helicopter operators and .

(2)   Declaring that Plaintiffs' may operate out of the West 30th Street Heliport in a nondiscriminatory manner and on equal terms and conditions as all other helicopter operators for its charter business on a full time basis such as all other helicopter operators.

(3)   Declaring that Plaintiffs' may land, take off and refuel, as necessary out of the West 30th Street Heliport in a nondiscriminatory manner and on equal terms and conditions as all other helicopter operators.

(4)   Restraining and Enjoining APH and HRPT from continuing to "bar" plaintiffs from the use of the West 30th Street Heliport.

(5)   Declaring that the existing operation of the Heliport is in violation of federal and state law;

(6)     Awarding plaintiffs actual and compensatory damages for each claim in an amount to be determined at trial but no less than $ 500,000.

(7)     Awarding Plaintiffs the costs and disbursements of this action, including attorneys' fees; and

(8)     On the Fifth Claim a Declaration and Order that: (a) HRPT acted arbitrarily and capriciously and abused its discretion by settling its dispute with APH on such favorable terms to APH, (b) HRPT acted arbitrarily and capriciously and abused its discretion and permitting APH to continue operating the Heliport, rather than terminating APH; (c)  HRPT violated its by-laws and acted arbitrarily and capriciously and abused its discretion by failing to obtain board approval of its settlement with APH; (d) HRPT violated its inherent statutory duties and fiduciary obligations to the public by failing to resolve financial disputes with APH on rational and reasonable terms that protect the public interest and its failure to remove APH for engaging in the diversion of funds as described herein and reflected in various independent reports.

(9)     On the sixth claim compensatory and punitive damages against defendants jointly and severally in an amount to be determined at trial but no less than $500,000.

(10)    Awarding such other and further relief as this Court deems just and proper.

# JURY DEMAND

Plaintiffs' hereby demand, pursuant to Rule 38 of the Federal Rules of Civil Procedure, a

trial by jury on all issues so triable.

        Dated:  New York, New York
                April 25, 2008

                                HANTMAN & ASSOCIATES


                        By:_____
                            Robert J.Hantman, Esq. (3947)
                            1414 Avenue of the Americas Suite 406
                            New York, New York 10019
                            Telephone:   (212) 684-3933
                            Facsimile:   (212) 755-1989
                            *Attorneys for Plaintiff Michael Roth and*
                            *New York Helicopter Charter, Inc.*