UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
NEW YORK HELICOPTER CHARTER INC., and
MICHAEL ROTH, individually,                                              Case No.07 Civ. 4069(MGC)

                      Plaintiffs,
  -against-                                                                        **AMENDED COMPLAINT**
                                                                            **AND JURY DEMAND**

AIR PEGASUS HELIPORT, INC., and
HUDSON RIVER PARK TRUST

                      Defendants.
-----------------------------------------------------------X

New York Helicopter Charter Inc., ("hereafter referred to as "NYH or NYHC" or "New York Helicopter"), and Michael Roth, individually, by their undersigned attorneys, for their complaint, allege as follows:

## INTRODUCTION

1. This case arises, *inter alia*, out of the defendants' violation of the plaintiffs' rights guaranteed under the Equal Protection and Due Process clauses of the United States Constitution, tortious interference with the plaintiffs' existing contracts and prospective economic relations, relief pursuant to C.P.L.R. Article 78, and breach of the public trust. For all claims plaintiffs' have suffered irreparable injury, have a substantial likelihood of success, require more than money damages while the equities are in their favor.

2. Essentially, this case involves the selective, arbitrary, irrational, capricious and discriminatory policies implemented by defendants, a public heliport operator, Air Pegasus Heliport Inc. ("APH"), and the entity in charge of the West 30th Street Heliport located on public property, the Hudson River Park Trust ("HRPT"), on behalf of the State, for the private benefit of Air Pegasus Heliport Inc. to the detriment of

1

New York Helicopter Charter Inc. ("NYH"), a helicopter company, - with three helicopters and twenty five (25), employees – and its president Michael Roth and the public.

3. The discriminatory practices outlined herein were followed by the denial of heliport landing rights – for sightseeing, charter flights and even for refueling-, at a public facility, located on public property, to NYH by APH with the consent, acquiescence and approval of HRPT in order that APH, in part, could eliminate competition and favor certain helicopter operators such as Zip Aviation to unfairly compete as detailed hereafter.

4. In addition, upon information and belief, APHs' principal owners have a twenty percent (20%) ownership interest in Liberty Helicopters Inc which also operates out of the West 30th Street Heliport and is a competitor of NYH.

5. The acts complained of herein interfere with the operation of interstate air transportation, interstate commerce and free competition and violate plaintiffs' due process and equal protection rights to have the same access to a public service, on public property, as others in a similar situation.[1]

## PARTIES

### New York Helicopter and Michael Roth

6. Plaintiff New York Helicopter Charter, Inc. is a New York corporation with its principal place of business in New York whose President, Michael Roth, is licensed by the Federal Aviation Administration.

7. NYH's charter flights involve interstate travel as its helicopters take off in one state and land in other states thereby involving interstate commerce. NYH's customers include, but are not limited to business people, tourists, the general public and

---

[1] In addition to the foregoing, Plaintiffs also believe there is a claim for violations of the antitrust law which may be the subject of a separate action.

celebrities such as Calvin Klein and Ian Schrager who has entered into a proposed contract with NYH which is dependent on NYH having the right to land and take-off, from the West 30th Street Heliport as detailed hereafter.

8.  Plaintiff Michael Roth, in his individual capacity, is a resident of New York and a naturalized citizen of the United States whose rights have been violated and who has been arbitrarily and wrongfully discriminated against and whose wrongful ouster from the West 30th Street Heliport is causing damage to him, his employees, his customers and the public consumer and threatens the very existence of NYH since the West 30th Street Heliport is the only heliport open twenty four (24 hrs) hours a day seven (7) days a week and is in close proximity to the majority of tourists and customers for helicopter services – both sightseeing and charters.

**Air Pegasus Heliport Inc.**

9.  Defendant Air Pegasus Heliport, Inc. ("APH") is a Delaware corporation incorporated in May, 1996 with its principal place of business in New Jersey.

10.  APH is the sole and exclusive fixed base operator (the "FBO") at the West 30th Street Heliport ("Heliport" or "West 30th Street Heliport") pursuant to a March 25, 1996 Agreement (the "Permit" attached hereto as "Exhibit A") with the New York Department of Transportation (the "NYDOT"), which the Hudson River Park Trust later assumed. The Permit expired, by its terms, on March 24, 2001.

11.  The meaning of the term "Fixed Base Operator" ("FBO") in today's aviation vernacular refers to a business that is located at a permanent and ongoing airport or heliport facility and is a provider of fuel, repairs, aircraft parking, based and transient passenger facilitation, and other aviation services to the public.

12.  There are only three public heliports in New York City: a) the West 30th Street Heliport, whose FBO operator is "Air Pegasus Heliport" ("APH") which is under the control of the Hudson River Park Trust and whose FBO permit, unlike the permits at the two other heliports, has not been competitively bid on for over thirty (30) years as a

3

result of APHs' entrenched political influence b) the East 34th Street Heliport, whose FBO operator is Atlantic Aviation (www.atlanticaviation.com).and c) the Downtown Manhattan Heliport, whose FBO operator is the New York- New Jersey Port Authority.

13.   These heliports are the nexus of the interstate regional helicopter transportation system. Corporate, private and air carrier (both charter and scheduled) helicopters must use these heliports to provide access into and out of Manhattan from the surrounding region, and commonly include flights originating or terminating in New York, New Jersey, Connecticut, Pennsylvania, Massachusetts, and Delaware. They effectively provide an "exit" off the national airspace "highway system".

14.   The heliports are used by approximately 200 helicopter companies and at least 900 to 2100 passengers per day, who spend at least $60,000 to $120,000 dollars per day on sightseeing and charter flights.

15.   The Manhattan heliports do not provide regular overnight storage or helicopter maintenance, which requires helicopters to be based remotely and fly to the desired Manhattan heliport each day from the surrounding locations e.g., New Jersey and Connecticut.

16.   Thus, there exists a mutual dependence between the Manhattan heliports and the numerous air tour, aerial photography, Electronic News Gathering, flight training, and aircraft maintenance operations located throughout the surrounding region including New Jersey and Connecticut.

**Hudson River Park Trust**

17.   Defendant Hudson River Park Trust (the "HRPT") is a New York public benefit corporation that was created by the Hudson River Park Act ("HRP Act") in 1998.

18.   The HRPT was intended to be a "partnership between New York State and City," and was charged by the legislature "with the design, construction and operation of the five-mile Hudson River Park."

19. The HRPT was created to design, construct, operate and maintain the Park subject to the restrictions imposed by the HRP Act. *Id.* at § 5(1).

20. The HRP Act dictates that, upon the HRPT's creation, "the trust shall succeed to all contracts, leases, licenses and other legal obligations respecting the park to which its predecessors are party at or after the effective date of this act." *Id.* at § 5(1).

21. The HRP Act also governs the HRPT's process with respect to awarding certain types of contracts. First, the HRPT must treat as a "significant action ... any proposed lease, concession arrangement, license or other agreement ... for a period in excess of ten years." *Id.* at § 7(11). In so doing, the HRPT must:

> a. hold a public hearing on not less than 30 days advance public notice; (b) solicit and consider the views of Manhattan community boards one, two, and four, the planning commission of the city of New York, the advisory council, elected officials representing communities neighboring the park, and interested groups and individuals, allowing not less than sixty days following the notice of the proposed action for the submission of such views; and (c) publish notice of the hearing and proposed action in the city record and state register.

*Id.* at § 7(6).

## JURISDICTION AND VENUE

22. The jurisdiction of this Court over the subject matter of this action is predicated on 28 U.S.C. § 1331, as the acts herein alleged arise under the Constitution, laws or treaties of the United States, and 28 U.S.C. § 1337, as the acts herein arise under enactments of Congress regulating commerce and also relate to "due process" and 28 U.S.C §1367.

23. New York Helicopter has standing to bring this action because it has a significant stake in a judicial resolution of the dispute, and has been adversely affected and discriminated against as detailed herein.

24. Declaratory relief is appropriate because an actual controversy exists regarding the operation of the Heliport by HRPT and APH.

25.  This Court may also exercise personal jurisdiction over defendants, as they have purposefully committed acts within the State of New York from which these claims arise and they systematically and continuously do business within the Southern District of New York. .

## FACTS

### I. The Heliport

26.  The Heliport operated by HRPT and APH is located at West 30th Street, New York, New York.

27.  The Heliport was built more than 50 years ago when a dock at West 30th Street in the Chelsea section of Manhattan was converted into a landing pad for helicopters. [2]

28.  The Heliport is a public heliport and it is the only heliport that is open seven days a week. It also has fueling facilities.

29.  A substantial portion of the Heliport's business consists of sightseeing tours and charter flights.

30.  Since at least 2001, the HRPT has planned to relocate the Heliport. *See Estuarine Sanctuary Management Plan*, dated September 2001, *available at:* http://www.hudsonriverpark.com/pdfs/policies/sanctuary.pdf, at 1-23 ("The current heliport activities will be relocated pursuant to the HRP Act. Under the HRP Act, there are two possible locations on the west side of Manhattan that are permitted for relocation (Piers 72 or 76)."); HRP Act at § 7(9) (i), 1998 Sess. Law. Ch. 592 (S. 7845) (McKinney's 1998) ("Consistent with the general project plan, the area of the park east of the bulkhead line shall be used *solely for park use and to permit access to permitted uses.*") (emphasis added).

---

[2] Jefferson Siegel, *Heliport on Hudson Still Flying High After 50 Years*, The Villager, (Oct. 18-24 2006), *available at*, http://www.thevillager.com/villager_181/heliportonhudson.html.

31. The FAA Rules and Regulations govern Helicopters' activities vis-à-vis 135 (Charters), 136 (Sightseeing Tours).

32. The FAA is primarily responsible for the advancement, safety and regulation of civil aviation, as well as overseeing the development of the air traffic. (*See* www.faa.gov/regulations/policies).

33. There have been numerous complaints regarding the operation of the heliport including various letters written to the HRPT by plaintiff (Exhibit B), users and numerous public officials, including but not limited to the former New York State Comptroller Alan G. Hevesi, Assemblyman Richard Brodsky, previous officials from the New York State Attorney General's Office and others.[3]

34. HRPT continues to illegally operate the heliport and delegates many of its governmental responsibilities for operating said heliport to the quasi-governmental APH, which operates the heliport in an arrogant, unreasonable, unfettered and, above all, discriminatory manner that interferes with and adversely impacts interstate commerce, contravenes applicable federal regulations, and violates the plaintiffs' constitutional rights to substantive due process, procedural due process and equal protection under the law.[4]

## II. The Permit Agreement

---

[3] A request for declaratory relief regarding the operation of the Heliport was filed in state court on December 13, 2007 by Friends of the Hudson River Park, Chelsea Waterside Park Association, Hells Kitchen Neighborhood association and others against HRPT, APH and Liberty Helicopters index No. 07116581.

[4] While there is a case pending in the Supreme Court, New York County, the issues raised therein are sufficiently distinct and arise out of a "settlement agreement" and alleged overcharges and although preliminary relief was denied, the case is proceeding and the State Court Judge specifically is aware of and referred to the pending federal case in his decision. This was sent by defendant APH to the Court by letter dated October 30, 2007.

35. On March 25, 1996, the DOT, which preceded Defendant HRPT as the State agency overseeing the Heliport, entered into an agreement that provided Defendant APH with the sole and exclusive right to serve as the FBO at the Heliport. *94*

36. In return for this lucrative right, APH is required, among other things, to pay a monthly fee to the HRPT. Permit at § 6(a). *95*

37. In addition, APH is required to remit to the HRPT a percentage fee equivalent to ten percent (10%) of its gross receipts for amounts in excess of $250,000.00, up to and including $1,000,000.00; a percentage fee equivalent to eleven percent (11%) of APH's gross receipts for amounts in excess of $1,000,000.00, up to and including $2,000,000.00; and a percentage fee equivalent to twelve percent (12%) for all amounts over $2,000,000.00. *Id.* at § 6(b). *96*

38. APH is also required to pay the HRPT a use charge computed at the rate of $15 per every ten sightseeing passengers. *Id.* *97*

39. The Permit requires APH to charge fees at the Heliport that are "fair, reasonable and non-discriminatory." *Id.* at § 34(b). *98*

40. Moreover, APH must "undertake at its own expense to comply with all laws and ordinances and governmental rules, regulations and orders now or at any time during the term of [the Permit] which as a matter of law are applicable to the operations of APH at the Heliport." *Id.* at § 8(a). *99*

41. The relationship between APH and HRPT is mutually beneficial. They both benefit financially from the relationship. *100*

42. APH, pursuant to the Permit, has a lucrative monopoly over the operations at the Heliport. *101*

43. For its part, the HRPT enjoys a steady, significant revenue stream from the operation of the Heliport without having to involve itself in the details of the complicated business of actually operating the Heliport. *102*

44. Significantly, the operation of the Heliport is traditionally an exclusive function of the state.

45. Responsibility for the operation of the Heliport lies ultimately and exclusively with the NYDOT.

46. On its website (at www.dot.state.ny.us/info/info.html), the DOT explicitly stated that its functions and duties include "coordinating and assisting in the development and operation of transportation facilities and services for highways, railroads, mass transit systems, ports, waterways, and *aviation facilities*[.]" (emphasis added.)

47. The DOT, in entering into the Permit with APH, delegated its responsibility to operate the Heliport to APH.

48. Accordingly, in operating the Heliport pursuant to the Permit, APH can be said to be an arm of the state fulfilling a governmental function and, therefore, a state actor.

49. When signing the permit/agreement with APH, the NYDOT went beyond its authority when it agreed that third parties could not assert any rights under the permit because the NYDOT was acting in a fiduciary capacity on behalf of the public (the beneficiary) when it signed the contract and therefore it could not give up a right it did not possess.

50. The Permit Agreement indicates that the rates should be reasonable and non discriminatory. This was meant to protect the heliport's users and the public.

51. Thus, the public, and in particularly NYH, is entitled to assert the right to non-discriminatory policies under the commerce clause, due process clause and the equal protection clause, as well as the Permit Agreement itself.

52. APH's Permit Agreement expired by its terms on March 24, 2001. *Id.* at § 2.

53. APH's contract with the HRPT, or predecessors, the Port Authority of New York and New Jersey and then the NYDOT, has lasted almost thirty (30) years without competitive bidding.

54. This situation is in stark contrast to that prevailing at the other two heliports in Manhattan, one located on the East Side at 34th Street and the other one in downtown.

55. Moreover, the Permit "provide[s] for a total capital investment in the park of no less than one million dollars." *Id.* at § 7(11).

56. Accordingly, the HRPT was required to initiate a competitive process with respect to the contract to serve as the FBO for the Heliport by "hold[ing] a public hearing," "solicit[ing]" the views of the public, "publish[ing] notice of the hearing and proposed action in the city record and state register," and "issu[ing] a bid prospectus." *Id.* at §§ 7(6), 7(11).

57. The HRPT failed to take any of these required steps.

58. Instead, the HRPT simply continued to "sole source" the Heliport's operations to APH, in violation of the HRP Act.

59. In addition, APH is operating illegally on a "subterfuge" month-to-month permit extension.

60. APH's method of operation[5] and fees—having no correlation to APH's costs of operation—result in NYH's receiving treatment different from, and less favorable than, its competitors, and constitute an unreasonable burden on NYH and the public as well as unfair interference with interstate commerce.

---

[5] APH's method of operation includes threatening charter and sightseeing operators that if they complain to HRPT or APH, they will be refused privileges, discriminating in charges, demanding that existing lawsuits be dropped as a condition of operating, unreasonable limits on takeoffs and landings and wrongfully discriminating against operators.

61.     APH's fare increase and ouster of NYH, without a hearing, is in violation of "procedural due process and equal protection," such that APH is receiving a "windfall" of over two million dollars per year.

### III. Previous Litigation And History Among the Parties

62.     NYH has been improperly discriminated against and arbitrarily denied operating rights at the Heliport since May 6, 2007, for among other reasons, refusing to drop a pending State lawsuit, complaining to the HRPT regarding APH's activities, and for joining in with other helicopter operators in complaints to APH.

63.     There was prior litigation between the parties involved in the action.

64.     In 2004, NYH was forced to file an action against Air Pegasus Heliport, Inc. and others to insure its continued access to the public heliport at West 30th Street in Manhattan. The action entitled *New York Helicopter Charter, Inc. v. Air Pegasus Heliport, Liberty Helicopters, Inc. and Hudson River Park Trust* under index number 603773-04 was settled by Settlement Agreement dated April 28, 2005 (a copy of which Settlement Agreement is annexed hereto as Exhibit "C").

65.     After months of access to the heliport, when NYH attempted to use the heliport on Sunday, May 6, 2007, it was suddenly informed by APH that its rights to utilize the heliport had been "terminated" which is the subject of a separate and distinct lawsuit

66.     NYHs expulsion from the Heliport since May 6, 2007 has caused tremendous financial damage to NYH as well as to its reputation, and ability to compete with similarly situated helicopter operators which have resulted in injury to its business, reputation and profile that cannot be calculated in money damages alone.

67.     NYH has been trying to mitigate the damages by operating from the Downtown Manhattan Heliport even though this is not the most convenient spot for tourists given that 80% of hotels are located in midtown and the Downtown Heliport has limited hours of operation.

68. Since the time NYH was operating at the Heliport, APH, with the knowledge and auspices of the HRPT, has been sponsoring and granting privileges to other helicopter companies which have not been afforded to NYH.

69. Roth and NYH's rights to utilize the West 30th Street Heliport were terminated to accommodate Zip Aviation LLC and other helicopter operators favored by APH.

70. The right to operate the heliport and charge customers has its source in state authority because the NYDOT, a state agency, was responsible for the Permit Agreement and authorized and approved the granting of these rights.

71. The original Permit Agreement, which was agreed to by the NYDOT and APH, clearly establishes the public service of the heliport at section 32(a): "A principal purpose of the Department in the making of this agreement is to have the Heliport operated as a first-class public heliport…"

72. Since the heliport is "public," as opposed to those owned by corporations and medical facilities, the state is involved in some aspects of the operations.

73. For example, in a letter dated February 9, 2007 [Exhibit D] HRPT wrote to APH about Zip Aviation's failure to comply with the Federal Aviation Administration regulations.

74. Thus, the HRPT acts in a supervisory capacity and approves certain matters related to the operation of the heliport and oversees the compliance with the regulations of the Federal Aviation Administration.

75. In addition, HRPT oversees the pricing to ensure that the use of the heliport is afforded in a fair and non-discriminatory manner as mandated by the agreement.

76. The requirement that the Heliport is operated in a fair and non-discriminatory manner reasserts the public nature of the heliport and creates the kind of entwinement between the APH and HRPT that makes APH a state actor.

77. The HRPT has the power to prohibit a charge or action if it is discriminatory or does not comply with the terms of the permit agreement.

78. As will be explained in detail hereafter, APH raised its passenger fees from $1.50 per passenger, which was the original sum payable to the HRPT to $10 per passenger.

79. This rate increase was enforced only against selected Heliport users including NYH.

80. For this reason, NYH complained to the HRPT about the discriminatory pricing that was taking place, as evidenced by the letter dated January 26, 2006. (Exhibit E)

81. The HRPT was aware of the discriminatory pricing, not only from plaintiff's letter, but also from the results from an audit of APH that HRPT conducted as detailed hereafter.

82. Furthermore, the Office of New York State Comptroller conducted a second audit of APH. The report of the Office of New York State Comptroller dated December 21, 2007: Hudson River Park Trust West 30th Street Heliport Revenue Operations Report 2006-s-75 available at www.osc.state.ny.us contains further evidence of the joint responsibility that HRPT and APH have in the operation of the heliport. It stated:

> "In light of the specific requirements of the permit, we believe that the Trust has a responsibility to ensure Pegasus is operating the Heliport in an appropriate manner and in conformance with permit provisions.
>
> Recommendations include:
>
> 1. Take appropriate measures to complete and execute the re-bid process for the Heliport at its new location
> 2. Require Pegasus to prepare written policies regarding discounts

> 3. <u>Monitor periodically all aspects of the Heliport operations, including revenue collections, compliance with posted fees, and the business climate enjoyed by Heliport carriers. As necessary, take appropriate corrective actions.</u> [emphasis added] (Exhibit F)

83. As evidenced in the letter sent by Christopher Gengaro, attorney for APH, both APH and HRPT have "enjoyed a long-standing, mutually beneficial, and respectful relationship over the course of two and a half decades." (Exhibit G).

84. Nevertheless, the HRPT failed to protect NYH and the public from the discriminatory actions taken by APH.

85. In the past year, Roth called the HRPT's Vice President and General Counsel, Laurie Silberfeld, at least 12 times to discuss the discriminatory practices. However, he was unable to reach her. A similar situation occurred with Connie Fishman, President of HRPT. From time to time, Roth also sent e-mails to both of them to no avail.

86. In addition, Roth sent various letters requesting the HRPT intervention during the time the discriminatory actions were taking place and after he was kicked out of the heliport. (Exhibit B).

87. On May 7th, 2007, the day after plaintiff was ousted from the heliport, Roth sent a letter to the HRPT. The letter complained that once again, NYH was being denied access to the heliport by APH and requested HRPT's intervention. (Exhibit H).

88. The HRPT took no action. In fact, as recently as April 16, 2008, plaintiff sent a letter to HRPT requesting access to the heliport for chartering because NYH was about to lose a contract with Ian Schrager due to its inability to use the heliport.

89. The HRPT responded by asking plaintiff to contact APH directly even though they were aware of the fact that APH had already denied the request and that this litigation is pending.

90. Helicopter operators are permitted to land at a public heliport, as it exists for public use. This includes charter flights, which do not need authorization or a permit

as opposed to sightseeing operations which do. Yet despite its use of the Heliport for charter flights, NYH still sought and obtained authorization.

91. As a result, even though APH ousted NYH from sightseeing operations, it should be allowed to land at the West 30th Street Heliport for charter operations.

92. APH, as the FBO cannot arbitrarily deny NYH's right to land under such conditions as the West 30th Street Heliport is a public heliport in the same way that La Guardia is a public airport. Any private airplane that wants to land in La Guardia calls from airspace and expresses its need for landing and the airport accommodates it.

93. After the plaintiffs were ousted from the heliport, one of its helicopters attempted to land at the heliport to refuel and for a passenger pick charter and were refused.

94. The HRPT were advised of this by Mr. Roth and did nothing.

95. The HRPT has been requested to allow use of the heliport for at least charter operations and has done nothing to intervene.

96. The fact that the HRPT was a party in the state action requesting a temporary restraining order so that NYH could remain at the heliport reiterated the need for their intervention regarding the discriminatory actions and is further proof that they have been aware of the situation and have refused to act.

97. As further evidence that the HRPT was aware of the irregularities that were taking place at the West 30th Street Heliport, the Report of the Office of New York State Comptroller also states:

> The Trust (HRPT) is responsible for ensuring that Pegasus complies with Permit terms and operates the Heliport in a productive manner.
>
> However, our audit found that some of the additional fees that Pegasus imposed on carriers were questionable. For example, Pegasus initiated a Safety and Facility Enhancement (SAFE) fee following September 11, 2001, which we were told would