provide increased security and related improvements to the Heliport....However, Pegasus could not show us any facility enhancements or improvement that it funded with SAFE fee collections. (Report at Page 5)

### IV. The HRPT's Audit of APH

98. In early 2005, the HRPT commenced an inspection of APH's books and records to determine the accuracy of APH's reporting. (Settlement Agreement between APH, Air Pegasus New York, Inc., and the HRPT, dated Nov. 22, 2006, at 1.) Specifically, the HRPT retained Debra Cutler, CPA, CFE to "evaluate whether APH had reported and remitted fees and charges in accordance with the terms of the Permit." *See* Debra A. Cutler, *Report on Schedule of Fees and Charges of Air Pegasus Heliport, Inc.*, October 31, 2006, at 3. (Exhibit J).

47 and 142

99. Among other things, the auditor examined whether APH was properly reporting and remitting to HRPT monies arising from operations of the Heliport that were paid to an entity related to APH, Air Pegasus New York ("APNY").

143

100. Even though the HRPT was fully within its rights in conducting an audit of APH's books and records, APH filed suit in the Supreme Court, New York County, challenging the breadth and scope of the HRPT's audit rights under the Permit. *Id.* (Ex K).

48 and 144

101. On January 5, 2006, the HRPT filed suit against APH and its CEO, Alvin Trenk, alleging that APH had violated the Permit by, among other things, entering into subsidiary agreements without the HRPT's knowledge, consent or prior written approval, and by diverting funds received by APNY that should have been included in APH's reports and payments to the HRPT. The HRPT's action sought to recover all unpaid fees. *Id.*

145

102. The HRPT also continued its audit, and, on October 31, 2006, Ms. Cutler issued a report of significant wrongdoing on the part of APH. (Ex J).

49 and 146

103. Repeatedly noting APH's failure to maintain proper records, which complicated her inspection, Ms. Cutler nevertheless was able to reach the following alarming conclusions about APH, among others:

- Over a nine-year period from 1996 through 2005, APH concealed and diverted $3,853,229 to its related entity APNY;

- Investigation of $565,000 received by Air Pegasus Enterprises, another APH-related entity;

- APH gave discounts and price preferences, including non-volume discounts on fuel and landing fees, to certain preferred customers;

- For a number of months, US Helicopter was charged a flat monthly fee for landing and parking, rather than the fee due under the Schedule of Charges that applied to other operators;

- Zip Aviation, LLC a/k/a Wings a/k/a Print International (collectively, "ZIP") was billed a flat $500 per month regardless of the number of its landings or the amount of time parked;

- APH also disingenuously characterized NY Helicopters and Helicopter Flight Services, another of APH's sightseeing operator customers, as "charter tours on a reservation basis only," and failed to properly collect, report, or remit Sightseeing Use Charges, as required under Section 6(b) of the Permit, in connection with these operators; and

- The APH monthly Deposit Cash Sheet prepared by APH did not include all bank deposits.

104. More recently, the report of the Office of New York State Comptroller dated December 21, 2007: Hudson River Park Trust West 30th Street Heliport Revenue Operations Report 2006-s-75 revealed at pages 2-4:

> There were significant revenues Pegasus did not include in its determination of gross receipts. These revenues were being paid by one of the carriers at the Heliport to a Pegasus-related entity under the terms of a "consulting agreement" entered into between the parties. As far as we could determine of audit, no consulting services were even provided in connection with this agreement. P. 2

17

> The Trust is responsible for ensuring that Pegasus complies with the terms of the Permit and operates the Heliport in an efficient and effective manner. P.3

> When we checked the rates charged on these sampled invoices to the published rate schedules, we found that lower fees than posted (discounts) were charged to at least four carriers at the Heliport during the audit period. Two carriers received 20-percent discounts for parking and landing, one received a 50-percent discount for landing, and the fourth received a reduced flat rate for monthly parking. P.4

### V. HRPT and APH Discriminatory Actions and Favoring of NYH's Competitors

105. The Permit Agreement does provide that from time to time, APH may amend the schedule of charges at the West 30th Street Heliport upon fifteen (15) days prior notice to the public and the HRPT, so long as such charges and fees are "fair, reasonable, and non-discriminatory." *164*

106. APH abused their power, with the consent and active participation of HRPT by imposing a new fee, without any legitimate basis or justification, solely for the purpose of funding a settlement with the HRPT based on monies diverted from HRPT by APH. *165*

107. The fee affected selected companies, including NYH. *166*

108. The settlement was the result of litigation between APH and the HRPT based on the fact that APH failed to comply with the terms of the Permit Agreement and diverted monies payable to HRPT. *167 (and 120)*

109. Although the notice to raise prices was given before the settlement, APH knew that they had to pay back the money they had diverted and needed additional funds for those purposes. *168*

110. On October 31, 2006, the HRPT's auditor had issued findings of egregious wrongdoing by APH. *169*

111.  These findings included APH's concealment of millions of dollars in operating revenue from the HRPT in an effort to deny the HRPT its share of that revenue.

112.  Perhaps the most egregious finding, and the one most directly damaging to NYH, was that in direct contravention of the Permit Agreement, APH also gave substantial discounts and price preferences to certain preferred customers, including Zip Aviation, Inc.

113.  It even went so far as to vouch for Zip Aviation to allow it to operate at the heliport even though Zip did not have the proper approval from the Federal Aviation Administration, to which the HRPT wrote:

> Further we are troubled by what would appear to be a lack of due diligence on the part of APH in putting forth and vouching for ZIP Aviation in connection with your sightseeing authorization request. Section 8 of the permit obligates APH to undertake its operations in compliance with all applicable laws and requirements and not to conduct any activity at the heliport that requires a permit or other approval without first having obtained such authorization. As an experienced heliport operator, APH should have confirmed the accuracy of the statements and representations set forth in ZIP Aviation's submittal...."

114.  Furthermore, Exhibit I contains the handwritten letter dated March 15, 2007 sent by Abigail Trenk from Air Pegasus to HRPT recommending and vouching for Air Pegasus:

> "Dear Laurie:
>
> As per our recent phone conversation, I am writing this letter as a personal recommendation of Itai Shosharani d.b.a Zip Aviation. I have known Itai professionally for well over seven years. He has owned and operated a jet ranger helicopter for his personal business until recently....... He recently purchased a second Jet Ranger and established a helicopter charter...."

115.  Exhibit G is a letter from APH's counsel, Christopher Gengaro, to HRPT regarding Zip Aviation application in which he states:

19

> There is no apparent reason for the HRPT to continue to withhold approval of ZIP. Accordingly, APH hereby requests that the HRPT approve ZIP as a sightseeing operator immediately. APH remains concerned that the HRPT's refusal to issue approval could lead to a lawsuit by ZIP (similar to the New York Helicopter Charter Inc. lawsuit").

116. The recent report of the Office of New York State Comptroller, dated December 21, 2007, Hudson River Park Trust West 30th Street Heliport Revenue Operations Report 2006-s-75, also mentioned the favoring of some operators:    175

> .....Pegasus charged the fourth carrier a fixed rate of $500 per month for unlimited landings and parking. During our audit period this carrier was charged $13,000 for parking. However, based on recorded activity, if the posted fees were charged, it would have paid $62,205 to Pegasus and Pegasus would have to remit an additional $4,900 to the trust.
> Pegasus claimed that it made this deal because this specific carrier was willing to utilize what Pegasus characterized as an undesirable space due to its remote location and size. However, when we queried several other carriers, they told us that they would have been more than willing to use that parcel of the Heliport for that price. P.4

117. This practice of discriminating against NYH and some other operators in favor of other competing operators had no rational basis in cost, in volume, or in any other economic justification.    176

118. The discounts and price preferences included non-volume discounts on fuel and landing fees, parking fees, fuel charges and late operations.    177

119. Another clear discrimination was the fact that there is no landing or parking fee for stopping to buy fuel. However, APH would charge NYH parking fees for fueling.    178

120. After Zip Aviation started operating at the Heliport, APH sent a communication to some helicopter operators indicating that they were prohibited from soliciting customers on the park premises.    179

121. However, APH allowed Zip Aviation to engage in such solicitation.

122. By forcing NYH to compete on an unleveled playing field, the HRPT and APH increased NYH's operating costs, complicated NYH's ability to invest in expanding its business, and caused NYH to lose it business to APH's "favored" operators with lower operating costs.

123. Each of these unfair cost differentials had a direct negative effect on NYH's business, causing it both to lose volume and to lose profits on the customers that it served.

124. In addition, NYH had to pass part of the cost increase to consumers, who were directly affected by the discriminatory practices.

125. APH's practices in the managing of the Heliport have impaired free competition and have restrained trade which has impacted on the public.

126. The HRPT clearly was aware of the discriminatory and anticompetitive practices with respect to price and the competitive advantages that APH was giving to some users.

127. The Report on Schedule of Fees and Charges issued by the auditing company hired by HRPT found that some customers received special discounts.

128. Two of those customers did not appear on the Device Control Register ("DCR") and one of the customer's information did not match up with the DCR.

129. The remaining customers were selected by the auditors because their name contained the word 'Pegasus'.

130. This suggests that the HRPT had knowledge or at least reasons to know that APH was favoring some of its business associates, especially ZIP aviation, since APH vouched for ZIP even though it did not have the proper authorizations from the Federal Aviation Administration.

131. HRPT's audit had also previously found that U.S. Helicopter and Zip Aviation were charged $500 per month regardless of the number of landings, and that this

[handwritten margin numbers: 180, 181, 182, 183, 185, 186, 187, 188, 189, 190, 191]

specific customer did not appear on the DCR. <u>This was confirmed by the recent report of the State Comptroller as indicated before.</u>

132. The transactions with Zip Aviation were investigated by the HRPT.

133. Zip Aviation operations were mixed with other operators.

134. Specifically the first audit report stated:

> "Zip Aviation: Zip/Wings/Print International.... We tested the February and March 2005 daily flight logs to determine if the same aircraft number appeared for the above companies, as we understand all of these companies are under common control. We noted that 691S was listed as both a Print and Zip aircraft number, in the daily flight log indicating that at a minimum, <u>Print and Zip appear to be under common control</u>. The February 24, 2005 daily control log, ops#41, identified the customer as Zip/Wings. We noted that Print was <u>billed a flat fee of $500/month regardless of the number of landings or the time parked</u>." [emphasis added]. (Exhibit F)

135. Such agreements and benefits were not allowed since the Permit establishes in section 34(d) that:

> ..."the operator shall not itself use the heliport for its own aircraft and shall refrain from entering into continuing contracts or arrangements with third parties for use of the Heliport of for furnishing services covered hereunder when such use by the Operator or contracts or arrangements will have the effect to utilizing to an unreasonable extent the operator's capacity for rendering such services...."

136. However, APH vouched for Zip Aviation to obtain permission to operate at the heliport for HRPT, even though Zip Aviation had not been approved by the Federal Aviation Administration.

137. Although there is another heliport downtown and one on the east side (for charters only) the West 30th Street Heliport has a competitive advantage because it is more convenient to tourists as approximately 80% of the hotels are located in midtown

and a the largest percentage of tourists prefer tours from the midtown area which is why the main business of the Heliport is sightseeing operations.

138.  In addition, the West 30th Street Heliport is the only heliport that is open seven days a week, twenty four (24), hours a day.

139.  NYH's lost presence in midtown has had serious detrimental business consequences since NYH cannot provide a reasonable explanation to their customers as to why everyone else can operate out of the Heliport but not NYH.

### VI. Defendant HRPT's Arbitrary and Capricious Decision to Settle Its Dispute with APH on Such Favorable Terms to APH and to Permit APH to Continue to Operate, Rather Than Terminate APH

140.  The HRPT's violations of the HRPT Act are not limited to continuing the operation of the Heliport.

141.  In the face of findings by the HRPT's own auditor of abuses by APH, and notwithstanding that the State Comptroller was expected to release similar findings imminently, the HRPT also has arbitrarily and capriciously decided to settle its dispute with APH on very favorable terms for APH, instead of terminating APH. In this way, the HRPT has violated its duty to protect and advance the interests of the people of the State of New York.

142.  In fact, as previously stated, the New York State Comptroller recently released a report dated December 21, 2007: Hudson River Park Trust West 30th Street Heliport Revenue Operations Report 2006-s-75 (Exhibit F) which confirms APH's mismanagement of the heliport.

143.  Based on these findings, the HRPT should have terminated APH. Instead, on November 22, 2006, less than one month after the auditor issued her findings, the HRPT simply settled its dispute with APH and on very favorable terms for APH. (Exhibit C)

144. For example, among other things, the HRPT stated as part of the settlement that "it has no knowledge that [APH] is in violation of any of the provisions of the permit and, accordingly, APH is in good standing with the HRPT." Settlement Agm't at 4.

145. The HRPT agreed to this "acknowledgement" despite its <u>actual</u> knowledge that APH had committed significant wrongdoing.

146. The HRPT also stated that "it is the HRPT's interpretation of the HRP Act that no operator other than [APH] can be allowed to operate the Heliport." *Id.* The HRPT agreed to this acknowledgement despite the fact that, under the HRP Act, it is entitled (and, indeed, required) to "issue a bid prospectus" seeking proposals to operate the Heliport. *See* HRP Act § 7(11).

147. Finally, the HRPT agreed to acknowledge that it "shall not use the Litigations as a basis for disqualifying APH from any HRPT Request for Proposal ("RFP") and APH shall have the right to respond to any such RFP." Settlement Agm't at 4.

148. The HRPT agreed to these terms exonerating APH despite its duty to operate the Park in the best interests of the public.

149. In return for these "acknowledgements," APH paid HRPT $462,387.

150. This payment purportedly was in "full and complete satisfaction" of the percentage of monies owed from revenues improperly diverted by APH.

151. However, this figure does not include payments relating to other operators that APH previously withheld from the HRPT. Nor does it include any interest on any of the improperly withheld monies.

152. In addition to violating its statutory duties, the HRPT's agreement to settle on these terms also violated its own procedures.

153. As previously explained, the HRPT operates pursuant to by-laws which, among other things, require board approval of all "contracts for the general corporate

purposes of the Authority which are in excess of one hundred thousand dollars ($100,000)." Hudson River Park Trust By-Laws at Art. III. § 3 ("Contracts Requiring Board Approval").

154. Nevertheless, upon information and belief, the HRPT failed to seek board approval of this settlement before binding the HRPT.

155. Notwithstanding these findings, the HRPT settled the matter with APH and not only allowed the discrimination to continue but did not object with the price increase since it had a financial interest in it.

156. Incredibly the HRPT permitted APH to impose a $10 passenger fee to some operators including NYH.

157. No other FBO in New York charges this fee.

### FIRST CLAIM
### AGAINST APH AND HRPT FOR
### VIOLATION OF THE EQUAL PROTECTION CLAUSE

158. Plaintiffs repeat and reallege, as if set forth fully herein, the allegations contained in the previous paragraphs.

159. Plaintiffs' enjoyment upon terms of equality with all others in similar circumstances of the privilege of pursuing an ordinary calling or trade—for which he is licensed—is an essential part of his rights to liberty and property as guaranteed by the Fourteen Amendment and the Due Process Clause of the United States Constitution.

160. The discrimination against NYH and its ouster from the heliport was motivated by ill will resulting from NYH's previous complaints regarding APH and HRPT and the previous litigation in which all the parties in this action had been involved.

161. In fact, NYH's operating rights were terminated as retaliation for not dropping a lawsuit that was pending in state court.

162. APH and HRPT are state actors.

25

163. The disparity in treatment by APH and HRPT concerning NYH's operating rights vis-à-vis its competitors is arbitrary and capricious and serves no legitimate governmental objective.

164. There is no rational basis for this disparity in treatment.

165. APH and HRPT have violated NYH's rights by providing favorable treatment, discounts and price reductions to certain similarly-situated customers of the Heliport, but not to NYH.

166. NYH has been intentionally treated differently from other similarly situated helicopter operators by the discriminatory practices of APH which are endorsed by HRPT. Therefore, at the very least, either APH and/or HRPT—as effective state entities bestowed with essential governmental functions—are liable to NYH for violating its constitutional rights to equal protection under the law.

167. There is no rational basis for the difference in treatment that NYH has received from APH. The discriminatory practices had no basis in cost, volume, or any other economic justification.

168. NYH has suffered real damages as a result of APH's implementation of the discriminatory and arbitrary regulations at the West 30th Street Heliport.

169. By forcing NYH to compete on an uneven playing field, the HRPT and APH increased NYH's costs, complicated NYH's ability to invest in expanding its business, increased NYH's operating costs, and caused a significant loss of its business to APH's "favored" operators blessed with lower operating costs.

170. Each of these unfair cost differentials had a direct negative effect on NYH's business, causing it both to lose volume and to lose profits on the customers that it did serve.

171. The operation of and access to state parks and grounds is a traditional state function; the Hudson River Park is a public park created by the New York State Legislature in the Hudson River Park Act.