**EXHIBIT F TO AMENDED COMPLAINT**

**Thomas P. DiNapoli**
**COMPTROLLER**

OFFICE OF THE
NEW YORK STATE COMPTROLLER

DIVISION OF STATE
GOVERNMENT ACCOUNTABILITY

Audit Objectives .......................... 2

Audit Results - Summary ............. 2

Background ................................. 3

Audit Findings and
   Recommendations ................... 3

Carrier Charges .......................... 3
Revenue ...................................... 4
Business Environment ................ 5
Recommendations ...................... 6

Audit Scope and Methodology ..... 6

Authority ..................................... 7

Reporting Requirements ............. 7

Contributors to the Report .......... 7

Appendix A - Auditee Response ... 8

Appendix B - State Comptroller's
   Comments on Auditee
   Response ............................... 25

# HUDSON RIVER PARK TRUST

# WEST 30TH STREET HELIPORT REVENUE OPERATIONS

**Report 2006-S-75**

## AUDIT OBJECTIVES

Our objectives were to determine whether the West 30th Street Heliport manager charged carriers the appropriate fees, and accurately reported and remitted the appropriate revenues to the Hudson River Park Trust.

## AUDIT RESULTS - SUMMARY

The West 30th Street Heliport (Heliport), located in Manhattan, is one of three public heliports in New York City. It is managed by Air Pegasus Heliport, Inc. (Pegasus), pursuant to an agreement (Permit) with the Hudson River Park Trust (Trust).

Heliport revenues are derived primarily from helicopter landings, parking, fuel, and other associated charges. Under its Permit with the Trust, Pegasus is required to remit a basic monthly Permit fee and an additional fee equal to a percentage of its gross receipts. During our audit period, Pegasus reported $11.5 million in total revenue and paid $1.9 million to the Trust.

Our audit could not determine whether Pegasus charged all customer carriers appropriate fees because it gave discounts to select carriers without the benefit of a formal written discount policy. We also note that, during the course of the audit, the Trust effectuated a settlement with Pegasus relating to revenues being received by a Pegasus-related entity which had not previously been reported to the Trust.

According to its Permit, Pegasus must provide services on a fair, equal, and non-discriminatory basis to all carriers at the Heliport. Pegasus also has the right, pursuant to the Permit, to offer discounts to carriers within this framework. However, we found that Pegasus offered discounts to at least four of the dozens of carriers at the Heliport, totaling $109,000 during the audit period, but these discounts were given without the benefit of a formal written discount policy thereby negating our ability to determine either their propriety or fairness. If the posted fees had been charged, Pegasus would have had to remit at least an additional $11,000 to the Trust. [Pages 3-4]

We also found that Pegasus correctly remitted the basic monthly Permit fee. However, as noted, there were significant revenues Pegasus did not initially include in its determination of gross receipts. These revenues were being paid by one of the carriers at the Heliport to a Pegasus-related entity under the terms of a "consulting agreement" entered into between the parties. As far as we could determine on audit, no consulting services were ever provided in connection with this agreement. The agreement called for the carrier to make payments to the Pegasus-related entity based upon the carrier's revenues attributable to its sightseeing business conducted from the Heliport. Payments to the Pegasus-related entity under this consulting agreement totaled $5.57 million over the period 1997 through July 2006. After the Trust asserted a right to a portion of these payments under the Permit and the commencement of litigation between the Trust and Pegasus, these parties entered into a settlement agreement pursuant to which Pegasus paid the Trust in accordance with the Permit its share of these moneys (in the amount of $462,387) and agreed to pay the Trust its appropriate share of any future payments associated with the consulting agreement. [Pages 4-5]

Our audit found that some of the additional fees that Pegasus imposed on carriers were questionable. [Pages 5-6]

Our audit report contains three recommendations.

This report, dated December 21, 2007, is available on our website at: http://www.osc.state.ny.us Add or update your mailing list address by contacting us at: (518) 474-3271 or
Office of the State Comptroller
Division of State Government Accountability
110 State Street, 11th Floor
Albany, NY 12236

## BACKGROUND

The West 30th Street Heliport (Heliport), located in Manhattan at 30th Street and the Hudson River, is one of three public heliports in New York City. It is managed by Air Pegasus Heliport, Inc. (Pegasus), pursuant to an agreement (Permit) with the New York State Department of Transportation in 1996. The Permit was later assumed by the Hudson River Park Trust (Trust), a New York State/New York City partnership created by the New York State Legislature in 1998 to design, develop, operate, and maintain Hudson River Park. The original contract ran for five years, expiring in 2001. Since then, Pegasus has been operating the Heliport under an automatic renewal provision as provided for in the original agreement.

The Heliport hosts thousands of helicopter landings and take-offs each year. Most of the carriers using this facility are either sightseeing, corporate, or charter operators. Heliport revenues are derived primarily from helicopter landing, parking, fuel, and other associated charges. For the period January 1, 2004 to March 31, 2006, Pegasus reported $11.5 million in total revenue collections and paid $1.9 million to the Trust.

The Trust is responsible for ensuring that Pegasus complies with the terms of the Permit and operates the Heliport in an efficient and effective manner.

## AUDIT FINDINGS AND RECOMMENDATIONS

### *Carrier Charges*

The Heliport Permit requires Pegasus to provide services on a fair, equal, and non-discriminatory basis to all carriers, and to charge carriers non-discriminatory fees for landings, parking, and fuel. All fees must be posted publicly at the Heliport. While the Trust does not have to approve the fees, Pegasus is required to file a list of its fees with the Trust and pay the Trust a percentage of all fees collected. The Permit also allows Pegasus to offer discounts to carriers within the above-noted framework. We observed that Pegasus did publicly post its basic fees and filed them with the Trust. However, we found Pegasus offered discounts to at least four of the dozens of carriers using the Heliport without any formal discount policy in place, thereby negating our ability to determine either their propriety or fairness.

Helicopter activity is recorded via daily activity logs at the Heliport, noting all helicopter take-offs and landings. We observed 47 helicopter landings and take-offs, and then matched the observation times to the postings in the activity logs. We also compared the activity logs with invoices issued to carriers to determine whether the appropriate amounts were charged based on the fee schedules in place and the noted activities.

We selected one day during each month of our audit period and compared the first 10 log entries per day (133 in total, as certain days selected had fewer than 10 entries) with the corresponding invoices to verify whether the helicopter landing and take-off information was reported accurately on the invoices and whether the appropriate rates were charged. We found no discrepancies when comparing

these documents with the times recorded for the landings and take-offs. However, when we checked the rates charged on these sampled invoices to the published rate schedules, we found that lower fees than posted (discounts) were charged to at least four carriers at the Heliport during the audit period. Two carriers received 20-percent discounts for parking and landing, one received a 50-percent discount for landing, and the fourth received a reduced flat rate for monthly parking.

According to Pegasus, it offered discounts or other types of price reductions to volume customers in connection with the landing or parking of helicopters. However, because Pegasus did not have a written policy describing the type or quantity of discounts to be given, and the level of business volume required in order for these carriers to receive these discounts, we could not determine whether discounts were offered in a fair and non-discriminatory manner. The discounts received by the three carriers receiving percentage discounts during 2005 totaled $59,945. If Pegasus had not provided the above discounts, it would have had to pay the Trust an additional $6,000.

Pegasus charged the fourth carrier a fixed rate of $500 per month for unlimited landings and parking. During our audit period, this carrier was charged $13,500 for parking. However, based on recorded activity, if the posted fees were charged, it would have paid $62,205 to Pegasus and Pegasus would have had to remit an additional $4,900 to the Trust.

Pegasus claimed that it made this deal with this specific carrier because it was willing to utilize what Pegasus characterized as an undesirable space due to its remote location and size. However, when we queried several other carriers, they told us that they would have been more than willing to use that parcel of the Heliport for that price.

Trust officials could not tell us what Pegasus' policy was regarding discounts. However, they noted that all Pegasus discounts were discontinued in 2006 after their inquiries in response to complaints from carriers. We recommend the Trust require that Pegasus, to the extent it offers any discounts in the future, do so in accordance with a written policy that is submitted to the Trust. We also recommend that the Trust evaluate whether any such future discounts are applied fairly and meet the intent of the Permit.

### Revenue

The Permit requires Pegasus to remit a basic monthly permit fee to the Trust to manage and operate the Heliport. In addition, Pegasus must pay a fee equal to a percentage of its gross receipts that generally ranges from 10 to 12 percent based on the monthly activity at the Heliport. "Gross receipts" is defined in the Permit as all monies paid to Pegasus by its carriers for the landing and parking of helicopters, and any other revenues arising out of Heliport operations. We selected a random sample of 25 invoices and traced associated payments to detailed general ledger accounts to determine the proper recording thereof, and found no discrepancies. Further, we verified, based on the revenues it reported to the Trust, that Pegasus calculated the appropriate percentage fee during our audit period.

We were advised during the audit that there were significant revenues that Pegasus did not initially include in its determination of gross receipts. This matter had also been brought to the Trust's attention in 2004 at which time it began pursuing recovery of its share of these revenues. In November 2006, Pegasus and the Trust entered into a settlement agreement

with respect to these revenues. The settlement agreement provided for the payment of the Trust's share of these revenues for the period 1997 through 2006, and Pegasus' promise to pay the Trust its share of any such future revenues.

### Consulting Agreement

According to the Permit, any revenue relating to Heliport operations or earned by the Heliport management company by virtue of its position must be reported to the Trust. On December 30, 1996, a Pegasus-related entity entered into a "consulting agreement" with the Heliport's sightseeing carrier. Among other terms, the consulting agreement called for the carrier to pay to the Pegasus-related entity 5% of its monthly gross revenues attributable to its sightseeing business conducted from the Heliport and from within 20 miles of any "restricted heliport" (as defined in the agreement). Because these revenues derived from or were related to Heliport operations, the Trust believed that they constituted "gross receipts" from which it was entitled to a share under the Permit.

Based on information provided to us by the sightseeing carrier for the period 1997 through July 2006, the carrier paid $5.57 million in consulting fees to the Pegasus-related entity in accordance with above consulting agreement. We determined that, had these payments been included in the revenue figures reported to the Trust, Pegasus would have paid the Trust an additional $557,317.

After the Trust asserted a right to these payments, litigation ensued between the parties. Ultimately, the Trust was allowed to audit the books of the Pegasus-related entity with respect to these payments, and subsequently Pegasus and the Trust negotiated a settlement of the matter, pursuant to which Pegasus agreed to include the disputed fees in its calculation of gross receipts under the Permit; and to pay $462,387 to the Trust in November 2006. The settlement agreement also stipulated that Pegasus would report future fee amounts of this type, if any, and pay the appropriate percentage to the Trust.

### Business Environment

The Trust is responsible for ensuring that Pegasus complies with Permit terms and operates the Heliport in a productive manner. However, our audit found that some of the additional fees that Pegasus imposed on carriers were questionable. For example, Pegasus initiated a Safety and Facility Enhancement (SAFE) fee following September 11, 2001, which we were told would provide increased security and related improvements to the Heliport. This fee was assessed on all carriers at an amount equal to $25 per each helicopter landing. During our audit period, this amount totaled $562,245. Based on our testing, we conclude that the appropriate percentage of collected fees went to the Trust. However, Pegasus could not show us any facility enhancements or improvements that it funded with SAFE fee collections. Pegasus discontinued the SAFE fee in May 2006.

However, shortly thereafter, Pegasus increased its parking and landing fees and imposed new fees on carriers including the initiation of a per-passenger fee, which ranged from $10 to $30 per passenger, per flight, departing from or arriving at the Heliport. These new fees reportedly caused the Heliport's sightseeing carrier to leave in protest and expand its operations at the Downtown Heliport for a few days.

In light of the specific requirements of the Permit, we believe the Trust has a

responsibility to ensure Pegasus is operating the Heliport in an appropriate manner and in conformance with Permit provisions. We observed that the Trust's oversight of Heliport operations consisted primarily of verifications of information provided by Pegasus and was for the most part conducted off-site. While we note that the Trust took prompt and appropriate action upon learning of many of the issues discussed in this report, we believe the Trust would benefit from more active, on-site monitoring of Heliport activities, designed to increase the likelihood of uncovering irregularities or instances of noncompliance with Permit requirements. While we were on-site at the Heliport, carriers actively sought us out to bring certain issues to our attention.

Trust officials believe that they have actively and aggressively monitored Heliport operations. They cite as examples of their oversight the audit they performed of Heliport operations in 2002 of calendar year 2000 and 2001 operations, as well as their aggressive activities since 2004. These activities include following up on carrier complaints and initiating a lawsuit to audit Pegasus books to determine whether it had been receiving its appropriate share of Heliport revenues.

The current Permit with Pegasus, as well as the governing statutes, does not allow the Trust to re-bid the contract for Heliport management at the current location. However, Trust officials informed us they are looking for a new location for the Heliport on the west side of Manhattan and have been discussing relocation issues with both the State and City. Once it finds a new location, we recommend the Trust solicit competitive bids from a sufficient number of potential Heliport operators to ensure the delivery of quality services and the best possible financial return to the Trust.

### Recommendations

1. Take appropriate measures to complete and execute the re-bid process for the Heliport at its new location.

2. Require Pegasus to prepare formal written policies pertaining to any future discounts, including the basis of such discounts, and monitor Pegasus to ensure discounts are applied uniformly to all carriers.

3. Recommendation deleted. (Our prior audit recommendation pertaining to reviewing discounts was deleted based on agency responses to our draft audit report.)

4. Monitor periodically all aspects of Heliport operations, including revenue collections, compliance with posted fees, and the business climate enjoyed by Heliport carriers. As necessary, take appropriate corrective actions.

## AUDIT SCOPE AND METHODOLOGY

We conducted our audit in accordance with generally accepted government auditing standards. The objectives of our audit were to determine whether Pegasus charged carriers the appropriate fees, and accurately reported and remitted appropriate amounts to the Trust based on provisions in the Permit. This audit covered the period from January 1, 2004 to July 31, 2006.

To accomplish these objectives, we observed landing and take-off times for helicopters, reviewed activity logs maintained at the Heliport as well as invoices, fee schedules, the Permit, and contracts between Pegasus and selected carriers. We reviewed a random sample of carrier billing invoices issued by Pegasus for the audit period; analyzed accounts receivable records; and reconciled

cash collection amounts per heliport records to bank deposits, tax returns, and available certified financial statements. In addition, we assessed the accuracy of the monthly revenue reports submitted to the Trust; reviewed documentation pertaining to allegations made by Heliport carriers; and interviewed Trust, Pegasus, and Heliport officials as well as certain carriers using the Heliport.

In addition to being the State Auditor, the Comptroller performs certain other constitutionally and statutorily mandated duties as the chief fiscal officer of New York State. These include operating the State's accounting system; preparing the State's financial statements; and approving State contracts, refunds, and other payments. In addition, the Comptroller appoints members to certain boards, commissions and public authorities, some of whom have minority voting rights. These duties may be considered management functions for purposes of evaluating organizational independence under generally accepted government auditing standards. In our opinion, these functions do not affect our ability to conduct independent audits of program performance.

### AUTHORITY

This audit was performed according to the State Comptroller's authority as set forth in Article X, Section 5, of the State Constitution; and Section 7, paragraph 12, of the Hudson River Park Act.

### REPORTING REQUIREMENTS

We provided a draft of this report to Trust and Pegasus officials for their review and comment. Their comments were considered in preparing this report, and are included as Appendix A. The Exhibits referred to in Appendix A are available upon request. Appendix B contains State Comptroller's comments which address certain points in the Trust's and Pegasus' response.

In response to our draft report, Trust officials reiterated their belief that they have provided continuous comprehensive oversight of Pegasus' Heliport Operations. They cite the discontinuance of carrier discounts and their negotiated settlement with Pegasus as proof of such oversight. They also believe that our calculated underpayment of Consulting Agreement fees is incorrect based on actual carrier activity at the Heliport.

Pegasus officials responded that the audit team did not adequately take into account the information they provided to us regarding carrier complaints and lawsuits and the background events leading up to such. They assert that they have managed the Heliport effectively and efficiently in compliance with contract requirements.

Within 90 days of the final release of this report, as required by Section 170 of the Executive Law, the Trust shall report to the Governor, the State Comptroller, and the leaders of the Legislature and fiscal committees, advising what steps were taken to implement the recommendations contained herein, and, if not implemented, the reasons therefor.

### CONTRIBUTORS TO THE REPORT

Major contributors to this report include William Challice, Frank Patone, Anthony Carbonelli, Salvatore D'Amato, Anthony Carlo, Ira Lipper, Unal Sumerkan, and Sue Gold.

**APPENDIX A - AUDITEE RESPONSE**



Hudson River Park Trust

October 18, 2007

William P. Challice
Audit Director
Office of the State Comptroller
123 William Street
New York, N.Y. 10038

Re: West 30th Street Heliport Revenue Operations
OSC Report 2006-S-75

Dear Mr. Challice:

This letter, together with the enclosed comments and annexed documents from Air Pegasus Heliport, is in response to the above referenced New York State Comptroller's (OSC) draft audit report and in furtherance of our discussions and prior correspondence concerning same. We appreciate OSC's meeting with us and allowing us to offer comments along the way as you conducted your audit and developed the draft report over the past 1½ years. However, as we have previously advised, we continue to take exception to a number of misimpressions and inaccuracies in the draft report. We strongly believe that the draft report simply does not fairly nor accurately address the Trust's oversight of the heliport nor does it fully acknowledge the Trust's substantive efforts over the past three years to investigate and address the under-reporting of gross receipts or our pursuant and recovery of all such monies from the heliport operators. Indeed, the draft report gives the impression that but for the State Comptroller's involvement, the Trust would not have collected its share of the 5% Consulting Fees and that the disputed discounts would still be in place. Nothing could be further from the truth. We strongly urge that the final report (and record) be corrected to reflect these comments.

As we have discussed previously, the Hudson River Park Act (the "Act") restricts future heliport operations in Hudson River Park to corporate, government and emergency use only; tourism and recreational flights are expressly prohibited. The Act also generally prohibits commercial operations in the Park east of the bulkhead. Nonetheless, as we have explained, the ongoing operations at the existing heliport (which is east of the bulkhead), including the tourism flights, are authorized at this time pursuant to Section 3(j)(iv) of the Act which allows for the continuation of uses authorized under leases, permits and other occupancy agreements that were

Pier 40, 2nd Fl., West St. @ W. Houston St., New York, NY 10014  Phone: 212-627-2020  Fax: 212-627-2021

\* See State Comptroller's Comments on page 25.

existing at the time of passage of the Act but only in accordance with the terms of such agreements. The current Permit for the heliport between Air Pegasus and the State dates back to 1996 (the "Permit") and was in effect at the time of passage of the Act. Pursuant to the Act, the Trust is now the Permittor under the Permit. In addition to an initial five year term (which ended in May 2001), the Permit provides the operator a continuing right to operate pursuant to a 30 day automatic renewal provision. The Trust has the right under the Permit to terminate when the premises are needed for park development. Thus, until the Trust is ready to proceed with such development, the Act allows for the continuation of existing heliport operations at the current location in accordance with the terms of the existing Permit. Indeed, given the Act's mandate that, to the extent practicable, the Park's operating costs are to be funded through revenues generated within the Park, continued operation of the existing heliport until that portion of the Park is needed for park development and the heliport is relocated is in the Park's fiscal interest, separate and apart from the continuing corporate and governmental need for a west side heliport.

However, the right granted under Section 3(i)(iv) of the Act is a limited one as it is restricted to the current operations pursuant to the existing Permit. Further, as noted above, Section (9)(i) of the Act prohibits park areas east of the bulkhead to be used for commercial use. Consequently, any future heliport in the park must be relocated to west of the bulkhead and cannot include any sightseeing or other tourism/recreational flights. Given the restrictions on heliport operations and locations in the Act as well as the ongoing park development work, competitive bidding of such operations under a new agreement at the current location is prohibited. That being said, as we have previously advised, we are actively working with the City and the State on the preparation and issuance of an RFP for relocation and development of the west side heliport.

## AUDIT RESULTS - SUMMARY

The draft audit focuses on two aspects of the heliport's revenue reporting and operational practices, to wit, accounting for the 5% Consulting Fee and application of APH's discount policy. Despite the impression given in the draft report both issues were identified and addressed by the Trust with APH well before the State Comptroller initiated its audit in April 2006. As you have noted in your draft audit, the Heliport Permit entitles the Trust to a percentage of gross receipts arising out of the heliport operations, in addition to a base monthly fee and a per passenger fee on all sightseeing operations. As we have previously commented, as part of its regular review of the various payments from APH, the Trust routinely checks the backup documentation for all such payments and has made and continues to make inquiry of APH, as needed, for explanations of any questions we may have regarding such payments. In addition, the Trust's initial audit of the heliport's operations in 2002 did not find any irregularities or substantive issues with the heliport gross revenue reporting or payments to the Trust during such period.

However, as is abundantly clear from the Trust's January 4, 2006 complaint in its litigation against APH and its related parties (a copy of which was previously provided to your office), neither the State nor the Trust was advised or otherwise aware (until November 2004)

2

that APH entered into an agreement with Liberty Helicopter in December 1996 amending the terms of the May 1996 sightseeing agreement or that, at that same time, Air Pegasus of New York (APNY) and Liberty Helicopter entered into a separate Consulting Agreement which provided APNY with a 5% share of Liberty's gross receipts, including from revenues derived from operations at the Heliport. Given that such parties did not disclose the existence of the December 1996 agreements and that payments from such agreements did not flow through APH (and were not included on its books and records), regular review and periodic audits of APH's books and records did not reveal (nor ever would have revealed) the additional stream of income related to the heliport. Notwithstanding any documents that may have since come to light, it was only through Liberty's disclosure of the existence of such agreements at the end of 2004 that the Trust became aware of 8 years of such payments.

As soon as the Trust became aware of the existence of Amended Sightseeing Agreement and the Consulting Agreement in November 2004, we promptly and thoroughly reviewed such agreements and put APH on notice that Section 6(b) of the Permit entitled the Trust to a share of the 5% fee paid by Liberty to Air Pegasus New York (APNY) equal to that portion of the fee that derives from sightseeing flights out of the West 30th Street heliport and we demanded a full accounting and payment of a share of all such percentage fees. We subsequently notified APH and others, in December 2004, that we intended to conduct an audit to determine the extent of payments due the Trust pursuant to Section 6 of the Permit. Clearly, the Trust and APH were not in agreement as to the import of the December 1996 Agreements or the Trust's entitlement to a share of the 5% payments that were made by Liberty to APNY. As is noted in APH's comments submitted herewith, APH and its principals strenuously maintained throughout the Trust's investigation and the subsequent litigations that the 5% payments did not derive from heliport operations and therefore were not subject to the Permit's gross revenue provision and, further, that Trust had limited audit rights under the Permit which did not extend to APH expenses or other related company records. When APH and APNY continued to resist the Trust's efforts to gain access to all related APH and APNY records, we subsequently sought to terminate the Permit in July 2005. In response to the Trust's termination notice, APH brought suit and obtained a preliminary injunction from the New York State Supreme Court, which accepted APH/APNY's narrow reading of the Trust's audit rights under the 1996 Permit. In turn, the Trust instituted the January 2006 litigation mentioned above to recover its share of the 5% payments. After lengthy negotiations, APH, APNY and its principals subsequently provided the Trust's auditors with full access to their books and records in all the Trenk-owned companies in the summer of 2006. Indeed, once complete, the Trust shared its auditor's findings with your office last year well before the release of your initial draft revenue report this past March.

In November 2006, following completion of the Trust's audit of all such companies, APH, APNY and the Trust settled their claims and dismissed their respective complaints, with APH paying the Trust its full share of all monies received by APNY under the Consulting Agreement. In fact, the settlement agreement was executed in the State Comptroller's office following our meeting last November regarding the security portion of the State Comptroller's heliport audit and we provided the Comptroller's office with copies of such agreement at that time. The difference between the amount that APH paid the Trust to date respecting the 5%

3

consulting fees and the amount identified in your draft report relates to revenue generated from Liberty Helicopter's Downtown Heliport operations and not from the West 30th Street facility. Given that such additional sums do not arise out of or otherwise relate to the West 30th Street operations, the Trust is not entitled under the Permit's "gross receipts" provision to a share of such revenue. Consequently, the settlement amount contained in our November 2006 Settlement Agreement (and not the figure set forth in your draft report) reflects the total amount that was due the Trust from such 5% payments through January 2006.

Moreover, contrary to the impression set forth in the draft report, the forest of correspondence and pleadings that the various sightseeing operators have submitted in the past three years (since the Trust began its investigation into the claims of underreporting) does not reflect any "lack of involvement" on the part of the Trust. Rather, the prolific letter writing campaign engaged in by the heliport parties is simply indicative of the fractured and sometimes hostile relationship between APH and most of the sightseeing operators at the heliport, primarily Liberty. As we have previously advised, the principals of APH hold a minority shareholder interest in Sightseeing Tours of America ("STA"), Liberty Helicopters' parent company, and have been in active litigation with other STA shareholders for the past several years regarding such ownership interest.

Considerable time is also spent in the draft report on APH's discount policies. The Permit allows APH to provide discounts to its customers. As the draft report acknowledges, there is no obligation under the Permit that APH obtain the Trust's approval prior to implementing any such discounts. All that is required is that APH charge "fair, reasonable and nondiscriminatory prices" for its services for each unit of sales or services, provided that the Operator may make reasonable and non-discriminatory discounts, rebates or other similar types of reduction to volume purchasers in connection with the landing, taking off and parking of aircraft." (Permit Section 34(b); emphasis in original).

Concerns regarding APH's discount practice were first raised by heliport customers in late January 2006 as part of their complaints of unfair and/or discriminatory practices regarding APH's proposed rate. The Trust promptly responded, asking APH to refrain from imposing the rate increase to give the Trust time to review the complaints about the rate increase and charges of unfair practices. The Trust also requested that APH provide (a) an explanation for the revised rates, (b) a comparison of the amount and types of rates charged at the West 30th Street heliport with the rates charged by the Downtown and East 34th Street Heliports, and (c) a copy of APH's discount policy or procedures, or in the absence of a written policy, an explanation for how rates are set and discounts provided to customers of the Heliport. By letter dated March 13, 2006, APH replied that although it only provided a limited number of discounts over the years, to avoid any further issue concerning such practice it would cease providing any further discounts at all. Thus, contrary to the suggestion in the draft report, the Trust closely evaluated the rate increase and discount complaints which directly resulted in an end to all discounts and a significant delay in the implementation of such rate increase (which APH was entitled to impose under the Permit). Further, the "calculation" of what "would have been owed the Trust had APH not provided discounts to certain heliport customers is entirely speculative and at odds with the

4

APH's rights and obligation under the Permit. As the State Comptroller may recall, the New York Supreme Court, in two separate decisions, rejected the unfair and discriminatory practices claims by the heliport customers and dismissed their suits which had sought to enjoin imposition of the rate increase. The Appellate Division upheld such rulings earlier this year (Copies of such decisions were previously provided to your office).

### AUDIT- RECOMMENDATIONS

1. "Take appropriate measures to complete and execute the re-bid process for the Heliport at its new location." – As we have discussed in detail above, we have been actively working with the City and the State on relocation issues and have prepared a draft RFP for development that is under review.

2. "Require Pegasus to prepare formal written policies pertaining to any discounts, including the basis of such discounts, and monitor Pegasus to ensure discounts are applied uniformly to all carriers." – As we have discussed, currently APH does not have a discount practice or policy, having ended all discounts last year. In the future, should APH seek to provide any discounts, the Trust will look to have APH provide a written policy as to any such discounts.

3. "Review the circumstances surrounding the discounts noted in this report. If they were offered without basis or support, recoup the $11,000 owed to the Trust had appropriate fees been charged to the carriers which received the discounts." – As noted above, the Trust does not agree with the draft report's conclusion that APH is obligated under the Permit to pay any additional monies to the Trust in connection with the previous discounts.

4. "Periodically monitor all aspects of Heliport operations including revenue collections, compliance with posted fees, and the business climate enjoyed by Heliport carriers. As necessary, take appropriate corrective actions." -The Trust will continue, as it has to date, to monitor the heliport operations and respond, as needed, to compliance or other operational or reporting issues.

While, as noted above, we do not agree with a number of the impressions, suggestions, assertions and/or conclusions set forth in the draft report, we nonetheless, greatly appreciate the opportunity to review and comment on it. We request that you carefully consider our comments and revise the draft report accordingly. As always, please feel free to contact either Laurie Silberfeld or me if you have any questions or wish to discuss this matter further.

Sincerely,

Connie Fishman