COMMENTS OF AIR PEGASUS HELIPORT, INC.
TO REPORT ON WEST 30TH STREET HELIPORT REVENUE OPERATIONS
(REPORT 2006-S-75)

Air Pegasus Heliport, Inc. ("APH") has received the draft of the Report on West 30th Street Heliport Revenue Operations (Report 2006-S-75) (the "Draft Report"). APH previously submitted detailed comments and corrections to the prior version of the Draft Report (identified as the Discussion Document). In APH's response to the Discussion Document it requested that a second Discussion Document be issued and a second meeting be held, before a Draft Report is issued. Those requests were ignored. Instead, the New York State Auditors elected to distribute a Draft Report.

Unfortunately, as APH had feared, its corrections and comments were largely ignored and the Draft Report continues to contain numerous factual errors and inaccurate conclusions. Indeed, it appears clear that the auditors do not even understand basic details about APH's corporate structure and operation of the Heliport. Thus, after receiving the Draft Report, APH again requested a meeting before providing its responses so that the auditors could have the benefit of all the facts and correct its errors before APH submitted its comments. For reasons that are not clear to APH, the auditors refused to meet. APH again urges the auditors to meet to ensure that an accurate report is ultimately submitted.

The Draft Report contains two primary conclusions regarding revenue: (1) if APH had not provided certain discounts to a handful of customers, it would have paid the HRPT an additional $11,000; and (2) Liberty Helicopters, Inc. (NY)'s ("Liberty") payment of a 5% consulting fee to its 23% shareholder (not APH, but a wholly separate and independent entity, Air Pegasus of New York, Inc. ("APNY")), which was established in the early 1990s in lieu of profit distributions to the shareholder, should have been included in APH's revenue. Had it been included, APH would have owed the HRPT an additional $557,317 between 1997 and July 2006. The audit period was January 1, 2004 through March 31, 2006. No explanation is provided for why the Draft Report expands the scope of the period for this one area only.

The consulting fee, as explained previously and as explained again in detail herein, was not paid and has never been paid to APH and it has absolutely nothing whatsoever to do with APH's operations at the Heliport. Rather, it was paid pursuant to a separate Consulting Agreement to APNY and pre-exists the Permit by many years. The near complete disregard of the separate corporate existence of APNY is reminiscent of the tactics, including malicious and false accusations that Liberty has employed for years against APH, blurring the distinction between APH, APNY and Alvin S. Trenk in an attempt to treat them as though they are all one nefarious entity.[1]

The Draft Report also completely ignores the Settlement Agreement between APH and the HRPT and the significant events that led to that amicable resolution. Most significantly, in what appears to be a purposeful effort to find fault with both APH and the HRPT, the Draft

---

[1] In mid-August 2007, Liberty sought, as part of discovery in a New Jersey lawsuit, drafts of audit reports and documents related thereto. The New Jersey Court has denied Liberty's request at this time finding that such documents are not relevant given the current posture of the case. APH is extremely concerned that the rush to release the New York State Audit Report while it remains replete with numerous material errors, is designed to assist Liberty by making the audit report and APH's response public. It appears that the auditors are not independent but are being influenced by Liberty.

Report ignores the fact that the HRPT conducted a thorough and intensive independent audit of APH for the period April 1, 2001 through March 31, 2005[2], which included the review of books and records of a multitude of other entities. The HRPT's independent auditor, Deborah A. Cutler, CPA, CFE of Kramer, Love & Cutler, LLP, issued a comprehensive report on October 31, 2006 (the "Audit Report"), a copy of which the HRPT provided to the Comptroller's Office.[3] The Audit Report addressed all of the issues identified in the Draft Report including discounts and the alleged under-reporting of income that Liberty paid to APNY pursuant to the APNY/Liberty Consulting Agreement.

Based on that Audit Report, the HRPT entered into a Settlement Agreement with APH dated November 22, 2006 (the "Settlement Agreement"). A copy of the Settlement Agreement is attached as Exhibit 1. In the Settlement Agreement, which the HRPT executed *after* the Audit Report was issued and with full knowledge of the Audit Report, the HRPT acknowledged that:

(a) APH fully cooperated with the auditors by providing them with all requested information and documents;

(b) the HRPT has no knowledge that APH is in violation of any of the provisions of the Permit;

(c) APH is in good standing with the HRPT.

Instead of providing a balanced and objective explanation of the background between APH and the HRPT, the Draft report instead irresponsibly and without any factual basis concludes that the HRPT has been remiss in its oversight responsibilities of APH and did not vigorously pursue its rights. The corollary conclusion, of course, is that APH was thereby able to divert revenue from the HRPT. These bald conclusions, which echo Liberty's assertions, are completely unsupported and insupportable, as more fully explained below.

Against this backdrop, APH sets forth its response to the issues identified in the Draft Report.

1. **Consulting Fee Payment.** The Draft Report accuses APH of impropriety in connection with a consulting fee that Liberty paid to APNY. The Draft Report defines "Pegasus" as Air Pegasus Heliport, Inc., the operator of the West 30th Street Heliport. *See* Draft Report at 1. It then erroneously states that "On December 30, 1996, Pegasus entered into a consulting agreement with the Heliport's sightseeing carrier [Liberty]." *See* Draft Report at 5. It then states that the consulting agreement required the 5% consulting fee be paid to a "Pegasus-related entity, instead of to Pegasus directly." *See* Draft Report at 5. The Draft report therefore concludes that these payments should have been included in APH's revenues and reported to the HRPT.

The statements are blatantly and demonstrably false. This error is particularly egregious because the *exact same error* appeared in the Draft Report and was called to the auditors' attention by APH in its written response to that document. Nevertheless, the Draft Report

---

[2] Although the Audit Report states it was for the period April 1, 2001 through March 31, 2005, APH in fact provided detailed documentation through January 2006.
[3] If you require a copy of the Audit Report, please advise.

2

Report ignores the fact that the HRPT conducted a thorough and intensive independent audit of APH for the period April 1, 2001 through March 31, 2005[2], which included the review of books and records of a multitude of other entities. The HRPT's independent auditor, Deborah A. Cutler, CPA, CFE of Kramer, Love & Cutler, LLP, issued a comprehensive report on October 31, 2006 (the "Audit Report"), a copy of which the HRPT provided to the Comptroller's Office.[3] The Audit Report addressed all of the issues identified in the Draft Report including discounts and the alleged under-reporting of income that Liberty paid to APNY pursuant to the APNY/Liberty Consulting Agreement.

Based on that Audit Report, the HRPT entered into a Settlement Agreement with APH dated November 22, 2006 (the "Settlement Agreement"). A copy of the Settlement Agreement is attached as Exhibit 1. In the Settlement Agreement, which the HRPT executed *after* the Audit Report was issued and with full knowledge of the Audit Report, the HRPT acknowledged that:

(a) APH fully cooperated with the auditors by providing them with all requested information and documents;

(b) the HRPT has no knowledge that APH is in violation of any of the provisions of the Permit;

(c) APH is in good standing with the HRPT.

Instead of providing a balanced and objective explanation of the background between APH and the HRPT, the Draft report instead irresponsibly and without any factual basis concludes that the HRPT has been remiss in its oversight responsibilities of APH and did not vigorously pursue its rights. The corollary conclusion, of course, is that APH was thereby able to divert revenue from the HRPT. These bald conclusions, which echo Liberty's assertions, are completely unsupported and insupportable, as more fully explained below.

Against this backdrop, APH sets forth its response to the issues identified in the Draft Report.

1.  **Consulting Fee Payment.** The Draft Report accuses APH of impropriety in connection with a consulting fee that Liberty paid to APNY. The Draft Report defines "Pegasus" as Air Pegasus Heliport, Inc., the operator of the West 30th Street Heliport. *See* Draft Report at 1. It then erroneously states that "On December 30, 1996, Pegasus entered into a consulting agreement with the Heliport's sightseeing carrier [Liberty]." *See* Draft Report at 5. It then states that the consulting agreement required the 5% consulting fee be paid to a "Pegasus-related entity, instead of to Pegasus directly." *See* Draft Report at 5. The Draft report therefore concludes that these payments should have been included in APH's revenues and reported to the HRPT.

The statements are blatantly and demonstrably false. This error is particularly egregious because the *exact same error* appeared in the Draft Report and was called to the auditors' attention by APH in its written response to that document. Nevertheless, the Draft Report

---
[2] Although the Audit Report states it was for the period April 1, 2001 through March 31, 2005, APH in fact provided detailed documentation through January 2006.
[3] If you require a copy of the Audit Report, please advise.

2

repeats the error. Either the auditors are sloppy, incompetent, or are simply doing Liberty's bidding, instead of acting in an independent, fair and impartial manner, which is a requirement for any *bona fide* audit.

Once again, since the auditors seem not to have understood it the first time:

The Consulting Agreement was entered into by Air Pegasus of New York, Inc. when it was Liberty's 23% shareholder. APH (which you define as Pegasus) is *not* a party to it. APNY and APH are separate and independent entities. An additional copy of the Consulting Agreement is attached as Exhibit 2.

A brief background of the consulting fee, which was provided in APH's response to the Draft Report but was ignored, is necessary for a complete understanding of this issue.

(a) Background. Alvin S. Trenk co-founded Liberty with Drew Schaefer ("Schaefer") in or about 1990. Since its inception, Trenk has owned approximately 23% of the outstanding shares of Liberty (and later its newly formed parent company, Sightseeing Tours of America, Inc. ("STA")) and Schaefer (or later his ex-wife) owned approximately 35% of the shares. Trenk's shares were owned from the outset by APNY, a corporation that was formed years before APH was formed.

In order to protect APNY as a minority shareholder, Trenk and Schaefer agreed that Liberty would pay APNY 5% of Liberty's gross revenues related to sightseeing from all heliports within 20 miles of West 30th Street, which was to be an advance against profit distributions. This arrangement was memorialized in a letter agreement between APNY (not APH, which did not even exist at that time) and Liberty dated March 8, 1994 (the "1994 Letter Agreement"), long before the Permit was entered into with the HRPT. A copy of the 1994 Letter Agreement is attached as Exhibit 3. The 1994 Letter Agreement provides, in relevant part, as follows:

> Liberty shall pay to [APNY] a sum equal to five (5%) percent of Liberty's monthly gross revenues attributable to its sightseeing business conducted from the Heliport. All such sums due hereunder shall be paid monthly by Liberty to Pegasus no later than the tenth (10th) day following the end of each calendar month. For any period for which Liberty pays dividends to its shareholders, it shall have the right to take credit against any such dividends paid to Pegasus the amounts paid hereunder as a percentage of gross revenues for the same period for which such dividends were paid.

The 1994 Letter Agreement predates the Permit and was in effect when APH's predecessor operated the West 30th Street Heliport under the auspices of the Port Authority. It remained in effect at the time the Permit was entered with the Department of Transportation (the "Department"), and was modified slightly by a letter agreement dated May 9, 1996 (Exhibit 4), which remained in effect until the end of 1996. Both the Port Authority and the Department were aware of APNY's ownership interest in Liberty and that APNY was receiving the 5% consulting fee. In fact, that ownership interest is specifically referenced in the Permit. *See*

3

ultimately filed in revised form with the Court, that the HRPT first questioned APH regarding the 5% Consulting Fee. Attached as **Exhibit 6** is the November 23, 2004 letter from Laurie Silberfeld, General Counsel to the HRPT, which first raised the Consulting Fee as an issue and specifically referenced Rubino's emails and the draft affidavit.

       (i)    <u>Reason for Liberty's Attack.</u>

In late 2002, Trenk learned that Schaefer was misappropriating funds from Liberty. He ultimately determined, by employing a forensic accountant and subsequently confirmed by a court-appointed accountant, that Schaefer had bilked Liberty out of approximately $4,000,000. Trenk met with Mario Cuomo, who is of counsel with Willke Farr and a mutual acquaintance of Trenk and Schaefer, in an effort to resolve the dispute without litigation. Those efforts were unsuccessful and Trenk instituted a lawsuit against Schaefer and others in the Superior Court of New Jersey, Chancery Division seeking, among other things, to recoup the funds improperly paid to Schaefer or on his behalf. A few months later, APH and APNY instituted a separate lawsuit against Liberty in the Superior Court of New Jersey, Law Division, for, in general, breach of contract. Cuomo's law firm, Willke Farr, represented Schaefer and the other defendants. Immediately after the first lawsuit was filed, Liberty's shareholders voted in secret to remove Trenk as President and CEO of Liberty.

Liberty, throughout these lawsuits and continuing through today, has sought to use its political influence to terminate APH's right to operate the Heliport. Liberty's counsel, Daniel Rubino, employed this powerful threat to force Trenk to agree to arbitrate both of the New Jersey lawsuits. In a letter dated June 11, 2004, Rubino wrote:

> Toward that end, we are prepared to pursue the following action:
>
> 2.    Schedule meetings with the HRPT and others to explore and pursue open bidding rights to the West 30th Street Heliport....

A copy of Rubino's letter is attached as **Exhibit 7**.

Trenk knew that because of the powerful politically connected allies that Schaefer had on his team, the threat to the Heliport was real. Rather than jeopardize APH's 25 year relationship as operator of the Heliport, Trenk signed the arbitration agreement.

On April 8, 2005, the arbitrator that Trenk was forced to accept, James Ortenzio, issued a Determination. A copy of the Determination is attached as **Exhibit 8**. The Determination improperly changed material contractual terms by reducing the Consulting Fee from 5% to 3.5% and requiring Liberty to pay it only with respect to sightseeing operations from the West 30th Street and Downtown Manhattan heliports. Liberty also conducts operations out of Jersey City, New Jersey (which is within 20 miles of the Heliport and therefore subject to the Consulting Agreement), but Ortenzio simply re-wrote the contract and ruled that Liberty was not required to pay the Consulting Fee with respect to those operations. The Arbitrator's Determination also potentially voided Liberty's restrictive covenant suspiciously allowing Liberty to compete with APH in operating a heliport in the New York area for the first time.

5

Trenk appealed the trial court's confirmation of the Arbitrator's Determination. The Appellate Division reversed the arbitrator's decision, and restored the parties to the pre-arbitration position.

As a result of Trenk's investigation, which uncovered Schaefer's misconduct, and the lawsuits, APH/Trenk and Liberty/Schaefer have been essentially at war with each other. It is crystal clear that Liberty and Schaefer seek the complete and total destruction of APH and Trenk, and want to usurp control of the Heliport for themselves. In fact, Rubino wrote to the HRPT on January 7, 2005 and, after reminding the HRPT that Mario Cuomo and he both represent Liberty, specifically asked to meet with the HRPT to establish a "direct relationship between the HRPT and Liberty." A copy of Rubino's January 7, 2005 letter is attached as **Exhibit 9.**

The submission of the irrelevant draft affidavit in the NYH Lawsuit and Rubino's November 19, 2004 email triggered the HRPT audit, Liberty's first gambit to cause the HRPT to terminate APH's Permit.

(c) The HRPT Audit. As Liberty calculated, the HRPT commenced an audit of APH in early 2005. By letter dated April 25, 2005, the HRPT's auditing firm, Kramer, Love & Cutler, L.L.P., demanded access to 19 categories of documents. A copy of the April 25, 2005 letter is attached as **Exhibit 10**. The document request included all manner of irrelevant documentation such as APH's "Minutes of meetings of the Board of Directors;" and "all transactions between Mr. Alvin Trenk, Ms. Abigail Trenk and Air Pegasus or any other subsidiary or affiliate owned by Mr. Trenk or Ms. Trenk, including but not limited to Pegasus Aviation, Air Pegasus of New York, and Pegasus Holding Corporation." The audit expanded from there. The documents the HRPT auditors sought went well beyond those which the HRPT was entitled to inspect under the Permit and litigations ensued.

(i) The Terms of the Permit. In addition to a basic monthly fee, the Permit requires APH to pay the HRPT 10% of its gross receipts between $250,000 and $1,000,000; 11% of its gross receipts between $1,000,000 and $2,000,000; and 12% of its gross receipts over $2,000,000 (the "Percentage Payment"). *See* Permit at §6(b).

The term "gross receipts" is defined in the Permit as follows:

> The term "gross receipts" shall include all monies paid for services rendered beginning on the Commencement Date and ending on the Termination Date to the Operator [APH] for the landing, take-off and parking of aircraft at the Heliport (including all fees as set forth in paragraph (c) hereof) and all other monies paid to the Operator [APH] for sales made or services rendered at or from the Heliport regardless of when or where the order therefore is received at the Heliport and any other revenue of any type arising out of or in connection with the Operator's operations at the Heliport'....

*See* Permit at §6(b).

6

The Permit also requires APH to maintain certain records in connection with its operation of the Heliport and the HRPT is granted the right to audit these required, but limited, records. The records that APH is required to maintain and the scope of the audit by the HRPT of *those* required records are clearly defined by the Permit, as follows:

> A system of books, records and accounts...as may be adequate and appropriate for the recording with respect to the Heliport of:
>
> (a) sightseeing passenger counts;
>
> (b) all arrival and departures of aircraft (regardless of whether a fee is charged therefore) which must include:
>
> > (i) all of APH's aircraft operations;
> > (ii) times and dates of all arrivals and departures;
> > (iii) type and registration number of all arriving and departing aircraft;
> > (iv) the time of parking and storage of all aircraft; and
> > (v) the charges incurred by each aircraft during its stay at the Heliport;
>
> (c) all transactions pertaining to APH's flight operations (if any); and
>
> (d) the dispensing of aviation fuel and the fuel charges.

*See* Permit at §7(c).

These record-keeping requirements and audit rights under Section 7(c) of the Permit are logically limited to allow the HRPT to verify APH's gross receipts because APH's Percentage Fee payments are a function of APH's gross receipts only. *See* Permit at §6(b). Only records pertaining to monetary receipts and traffic at the Heliport are required, and APH is required to allow an audit of only those records. Under the Permit, the HRPT does not have the power to audit any other records of APH. And it certainly has no right to audit or inspect records from other entities including Trenk's personal financial statements, tax and other personal information. APH's expenses, debts, disbursements and profits also are entirely irrelevant to the amount it pays the HRPT.

The HRPT auditors, therefore, went far beyond the scope of the Permit and sought documents that do not have anything whatsoever to do with the gross receipts that APH received in connection with its operation of the Heliport or the Percentage Fee due to the HRPT under the Permit.

7

(ii) The APH/HRPT Lawsuits. As a result of what APH considered to be substantial overreaching, APH initially declined to provide all the documents that the HRPT's auditor's sought. The HRPT, therefore, sent APH a Notice of Default dated July 1, 2005. A copy of the Notice of Default is attached as **Exhibit 11**.

APH then filed a lawsuit against the HRPT seeking a declaration that the HRPT's audit rights under the Permit were limited, as defined above. APH sought and obtained a preliminary injunction against the HRPT. The New York Supreme Court found that APH was likely to succeed on the merits of its claim that the HRPT's audit rights were limited by the specific Permit terms. A copy of Justice Richter's August 23, 2005 Order Decision and Order granting APH a Preliminary Injunction is attached as **Exhibit 12**.

APH then filed a summary judgment motion. The HRPT filed a separate lawsuit against APH, APNY and Trenk alleging, among other things, that the Consulting Fee payment that Liberty had been paying to APNY was subject to the percentage fees under the Permit.

APH and the HRPT then agreed to stay both of the lawsuits and entered settlement discussions. During those discussions, APH, APNY and Trenk voluntarily allowed the HRPT's auditors complete and unfettered access to all the documents and information they sought notwithstanding the fact that the New York Supreme Court had preliminarily ruled in APH's favor regarding the limited scope of the HRPT's audit rights. A complete list of all the documents that were provided to the HRPT's auditors is attached to the Audit Report as Exhibit V.

During the course of the audit, the HRPT's auditors repeatedly requested additional information and documentation from an ever expanding list of entities that have nothing whatsoever to do with the West 30th Street Heliport. APH and all these separate and independent entities fully and completely cooperated with the auditors, opening all the books and records the auditors requested for their review.

The settlement discussions took approximately ten months. The HRPT's Audit was completed and a final report was issued on October 31, 2006. Shortly thereafter, APH, APNY and the HRPT entered into a comprehensive Settlement Agreement that resolved all the outstanding issues between APH, APNY and the HRPT. The HRPT specifically acknowledged in that Settlement Agreement that:

(i) APH fully cooperated with the auditors by providing them with all requested information and documents;

(ii) the HRPT has no knowledge that APH is in violation of any of the provisions of the Permit;

(iii) APH is in good standing with the HRPT.

(d) Settlement of Consulting Fee Issue. In order to settle the issue regarding the Consulting Fee, APH and APNY agreed to include the Consulting Fee as part of the gross

8

receipts subject to the percentage fee under the Permit *retroactive* to May 1996, the date of the Permit. APH, APNY and the HRPT's auditors all agreed that the percentage fee due for the period May 1996 through January 31, 2006 was $462,387. *See* Settlement Agreement at ¶1. APH remitted this amount by wire transfer to the HRPT on November 27, 2006. The percentage fee for the period February 1, 2006 through November 30, 2006 was paid by December 31, 2006 in the amount of $41,624.00. *See* Settlement Agreement at ¶1.

It is unclear why the Draft Report calculates the amount due to the HRPT related to the Consulting Fee is $557,317. *See* Draft Report at p. 2. It may be that the New York State auditors erroneously included consulting fee payments that Liberty paid based on its sightseeing operations from the Downtown Manhattan Heliport, which the HRPT has agreed have nothing whatsoever to do with West 30th Street. In fact, the requirement that Liberty pay the Consulting Fee on all it sightseeing operations conducted anywhere within 20 miles of the West 30th Street Heliport is substantial evidence that the consulting fee is unrelated to APH's operations at West 30th Street, and constitutes an independent agreement between Liberty and its shareholder, APNY, for independent consideration. The correct and audited amount of percentage fees on the Consulting Agreement for the period May 1996 through January 31, 2006 is $462,387. The Draft Report is simply wrong.

In addition, in order to resolve the disputes with the HRPT, APH and APNY have agreed to include all future Consulting Fee payments that APNY receives from Liberty related to West 30th Street sightseeing operations in its calculation of the Percentage Fee due to the HRPT under the Permit. *See* Settlement Agreement at ¶2(a).

(e)     Implications of Settlement. At the meeting among APH, the HRPT and the Comptroller's Office on April 2, 2007, it was suggested that by agreeing to the settlement and including the Consulting Fee payments as gross receipts subject to percentage fees, APH and APNY had somehow conceded that they had committed some wrongdoing and owed those funds to the HRPT. Nothing could be further from the truth and the assertion is defamatory.

Litigants settle lawsuits all the time, for a multitude of reasons. In this case, APH has enjoyed 25 years of amicable relations with the HPRT and its predecessors that have been mutually beneficial and profitable.

It is noteworthy that in the 25 years of successful operation of the Heliport, not a single complaint was filed against APH until Trenk uncovered Schaefer's misconduct and Liberty/Schaefer retaliated with its campaign of false and malicious allegations designed to destroy APH's rights to continue to operate the Heliport. Indeed, up until that time, the relationship between Trenk and Schaefer and APH and Liberty was amicable and peaceful.

As set forth above, APH and APNY firmly believe, and have never deviated from their position, that the HRPT is not entitled to any percentage fees on the Consulting Fee. APH and APNY, however, were not willing to risk the potential loss of the right to operate the Heliport. They could certainly foresee the possibility that they could win the battle regarding the Consulting Fee (they had already obtained a preliminary injunction), but lose the war by having the HRPT simply attempt to terminate the Permit on thirty days notice.

In order to avoid any risk, and recognizing that the relationship with the HRPT had, up until Liberty's muckraking, been mutually beneficial and respectful, and also

9

recognizing the vagaries of the litigation process, APH and APNY elected to settle all the disputes and re-establish a peaceful relationship with the HRPT. As part of that global resolution, APH and APNY agreed to include the consulting fees it received from Liberty related to Liberty's sightseeing operations from West 30th Street in APH's gross receipts subject to the percentage fees. The Settlement Agreement also specifically provides that "none of the parties has admitted any fault, wrongdoing or liability in connection with the Litigations or otherwise."

Under these circumstances, it is outrageous for the auditors to conclude or imply that APH engaged in any wrongdoing or diversion of funds whatsoever. Equally outrageous is the conclusion that the HRPT was somehow remiss in its oversight duties.

In short, APH and the HRPT engaged in a nearly two year battle that included two lawsuits and an extremely thorough and comprehensive audit that far exceeded the scope of the audit that the New York State Auditors have conducted. There is no basis for the New York State Auditors to reach conclusions at variance with those reached by the HRPT's auditors and to second guess the HRPT's decision to enter the Settlement Agreement.

2. **Discounts/Customer Relationships.** The Draft Report also spends considerable time on APH's discount policies and criticizes the "environment" at the Heliport which has led to customer complaints. To our knowledge, there were no more than a handful of complaints out of hundreds of heliport customers, all of which were made or instigated by Liberty and began after litigation between Liberty and APH began. The Draft Report identifies several discounts that were provided to customers of the Heliport. It does not, however, identify the customers that received discounts. The Report concludes that APH should remit $11,000 to the HRPT representing the percentage fee that would have been paid to the HRPT had the discounts not been provided. This conclusion is flawed.

The Permit that governs the relationship between APH and the HRPT specifically allows APH to grant discounts to customers. *See* Permit at §34(b). APH has no obligation under the Permit to obtain the HRPT's approval of its discounts.

The issue of discounts was specifically addressed in the independent Audit Report commissioned by the HRPT. Those auditors reviewed every single discount that had been provided over the four year audit period. Some of the discounts had been granted years before the Permit was executed and were considered "grandfathered." Others were provided to operators who had or who promised increased volume. A grand total of 15 customers (exclusive of Liberty) out of hundreds of total customers received discounts during the four year audit period.

The issue of discounts was first raised by Heliport customers in January 2006 in connection with the complaints of two or three customers (out of hundreds of total customers), regarding APH's proposed rate increases. At the HRPT's request, APH delayed implementation of its new Schedule of Charges to afford the HRPT time to review the complaints. After review, the HRPT requested various information regarding the new rates as well as APH's discount policy.

APH responded promptly. APH provided the HRPT with a copy of a letter it had previously sent to the Eastern Region Helicopter Council ("ERHC"), the largest industry trade

10

group in the Metropolitan New York Area. A copy of APH's letter to the ERHC dated February 7, 2006 is attached as **Exhibit 13**. In the letter, APH conclusively demonstrates that the fees and charges at the West 30th Street Heliport, even after the first rate increase in two years, are competitive with, and often less expensive than, the fees and charges at the two other New York City Heliports. The two or three letters are from disgruntled customers inspired by Liberty. The vast majority of heliport customers have never raised any complaints. The criticism regarding the "environment" at the heliport should therefore be deleted as there is no factual basis for such a conclusion and it is defamatory.

The Draft Report also points out that no formal written discount policy was in effect. The fact is that because so few discounts were provided, a formal policy was never necessary nor required. However, in order to avoid any future issues regarding discounts, APH simply discontinued all discounts to all customers, regardless of volume. The sole exception to this rule is Liberty, whose discounts are memorialized in the approved Sightseeing Agreement and the Arbitrator's Decision. It is both ironic and suspect that Liberty, the biggest beneficiary of discounted rates, is also the most vocal in complaining about legitimate rate increases and discounts granted to others.

The HRPT, therefore, carefully and closely considered APH's rate increases and the issue of discounts. Its review resulted in the voluntarily termination of all discounts and a resolution of this minor issue by APH. The Draft Report's "calculation" of approximately $11,000 that would have been due to the HRPT had APH not provided discounts (which is *de minimis* in the context of over seven million dollars APH has paid to the HRPT and the Department under the Permit) is entirely speculative and completely ignores the fact that APH had a contractual right, under the Permit, to provide discounts. There is no basis for the discussion of discounts.

Finally, also noteworthy is the fact that Liberty and Helicopter Flight Services, Inc. ("HFS"), the two primary companies that raised complaints regarding APH's new Schedule of Charges, filed lawsuits against APH and the HRPT alleging unfair and discriminatory pricing practices at the Heliport. The New York Supreme Court dismissed Liberty's and HFS's claims with prejudice, finding that they failed to state a cognizable cause of action. The November 17, 2006 decision of the New York State Supreme Court are attached as **Exhibit 14**. The Comptroller's Office should not give credence to claims that the Court found devoid of merit.

3.  **Other Errors.**

The Draft Report also contains other errors. The Draft Report states that APH is required to remit a basic monthly permit fee and an additional fee equal to a percentage of its gross receipts. Draft Report at page 2. The Draft Report fails to mention that under the Permit APH also pays a use fee calculated based upon the number of sightseeing passengers. Additionally, the Draft Report states that when APH instituted a passenger fee, Liberty, a sightseeing carrier who operates at the Heliport, left in protest and returned upon a temporary stay of the new rates by the Courts. This is totally misleading. What actually occurred is that APH filed a motion to dismiss Liberty's lawsuit. That motion was granted. The New York Court found that Liberty's claims had no merit and dismissed its Complaint with prejudice.

11

4. **Conclusion.**

The Draft Report contains numerous factual mistakes, misleading statements, and erroneous conclusions that must be corrected. It is noteworthy that the HRPT's independent team of professional, certified accountants reviewed thousands of documents over the course of a year and found nothing of note, other than the debatable issue of the consulting fee which the HRPT and APH resolved amicably. APH has undergone several audits prior to the HRPT's audit, none of which disclosed any significant issues.

The New York State auditors, in contrast, requested only a fraction of the documents that the HRPT's auditors reviewed and somehow manage to conclude that APH diverted funds and engaged in other misconduct.

Under these circumstances, and in light of Liberty's involvement in the audit process, in the event that the Draft Report is not substantially revised and corrected, APH can only conclude that the Comptroller's Office has chosen to accept the outrageously false allegations of Liberty (whose mission is to destroy APH), and to disregard the conclusions of the HRPT's team of independent auditors and the HRPT itself which, based on its auditor's report, agreed that APH had *not* violated the Permit and is in good standing.

LENTZ & GENGARO
Attorneys for Air Pegasus Heliport, Inc.

By: _____
Christopher F. Gengaro

Dated: October 18, 2007

12

## APPENDIX B - STATE COMPTROLLER COMMENTS ON AUDITEE RESPONSE

1. We have revised the Final Audit Report (Report) to reflect the comments of Trust officials, whose response to the Draft Audit Report (Draft) incorporated the comments of Pegasus as well. Essentially, these comments centered on two issues presented in the Draft: (i) the characterization of certain revenues which the Trust and Pegasus, by their settlement agreement effectuated on November 22, 2006, resolved to treat as gross receipts under the terms of the Permit; and (ii) the characterization of certain discounts accorded by Pegasus during the period as potentially entitling the Trust to additional payments from Pegasus. The information and documentation provided by the Trust and Pegasus in response to our audit suggested that our findings in regards to these issues did not adequately address all of the circumstances surrounding them and, therefore, we have modified such findings and associated recommendations from the Report. Accordingly, we believe that the Report adequately addresses the concerns raised by the Trust and Pegasus.