**EXHIBIT K TO AMENDED COMPLAINT**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------X
HUDSON RIVER PARK TRUST,

                    **Plaintiff,**

       -against-

AIR PEGASUS HELIPORT, INC., AIR
PEGASUS NEW YORK, INC., ALVIN S. TRENK

                 **Defendants.**
------------------------------------X

Index No.
Date Purchased:

VERIFIED
COMPLAINT

00800035

    Plaintiff, Hudson River Park Trust, by its attorneys, Konner, Teitelbaum & Gallagher, for its Complaint, alleges as follows:

SUPREME COURT
NEW YORK
JAN 05 2006
FILED

## THE PARTIES

    1.    Plaintiff, Hudson River Park Trust ("Plaintiff" or the "Trust") is a State public benefit corporation created pursuant to the Hudson River Park Act, Chapter 592 of the Laws of 1998 of the State of New York (the "Act"). Pursuant to the Act, the Trust is charged with the planning, construction and operation of a world class river-front park on Manhattan's west side between Battery Place and 59th Street (the "Park"). The West 30th Street Heliport (the "Heliport") is located within the Park between West 29th Street and West 30th Street in the Borough of Manhattan, City and State of New York.

    2.    Upon information and belief, defendant Air Pegasus Heliport, Inc. ("APH") is a Delaware corporation with an executive office at the Heliport.

F:\COMMON\Docs\HudsonRiverPark\6183.0002\HRPT Complaint.wpd

3.     Upon information and belief, APH is authorized to do business, and in fact does transact business, in the State of New York.

4.     Upon information and belief, defendant Air Pegasus New York, Inc. ("APNY") is a Delaware corporation with offices at the Heliport.

5.     Upon information and belief, APNY is authorized to do business, and in fact does transact business, in the State of New York.

6.     Upon information and belief, APNY does business under the assumed name of Pegasus Aviation with offices at the Heliport.

7.     Defendant, Alvin S. Trenk ("defendant Trenk") is an individual who, upon information and belief, resides at 350 East 79th Street, New York, New York 10021.

8.     Upon information and belief, defendant Trenk is an officer, director, and/or shareholder of APH.

9.     Upon information and belief, defendant Trenk is an officer, director, and/or shareholder of APNY.

10.    Upon information and belief, defendants APNY and APH are affiliated companies in that they have officers, directors, and/or shareholders in common, either directly or beneficially.

11.    Upon information and belief, a majority of the share interests of APNY and APH are owned or controlled, of record or

-2-

beneficially, by defendant Trenk or members of his immediate family.

12. Upon information and belief, the boards of directors of APNY and APH are comprised or controlled, of record or beneficially, by defendant Trenk or members of his immediate family.

13. Upon information and belief, the officers of both APNY and APH are defendant Trenk, members of his immediate family, or people or parties under direct supervision and control of defendant Trenk or his family.

<u>FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION</u>

14. The Trust is the successor in interest to the New York State Department of Transportation (the "State") in respect of a Permit Agreement dated March 25, 1996 (the "Permit") granted by the New York State Department of Transportation to APH. A copy of the Permit is annexed hereto as Exhibit "A" and is incorporated herein as if set forth in full. The Permit was signed on behalf of APH by defendant Trenk, as President.

15. The Permit was made in New York and is to be performed within New York.

16. The Permit provides APH with status as the "Operator" of the Heliport and affords APH the exclusive right to use and operate the Heliport, subject to and in accordance with the terms and conditions contained therein.

-3-

17.   In exchange for the right to operate the Heliport, the Permit provides, *inter alia*, that in addition to other consideration, APH is obligated to pay to the Trust, as successor to the Department of Transportation, a percentage of all "gross receipts" resulting from its operation of the Heliport. See Exhibit A, Section 6 (b).

18.   Specifically, Section 6 (b) of the Permit provides as follows:

> In addition to the basic monthly permit fee as set forth in paragraph (a) above the Operator shall pay to the Department a percentage fee equivalent to ten percent (10%) of the Operator's gross receipts for amounts in excess of $250,000.00 to and including $1,000,000 and a percentage fee equivalent to eleven percent (11%) of the Operator's gross receipts for amounts in excess of $1,000,000 to and including $2,000,000 and a percentage fee equivalent to twelve percent (12%) for all amounts over $2,000,000, plus a use charge computed at the rate of $15.00 per every ten sightseeing passengers, with the number of passengers rounded to the next higher integral multiple of 10, in connection with approved sightseeing operations.
>
> The terms "gross receipts" shall include all monies paid for services rendered beginning on the Commencement Date and ending on the Termination Date to the Operator for the landing, take-off and parking of aircraft at the Heliport (including all fees as set forth in paragraph (c) hereof) and all other monies paid to the Operator for sales made or services rendered at or from the Heliport regardless of when or where the order therefor is received at the Heliport *and any other revenues of any type arising out of or*

-4-

*in connection with the Operator's operations
at the Heliport <u>provided</u>, <u>however</u>, that any
taxes imposed by law which are separately
stated to and paid by the customer and
directly payable to the taxing authority by
the Operator shall be excluded therefrom.*

*The fee provided for in Section 6(b) shall be
due and payable monthly on the thirtieth day
of each month following the calendar month in
which the effective date hereof falls, and
shall be based on the Operator's gross
receipts for the preceding calendar month,
<u>provided</u>, <u>however</u>, that if the Agreement
shall expire or be revoked or terminated
effective on a date other than the last day
of a month, the percentage fee for said month
shall be due and payable within ten days
after such effective date of expiration,
termination or revocation or should such
monies be paid after the Termination Date,
within ten (10) days of receipt of such
monies.* (Emphasis in italics added.)

19.   The Permit term commenced in May 1996 and expired by

its terms five years later in May of 2001.   Pursuant to Section 2

of the Permit, it thereafter continued on a "month-to-month"

basis subject to cancellation by either party on thirty (30) days

written notice to the other.   To date, the Permit has not been

canceled by either party and remains in effect.

20.   Section 3 (e) of the Permit provides, in relevant part,

as follows:

The Operator or any other aircraft operator shall
conduct sightseeing operations only upon prior written
approval of the Department of (i) the sightseeing
operator and its aircraft and procedures, and (ii) the
terms of any agreement between the Operator and any
such sightseeing operator, which approval shall not be
unreasonably withheld.

-5-

21.  Section 7 of the Permit provides, in relevant part, as follows:

> In connection with the exercise of the privileges granted hereunder, the Operator shall:
>
> (b) not directly or indirectly divert or cause to be diverted, any business from the Heliport.

22.  In or about May 1996, with the knowledge and consent of the State or the Trust, APH entered into an agreement (the "Sightseeing Agreement") with Liberty Helicopter Tours, Inc. (N.Y.) ("Liberty") pursuant to which, *inter alia*, Liberty was afforded the non-exclusive right to conduct a portion its sightseeing business from the Heliport. A copy of the Sightseeing Agreement is annexed hereto as Exhibit "B" and incorporated herein as if set forth in full.  The Sightseeing Agreement was signed by defendant Trenk, as President of APH.

23.  Pursuant to Section 4 of the Sightseeing Agreement, the term thereof commenced on the later of (i) May 13, 1996, (ii) the date on which the State approves the Sightseeing Agreement, or (iii) such date as the State may specify for commencement (the "Commencement Date") and was to remain in effect until May 12, 2001, the termination date set forth in the Permit.

24.  Section 15 (f) of the Sightseeing Agreement provided as follows: "This Agreement is subject to the approval of the State.

-6-

In the event the State fails to give or at any time revokes its approval, this Agreement shall immediately terminate and neither party shall have any further liability to the other."

25.  On or about December 31, 1996, without the knowledge or consent of the State or the Trust, and in violation of Section 3 (e) of the Permit, APH and Liberty entered into a certain First Modification Agreement to the Sightseeing Agreement (the "Modification Agreement"), a copy of which is annexed hereto as Exhibit "C" and incorporated herein as if set forth in full.  The Modification Agreement was signed by defendant Trenk, both individually and as President of APH.

26.  The Modification Agreement, in relevant part, provided as follows:

> 2.  Exclusive Rights; Payments.  Subject to all the terms and conditions of the Agreement and the State Permit, including but not limited to those relating to default, expiration, termination and cancellation, and provided Liberty is not in default under the Agreement, for so long as APH, Trenk, or any Affiliate thereof is the fixed base operator of the Premises, then Liberty shall continue to have the exclusive right, beyond May 12, 2001, to conduct aircraft sightseeing services from the Premises, subject to increases in Payments as may be established by APH from time to time.

> 3.  Restrictive Covenants.  During the term of the Agreement and for so long thereafter as Liberty is paying a percentage of revenues to Air Pegasus of New York, Inc. a Delaware corporation ("Pegasus"), pursuant to that certain Consulting Agreement, of even date herewith, among Liberty, Pegasus, Drew E. Schaefer, Pamela Schaefer and Sightseeing Tours of America, Inc., APH and Trenk shall not, and shall not cause any Affiliate to:

-7-

     (a) become the fixed based operator of,
or acquire, directly or indirectly, a legal
or beneficial equity interest in the fixed
based operator of, any heliport within fifty
(50) miles of the Premises or the Downtown
Heliport, located in New York, New York (the
"Downtown Heliport"), unless Liberty is
granted identical rights with respect to such
heliport as it holds pursuant to the
Agreement with respect to the Premises; or

     (b) operate, directly or indirectly, an
aircraft at or within twenty (20) miles from
any of (i) the Premises, (ii) the Downtown
Heliport or (iii) any other Heliport in which
Liberty is or may be granted rights pursuant
to Section 3(a) of this First Modification.

    27.   Simultaneously with the execution of the Modification

Agreement, and without the knowledge or consent of the State or

plaintiff as its successor in interest, and in further violation

of the terms of the Permit, Defendant APNY entered into a certain

consulting agreement (the "Consulting Agreement") with Liberty, a

copy of which is annexed hereto as Exhibit "D" and incorporated

herein as if set forth in full.  The Consulting Agreement was

signed by defendant Trenk, as President of APNY.

    28.   Section 2 of the Consulting Agreement provided as

follows:

     2.  <u>Payment of Revenues</u>.  Liberty shall pay to
Pegasus [defendant APNY] a sum equal to five percent
(5%) of Liberty's monthly gross revenues attributable
to (i) Liberty's aircraft sightseeing business from the
Heliport and (ii) any aircraft sightseeing business of
Liberty or Liberty Affiliates conducted pursuant to
Section 4 of this Agreement, at or within 20 miles from
any Restricted Heliport.  All such sums due hereunder
shall be paid monthly by Liberty to Pegasus [defendant

-8-

APNY] no later than the tenth day following the end of
each calender month.

    5. Cross Default.  The failure to comply with any
of the terms of this Agreement shall constitute an
event of default under the Sightseeing Agreement.

    29.  Neither the State nor the Trust had any knowledge of
the Modification Agreement or the Consulting Agreement until
in or about November, 2004 when disputes arose between APH and
Liberty Helicopter Tours, Inc. (N. Y.) and the Trust was made
aware of such Agreements.

    30.  Neither the State nor the Trust consented to the
Modification Agreement or the Consulting Agreement as required by
the Permit.

### FIRST CAUSE OF ACTION AGAINST DEFENDANT APH

    31.  Pursuant to Section 6 (b) of the Permit, the term
"gross receipts" includes "any other revenues of any type arising
out of or in connection with the Operator's operations at the
Heliport."

    32.  Pursuant to Section 6(b) of the Permit, defendant APH
was obligated to pay to Plaintiff or the State the stated portion
of all of its gross revenue, whether or not actually received by
APH, i.e. all revenue arising out of or in connection with its
operations at the Heliport.

    33.  By virtue of the First Modification Agreement and
Consulting Agreement, APH directed that, or consented and

-9-

acquiesced in, its portion of the revenue generated by Liberty's activities at the Heliport be paid to APNY rather than to APH.

34. The fees payable by Liberty pursuant to the Sightseeing Agreement and First Modification Agreement constituted revenue which arose out of or in connection with APH's operations at the Heliport.

35. APNY became entitled to, and did, receive fees from Liberty solely as a result of the fact that APH was the Operator of the Heliport pursuant to the Permit. Had APH not been the Operator of the Heliport pursuant to the Permit, APNY would have had no basis for entering into the Consulting Agreement pursuant to which Liberty paid fees to APNY, rather than to APH.

36. Liberty paid the fees for its sightseeing operations out of the Heliport to APNY at the direction of, or with the knowledge and consent of APH. APH directed or permitted those fees to be paid to APNY with the intention of avoiding paying a percentage of such fees to the State or the Trust.

37. From the inception of the First Modification Agreement until the present time, APH has excluded from the revenue reported to plaintiff and its predecessor in interest the money paid by Liberty to APNY pursuant to the Sightseeing Agreement and First Modification Agreement and failed to report such revenue to plaintiff or the State.

-10-

38. From the inception of the First Modification Agreement until the present time, APH has failed to pay to plaintiff or the State any portion of the revenue received from Liberty pursuant to the Sightseeing Agreement.

39. The funds paid by Liberty to APNY under the Consulting Agreement constituted "other revenues of any type arising out of or in connection with the Operator's operations at the Heliport" as provided by Section 6(b) of the Permit.

40. The funds paid by Liberty to APNY under the Consulting Agreement constituted a diversion of business from the Heliport in violation of Section 7 (b) of the Permit.

41. Defendant APH failed to remit to Plaintiff or the State the percentage of the revenue received from Liberty as a result of Liberty's operations at the Heliport as required by Paragraph 6(b) of the Permit.

42. The failure of APH to include the amounts paid by Liberty to APNY in "gross receipts" and thereby exclude such amounts from the amounts upon which it calculated the percentage to be paid to the State and the Trust breached the Permit.

43. Upon information and belief, the concealment of the First Modification Agreement and Consulting Agreement from the plaintiff or the State, and APH's failure to seek or obtain their consent thereto as required by the Permit was intended to, and did, prevent plaintiff and the State from discovering the full

-11-

amount of money owed by APH to the State and Plaintiff under the Permit, and APH's breach of the Permit in failing to remit the proper amounts due.

44.   As a result of defendants' wrongdoing and concealment of the facts relating to the funds paid by Liberty to APNY, plaintiff had no knowledge of the above transactions until in or about November of 2004, and was therefore unable to commence an action to recover the amounts defendant APH failed to pay in breach of the Permit.

45.   As a result of the foregoing, plaintiff is entitled to recover from APH the percentages set forth in Paragraph 6(b) of the Permit of all amounts paid by Liberty to APNY from the inception of the Permit to the date of the Judgment herein, together with applicable interest thereon from the dates when such money was due and owing.

### SECOND CAUSE OF ACTION AGAINST DEFENDANT TRENK

46.   Upon information and belief, defendant Trenk, in his various corporate capacities with APH and APNY and individually, instigated, directed and controlled all of the actions alleged above.

47.   Defendant Trenk knew or should have known that the First Modification Agreement and Consulting Agreement and the resulting diversion of funds from APH to APNY constituted a breach of the Permit.

-12-

48.  Defendant Trenk took such actions with the intent to cause and induce APH to breach the Permit, and in fact did so induce and cause APH to breach the Permit.

49.   Defendant Trenk took such actions with the intent to benefit thereby and in fact, did so benefit.

50.  As a result of the foregoing, defendant Trenk is jointly and severally liable for APH's breach of the Permit.

### THIRD CAUSE OF ACTION AGAINST APNY AND TRENK

51.  The First Modification Agreement between APH and Liberty was void and ineffective insofar as it purported to modify the Sightseeing Agreement because APH failed to seek or obtain the consent of the State to enter into that Agreement.

52.  APNY, through its common officers, directors, and shareholders with APH, and Trenk individually, knew or should have known, that the First Modification Agreement was invalid because it had not been approved by the State.

53.  APNY, through its common officers, directors, and shareholders with APH, and Trenk individually, knew or should have known, that the payments provided for in the Consulting Agreement with Liberty were intended to, and did, divert funds which properly should have been paid to APH pursuant to the Sightseeing Agreement.

54.  The payments made to and accepted by APNY from Liberty were in fact intended as compensation for Liberty's operations at

-13-

the Heliport, rather than for any legitimate services provided by APNY to Liberty.

55. As a result of the foregoing, a portion of the payments made by Liberty to APNY, with the knowledge and consent of APH and Trenk, were due and owing to the State and the Trust pursuant to the Permit.

56. The transactions alleged above were part of a scheme and conspiracy among APH, APNY, and Trenk which was intended to breach to the Permit and deprive the State and plaintiff of the fees to which it was entitled pursuant to the Permit.

57. To the extent that the percentage of the fees paid to APNY by Liberty which were due to the State and the Trust were not paid pursuant to the Permit, APNY has been unjustly enriched at the expense of the State and the Trust.

58. As a result, APNY is liable to plaintiff for the amount by which it has been so enriched.

59. By orchestrating, directing and controlling the above scheme, defendant Trenk unlawfully caused APH to breach the Permit and unlawfully caused APNY to retain funds which should have been paid to the State and the Trust pursuant to the Permit.

60. As a result, defendant Trenk is individually liable for the amount improperly and unlawfully retained by APNY at the expense of the State and the Trust.

WHEREFORE, Plaintiff demands judgment as follows:

-14-

A. On the first cause of action against defendant APH for damages in an amount to be determined upon trial based upon defendant's failure to pay the percentages of gross receipts due under the terms of the Permit, together with interest thereon from the dates such percentages were due to be paid until entry of judgment;

B. On the second cause of action against defendants APH, APNY and Trenk for damages in an amount to be determined at trial based upon APH's breach of the Permit induced and caused by defendants Trenk and APNY, together with interest thereon from the dates when such breaches occurred until entry of judgment;

C. On the Third Cause of Action against defendants APNY and Trenk for damages in an amount to be determined at trial by which APNY has been unjustly enriched by receiving and retaining funds which were due to the State and the Trust pursuant to the Permit, together with interest thereon from the dates when APNY improperly received such funds until entry of judgment;

F:\COMMON\Docs\HudsonRiverPark\6183.0002\HRPT Complaint.wpd

D. Such other, different and further relief as the Court may determine to be just and proper based on the facts and law, together with the costs and attorneys' fees of this action.

January 4, 2006

Yours etc.,
Konner, Teitelbaum & Gallagher
Attorneys for Hudson River Park Trust
462 Seventh Avenue-12th Floor
New York, New York 10018


By: Brian P. Gallagher
    A Member of the Firm

F:\COMMON\Docs\HudsonRiverPark\6183.0002\HRPT Complaint.wpd