SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: IAS PART 24
------------------------------------x
FREEFALL EXPRESS, INC.,

           Plaintiff,

    -against-

HUDSON RIVER PARK TRUST, AIR PEGASUS
HELIPORT, INC., AIR PEGASUS OF NEW
YORK, INC. and LIBERTY HELICOPTERS,
INC. (N.Y.),

           Defendants.
------------------------------------x

DECISION AND ORDER
Index No. 602901-06
Motion Sequence No. 1

ROSALYN RICHTER, J.:

    Plaintiff Freefall Express, Inc. ("Freefall") is involved in the aviation business and utilizes the West 30th Street Heliport in Manhattan. Defendant Hudson River Park Trust ("HRPT") is a public benefit corporation that operates and maintains Hudson River Park, where the Heliport is located. Defendant Air Pegasus Heliport, Inc. ("Air Pegasus") is the sole and exclusive fixed base operator of the Heliport pursuant to a March 25, 1996 agreement between Air Pegasus and HRPT ("the Agreement"). Defendant Air Pegasus of New York, Inc. ("APNY") is a company that is connected to Air Pegasus. Defendant Liberty Helicopters, Inc. (N.Y.)("Liberty") provides helicopter tours and charters at the Heliport.

    Under the Agreement, Air Pegasus may collect fees and charges for the use of the Heliport and must pay to HRPT a certain percentage of its gross receipts. In this action, Freefall alleges that Air Pegasus, APNY and Liberty are engaged in a continuing scheme to defraud HRPT of revenues generated at the West 30th Street Heliport in Manhattan. Freefall maintains that through a series of

side agreements, some of which were purportedly hidden form HRPT, the corporate defendants have enabled Air Pegasus to divert funds from HRPT. Freefall contends that despite learning about the allegedly fraudulent scheme, HRPT has allowed Air Pegasus to continue to operate the Heliport.

In the first cause of action, brought under Article 7-A of the State Finance Law, Freefall contends that HRPT's inaction has caused the wrongful expenditure, misappropriation and waste of state funds and property.[1] The second cause of action alleges that Air Pegasus, APNY and Liberty have violated General Business Law § 349. In the third cause of action, Freefall contends that the corporate defendants' side agreements have resulted in Freefall's being charged excessive rates for using the Heliport. The fourth cause of action alleges that Air Pegasus has improperly charged security fees but has not used the funds collected for security purposes.

In this motion, Freefall seeks a preliminary injunction enjoining defendants from continuing to operate pursuant to the various agreements and from diverting funds from HRPT. It is well-settled that in order to obtain preliminary injunctive relief, the movant must show that it would be irreparably harmed if the injunction is not granted. Here, Freefall's motion does not

---

[1] Although the complaint does not explicitly refer to Article 7-A of the State Finance Law, it is clear from the parties' papers that the first cause of action is brought pursuant to this law.

contain any showing whatsoever that it would suffer irreparable harm. Indeed, those words are not even mentioned in the motion papers. Thus, the motion for a preliminary injunction must be denied. *See Matter of Schapira v. Grunberg*, 30 A.D.3d 345 (1st Dept. 2006)(since the petitioners made no showing of irreparable harm, there was no basis for issuing an injunction). In addition, the motion should be denied because Freefall does not ask to maintain the *status quo*, but rather seeks the ultimate relief in this action. *Putter v. City of New York*, 27 A.D.3d 250 (1st Dept. 2006)(injunction denied where "[p]laintiffs clearly did not seek to maintain the *status quo*, but rather sought the ultimate relief in their action").

HRPT's cross-motion to dismiss the action against it is granted. The only claim in the complaint pled against HRPT is the first cause of action under Article 7-A of the State Finance Law. However, the Appellate Division, First Department has held that an action under Article 7-A may not be maintained against a public benefit corporation. In *Madison Square Garden v. New York Metropolitan Transit Authority*, 19 A.D.3d 284, 286 (1st Dept. 2005), the Court concluded that the petitioners could not sue the Metropolitan Transit Authority, a public benefit corporation, "because the MTA is separate from the State". Because HRPT is a public benefit corporation distinct from the State, Freefall cannot maintain an Article 7-A action against it. Thus, HRPT's cross-motion to dismiss the complaint is granted. As a result,

3

Freefall's motion for a preliminary injunction under the State Finance Law is moot. Accordingly, it is

ORDERED that Freefall's motion for a preliminary injunction is denied; and it is further

ORDERED that HRPT's cross-motion to dismiss the complaint is granted and the Clerk shall enter judgment accordingly; and it is further

ORDERED that the remaining parties are directed to appear for a preliminary conference in Part 24 on January 3, 2007 at 10:00 a.m.

This constitutes the decision and order of the Court.

November 17, 2006

Justice Rosalyn Richter

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------X
PIER 59 STUDIOS, L.P.,

                Plaintiff,

    -against-

HUDSON RIVER PARK TRUST, NEW YORK STATE
DEPARTMENT OF TRANSPORTATION, THOMAS J.
MADISON, JR., NEW YORK STATE OFFICE OF
PARKS, RECREATION AND HISTORIC
PRESERVATION, BERNADETTE CASTRO, NEW
YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION, DENISE M.
SHEEHAN, CHARLES DORKEY, III, DANIEL L.
DOCTOROFF, THEODORE ROOSEVELT, IV,
JOSEPH B. ROSE, HENRY J. STERN, GEORGETTE
MOSBACHER, JULIE NADEL, and ADRIAN
BENEPE,

                Defendants.
-----------------------------------------------------------X
HUDSON RIVER PARK TRUST,

                Third-Party Plaintiff,

    -against-

CHELSEA PIERS, L.P.,

                Third-Party Defendant.
-----------------------------------------------------------X

DECISION & ORDER

Index No. 107837/06

FILED
APR 23 2007
NEW YORK
COUNTY CLERK'S OFFICE

Third-Party Index No. 590883/06

SHIRLEY WERNER KORNREICH, J.

    Motion sequences 2, 3 and 4 are hereby consolidated for disposition.

I.   *Motions before the Court*

    This action involves plaintiff's claims that defendants failed to maintain the piers underlying the premises plaintiff sublets and violated State Finance Law §123-b. Defendants

Hudson River Park Trust ("Trust"), and the members of its board of directors ("Board")[1] now move in motion sequence 3 for summary judgment dismissing the complaint for: (1) failure to state a cause of action; and 2) failure to comply and to allege compliance with the notice of claim procedure prescribed by §11 of the Hudson River Park Trust Act ("Act"). The Trust and the Board move in motion sequence 4 to serve a second amended answer, adding a statute of limitations defense to plaintiff's third cause of action, and for summary judgment on the proposed defense. In motion sequence 2, the New York State Office of Parks, Recreation and Historic Preservation ("State Parks"), State Parks Commissioner Bernadette Castro, the New York State Department of Environmental Conservation ("DEC"), DEC Commissioner Denise M. Sheehan, the New York State Department of Transportation ("DOT") and DOT Commissioner Thomas J. Madison, Jr. (collectively "State defendants"), move to dismiss the complaint on the following grounds: improper joinder of the State, failure to join a necessary party, statute of limitations, equitable estoppel, laches, and failure to state a cause of action under the State Finance Law.[2]

II. *Factual Background*

   A. *Facts*

   The Act became effective on September 8, 1998.[3] In June 1994, prior to passage of the

---

[1] The Trust's Board ("Board") is composed of the individual defendants, Bernadette Castro, Denise Sheehan, Charles Dorkey II, Daniel L. Doctoroff, Theodore Roosevelt IV, Joseph B. Rose, Henry J. Stern, Georgette Mosbacher, Julie Nadel, Lawrence B. Goldberg, Franz Leichter and Adrien Benepe (collectively "Board Members").

[2] In its reply memorandum of law, the State defendants withdrew the branch of their motion based on lack of personal jurisdiction. Bernadette Castro and Denise Sheehan join in the State's motion in their capacities as State Commissioners.

[3] 1998 Session Laws of N.Y. Ch. 592.

Act, Chelsea Piers, L.P. ("Chelsea Piers") leased piers 59, 60, 61 and 62 from the DOT ("Prime Lease"). It is undisputed that the Prime Lease obligates Chelsea Piers to maintain the piers. In October 1994, also prior to the Act, Chelsea Piers subleased portions of pier 59 to plaintiff, Pier 59 Studios, L.P. ("Pier 59" or "plaintiff")("Sublease"). The Sublease has been amended by several written agreements, which added additional space to Pier 59's Sublease, including the first floor and a corridor on pier 59 and Room 203 at pier 62 ("Premises"). The complaint alleges that Pier 59 has invested over $20,000,000.00 to create a "premier fashion and photography studio that includes a dining facility."

This is the fourth related action that has been brought before this court. The initial action relating to alleged overcharges paid by Pier 59 to Chelsea Piers, Index No. 601211/04 (the "Initial Action"), also involves claims alleging damages to the Premises and failure to maintain pier 59. In the Initial Action, on June 16, 2005, this court granted a motion on consent of all parties dismissing Pier 59's complaint against the State and DOT. The order stated that "[a]ll parties agree that the overlandlord is the Hudson River Park Trust." However, the cause of action dismissed sought a declaratory judgment declaring that DOT had no right to construction performed by Pier 59. It did not involve the claims made against DOT in this action. Discovery is complete in the Initial Action and summary judgment motions are pending.

The Act defines Hudson River Park as the park land bordering the Hudson River between Battery Park and 59th Street in Manhattan ("Park"). Section 3(a) of the Act provides that fee title to the land in the Park held by the State prior to the Act shall remain with the State, but upon the Act's effective date, authority over the State's land in the Park other than underwater lands shall be exercised by State Parks, while authority over the State's underwater lands in the Park shall be exercised by DEC. Section 3(b) of the Act directs the State and New York City ("City")

3

to expeditiously enter into agreements with the Trust granting it a possessory interest in the Park. The parties agree that pursuant to §3(b) of the Act, DEC and State Parks conveyed a 99-year lease of the Park to the Trust. Section 5 of the Act provides that the Trust is a public benefit corporation.

The Act's stated purpose is to authorize the Trust to "design, develop, operate and maintain" the Park, using revenues generated within the Park, financing from the City and State "as necessary," and "available federal funds." The Act declares that among the purposes to be served by the legislation is the planning and developing of the Park consistent with encouraging "park uses," allowing "limited park/commercial uses," "promoting and expanding public access to the Hudson River," encouraging "water-based recreation," boosting tourism, and providing for the "health, safety and welfare of the public" using the Park's facilities. Pier 59's Sublease is apparently mentioned in §3(g)((iv) of the Act, which authorizes "studio facilities" on pier 59.

The Act further provides as follows:

> The trust shall have the rights, powers, responsibilities and duties set forth in this act, subject to the limitations set forth herein and it shall replace the New York state department of transportation and the New York state urban development corporation, and the wholly owned subsidiary of said corporation, known as the Hudson river park conservancy, in their authority over the planning, design, construction, operation and maintenance of the park. Upon coming into existence of the trust, ... the New York state urban development corporation, the Hudson river park conservancy and the New York state department of transportation shall have no further responsibility for or authority over the park, and the Hudson River Park conservancy shall be dissolved. Upon the coming into existence of the trust, the trust shall succeed to all contracts, leases, licenses and other legal obligations respecting the park to which its predecessors are party at or after the effective date of the act....

Act, §5.

Among the specifically enumerated powers of the Trust, are: the rights to plan, develop, construct, operate and maintain the Park; to enter into contracts, including customary trade

4

credits; to conduct meetings and hearings; to procure insurance; to prepare and approve an annual budget for its operations; to develop a financing plan; to work with the City and State to develop programming for recreational and revenue-producing uses of the Park; to bring or defend actions; to grant leases, licenses and concessions for periods of less than thirty years; to adopt and amend rules, regulations and orders; and to appoint officers, employees and consultants. Significantly, the Trust has the power to "receive rents... generated within the park," and the Act grants the Trust "exclusive title to all rents ... paid to it pursuant to any lease...."

On October 15, 2003, Chelsea Piers and the Trust executed a letter agreement,[4] in which the Trust agreed to provide Chelsea Piers with an annual rent credit of up to $500,000.00 per year for five years ("Rent Credit") for "costs incurred in connection with undertaking the needed pier repair and replacement work identified by HPA," the Trust's engineering consultant. The Rent Credit agreement requires Chelsea Piers to submit plans and specifications for the work and to document its expenditures in order to receive the Rent Credit. The record is silent as to the Trust's reason for authorizing a $2,500,000.00 Rent Credit for pier repairs that the Trust insists are Chelsea Piers' obligation under the Prime Lease.

B.   Complaint

The instant complaint contains three causes of action: private nuisance (1st cause of action); public nuisance (2nd cause of action); and violation of the State Finance Law §123-b (3rd cause of action). The nuisance causes of action are predicated on alleged damages to the Premises, described in the complaint as "cracks in the concrete floors..., roof leaks in the ceilings

---

[4] *See* Supplemental Affirmation of Brian P. Gallagher, dated November 20, 2006, Ex. A.

5

and warping of steel beams and other damages" caused by "the severely degraded state of the wooden pylon foundations, cement supporting joists beneath Pier No. 59 and decaying and rotten structural steel beams supporting the over-structures." The complaint asserts that these conditions are dangerous, require immediate maintenance, repair and/or replacement, that Pier 59 has suffered an interference with use and enjoyment of the Premises and diminution in its value, that the conditions have "continuously worsened to date" and that there is "an imminent and substantial danger that the Studio will be further and irreparably damaged." Pier 59 alleges that its personnel, employees, clients, guests, invitees and members of the public frequent the Park in the vicinity of pier 59 and that there is an imminent and substantial danger that pier 59 will collapse. Paragraph 45 of the complaint alleges that defendants "have failed to cause to be performed the necessary and required maintenance, repair and replacement of the substructure and superstructure of Pier No. 59...."

C.  *Summary Judgment*

In support of their motion for summary judgment, defendants have not submitted any proof regarding the condition of pier 59 or its maintenance. There is no affidavit, deposition testimony, or expert report to contradict Pier 59's allegations of the existence of dangerous conditions.

Pier 59, in response, has submitted an affidavit by its principal, Federico Pignatelli, in which he verifies the allegations of the complaint, adding that Pier 59 has 18 years left under the Sublease, that it has invested $20,000,000.00 in the Premises, that it employs over 100 people and allows hundreds more to work at the Premises, that Pier 59's investment is in jeopardy due to the failure to maintain pier 59 and that "if the pier structures continue to degrade at the rate that they have over the last years, a tragic event could occur...."

6