UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------
NEW YORK HELICOPTER CHARTER INC., and
MICHAEL ROTH, individually,

07 Civ. 4069(MGC)

Plaintiffs, -

against-

AIR PEGASUS HELIPORT, INC.,
HUDSON RIVER PARK TRUST, and FEDERAL
AVIATION ADMINISTRATION,

Defendants.

**AFFIDAVIT OF
MICHAEL
ROTH IN
OPPOSITION
TO MOTION
TO DISMISS**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Michael Roth, being duly sworn according to law deposes and says:

## INTRODUCTION

1. I am a principal of New York Helicopter Charter Inc., ("NYHC"), a resident of

   New York, citizen of the United States and have personal knowledge of the material

   facts stated herein.

2. I incorporate and reiterate the allegations contained in the complaint filed on May

   24, 2007 which alleges various claims as follows:  that the actions of Air Pegasus

   Heliport Inc ("APH"), and Hudson River Park Trust ("HRPT"), against plaintiffs'

   constitute: a) a violation of procedural due process; b) a violation of substantive due

   process; c) a violation of the equal protection clause; d) illegal operation of the

   heliport in violation of Federal Law.

3. The complaint also requests that the court issue an Order terminating the illegal

   operation of the heliport and declaring that: 1) the permit agreement between HRPT

   and APH ("permit-agreement"),  should have been granted under a competitive bid;

   2) the extension of the permit agreement required board approval; 3) the settlement

between HRPT and APH was unreasonable, irrational, and capricious; 4) the settlement required approval of HRPT's board of directors; 5) the heliport was not "grandfathered" and should be shut down, as presently operated.[1]

4.     NYHC is a New York corporation and, until May 6, 2007, operated out of the W. 30th Street Heliport, located at W. 30th Street, New York, New York (sometimes referred to as "Heliport").

5.     The W. 30th Street Heliport is located inside the Hudson River Park.

6.     The Hudson River Park Trust ("HRPT") is a state entity, which has jurisdiction to regulate, operate, develop and maintain the Hudson River Park and the Heliport.

7.     The W. 30th Street Heliport is operated by Air Pegasus Heliport, Inc. ("APH"), which is the exclusive "fixed base operator" ("FOB"), pursuant to a permit-agreement which was never competitively bid and was not the subject of a "request for proposal".

8.     APH was last established as the sole and exclusive fixed base operator of the W. 30th Street Heliport through a contract -"permit/agreement"- dated March 25, 1996 (Compl. Exhibit C).

9.     As outlined in the complaint and detailed hereafter, APH and HRPT are abusing their power by implementing discriminatory policies at the Heliport, such as providing price preferences and other competitive advantages to NYHC's competitors.

---

[1] APH makes reference to these claims and simply suggests that they must be heard in State Court to the extent this Court were to dismiss plaintiff' alleged federal actions.

10. Defendants' actions have no reasonable justification in the service of a legitimate governmental objective, are "irrational", "shocking to the conscience", and are unreasonably interfering with interstate commerce.

11. In addition, the defendants' acts are having a serious impact on New York Helicopter's current business, imperiling its future business, harming the public and violating NYHCs constitutionally guaranteed civil liberties.

## BACKGROUND

12. I first learned to fly a helicopter when I was 22 years old.

13. My instructor was a NYPD pilot, who died a year later when his NYPD Helicopter was struck by a sea plane in NYC.

14. From that time my dream was to go into the helicopter business once I had the financial ability to do so.

15. In 1994 I realized my dream and began working in the helicopter business.

16. By 2000 my company, New York Helicopter Charter, Inc. ("NYHC"), was my sole business and I had two (2) helicopters.

17. We were based at Republic Airport located in Farmingdale, New York and were providing helicopter charter service to the public from the Air Pegasus operated public heliport in New York City based at West 30th street, New York.

18. The tragedy of 9/11 destroyed the helicopter aviation business and I had to sell one of NYCH's helicopters. I was barely able to salvage my businesses

19. In March of 2004, I was told by Abigail Trenk, the president of APH, that I was welcome to use the West 30th Street Heliport for sightseeing helicopter tours.

3

20. Four weeks later I was advised by Abigail Trenk that I had to stop using the public heliport and could not to come back. See Exhibit A which is the letter terminating NYHC charter tours operations.

21. The letter refers to violation of "policies" that are not described. In fact, APH never provided NYHC any written or express policies. APH made up rules arbitrarily as they operated the premises.

22. At that time, the only helicopter tour operator engaged in the tour business was Liberty Helicopters which commenced business in the early nineties.

23. For the previous thirty (30), years Island Helicopter was the tour operator from the Heliport until 1996 when the Trenk family used their political connection to have them terminated by the City of New York.

24. Thereafter Liberty Helicopters was the only helicopter tour operator from 1996 to March of 2004 at the West 30st street Heliport. I believe that Alvin Trenk, a principal of APH, was also a shareholder of Liberty Helicopters and was the president of Liberty Helicopters for a period of time I do not exactly recall.

25. While I believed that there would be room for one more helicopter operator at the Heliport in New York City, I was wrong.

26. I soon discovered that the politically powerful Trenk family, who are the principals of APH, and stock holders of Liberty Helicopters, were the reason why my company, NYHC, was deprived of its operating rights at the public Heliport at West 30th Street in 2004.

4

27. As a result of NYHC's ouster from the West 30th Street Heliport, I filed a lawsuit in state court based, among other reasons, the fact that APH had an exclusivity agreement with Liberty Helicopters which the permit-agreement did not allow.

28. The State court action ended with a settlement agreement between APH and NYHC, which allowed NYHC to operate at the heliport under certain restrictions.

29. For example, NYHC was allowed to operate only on weekends and holidays and was restricted to a limited number of flights while no other carriers were similarly restricted.

30. The relationship between APH and NYHC continued to be strained as they resented my operating at what they felt was "their Heliport" and APH was always less than willing to cooperate with my customers.

31. For instance, during the weekends, APH did not allow NYHC to place signs indicating customers where to go, so we were compelled to hire greeters for those purposes.

32. APH then objected claiming that we were "soliciting" Liberty's customers.

33. All these actions hampered the ability of NYHC to properly operate its business (See Exhibit B -letter from attorney Howard Biernbach, Nov 24, 2004).

34. After a number of improper actions outlined in the complaint and detailed later in this affidavit, on May 6, 2007 APH ousted NYHC from the West 30th Street Heliport (the "Heliport"), not only violating the settlement agreement but also

violating plaintiffs rights and giving rise to this lawsuit on grounds never
previously raised in the State Court.[2]

35.    The lost presence in midtown has serious business consequences for NYHC
since we cannot provide a reasonable explanation to our customers as to why
everyone else can operate there but not NYHC.

36.    In addition, NYHC is losing customers for sightseeing since 80% of the hotels
are located in midtown, the center of NYC tourism industry.

37.    For sightseeing, an operator needs authorization –which NYHC obtained- but
for chartering (private work) authorization is not required because the Heliport
is for public use.

38.    Helicopters are clearly supposed to be allowed to land at a public heliport. Even
though APH ousted NYHC from sightseeing operations, it should be allowed
to land there for charter operations.

39.    However, NYHC cannot use the West 30th street Heliport for sightseeing,
charter operations or even for fueling.

40.    As a consequence, NYHC's market share has diminished and it has lost a
substantial number of customers.

41.    It should be noted that the NYHC was authorized by the HRPT to be a
sightseeing operator at the West 30th Street Heliport.

42.    Curiously, APH attempted to keep this information from NYHC. APH never
gave me the letter signifying approval from HRPT and never told me that
NYHC was authorized.

---

[2] New York Supreme Court Judge Cahn recognized this when he stated to defendant APH," I don't care
about the federal case, it has nothing to do with me"

43.  I received the written authorization only as a result of Liberty Helicopters'
     request for various documents, some of which went into public record during
     litigation.

44.  While there is currently an action pending in state court based on the violation
     of the settlement agreement between NYHC and APH, the state action does not
     address the issues contained in this complaint.

45.  Significantly, in spite of the emergent nature of my requested relief- to be
     allowed access to West 30th Street Heliport– there has been no decision in over
     three (3) months.

## THE DISCRIMINATORY PRACTICES

46.  The West 30th Street Heliport has been operated by APH for 30 years without a
     bid or Request for Proposal ("RFP").

47.  Apparently that is the reason for APH's position, in their memorandum of law,
     that they, APH, is entitled to discriminate and charge more favorable rates to
     their business associates than the rates charged to other helicopter companies –
     such as NYHC and even Liberty.

48.  The Permit/Agreement that allows APH to operate the Heliport was executed
     between APH and the New York Department of Transportation, ("NYDOT"),
     which at that time had jurisdiction over the W. 30th Street Heliport.

49.  In 1998, the HRPT succeeded the NYDOT under the 1996 Agreement.

50.  The contract expired on March 25, 2001.

51.  However, the HRPT has allowed APH to continue as the exclusive fixed base
     operator of the W. 30th Street Heliport under a series of month-to-month

extensions.

52. APH as the fixed base operator has the obligation of operating the W. 30th

Street Heliport as a "public heliport".

53. In this capacity, APH is permitted to establish and collect fees and charges for

the use of the W. 30th Street Heliport and its facilities.

54. APH is required to remit, on a monthly basis, both a permit fee as well as a

percentage of its gross revenue (10-12%) to the HRPT.

55. The permit – agreement does provide that from time to time, APH may amend the

schedule of charges at the W. 30th Street Heliport upon fifteen (15) days prior

notice to the public and the HRPT – so long as such charges and fees are "fair,

reasonable, and non-discriminatory."

56. However, in this case they were unfair, unreasonable, discriminatory, and

irrational and there was no hearing on the price increase and no opportunity to

object.

57. The complaint states in detail how defendants violated my constitutional rights by

given preferences in the use of the Heliport to some of my competitors.

58. In addition, APH abused their power, with the consent and active participation of

HRPT by imposing a new fee, without any legitimate basis or justification, solely

for the purpose of funding a settlement with the HRPT based on monies diverted

from HRPT by APH.

59. The fee affected selected companies.

60. The settlement was the result of litigation between APH and the HRPT based on

the fact that APH failed to comply with the terms of the permit/agreement and

diverted monies payable to HRTP.

61.  Although the notice to raise prices was given before the settlement, APH knew that they had to pay back the money they had diverted and needed additional funds for those purposes.

62.  In the action that resulted in the settlement, HRPT sought to recover all unpaid fees improperly withheld by APH as HRPT -through an audit of APH- discovered that monies were being diverted.

63.  On October 31, 2006, the HRPT's auditor had issued findings of egregious wrongdoing by APH.

64.  These findings included APH's concealment of millions of dollars in operating revenue from the HRPT in an effort to deny the HRPT its share of that revenue.

65.  Perhaps the most egregious finding, and the one most directly damaging to NYHC, was that in direct contravention of the permit/agreement APH also gave substantial discounts and price preferences, to certain preferred customers.

66.  This practice of discriminating against NYHC and some other operators in favor of other competing operators had no rational basis in cost, in volume, or in any other economic justification.

67.  The discounts and price preferences included non volume discounts on fuel and landing fees, parking fees, fuel charges and late operations.

68.  Another clear discrimination was the fact that there is no landing or parking fee for stopping to buy fuel.  APH would charge NYHC parking fees for fueling.

69.    By forcing NYH to compete on an unlevel playing field, the HRPT and APH increased NYHC's operating costs, complicated NYHC's ability to invest in expanding its business, and caused NYHC to lose it business to APH's "favored" operators blessed with lower operating costs.

70.    Each of these unfair cost differentials had a direct negative effect on NYHC's business, causing it both to lose volume and to lose profits on the customers that it served.

71.    These lost profits constitute a real, tangible and measurable source of damage to NYHC, attributable solely and directly to illegal, discriminatory and unreasonable implementation of regulations at the West 30th Street Heliport.

72.    APH practices in the managing of the Heliport have impaired free competition and have restrained trade.

73.    The HRPT clearly was aware of the discriminatory and anticompetitive practices with respect to price and the competitive advantages that APH was giving to some users.

74.    The Report on Schedule of Fees and Charges issued by the auditing company hired by HRPT found that some customers received special discounts.

75.    Two of those customers did not appear on the DCR and one of the customer's information did not agree to the DCR.

76.    The remaining customers were selected by the auditors because their name contained the word 'Pegasus'.

77.    This suggests that the HRPT had reasons to believe that APH was favoring some of its business associates.

10

78. HRPT also found that U.S. Helicopter was charged $500 per month regardless of the number of landings, and that this specific customer did not appear on the DCR.

79. The transactions with Zip Aviation were also investigated.

80. Its operations were mixed with other operators.

81. Specifically the report states:

"Zip Aviation: Zip/Wings/Print International.... We tested the February and March 2005 daily flight logs to determine if the same aircraft number appeared for the above companies, as we understand all of these companies are under common control. We noted that 691S was listed as both a Print and Zip aircraft number, in the daily flight log indicating that at a minimum, Print and Zip appear to be under common control. The February 24, 2005 daily control log, ops#41, identified the customer as Zip/Wings. We noted that Print was billed a flat fee of $500/month regardless of the number of landings or the time parked." [emphasis added].

82. Such agreements and benefits were not allowed since the Permit establishes in section 34(d) that

..."the operator shall not itself use the heliport for its own aircraft and shall refrain from entering into continuing contracts or arrangements with third parties for use of the Heliport of for furnishing services covered hereunder when such use by the Operator or contracts or arrangements will have the effect to utilizing to an unreasonable extent the operator's capacity for rendering such services...."

83. Notwithstanding these findings, the HRPT settled the matter with APH and allowed the discrimination to continue.

84. Furthermore, APH passed the cost of its improper conduct to some customers - including NYHC- by imposing a per passenger fee.

85. Before the dispute between APH and HRPT there was not a per passenger fee payable to APH while no other heliport in New York charges this fee.

86. Rather, we were only required to pay the HRPT a fee of $15 per 10 passengers or $1.50 per passenger.

87. The settlement required APH to make payments to the HRPT for monies

previously diverted.

88.  Rather than repay these sums from "their own pocket," APH imposed a $10 passenger fee to some operators including NYHC.

89.  This change was arbitrary and outrageous and constituted an abuse of APH's position as the fixed based operator of the Heliport and interfered with New York Helicopters Charter Inc' property interest.

90.  Moreover, defendants not only imposed greater costs and additional burdens to NYHC than those imposed on the competition but, as previously stated, APH ousted NYHC from the West 30th Street Heliport (the "Heliport") on May 6, 2007.

91.  Among other reasons, the exclusion was the result of NYHC refusal to drop the pending State lawsuit.

92.  In addition, NYHC had joined in with other helicopter operators in complaining to APH.

93.  Defendant's motion to dismiss essentially relies on the allegations that APH is not a state actor and therefore is free to take discriminatory actions as the exclusive fixed base operator of the Heliport.

94.  It also states that NYHC has not been deprived of any property rights.

95.  Defendants are so arrogant that they assert in their memorandum that they have the right to operate a public heliport as if it was their own private business and therefore they are free to price discriminate at will.

96.  They ignore the impact of access to airspace in interstate commerce and that the public character of the heliport obligate them to give all users access to the heliport under objective and fair terms and conditions.

his case is very important as its outcome will not only affect me and my

mpany but also the future of the helicopter charter - and sightseeing business-

New York, as defendants Hudson River Park Trust ("HRPT"), and Air

gasus Heliport Inc. ("AP"), have and are engaging in practices in restraint of

ade that have negatively impacted interstate commerce.

fendants' actions have harmed my business, as NYHC has been "kicked out"

the Heliport for what I believe are unreasonable, arbitrary, blatantly

scriminatory and capricious reasons as detailed in the complaint.

though there is another heliport downtown and one on the east side – for

arters only- , the West 30th Street Heliport has a competitive advantage

cause it is more convenient to tourists as approximately 80% of the hotels are

cated in midtown and a the largest percentage of tourists prefer tours from the

dtown area which is why the main business of the Heliport is sightseeing

erations.

oreover, the West 30th Street Heliport is the only heliport that is open seven

ys a week twenty four (24), hours a day.

also believe and expect discovery to prove that HRPT and APH are

properly regulating the rates and services of helicopter services at the

liport in a manner that restrains, restricts, and precludes fair competition for

solutely no local or beneficial purpose other than to unreasonably enrich

emselves at the expense of the companies using the Heliport and the public.

fact I believe and would hope that the court would agree that there is no more

cisive manner by which to regulate rates and services than to exclude NYHC.

103. Essentially NYHC (and its employees), implore this court to end the arbitrary, unreasonable, capricious, blatantly discriminatory and illegal practices of HRPT and APH and if necessary shut down the Heliport as presently operated. NYHC and I want to be allowed to properly service our intrastate and interstate customers in a competitive, honest, constitutional and professional manner consistent with FAA rules and regulations free of what I believe are the corrupt or at least questionable practices and actions of HRPT, its Board of directors and Air Pegasus Heliport.

104. While I hope I am wrong, it appears that the heliport has been shifted from one agency to another (PA of NY & NJ-NYS DOT-HRPT) to prevent accountability and allow what is perceived by me as a political back door deal as I have written dozens of letters to governmental officials -including the Governor and the Mayor- to no avail.

105. I also expect that discovery will substantiate that APH and the HRPT are operating this public heliport in a manner that hobbles competition while unreasonably enriching APH at the expense of my company, its employees, and the public.

106. For these reasons and those contained in the complaint and body of this affidavit I respectfully request that defendant's motion be denied.

107. The above facts are true to my personal knowledge, information and belief, except as to the audit which I refer to, and I am aware I am subject to penalties for perjury if willfully false.

Dated: New York, New York

September 17, 2007

CARLOS M. CARVAJAL
NOTARY PUBLIC - STATE OF NEW YORK
REG. NO. 02CA6042401
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES MAY 22, 90

MICHAEL ROTH

15

# Exhibit A



**AIR PEGASUS**

November 4, 2004

Mike Roth
NY Helicopter Charter, Inc.
P.O. Box 474
Oceanside, NY 11572

This letter serves to confirm our telephone conversation this week, because of your violation of our rules and procedures you will no longer be allowed to operate charter tours from the West 30TH Street Heliport effective immediately.

My staff has been advised accordingly and your staff should be similarly notified.

If you have any questions regarding the above please feel free to contact my father.

Thank you,

*Abigail S. Trenk*

Abigail S. Trenk
President

Executive Office: 11 Hillside Ave. ▪ Bernardsville, NJ 07924 ▪ Phone: (908) 766-9509 ▪ Fax: (908) 766-8557
VIP Heliport: West 30th Street on the Hudson ▪ New York 10001 ▪ Phone: (212) 563-4442 ▪ Fax: (212) 244-9090

# Exhibit B

## HOWARD R. BIRNBACH

ATTORNEY AT LAW

111 GREAT NECK ROAD, SUITE 413

GREAT NECK, NEW YORK 11021

516/829-6305

FAX 516/829-0851

November 24, 2004

**By Facsimile (212) 627-2021**
Attention:    Laurie Silberfeld
HUDSON RIVER PARK TRUST
Pier 40, 2nd Floor
West Street
West Houston Street
New York NY 10014

Re:    NEW YORK HELICOPTER CHARTER, INC.
Vs.:    AIR PEGASUS HELIPORT, INC., et al.

Dear Ms. Silberfeld:

I just received the two (2) enclosed letters.

One is from counsel to Air Pegasus Heliport, Inc. and the other is from Ms. Trenk.

Positions are now being asserted that are attributable to the Trust.

Please inform us of your position on this matter.

New York Helicopter Charter, Inc. is a sightseeing operator, and its brochures so state.

The public uses the service individually, and is not obligated to rent space as a group.

Finally, we do not understand why our competition, Liberty Helicopters, Inc. has free use of signs, but we are afforded none.

As a public entity, commercial free space cannot be arbitrarily limited to certain parties.

We look forward to working with you on these issues.

Very truly yours,

LAW OFFICES OF
HOWARD R. BIRNBACH

By: _____
     JOSEPH MOLLOY

JM:jb
p.c.    Lentz & Gengaro
         Daniel D. Rubino, Esq.
         Michael Roth